IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CRIMINAL NO.  08-1669 JB |
| ) | |
| RICHARD ANTHONY MCKENZIE, ) | |
| ) | |
| Defendant. ) | |

## UNITED STATES' RESPONSE TO MOTION TO SUPPRESS

COMES NOW the United States of America, and hereby files this response to Defendant Richard Anthony McKenzie's motion to suppress evidence.  As grounds for this response the United States relies on the following points and authorities, and any other points and authorities that may be cited at a hearing on this matter.

## FACTUAL BACKGROUND

On Monday, July 7, 2009, DEA Special Agent Hyland and Task Force Officer Stephen Suprenant de Garcia reviewed an east bound Amtrak Passenger Named Record (PNR) for a Richard McKenzie.  The PNR indicated one-way, credit card travel from Flagstaff, Arizona to Penn Station in New York, New York.

The credit card was in a third party purchase, under the name of Ruby Johnston.  The reservation was made on Wednesday, July 2, 2008 at a cost of $1,836.00 for Delux Sleeper Car 431/Room A.

The PNR also indicated McKenzie was ticketed at Flagstaff, Arizona at 5:56 am on Monday, July 7, 2009.  The scheduled departure time for Amtrak Train Number 4 from Flagstaff, Arizona was 5:11 am.  Amtrak Train Number 4 was running late.

McKenzie's travel itinerary indicated travel from Flagstaff, Arizona to Chicago, Illinois and then to Washington, DC.  The first two (2) legs of the trip were both in deluxe sleepers with the final leg, Washington DC to New York, New York was in coach accommodations.  McKenzie would then have a scheduled arrival time in New York, New York of 6:40 am, Wednesday July 9, 2008.

DEA Special Agent Hyland knew this is the busy summer vacations season and Amtrak fares increase accordingly.  McKenzie's PNR indicated a telephone reservation five (5) days in advance for the most expensive sleeper accommodations Amtrak offers.  DEA Special Agent Hyland had seen one-way travel at or near $1836.00, but it was rare.  The Albuquerque Interdiction Group has made several cases from very highly priced ticketed reservations.

At approximately 12:40 pm, DEA Special Agent Hyland and TFO Garcia arrived at the Amtrak Station to find Train 4 had already arrived.

DEA Special Agent Hyland and TFO Garcia found the Sleeper Car 431 attendant and inquired if Deluxe Sleeper A had been occupied.  The attendant stated yes and further stated it was a male in his 20's-30's, wearing a white shirt.

DEA Special Agent Hyland and TFO Garcia went to the second floor of the sleeper Car 431 and walked to Deluxe Room A.  DEA Special Agent Hyland found the door to be partially open with the curtain partially covering the window. DEA Special Agent Hyland knocked on the door and there was no answer.  DEA Special Agent Hyland could see that the bed had been pulled down and there was a brown hair brush on the bed.

DEA Special Agent Hyland observed that Deluxe Sleeper Room B and C were also occupied with couples or families.  DEA Special Agent Hyland and TFO Garcia returned to the platform. The platform outside Sleeper Car 431 was sparely occupied since the scheduled departure time was approaching.  DEA Special Agent Hyland recalled seeing a man exercising on the platform but returned to the coach cars area.  Amtrak Number 4's scheduled departure times was 12:55pm.  DEA Special Agent Hyland walked over to the Amtrak/Greyhound station and did not observe anyone that would fit McKenzie's description.

DEA Special Agent Hyland returned to the train platform and observed an individual wearing a white shirt smoking a cigarette at the door of Sleeper Car 431.

DEA Special Agent Mark Hyland approached this individual  subsequently identified as Richard McKenzie.  Special Agent Hyland identified himself as a police officer and displayed his credentials and badge and returned them to his left rear pocket.  DEA Special Agent Hyland asked in a conversational tone of voice for permission to speak to him.  McKenzie agreed to speak with DEA Special Agent Hyland.  DEA Special Agent Hyland asked to see his ticket and he responded that it was in his room.  DEA Special Agent followed McKenzie to Deluxe Sleeper A.  DEA Special Agent Hyland remained in the hallway and did not block the doorway.  McKenzie provided an Amtrak ticket in his name indicating travel from Flagstaff, Arizona to a final destination of New York, New York.  DEA Special Agent Hyland immediately returned the tickets back to McKenzie.

DEA Special Agent Hyland had asked McKenzie about his trip to which McKenzie answered he was returning from a family reunion.  DEA Special Agent Hyland asked McKenzie if he was enjoying the train ride.  McKenzie stated he does not like to fly and that was why he was on the Amtrak.

DEA Special Agent Hyland asked if McKenzie had any luggage with him.  McKenzie stated he had two (2) bags in his room.  DEA Special Agent Hyland asked for consent to search both bags, McKenzie gave consent to search both bags to DEA Special Agent Hyland.  DEA Special Agent Hyland then asked for permission to enter Deluxe Sleeper A and McKenzie agreed.  DEA Special Agent

Hyland entered the Deluxe Sleeper and began searching a brown Louis Vuitton bag.  DEA Special Agent Hyland observed clothing and toiletries and on the bottom was one unopened (1) Great Value Fruit Spins cereal box.  The DEA Special Agent Hyland removed the Great Value Fruit Spins cereal box and could hear the sound of loose cereal but the Great Value Fruit Spins cereal box was heavier than the listed weight of 558 grams. DEA Special Agent Hyland, while holding the cereal box could feel that there was a heavy center weight  inside the cereal box.  DEA Special Agent Hyland asked permission to specifically search the Great Value Fruit Spins cereal box and McKenzie denied Special Agent Hyland consent to search the cereal box.  DEA Special Agent Hyland observed McKenzie's speech to increase in speed and a change in his motions.

McKenzie removed his second bag from a shelf on the window side. Special Agent Hyland observed this bag to be a black, Forecast-brand suitcase. Special Agent Hyland began searching the Forecast-brand suitcase and at the bottom of the suitcase were a Great value-brand Apple Express cereal box and a Kellog's-brand Corn Pops Cereal box.  Both of these boxes were unopened. Special Agent Hyland pulled out the Great Value-brand Apple Express cereal box and detected the same heavy, centered weighted cereal box.  Special Agent Hyland could also hear the sound of loose cereal.

DEA Special Agent Hyland also observed a US Airways checked baggage tag attached to the Forecast-brand suitcase.  DEA Special Agent Hyland also

observed that the U.S. Airways travel was to Phoenix, Arizona on Thursday July 3, 2008. McKenzie had stated that he did not like to fly.

Special Agent Hyland knew from his training and experience that the three (3) aforementioned cereal boxes contained contraband. Special Agent Hyland has been the lead agent and/or participated in many train/bus interdiction cases where narcotic contraband were discovered in a variety of containers. The Albuquerque Interdiction Group had made seizures from detergent boxes, gift wrapped presents and an X-Box electronic game.

Special Agent Hyland was of the opinion that he had reasonable suspicion of criminal activity based on the very expensive one-way travel and the heavy center weighted cereal boxes. McKenzie's reason to travel home was to return home from a family reunion for $1836.00. Special Agent Hyland expected that only a family medical emergency, unexpected family death of home fire would precipitate travel at that exorbitant price. Special Agent Hyland observed that McKenzie had flown to a source city of Phoenix, Arizona on Thursday, July 3, 2008. Special Agent Hyland knew that narcotic couriers utilize Amtrak because of the lack of security and screening.

McKenzie wanted to return the outside of the Amtrak car to smoke another cigarette. DEA Special Agent Hyland followed McKenzie to the outside platform. TFO Garcia went to get his Certified Drug Detection Canine Sasja from his Government vehicle.

DEA Special Agent Hyland continued to talk to McKenzie about his trip. McKenzie stated that he did not like dogs and would not allow TFO Garcia's canine to sniff the three (3) aforementioned unopened cereal boxes.

At this time, which approximately 1:00 pm, over the Amtrak public address system, passengers were being called for their 1:15 p.m. lunch reservations.

Shortly after this, DEA Special Agent Hyland and TFO Garcia explained to McKenzie that he would be detained and that DEA Special Agent Hyland would prepare a search warrant for the aforementioned cereal boxes. McKenzie stated that he came from a family full of lawyers and was an American citizen and would not comply with DEA Special Agent Hyland or TFO Garcia.

DEA Special Agent Hyland attempted to place handcuffs on McKenzie who then resisted and started to scream "help" several times. McKenzie then ran in a semi-circle and re-entered Sleeper Car 431 and ran back to Deluxe Sleeper A. DEA Special Agent Hyland and Amtrak Conductor Duane Chavez gave chase. Amtrak Conductor Chavez verbally stated to McKenzie that he was no longer welcome on Amtrak Train Number 4. Amtrak Conductor Chavez told McKenzie to get off the train.

Amtrak Conductor Chavez then told McKenzie that again he had to leave the train. Amtrak Conductor Chavez then left to get a crow-bar from the first floor of Sleeper Car 431. Amtrak Conductor Chavez stated to Special Agent Hyland he had no pass key to open a locked sleeper door.

Moments later, Amtrak Conductor Chavez returned with the crow-bar. McKenzie ignored all verbal orders to open the door by Amtrak conductor Chavez and Special Agent Hyland.  McKenzie did not say anything while inside Deluxe Sleeper A.  Special Agent Hyland heard motion coming from Deluxe Sleeper A.

A few minutes later, another Amtrak employee came to the hallway and stated someone had removed a window and was limping eastbound towards Broadway Boulevard, SE.  DEA Special Agent Hyland and TFO Garcia could see McKenzie limping beyond the Amtrak Train Station property and had jumped a chain linked fence topped with razor-wire.  TFO Garcia went back to his vehicle and drove to where McKenzie was located and detained.

DEA Special Agent Hyland worked with Amtrak personnel for several minutes until the locked sleeper car door was finally opened.  DEA Special Agent Hyland then removed the three (3) aforementioned unopened cereal boxes and all of McKenzie's personal property.

DEA Special Agent Hyland met TFO Garcia and emergency personnel at the location where McKenzie was taken into custody. McKenzie had severely injured his right ankle and was transported to Lovelace Hospital Downtown location.  McKenzie was released by the hospital but remained in custody of the DEA.

DEA Special Agent Hyland and TFO Garcia returned to the DEA Albuquerque Office and TFO Garcia presented the Great Values-brand Apple

Express cereal box, Great Value-brand Fruit Spins cereal box and the Kellogg's brand Corn Pops cereal box to Certified Canine Sasja. TFO Garcia and Canine Sasja have been trained and certified through U.S. Department of Homeland Security/Border Patrol National Canine Facility in January 2007.  The latest certification was December 2007 for cocaine, heroin, marijuana and methamphetamine.  Canine Sasja has proven reliable in previous investigations.

TFO Garcia relayed to DEA Special Agent Hyland that Canine Sasja had alerted to all three (3) aforementioned cereal boxes.

DEA Special Agent Hyland prepared a federal search warrant that was signed by U.S. Magistrate Judge Alan C. Torgerson.  At approximately 7:50 pm, DEA Special Agent Hyland and TFO Garcia executed the search warrant and obtained three (3) brown taped rectangular bundles from each of the aforementioned cereal boxes.  DEA Special Agent Hyland tested the white power inside one (1) of the bundles and obtained a positive reaction for cocaine.  The approximate weight of the three (3) bundles was 3.45 gross kilograms (7.6 pounds).

## **LEGAL ARGUMENT**

Defendant now seeks suppression of the cocaine that was found in his luggage because the search of his luggage was not supported by either probable cause or a reasonable suspicion.  The United States submits that (1) the encounter between the agents and McKenzie was consensual; (2) Agents

obtained McKenzie's consent to search his luggage; (3) agents had sufficient

reasonable suspicion and probable cause to detain three cereal boxes and seek

a search warrant; and (4) McKenzie abandoned his sleeper car and his luggage.

I.      **The Initial Encounter Between Law Enforcement and McKenzie was Consensual and Therefore, Beyond the Reach of the Fourth Amendment.**

The Fourth Amendment protects against unreasonable seizures.  *U.S.*

*Constitution Amendment IV.*  The United States Supreme Court has repeatedly

addressed whether, and under what circumstances, a police-citizen encounter

rises to the level of a Fourth Amendment seizure.  In *Terry v. Ohio*, 392 U.S. 1

(1968), the Supreme Court held that a seizure occurs "[o]nly when [an] officer, by

means of physical force or show of authority, has in some way restrained the

liberty of a citizen."  *Id.* at 19 n.16.

In order to determine whether a particular encounter constitutes a seizure,

a court must consider all the circumstances surrounding the encounter to

determine whether the police conduct would have communicated to a reasonable

person that the person was not free to decline the officer's requests.   *See Florida*

*v. Bostick*, 501 U.S. 429, 439 (1991).  That rule applies to encounters that take

place on a city street or in an airport lobby, and it applies equally to encounters

on a bus.  *Id.*

The Fourth Amendment proscribes unreasonable searches and seizures; it

does not proscribe voluntary cooperation.  *Id.* at 437. An encounter is deemed

consensual if the defendant is "free to leave at any time during the encounter."
*United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).  No reasonable
suspicion is required during a consensual encounter so long as a reasonable
person would feel free to disregard the police and go about their business.
*Bostick*, 501 U.S. at 434.   Further, there is no seizure when a police officer asks
questions of an individual, asks to examine the individual's identification, and
requests consent to search his or her luggage--so long as the officer does not
convey a message that compliance with his requests is required.  *See  Florida v.
Royer*, 460 U.S. 491, 497-99 (1983);  *Bostick*, 501 U.S. at 437.

     In *Bostick,* the Court clearly held that police officers may, without
articulable suspicion, approach passengers on a bus and ask them questions as
long as the police don't convey that compliance is required.  *Id.* at 435;  *See
United States v. Broomfield*, 201 F.3d 1270 (10th Cir. 2000); *United States v.
Torres-Guevara*, 147 F.3d 1261 (10th Cir. 1998).  The appropriate inquiry is not
whether a particular defendant felt free to leave, but rather whether a reasonable
person "would feel free to decline the officer's requests or otherwise terminate the
encounter." *Bostick*, 501 U.S. at 436. The reasonable person test "presupposes
an innocent person," *Id.* at 437, so the inquiry is not what a reasonable person
carrying contraband would do in response to the inquiry.  *Id.*   A limited number of
routine questions . . . followed by a question of contraband and a request to

search, are not sufficient to render an otherwise consensual encounter coercive.[1]
*Hernandez*, 93 F.3d at 1499.

In the instant case, the agents' brief and routine questions of McKenzie would <u>not</u> have conveyed to a reasonable person that he was required to comply. Law enforcement authorities routinely approach citizens in public places and ask questions that may potentially elicit incriminating responses.  Nonetheless, such encounters are permitted under the Fourth Amendment as long as they are consensual in nature.  *See Royer*, 460 U.S. at 497-98.   "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."  *INS v. Delgado*, 466 U.S. 210, 216 (1984).

There was nothing about the agents' inquiry of McKenzie that would have created such intimidation as to lead a reasonable person to believe that he could not refuse cooperation.  The United States contends that, at all times, the agents were professional, courteous and did not convey to McKenzie that compliance with his requests was required.  There was no overwhelming show or application of force, no intimidating movement, no brandishing of a weapon, and no threats

---

[1]Courts have identified several factors that could lead a reasonable innocent person to believe he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small enclosed space; and absence of other members of the public.  *See United States v. Mendenhall*, 446 U.S. 544, 554,(1980); *Berkemer v. McCarty*, 468 U.S. 420, 438,(1984); *United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir. 1992).

or commands.  Further, there is no *per se* rule requiring law enforcement officials to specifically advise individuals they do not have to answer police questions. See *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994); *see also United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir.1997) ("While [the officer] did not specifically tell [defendant] that he was free to leave, that is not required for an encounter to be consensual."). Taking into account all of the circumstances surrounding the encounter, the initial encounter between the agents and McKenzie was consensual.

## II.   McKenzie Voluntarily Gave the Agents Consent to Search his Luggage.

Absent any coercive factors, the initial contact between the agent and McKenzie did not amount to a Fourth Amendment seizure.  *See, Mendenhall*, 446 U.S. at 555.  *See also, Bostick*, 501 U.S. at 434 (An encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature).  Asking for consent to search an individual does not, *per se*, establish seizure on the grounds that a reasonable person would not feel free to leave.  *See, United States v. Glass*, 128 F.3d 1398 (10th Cir. 1997).  Whether consent is in fact voluntary, or is the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of all the circumstances.  *Mendenhall*, 446 U.S. at 557; *Schneckloth* v. Bustamonte, 412 U.S. 218, 248-49 (1973); *United States v. Prichard*, 645 F.2d 854, 857 (10th Cir. 1981), *cert. denied*, 454 U.S. 832, 102

S.Ct. 130 (1981).  The Government has the burden of proving that consent was given freely and voluntarily.  *Mendenhall*, 446 U.S. at 557; *Schneckloth*, 412 U.S. at 222.  Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent.  *Mendenhall*, 446 U.S. at 556.

McKenzie is a 36-year old man.  He is a United States citizen with a G.E.D. education.  Mckenzie's criminal history reaches back to 1991, and includes several contacts with law enforcement.  McKenzie's experience, intelligence and knowledge of the right to withhold consent can be inferred from his age, the fact that he was educated in the United States, his prior contacts with law enforcement, coupled with the resulting convictions, and the fact that he declined to allow law enforcement to search the cereal boxes.

When examining the issue of voluntary consent, the Tenth Circuit considers significant whether the encounter occurred in a confined or nonpublic space, *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993); *Bloom*, 975 F.2d at 1453-54; *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992); whether the officers seeking consent were armed or uniformed, *Bloom*, 975 F.2d at 1454; whether the officers exhibited intimidating or coercive demeanor, *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at 1533; and whether the officers asking potentially incriminating questions, *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at 1534; *Bloom*, 975 F.2d at 1454.  Further, no single factor is

-14-

dispositive.  *See, e.g., United States v. Little*, 18 F.3d 1499, 1053 (10th Cir. 1994) (*en banc*) (Only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred).  Further, the mere fact that McKenzie responded to the agents' inquiries did not turn the encounter into a seizure.  The fact that most citizens will respond to a police request, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.  *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 231-234, 93 S. Ct. 2041, 2049-2051 (1973).  In the instant case, the initial consensual encounter took place aboard the Amtrak Train in Albuquerque, New Mexico.  The agents were dressed in plain clothes, and were not displaying their badges or guns.  Nothing about the questioning or positioning of the agents was intimidating or coercive.  McKenzie consented to speak with the agents, then voluntarily consented to the search of his luggage which resulted in the discovery of the three unopened cereal boxes.

## III.    The Agents Had Reasonable Suspicion and Probable Cause to Detain the Three Cereal Boxes and Seek a Search Warrant.

When assessing the reasonableness of the agent's actions, the court must "judge the officer's conduct in light of common sense and ordinary human experience."  *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (citations omitted).  "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the

ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997).

Reasonable suspicion is one that would "warrant a man of reasonable caution and belief that [a stop] was appropriate." *Terry v. Ohio*, 392 U.S. 1, 22, (1968). The law does not specify a "minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria." *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994). "The process does not deal with hard certainties, but with probabilities 'based upon evidence' as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418 (1981). Each case turns on its own facts. *United States v. Martin*, 15 F.3d 943, 950 (10th Cir.) *on reh'g in part*, 19 F.3d 1515 (10th Cir.), *cert. denied*, 513 U.S. 868 (1994). In every case, however, the officer "is entitled to assess the facts in light of his experience," in detecting criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). Reasonable suspicion may exist even if "each of the factors alone is susceptible of innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The agent's assessment of the circumstances may depend upon objective observations, information obtained from individuals, reports, or other sources, and "consideration of the modes and patterns of operation of certain kinds of lawbreakers." *Cortez*, 449 U.S. at 418.

-16-

### 1.   Law Enforcement Training, Education and Experience.

DEA Special Agent Hyland has been assigned to the interdiction group, which works at various means of public transportation and package services, attempting to interdict or intercept drug couriers or money couriers transporting proceeds from illegal narcotics throughout the country and has participated in several seizures of illegal narcotics aboard the Amtrak Train.

### 2.   Factors Contributing to Reasonable Suspicion and Probable Cause.

In this case, agents learned that McKenzie had traveled to Arizona via airplane for a short stay.  Agents of the Drug Enforcement Administration are aware that persons engaged in the smuggling of narcotics often utilize an airline to travel to the source city with the funds to purchase the illegal narcotics. Furthermore, Arizona is a known source state for illegal narcotics.  See *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986)(Travel commencing from a city known for drug trafficking may factor into the assessment).  McKenzie was encountered aboard the Amtrak train traveling from Flagstaff, Arizona.  DEA agents are also aware that persons smuggling narcotics often elect to take the Amtrak Train to the destination city, because of the reduced security aboard the train, and that individuals engaged in narcotics trafficking do not remain in the source city for long periods of time, but rather, they remain only long enough to pick up the narcotics.

McKenzie then told agents he elected to travel aboard the train because he claimed he was afraid of flying.  However, his luggage had a US Airways checked baggage tag on it.

In the review of the Passenger Name Record, agents noted the upgraded sleeper compartment was also purchased with a third party credit card.

In this case, following the granting of consent to search the luggage the agents located three unopened cereal boxes which were heavy in the center and weighed more than indicated on the box. Additionally, the agents observed McKenzie to become nervous.

Police may detain an individual's luggage when they can articulate specific facts that give rise to reasonable suspicion that the traveler's luggage contains contraband.  *United States v. Place*, 462 U.S. 696, 698 (1983).  The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time.  *Florida v. Royer*, 460 U.S. 491,  499-500 (1983).

When addressing the issue of what is sufficient reasonable suspicion to detain an individual's luggage, the Second Circuit found sufficient reasonable suspicion to detain the defendant's luggage for further investigation when the defendant was traveling from a source city, traveled aboard a bus used by drug traffickers to transport narcotics to the Buffalo area, looked about nervously and separated himself from other passengers inside the terminal, and gave

-18-

inconsistent information regarding the purpose of his travel. *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992). In *United States v. Respress*, 9 F.3d 483 (6th Cir. 1993), the Circuit Court found that where a defendant had characteristics matching those of a typical drug courier, whose name on the airline ticket was not his true name, whose address on his driver's license was not the address given to agents, and where, after a brief exchange with police, the defendant suddenly changes travel plans, police had sufficient reasonable suspicion to detain defendant's luggage for a canine sniff. The Court in *United States v. Edwards*, 898 F.2d 1273 (7th Cir. 1990), held that police had sufficient reasonable suspicion to detain luggage where a defendant arrives from a source city, makes repeated attempts to keep law enforcement in his line of vision, becomes nervous during questioning, and whose story conflicts with that of a travel companion. The Eighth Circuit has found sufficient reasonable suspicion to detain luggage where the defendant traveled from a source city on a one-way ticket purchased with cash, carried her bags with her but had no identification, and supplied a false home telephone number on her train itinerary. *United States v. Jones*, 990 F.2d 405 (8th Cir. 1993).

In *United States v. Valles*, 292 F.3d 678 (10th Cir. 2002), the Tenth Circuit held that where a defendant used cash to purchase a one-way ticket on the date of travel aboard the Amtrak train, and where the contact number given to Amtrak was a false number, and where Amtrak ticket was in another name (as verified by

-19-

the defendant's driver's license), and listed travel two weeks earlier, and where the defendant became nervous when the conversation was directed toward his luggage, agents had sufficient reasonable suspicion to detain the luggage for a canine sniff. *Id.* at 680.

In this case, agents had sufficient collective knowledge, reasonable suspicion and probable cause to believe that McKenzie was involved in narcotics smuggling and therefore legally detained the cereal boxes in order to obtain a search warrant.

Moreover, the affidavit for the search warrant was supported by probable cause. Generally, a search must be made pursuant to a warrant based on probable cause. *U.S.Const. Amend. IV.* The reviewing court gives "great deference" to the issuing judge's determination of probable cause, for it is a determination based on common sense. *United States v. Finnigin*, 113 F.3d 1182, 1185 (10th Cir. 1997). The issuing judge must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The issuing judge is expected to draw reasonable inferences from the affidavits. *See United States v. Edmonson*, 962 F.2d 1535, 1540 (10th Cir. 1992). "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of rules." *Gates*, 462

-20-

U.S. at 232.  The existence of probable cause is a common-sense standard requiring facts sufficient to warrant a man of reasonable caution in the belief that an offense has been committed.  *See Wicks*, 995 F.2d at 972 (quoting *United States v. Mesa-Rincon*, 911 F.2d 1433, 1439 (quoting *Brinegar v. United States*, 338 U.S. 160, 174 (1949).  Probable cause is more than a mere suspicion, but considerably less than what is necessary to convict someone.  *United States v. Ventresca*, 380 U.S. 102 (1965).  Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched.  *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990).

In the instant case, the agents had sufficient probable cause for the issuance of a federal search warrant based on several factors, including their collective knowledge, their training, education and dog alert.  This experience includes prior seizures of narcotics aboard the Amtrak Train.  The agents noted the defendant's purposeful travel, including his one way air travel to a source state, his short stay, the purchase of a one way, Amtrak ticket.

## IV.    McKenzie Abandoned his Sleeper Car and his Luggage and its Contents.

Warrantless searches and seizures or abandoned do not violate the fourth amendment.  *United States v. Flynn*, 309 F3d 736. 738 (10th Cir. 2002)  McKenzie voluntarily abandoned his sleeper and car and his luggage and its contents by

fleeing and therefore forfeited any reasonable expectation of privacy in that property.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the United States respectfully

requests this court deny McKenzie's motion to suppress.

Respectfully submitted,

GREGORY J. FOURATT
United States Attorney

*Electronically filed on 6/1/09*

LARRY GOMEZ
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that a true
and correct copy of the foregoing
pleading was served on defense
counsel of record this 1st day of June, 2009.

*Electronically filed on* 6/1/09
_____/s/_____
LARRY GOMEZ
Assistant United States Attorney