1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3     UNITED STATES OF AMERICA,

4                    Plaintiff,

5          vs.                          CR-08-1669 JB

6     RICHARD ANTHONY McKENZIE,

7                    Defendant.

8

9          Transcript of Motion to Suppress Evidence

10    before THE HONORABLE JAMES O. BROWNING, United States

11    District Judge, held in Albuquerque, New Mexico,

12    commencing on Thursday, August 20, 2009, at 9:14 a.m.

13                    A P P E A R A N C E S

14    For the Plaintiff United States of America:

15         UNITED STATES ATTORNEY'S OFFICE
           201 Third Street, Northwest, Suite 900
16         Albuquerque, New Mexico  87102
           BY:  MR. DAMON P. MARTINEZ
17

18    For the Defendant Richard Anthony McKenzie:

19         UNITED STATES FEDERAL PUBLIC DEFENDER'S OFFICE
           111 Lomas Boulevard, Northwest, Suite 501
20         Albuquerque, New Mexico  87102
           BY:  MR. ALONZO J. PADILLA
21

22    Reported by:

23         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
           United States Court Reporter
24         333 Lomas Boulevard, Northwest
           Albuquerque, New Mexico  87102
25         (505)348-2209

1                          I N D E X

2                                                    PAGE

3    PRELIMINARY MATTERS                             3

4    WITNESSES FOR THE GOVERNMENT:

5      MARK HYLAND

6        Direct Examination by Mr. Martinez          5

7        Cross-Examination by Mr. Padilla            71

8        Cross-Examination (Continued) by Mr. Padilla    93

9        Redirect Examination by Mr. Martinez        130

10       Recross-Examination by Mr. Padilla          137

11       Further Redirect Examination by Mr. Martinez    142

12                 E X H I B I T S   A D M I T T E D

13   Government's Exhibit 3                           11

14   Government's Exhibit 2                           22

15   Government's Exhibit 4                           26

16   Government's Exhibits 5-A and 5-B               29

17   Government's Exhibits 6-A and 6-B               32

18   Government's Exhibits 8-A, 8-D, and 8-F         34

19   Government's Exhibits 7-A and 7-B               36

20   Government's Exhibit 11                          59

21   Government's Exhibits 8-B and 8-C               60

22   Government's Exhibits 8-E, 8-G, 8-H, 8-I        61

23   Government's Exhibit 9                           61

24   Government's Exhibits 10-A and 10-B             62

25   Government's Exhibit 1                           66

1                    MOTION TO SUPPRESS EVIDENCE

2                    THE COURT:  Good morning, everyone.  I appreciate

3        everyone making themselves available to me this morning.

4                    All right.  The Court will call United States of

5        America v. Richard Anthony McKenzie, Criminal Matter

6        08-01669-JB.

7                    Counsel will enter their appearances.

8                    MR. MARTINEZ:  Damon Martinez on behalf of the

9        United States.

10                   THE COURT:  Mr. Martinez, good morning to you.

11                   MR. MARTINEZ:  Good morning.

12                   MR. PADILLA:  Good morning, Your Honor.  Alonzo

13       Padilla on behalf of Mr. McKenzie, who also is present.

14                   THE COURT:  All right.  Mr. Padilla, good morning

15       to you.  Mr. McKenzie, good morning to you.

16                   MR. PADILLA:  As a preliminary matter, may I ask

17       that my client's right hand be uncuffed so that he can

18       write notes during the proceeding?

19                   THE COURT:  Do the marshals have any problem with

20       doing that?

21                   UNITED STATES MARSHAL:  No, Your Honor.

22                   THE COURT:  All right.  Let's uncuff that right

23       hand, then.  All right.  It's your motion, Mr. Padilla.

24       Are there any preliminary remarks you'd like to make before

25       we take evidence in this case?

1          MR. PADILLA:  Your Honor, we'll probably have

2     brief argument at the end, but I believe we're prepared to

3     proceed, and I believe the government is going to go ahead

4     and commence by calling the agent.

5          THE COURT:  All right.  Is that correct, Mr.

6     Martinez?

7          MR. MARTINEZ:  Your Honor, for the record, it is

8     the defendant's burden, and by the Court's statement it's

9     my sense that he has met his burden at this point.

10          THE COURT:  Well, his burden to do what?  It is

11     the government's burden, I believe, to show the evidence is

12     admissible.  Correct?

13          MR. MARTINEZ:  Yes, Your Honor.

14          THE COURT:  So whatever burden of coming forward

15     with sufficient information, I think the defendant has met

16     that.

17          MR. MARTINEZ:  Yes, Your Honor.  Okay.  Then Your

18     Honor, at this time I would impose the Rule.  I have

19     Officer Davis (sic) in the back of the courtroom.  I don't

20     expect him to testify this morning, unless there is some

21     evidence that needs to be further developed, but I would

22     invoke the Rule at this point.

23          THE COURT:  All right.  The Rule has been

24     invoked.  What that means is that witnesses will need to

25     remain outside the courtroom until they testify, except for

1    a representative of the government and the defendant.  It

2    doesn't include experts.  And witnesses should not talk

3    about their testimony with each other, but they are free to

4    talk about their testimony with the attorneys.  If you'll

5    step out, Mr. Davis (sic).

6              MR. MARTINEZ:  May I proceed, Judge?

7              THE COURT:  You may.

8              MR. MARTINEZ:  United States calls DEA Special

9    Agent Mark Hyland to the stand.

10             THE COURT:  Mr. Hyland, before you are seated,

11   Ms. Wild will swear you in.

12             CRD K'AUN WILD:  Please raise your right hand.

13   Do you solemnly swear or affirm under penalty of perjury

14   that the testimony you are about to give in the matter now

15   before the Court will be the truth, the whole truth, and

16   nothing but the truth?

17             THE WITNESS:  I do.

18             CRD K'AUN WILD:  Please be seated.  State your

19   name for the record.

20             THE WITNESS:  Mark Hyland, H-Y-L-A-N-D.

21             THE COURT:  Mr. Hyland.  Mr. Martinez.

22             MR. MARTINEZ:  Thank you, Your Honor.

23                       MARK HYLAND,

24        after having been first duly sworn under oath,

25        was questioned and testified as follows:

```
 1                    DIRECT EXAMINATION

 2   BY MR. MARTINEZ:

 3   Q.  All right.  Agent Hyland, could you please tell the

 4   Court where you work.

 5   A.  I'm a special agent with the Drug Enforcement

 6   Administration in Albuquerque, New Mexico.

 7   Q.  How long have you been working for the DEA?

 8   A.  I'm on my 22nd year of service.

 9   Q.  During that time, where have you been located as an

10   agent?

11   A.  I've been assigned to the Chicago field division and

12   here in Albuquerque.

13   Q.  How long have you been assigned here in Albuquerque?

14   A.  Since 1999.

15   Q.  Now, were you acting as a DEA agent on July 7, 2008?

16   A.  Yes, I was.

17   Q.  And were you part of a group within DEA on that day?

18   A.  Yes.  Yes, I was.

19   Q.  And what was the purpose of that group?

20   A.  It was the interdiction group.  We worked the Amtrak

21   train and the Greyhound buses.

22   Q.  How long had you been a part of that interdiction

23   group?

24   A.  Since the fall of 2000.

25   Q.  On that date, July 7, did you have prior experience
```

```
 1    with interdictions on the Amtrak train?
 2    A.  Yes.
 3    Q.  And also on the bus?
 4    A.  Yes, sir.
 5    Q.  Also on that day, did you have prior experience with
 6    seizing drugs on the Amtrak train?
 7    A.  Yes, sir.
 8    Q.  Was some of that experience involving finding illegal
 9    drugs in containers?
10    A.  Yes.
11    Q.  And also on this date, or prior to this date, did you
12    have experience seizing drugs within containers from buses?
13    A.  Yes, sir.
14    Q.  Could you please tell the Court some of your experience
15    concerning -- what are some of these containers that you're
16    talking about?
17    A.  Wrapped gifts, wedding paper, wrapped as Christmas
18    presents or wedding gifts; dry soap, detergent boxes; an
19    X-box game that had been hollowed out and there was a kilo
20    of cocaine in that; talcum powder boxes; Fiddle Faddle
21    snack boxes; and also Ritz crackers boxes.
22    Q.  In your experience prior to July 7, what type of drugs
23    had you seized at the Amtrak train?
24    A.  A wide variety.  Cocaine, methamphetamine, heroin,
25    marijuana, steroids, phencyclidine, otherwise known as PCP.
```

1    Q.  On this date, did you go to the Amtrak train station,

2    on July 7, 2008?

3    A.  Yes, I did.

4    Q.  Did you go with any other law enforcement personnel?

5    A.  I was with Task Force Officer Surprenant de Garcia.

6    Q.  Why did you go to the train station on this day?

7    A.  We had information on a passenger name record, a

8    reservation showing one-way travel from Flagstaff, Arizona,

9    to New York City.

10   Q.  And did you see the train that day?

11   A.  Yes, I did.

12   Q.  So what time did you go down to the train station?

13   A.  Officer Garcia and I arrived at approximately 12:40

14   p.m.

15   Q.  Now, did Officer Garcia have a partner with him?

16   A.  He has a certified -- he was a certified canine

17   officer, so he had his canine, Sasja, with him.

18   Q.  And the dog went with you?

19   A.  Yes.  Initially, Sasja stayed in his vehicle.

20   Q.  So on July 7, 2008, did you come into contact with a

21   Mr. Richard McKenzie?

22   A.  Yes, I did.

23   Q.  Do you see him in the courtroom day?

24   A.  Yes, I do.

25   Q.  Could you please describe what he is wearing.

1   A.  Mr. McKenzie is wearing a red top with a white T-shirt.

2   He has some light facial hair, and he's sitting to the

3   right of Mr. Padilla.

4           MR. MARTINEZ:  Your Honor, I would ask that the

5   record reflect that the witness has identified the

6   defendant.

7           THE COURT:  The record will so reflect.

8   Q.  When I'm talking about arriving at the train, did you

9   go to the train here in Albuquerque, New Mexico?

10  A.  Yes, sir.

11  Q.  At the depot?

12  A.  Yes.

13  Q.  That's in the County of Bernalillo, State of New

14  Mexico?

15  A.  Yes, sir.

16  Q.  Which way was that train traveling?

17  A.  This was Train Number Four, and traveling from Los

18  Angeles, California, through Flagstaff, to Albuquerque, and

19  end up in Chicago.

20  Q.  Agent, do you need to get some water?

21  A.  Yes, sir.

22  Q.  Now, as part of your job as an interdiction officer at

23  this time, was it important to you that that train was

24  traveling from Los Angeles, California, to Chicago?

25  A.  Yes, sir.

1     Q.  Why is that?

2     A.  We see that most of the drugs that are coming in

3     through the southwest border from California, Arizona, and

4     heading to all points east, Chicago, New York, Washington,

5     D.C., Detroit, Atlanta.

6     Q.  Now, are you familiar with the term "source city"?

7     A.  Yes, I am.

8     Q.  What is a source city?

9     A.  A source city would be a location where drugs are

10    coordinated and gathered so that they can be further

11    distributed at other points.

12    Q.  And are you familiar with the term "destination city"?

13    A.  Yes, sir.

14    Q.  What does "destination city" mean?

15    A.  A destination city would be a city that would be

16    receiving wholesale narcotics because they're not near

17    origin cities, so they're further east in this case.

18    Q.  In this matter, did you have a source city?

19    A.  Yes, sir.

20    Q.  What was that source city?

21    A.  We had Flagstaff, Arizona, and Phoenix, Arizona.

22    Q.  And also in this case, did you have a destination city?

23    A.  Yes, sir, we did.

24    Q.  What was that?

25    A.  That was New York City.

1          MR. MARTINEZ:  May I approach the witness, Your

2     Honor?

3          THE COURT:  You may.

4     Q.  Agent, I'm handing you what is marked as Government's

5     Exhibit 3.  Do you recognize this document?

6     A.  Yes, I do.

7     Q.  How do you recognize this document?

8     A.  This is a passenger name record, a PNR, for Richard

9     McKenzie, traveling from Flagstaff, Arizona, to New York

10    City.

11         MR. MARTINEZ:  Move for admission of Government's

12    Exhibit 3.

13         THE COURT:  Any objection, Mr. Padilla?

14         MR. PADILLA:  No objection, Your Honor.

15         THE COURT:  Defendant's Exhibit 3 will be

16    admitted into evidence -- that is, Government's Exhibit 3

17    will be admitted into evidence.

18      (Government's Exhibit 3 admitted into evidence.)

19         MR. MARTINEZ:  Your Honor, may I publish this to

20    the Court?

21         THE COURT:  You may.

22         MR. MARTINEZ:  Unfortunately, I'm learning this

23    this morning, the ELMO.

24    Q.  (By Mr. Martinez)  Agent, can you see what I put on the

25    prompt?

1      A.   Yes, sir.

2      Q.   On your monitor?

3      A.   Yes.

4      Q.   And is that the top part of what is marked as

5      Government's Exhibit 3?

6      A.   Yes, sir.

7      Q.   Agent, you spoke earlier that you had information

8      concerning this defendant; is that right?

9      A.   Yes, sir.

10     Q.   Now, on the top of this document, is there -- I'm

11     pointing with my pen to a name, "Richard McKenzie."  Was

12     that information important to you?

13     A.   Yes.  That's the name of the reservation.

14     Q.   I'm also going to come down about a few lines to

15     another name, and with my pen I'm pointing still to this

16     exhibit, and it says "Ruby Johnson."  Was that important to

17     you?

18     A.   In conjunction with other information on this document,

19     yes.

20     Q.   From your understanding on this date, what does this

21     information mean concerning Ruby Johnson?

22     A.   It indicates to me that it's a third-party payment for

23     the ticket.

24     Q.   All right.  Now, I'm also going to point to -- you have

25     other dates, and again I'm pointing with my pen.  You have

1    a 08 July, 09 July, and another 09 July in the upper

2    right-hand corner of this document.  Now, you're down at

3    the train station on July 7; is that right?

4    A.  Yes, sir.

5    Q.  So what does this July 8, July 9 mean?

6    A.  Those are the destination dates.  Mr. McKenzie would

7    arrive in Chicago on July 8, the next day.  He would then

8    depart July 8 from Chicago to Washington, D.C., and arrive

9    Washington, D.C., on July 9, and then have a short layover

10   in Washington, D.C., and complete his travel, arriving in

11   New York City at approximately 5:31 p.m. on July 9.

12   Q.  And that was important to you?

13   A.  That's normal ticketing for Amtrak.

14   Q.  Now, Agent Hyland I'm going to be -- I'm sorry.  Let me

15   point again to another part of this upper part of this

16   document.  There's some money figures there.  There is one

17   that says $1,401 and another that says $435.  On this date,

18   was this important to you?

19   A.  Yes, it was.

20   Q.  Why?

21   A.  Those indicated the ticketing prices for this travel

22   for Mr. McKenzie.

23   Q.  Now, from the information that is on the prompt at this

24   point, can you determine whether this is a -- I guess the

25   term is two-way ticket or a one-way ticket?

1    A.   It's one-way travel.

2    Q.   How do you know that?

3    A.   Because it starts in Flagstaff, Arizona, and ends in

4    New York City.

5    Q.   Agent Hyland, is there anything else in what is on the

6    prompt that was important to you on this date?

7    A.   The total of the numbers that you've previously

8    referenced, $1,401 and $435, the total of that is $1,836.

9    Q.   Okay.  And you're pointing that out.  Again, why was

10   that important to you?

11   A.   It's an exorbitant fee bought on July 2, and the

12   person, Mr. McKenzie, is traveling on July 7.  And it's a

13   third-party purchase.

14   Q.   From the information that you have before you, can you

15   determine what type of accommodation he's going to have on

16   the train?

17   A.   Yes.

18   Q.   Okay.  Where is that stated?

19   A.   It's near the -- it's to the right of the dates that

20   you had previously mentioned.  To the right of July 8, at

21   the top line, it says "DS" for deluxe sleeper.

22   Q.   And I'm pointing to it right now with my pen?

23   A.   Correct.

24   Q.   Now, a deluxe sleeper.  From your experience, are you

25   familiar with the makeup of the different compartments that

1     are offered for people who travel on the train?

2     A.  Yes.

3     Q.  And in the context of your understanding of the

4     different compartments to sleep in, what is a deluxe

5     sleeper?

6     A.  That is the best accommodations that Amtrak offers.  A

7     deluxe sleeper room contains a shower, a sink, and a bed.

8     Q.  I'll be going more into detail on this later on, but

9     did you visit this deluxe sleeper that's referenced in this

10    document?

11    A.  Yes, I did.

12    Q.  And where in the car is this deluxe sleeper located?

13    A.  All of the deluxe sleepers are on the second floor.

14    Our train here is -- well, it's two levels, so it's on the

15    second floor.

16    Q.  And are there any other benefits that go along with

17    having a deluxe sleeper?

18    A.  For all sleepers, you get all your meals included,

19    breakfast, lunch, and dinner.

20    Q.  Is that what you were thinking about on July 7?  Or did

21    you know that information on July 7?

22    A.  Yes, I did.

23    Q.  Agent Hyland, I'm now moving the document to the lower

24    part of the page.  Can you tell the Court what this

25    information is on the bottom half of this Government's

1     Exhibit 3?

2     A.  It's the additional information regarding

3     Mr. McKenzie's reservation.

4     Q.  Does this information tell you when his fare -- when he

5     made his reservation?

6     A.  Yes.

7     Q.  Where is that exactly?

8     A.  In the lower left-hand corner, below his name

9     "McKenzie/Richard."  On July 2, 3:42 p.m., there was a

10    phone call to make a reservation to reserve the room.

11    Q.  So basically five days before you go to the train, the

12    ticket or the reservation was made?

13    A.  Correct.

14    Q.  Agent, is there anything else that was important to you

15    on this part of the document on this date?

16    A.  On July 7, the day of travel, the SL indicates that

17    that's on the tickets.  That's when Mr. McKenzie received

18    the tickets, in Flagstaff, at 5:56 a.m. on July 7.

19    Q.  And so that means that he entered the train in

20    Flagstaff?

21    A.  Correct.

22    Q.  Agent, based upon your experience and your education as

23    an officer, are there certain patterns you look for when

24    you are looking for couriers carrying drugs on the train?

25    A.  Yes.  There's -- we see a lot of people traveling cash,

1      one-way.  And we definitely see people traveling one-way by

2      all forms of payment.

3      Q.  And did this fit your scenario, what you were thinking

4      about on July 7?

5      A.  Yes.

6      Q.  You said "cash."  In this case, was there cash or a

7      credit card payment?

8      A.  It was a credit card payment.

9      Q.  But this was one-way?

10     A.  Yes, sir.

11     Q.  Now, let me take you to July 7 at the train station.

12     What time or approximately what time did you get to the

13     train station?

14     A.  Approximately 12:40 p.m.

15     Q.  What did you first do when you got there?

16     A.  I walked to Sleeper Car 431, and I met the car

17     attendant and asked him if anyone was in Deluxe Sleeper A.

18     Q.  Now, was that information -- is 431 on this document,

19     Government's Exhibit 3 that we were just looking at?

20     A.  Yes, sir.

21     Q.  So it lists Car Number 431?

22     A.  Yes.

23     Q.  I'm sorry.  Once you got to that car, what did you do?

24     A.  I found the car attendant and asked him if Deluxe

25     Sleeper A was filled; was somebody traveling in Deluxe

1    Sleeper A.

2    Q.  Did he respond to your question?

3    A.  Yes.

4    Q.  What did he say?

5    A.  He said there was one gentleman in there.

6    Q.  So did that help confirm the information you had on

7    this cabin number?

8    A.  Yes.

9    Q.  What did you do next?

10   A.  I asked him, was he in his room, and he said that he

11   didn't think so.  And he said he was wearing -- I asked him

12   what he was wearing, and he said he was wearing a white

13   shirt.

14   Q.  Did he give you any other kind of information on this

15   individual?

16   A.  No.

17   Q.  Any other descriptors?

18   A.  No.

19   Q.  What did you then do?

20   A.  I then went to Deluxe Sleeper A, and the door was

21   partially opened, and there's a curtain that is -- that

22   also hangs in front of the door.  That was pushed to the

23   side, so I could look in the room.  I knocked on the side

24   post, and there was no response.  The room looked empty.

25   Q.  Did you notice anything about the room at that point?

1    A.  I saw that the bed was down.  I think I could see a

2    piece of luggage.  There was a hairbrush on the bed.

3    Q.  Let me go back to the description that this attendant

4    gave you of this individual in his cabin.  Did he tell you

5    the approximate age of this individual?

6    A.  He did say that he was a younger gentleman in his 20s

7    or 30s.

8    Q.  Did he give you height?

9    A.  No.

10   Q.  So once you saw that the cabin was empty, what did you

11   do then?

12   A.  I then thought I'd try to find Mr. McKenzie, and I went

13   to the dining car, which is attached to the sleeper car,

14   and I didn't see anybody that fit that description.  I

15   went -- I left the train car and walked across the platform

16   to the Greyhound/Amtrak snack bar depot area and walked

17   through there, and I couldn't find anybody that fit that

18   description.

19   Q.  Was Officer Garcia with you at this point?

20   A.  No.  Officer Garcia stayed in the approximate area of

21   Car 431.

22   Q.  Now, if you're there at approximately 12:40, do you

23   know what time the train is supposed to leave the station?

24   A.  Yes.

25   Q.  What time is that?

1    A.  12:55 p.m.

2    Q.  So it fair to say that you think you have limited time

3    with this train?

4    A.  Yes, I do.

5    Q.  If I understood you correctly, you said you went to

6    look for this individual at the train/bus station?

7    A.  There is a depot, which has a snack bar and bathrooms,

8    that is jointly used by Greyhound and Amtrak.

9    Q.  Did you find anyone there that you were looking for?

10   A.  No.

11   Q.  What did you do at that point?

12   A.  I then returned and -- returned to the platform.

13   Q.  What happened at that time?

14   A.  I then see an individual with a white golf shirt on,

15   smoking a cigarette, standing next to Sleeper Car 431.

16   Q.  What did you do?

17   A.  I turned on my recorder and approached the gentleman,

18   and showed him my badge and credentials, and told him I was

19   a police officer, and would he allow me to speak with him.

20   Q.  And when you say that you turned on your recorder,

21   could you describe to the Court exactly what type of

22   recorder that is?

23   A.  I have it in my front pocket.  It's a small digital

24   recorder.

25   Q.  And you turned it on?

1      A.   I turned it on, yes.

2                MR. MARTINEZ:   May I approach the witness, Your

3      Honor?

4                THE COURT:   You may.

5      Q.   I'm showing you what is marked as Government's

6      Exhibit 2.  Do you recognize this disk?

7      A.   Yes.

8      Q.   How do you recognize this?

9      A.   It's a copy of the my consensual encounter with

10     Mr. McKenzie.

11     Q.   And this is the result of the recording that you were

12     just talking about turning it on?

13     A.   Yes, sir.

14     Q.   In time, approximately how long is this recording?

15     A.   Excuse me.  It's approximately 19 minutes.

16     Q.   Did you listen to this recording in preparation for

17     this hearing?

18     A.   Yes, I did.

19     Q.   Are there parts of it that are more audible than

20     others?

21     A.   Yes.

22                MR. MARTINEZ:   Move admission of Government's

23     Exhibit 2.

24                THE COURT:   Any objection?

25                MR. PADILLA:   No objection, Your Honor.

1        THE COURT:  Government's Exhibit 2 will be

2   admitted into evidence.

3       (Government's Exhibit 2 admitted into evidence.)

4   Q.  So did you speak to this individual on the platform in

5   the white shirt?

6   A.  Yes.  Mr. McKenzie gave me permission to speak with

7   him.

8   Q.  This individual turns out to be Mr. McKenzie who you

9   have identified in the courtroom today?

10  A.  Yes, sir.

11  Q.  What did you say to him?

12  A.  I said I was a police officer, and would he be willing

13  to speak with me.

14  Q.  Did he respond to you?

15  A.  Yes, he did.

16  Q.  What did he say?

17  A.  He said yes, he would like to speak with me.

18  Q.  And what were you wearing?

19  A.  I was probably in jeans with a T-shirt, and then I wear

20  a cover, a short-sleeved collared shirt, and in the front

21  pocket of that is where I had the recorder.  It was July,

22  so it's very, very warm.

23  Q.  Did you identify yourself as an officer?

24  A.  Yes, I did.

25  Q.  Did you show Mr. McKenzie a badge?

1    A.  My picture credentials and my badge.

2    Q.  Were those displayed on your body, or did you have to

3    pull them out or put them back?

4    A.  I removed them from my left rear pocket.  I displayed

5    them, and then I returned them to the same pocket.

6    Q.  On this day, were you carrying a weapon?

7    A.  Yes, I was.

8    Q.  Was this weapon concealed, or was it out in the open?

9    A.  It was concealed.

10   Q.  At this point, had you displayed this weapon to

11   Mr. McKenzie at all?

12   A.  No.

13   Q.  And when you asked him if you could speak to him, what

14   kind of tone did you ask this?

15   A.  A conversational tone.

16   Q.  And was Officer Garcia around you?

17   A.  Yes.

18   Q.  What was he wearing on this date?  Let me ask it this

19   way:  Was he in uniform on this day?

20   A.  No.

21   Q.  Was he in casual clothing?

22   A.  Yes, he was.

23   Q.  Do you know if he was armed?

24   A.  I know he was armed.

25   Q.  Was his weapon -- was it out in the open, or was it

1    concealed?

2    A.  It was concealed.

3    Q.  Was he wearing any type of badge of office?

4    A.  No.

5    Q.  That you could see on his body?

6    A.  No, he was not wearing anything.

7    Q.  Once Mr. McKenzie -- let me set the stage.  How many

8    people were around you at this point when you were speaking

9    with Mr. McKenzie?

10    A.  The platform was fairly empty.  I remember seeing

11    someone jogging or walking fast, doing some exercises on

12    the platform, and Mr. McKenzie and myself and Task Force

13    Officer Garcia.

14    Q.  Was it noisy out there?

15    A.  I think it was windy.

16    Q.  Did you ask any other questions of Mr. McKenzie?

17    A.  I asked Mr. McKenzie for his ticket.

18    Q.  What did he say?

19    A.  He told me that his ticket was back in his room.

20    Q.  What did he do at that point?

21    A.  I asked him if he could get his ticket for me.

22    Q.  And what did he say?

23    A.  He said, "Sure," and he put his cigarette down on the

24    platform, and he entered the Sleeper Car 431 and I followed

25    behind him.

1    Q.  What did Officer Garcia do?

2    A.  He followed behind me.

3    Q.  You had mentioned earlier that Officer Garcia had his

4    dog -- you brought the dog to the train station.  Where was

5    Officer Garcia's dog?

6    A.  It was in his vehicle.

7    Q.  And where was his vehicle?

8    A.  It was parked at the south end of the platform, several

9    feet away, a distance away.

10   Q.  So the dog was not with the two of you at that point?

11   A.  No.

12   Q.  Did Mr. McKenzie go to his room?

13   A.  Yes, he did.

14   Q.  Did you go to his room?

15   A.  I followed Mr. McKenzie to his room.

16   Q.  Did you enter Mr. McKenzie's room?

17   A.  No.

18   Q.  Why didn't you?

19   A.  Because I always stay at the hallway, at the entrance

20   of the room.

21   Q.  So Mr. McKenzie entered his room?

22   A.  Yes.

23   Q.  You came basically to the threshold of the room?

24   A.  Yes, sir.

25   Q.  What happened next?

1    A.  Mr. McKenzie found his Amtrak tickets and provided them

2    to me.

3            MR. MARTINEZ:  May I approach the witness, Your

4    Honor?

5            THE COURT:  You may.

6    Q.  I'm showing you what is marked as Government's

7    Exhibit 4.  Do you recognize it?

8    A.  Yes, I do.

9    Q.  How do you recognize it?

10    A.  This is the Amtrak tickets for Richard McKenzie.

11           MR. MARTINEZ:  Move admission of Government's

12    Exhibit 4.

13           MR. PADILLA:  No objection, Your Honor.

14           THE COURT:  Government's Exhibit 4 will be

15    admitted into evidence.

16    (Government's Exhibit 4 admitted into evidence.)

17    Q.  Did this confirm the information that you previously

18    suspected about Mr. McKenzie?

19    A.  Yes.

20    Q.  Agent, I'm putting on the prompt what has just been

21    admitted as Government's Exhibit 4.  I'm pointing to the

22    right-hand side of it.  And this is basically a stub

23    showing the ticket from Flagstaff to Chicago; is that

24    right?

25    A.  Correct.

1   Q.  And then there's the figures at the bottom of $1,401?

2   A.  Yes, sir.

3   Q.  And then the ticket above is the ticket from Chicago to

4   Washington, D.C.?

5   A.  Yes, sir.

6   Q.  Again, there is a price at the bottom of $435?

7   A.  Yes, sir.

8   Q.  And then the last remaining stub on this side of the

9   document is Washington to New York, New York City?

10   A.  Correct.

11   Q.  When Mr. McKenzie showed you these tickets or these

12   ticket stubs, what was his demeanor?

13   A.  He was relaxed, cooperative.

14   Q.  At any point did you enter the room?

15   A.  I asked Mr. McKenzie if he had any luggage with him.

16   Q.  Did you ask to enter the room?

17   A.  Yes.

18   Q.  And what did he say?

19   A.  He told me, "Yes, come in."

20   Q.  And you just stated that you asked him if he had any

21   luggage with him?

22   A.  Yes, I did.

23   Q.  Let me go back to Government's Exhibit 3.  On this

24   document, does it indicate how many pieces of luggage this

25   individual is going to be carrying?

1    A.  The Amtrak reservation states that they were advised of

2    two pieces of carry-on luggage when they made the

3    reservation.

4    Q.  So is that what you were anticipating?

5    A.  Yes, sir.

6    Q.  And Mr. McKenzie told you that he had two pieces of

7    luggage?

8    A.  Yes.

9    Q.  What did you do next?

10   A.  After gaining permission to enter the room, I entered

11   the room.

12   Q.  And what did Officer Garcia do?

13   A.  He remained in the hallway.

14   Q.  Once you got into the room, what happened next?

15   A.  Mr. McKenzie presented me a brown Louis Vuitton brand

16   suitcase and put it down on the bed before me.

17   Q.  What did you do at that time?

18   A.  I had already asked for consent to search, which he

19   granted, and I unzipped the Louis Vuitton brand bag.

20   Q.  You asked for consent to search.  Can you be as

21   specific as possible.  What did you ask him for consent to

22   search?

23   A.  I asked him for consent to search his luggage.

24   Q.  And he said "Yes"?

25   A.  Yes, sir.

1    Q.  As a result, you went into this bag?

2    A.  Yes, sir.

3    Q.  I'm handing you what are marked as Government's

4    Exhibits 5-A and 5-B.  Do you recognize these photographs?

5    A.  Yes, sir.

6    Q.  How do you recognize them?

7    A.  These are the -- this is the Louis Vuitton brown bag

8    that I made reference to.

9            MR. MARTINEZ:  Move admission of Government's

10   Exhibits 5-A and 5-B.

11           THE COURT:  Any objection?

12           MR. PADILLA:  No objection.

13           THE COURT:  Government's 5-A and 5-B will be

14   admitted into evidence.

15     (Government's Exhibits 5-A and 5-B admitted into

16      evidence.)

17   Q.  Agent Hyland, I'm placing on the prompt Government's

18   Exhibit 5-A.  This is the bag that you're describing?

19   A.  Yes, sir.

20   Q.  I am now placing on the prompt Government's Exhibit

21   5-B.  Is this the bag with clothes out of it at this point?

22   A.  Correct.

23   Q.  Did you find anything else in this bag?

24   A.  Yes, I did.

25   Q.  What was that?

1    A.  I found one cereal box.

2    Q.  When you found the cereal box, what did you do?

3    A.  I picked up the cereal box, and I pulled it out of the

4    bag.  And when I did that, I could feel that there was a

5    heavy center of weight inside the cereal box.  I also noted

6    that the cereal box was sealed.

7    Q.  Now, when you picked up this cereal box, what if

8    anything were you thinking?

9    A.  Based on my prior training and experience, I've seen

10   narcotics hidden in sealed containers of food, in the past.

11   Q.  Were you aware of the weight of a traditional cereal

12   box?

13   A.  Yes, I was.

14   Q.  And were there indications on this box how much it

15   should weigh?

16   A.  It should weigh approximately 16 to 19 ounces.

17   Q.  Now, from picking up the cereal box was that

18   inconsistent with -- your knowledge of the basic cereal

19   box, is that inconsistent with you picking up the cereal

20   box?

21   A.  This box was considerably heavier.

22   Q.  I'm sorry.  I was coughing in the middle of that.  What

23   did you say?

24   A.  This box was considerably heavier.

25   Q.  And so at that point did you suspect anything?

1    A.  Yes.

2    Q.  What did you suspect?

3    A.  I suspected there was narcotics inside the cereal box.

4    Q.  Let me back up.  At about this point, had you had any

5    conversation with why Mr. McKenzie was taking the train?

6    A.  Yes.

7    Q.  What was that conversation?

8    A.  I asked him if he was traveling home or starting off

9    his trip, and he told me he was returning home from a

10   family reunion in Arizona.

11   Q.  Did he give any indication why he was taking the train?

12   A.  He told me he didn't like to fly and that's why he was

13   taking the train.

14   Q.  You testified earlier that there were two bags.  Did

15   you see a second bag?

16   A.  Yes.

17   Q.  Let me back up.  Once you pulled that cereal box out of

18   that bag, what did you do?

19   A.  I then asked for specific consent to search that cereal

20   box.

21   Q.  Did Mr. McKenzie reply to you?

22   A.  Yes.

23   Q.  What did he say?

24   A.  He denied me consent to search the cereal box.

25   Q.  What did you then do?

 1    A.  I then put it back, placed it back into the bag.

 2    Q.  Did you do anything else at that point?

 3    A.  At this point, Mr. McKenzie is offering a second bag to

 4    me.

 5    Q.  To search?

 6    A.  To search.

 7    Q.  What does he do?

 8    A.  I move the brown bag to the side, and he places the --

 9    it's a Forecast brand black suitcase, on the bed.

10    Q.  Did you open that suitcase?

11    A.  Yes, I did.

12    Q.  Did you search the suitcase?

13    A.  Yes, I did.

14         MR. PADILLA:  I don't have an objection to the

15    introduction of the exhibits he's about to show this

16    witness.

17         THE COURT:  All right.  What numbers are these?

18         MR. MARTINEZ:  Government's Exhibits 6-A and 6-B.

19         THE COURT:  6-A and 6-B.  Are you moving their

20    admission?

21         MR. MARTINEZ:  I am, Your Honor.

22         THE COURT:  They will be admitted into evidence.

23    (Government's Exhibits 6-A and 6-B admitted into

24    evidence.)

25    Q.  Agent Hyland, I'm putting on the prompt Government's

1    Exhibit 6-A.  Is this the black bag that you're testifying

2    to?

3    A.  Yes, sir.

4    Q.  And then is what I'm putting on now as Government's

5    Exhibit 6-B, is this the black bag opened, showing its

6    contents?

7    A.  Yes.

8    Q.  Did you find anything else in this black bag?

9    A.  I found two additional sealed cereal boxes, commingled

10   with clothing.

11   Q.  Did you pick these boxes up?

12   A.  Yes, I did.

13   Q.  And when you did, what was your impression?

14   A.  They also were heavier than the traditional cereal box

15   and had that solid middle object in them.

16   Q.  Was it noticeable?

17   A.  Yes.

18   Q.  How noticeable?

19   A.  Well, again, these cereal boxes would normally weigh

20   approximately a pound, and these cereal boxes were

21   considerably more than that.

22   Q.  Agent Hyland, I am handing you Government's Exhibits

23   8-A, 8-D, 8-F.  Do you recognize these photographs?

24   A.  Yes, I do.

25   Q.  What are they?

1    A.  They're photographs of the cereal boxes that were

2    contained within Mr. McKenzie's luggage.

3            MR. MARTINEZ:  Move admission of such exhibits,

4    Your Honor.

5            THE COURT:  Any objection?

6            MR. PADILLA:  No objection.

7            THE COURT:  Give me those numbers again.

8            MR. MARTINEZ:  8-A, 8-D, and 8-F.

9            THE COURT:  Exhibits 8-A, 8-D, and 8-F will be

10   admitted into evidence.

11       (Government's Exhibits 8-A, 8-D, and 8-F admitted into

12       evidence.)

13   Q.  Agent Hyland, I'm putting on the prompt what is marked

14   as Government's Exhibit 8-A.  Could you please tell the

15   Court what this is.

16   A.  This is a Great Value brand cereal box of Fruit Spins.

17   This is the cereal box that was found inside the Louis

18   Vuitton brown bag.

19   Q.  I'm going focus on the bottom left-hand corner.  Is

20   that the weight of the box?

21   A.  That's what was listed on the box, yes.  It's 19.7

22   ounces.

23   Q.  And is it fair to say that it's your testimony today

24   that this box weighed substantially more than this?

25   A.  Yes, sir.

1    Q.  I'm placing on the prompt what is marked as

2    Government's Exhibit 8-D.  Could you please tell the Court

3    what this is.

4    A.  This is a Kellogg's Corn Pops cereal box found inside

5    the black Forecast brand suitcase, and it weighs

6    approximately 19.5 ounces, is the listed weight.

7    Q.  I'm going to focus in on that.  That's contained on the

8    bottom left-hand corner of the box?

9    A.  That's printed on the box, yes.

10    Q.  Did you pick up this cereal box?

11    A.  Yes, I did.

12    Q.  Is it fair to say that your testimony is that it

13    weighed substantially more than the listed weight?

14    A.  Yes, sir.

15    Q.  I'm placing on the prompt Government's Exhibit 8-F.

16    Would you please tell the Court what this is.

17    A.  This is a Great Value brand Apple Express cereal box.

18    It's the second of the two cereal boxes I found inside the

19    Forecast suitcase, and it has a published weight of 19.1

20    ounces.

21    Q.  And did you lift this box when you were looking through

22    the black suitcase?

23    A.  Yes, I did.

24    Q.  And is it fair to say that this box weighed

25    substantially more than the listed weight?

1    A.  Yes, sir.

2    Q.  So based upon the lifting of the three cereal boxes

3    that I've just shown you, did you suspect anything

4    concerning all three boxes?

5    A.  That each cereal box contained narcotics, sir.

6    Q.  Agent, I'm handing you what are marked as Government's

7    Exhibits 7-A and 7-B.  Do you recognize those photographs?

8    A.  Yes, sir.

9    Q.  What are they?

10   A.  These are the U.S. Airways baggage claim tag that was

11   attached to the black Forecast brand bag that Mr. McKenzie

12   had in his room.

13           MR. MARTINEZ:  Move admission of Government's

14   Exhibits 7-A and 7-B.

15           THE COURT:  Any objection?

16           MR. PADILLA:  No objection.

17           THE COURT:  Government's Exhibits 7-A and 7-B

18   will be admitted into evidence.

19      (Government's Exhibits 7-A and 7-B admitted into

20      evidence.)

21   Q.  I just placed on the prompt 7-A.  Could you please put

22   the statement you made about these photographs in context

23   for the Court, for the Judge.  What happened with these

24   tags?

25   A.  These tags were affixed to the black Forecast brand

1    suitcase that I previously testified about.

2    Q.  And when did you notice -- or did you notice this tag?

3    A.  Yes, I did.

4    Q.  When did you notice this tag?

5    A.  When Mr. McKenzie removed this suitcase from the shelf

6    it was on and brought it to place it in front of me on the

7    bed.

8    Q.  And was this tag important to you?

9    A.  Yes, it was.

10   Q.  Why was this tag important to you?

11   A.  Mr. McKenzie had previously told me that he didn't like

12   to fly, and this indicated that he had flown on July 3 of

13   2008.

14   Q.  So I'm placing on the prompt Government's Exhibit 7-B.

15   Can you see that, Agent Hyland?

16   A.  Yes, I can.

17   Q.  Is there a date on this picture?

18   A.  Yes, there is.

19   Q.  And what is that date?

20   A.  Just below "U.S. Airways," there's a date of July 3,

21   2008.

22   Q.  So in the context of us talking about a courier

23   earlier, was this part of your consideration?

24   A.  Yes.

25   Q.  Why?

 1    A.   Because the Amtrak reservation was made on July 2, and
 2    now the next day Mr. McKenzie is flying from JFK to
 3    Phoenix, Arizona.
 4    Q.   And did you become aware of these tags before you
 5    started searching through the black suitcase?
 6    A.   Yes.
 7    Q.   Based upon your previous experience, had you asked
 8    other individuals if you could search their compartments on
 9    the train?
10    A.   Yes.
11    Q.   And based upon your previous experience, had other
12    people allowed you to search compartments?
13    A.   Yes.
14    Q.   Had you had experience previously with cereal boxes?
15    A.   Yes.
16    Q.   In this matter that we're talking about, was it common
17    or unusual for you to find three cereal boxes?
18    A.   Uncommon.
19    Q.   Did you ask Mr. McKenzie about the cereal boxes?
20    A.   Yes.
21    Q.   What did you ask him?
22    A.   I asked him why he had so many cereal boxes.
23    Q.   What did he say?
24    A.   He told me he likes cereal.
25    Q.   Did you look around -- when you were in his room, did

1    you look around the room?

2    A.  Yes, I did.

3    Q.  Did you see any indication that he liked to eat cereal?

4    A.  No.  There were no bowls or milk displayed.  I saw some

5    water bottles, but that's all I saw.

6    Q.  At this time did you consciously look for that kind of

7    evidence?

8    A.  Yes.

9    Q.  Once you found these two cereal boxes in the black bag,

10   what did you do?

11   A.  I knew I had probable cause to detain Mr. McKenzie, and

12   since he had denied me consent to search the cereal boxes,

13   I was allowed to detain him and the luggage and write

14   search warrants for the cereal boxes.

15   Q.  That was your intent at that point?

16   A.  Yes, sir.

17   Q.  You were still in the cabin room of the train?

18   A.  Yes.

19   Q.  Is that what happened?

20   A.  No.

21   Q.  What happened?

22   A.  At this time Mr. McKenzie requested that he would like

23   to continue to smoke a cigarette which he had left outside

24   on the platform.

25   Q.  And that's when you first met him, right?

1     A.  Correct.

2     Q.  And so did he go do that?

3     A.  Yes.

4     Q.  You started to say something there?

5     A.  I chose to follow him out and to continue my

6     investigation.

7     Q.  Now, was Officer Garcia with you at this point?

8     A.  Yes.

9     Q.  So did you get out there to the platform?

10    A.  Yes, we did.

11    Q.  Let me just make sure I understand something.  Did you

12    ask him for consent to search the two cereal boxes in the

13    black bag?

14    A.  I think --

15    Q.  Do you remember?

16    A.  Not offhand.  I can't specifically recall that.

17    Q.  Once you got out to the platform, what was

18    Mr. McKenzie's demeanor?

19    A.  He became more agitated.

20    Q.  Let me jump back to when you were in the cabin.  When

21    you discovered the two cereal boxes in the black bag, how

22    was his demeanor?

23    A.  When I raised the cereal, the first cereal box that was

24    in the brown Louie Vuitton bag, he moved his hands several

25    times from his elbows or from his waist up to his -- closer

1    to his shoulder.  And I noticed his voice changed to more

2    of a shrill during that interaction when I was handling the

3    cereal box and asking for specific consent for that cereal

4    box.

5    Q.  Now, when you went outside, you said he became agitated

6    on the platform?

7    A.  Yes.

8    Q.  How long were you out there on the platform,

9    approximately?

10   A.  Probably ten minutes.

11   Q.  As those ten minutes went by, how was -- did his

12   demeanor stay the same?

13   A.  No.

14   Q.  How did it change?

15   A.  He got more confrontational and less cooperative.

16   Q.  Was he cooperating with you?

17   A.  Initially, yes.

18   Q.  Initially on the platform, when you went out there the

19   second time?

20   A.  Yes, he was continuing to talk to me.

21   Q.  And he became uncooperative?

22   A.  Yes.

23   Q.  How did he become uncooperative?

24   A.  He wouldn't -- when I explained to him that I was going

25   to detain him and his luggage and write a search warrant,

1    he told me I couldn't do that.

2    Q.  At this point did you make any threatening gestures?

3    A.  No.

4    Q.  Did Officer Garcia make any threatening gestures?

5    A.  No, sir.

6    Q.  Did you ever unholster your weapon?

7    A.  No.

8    Q.  Did Officer Garcia ever unholster his weapon?

9    A.  No.

10   Q.  When you say you were out on the platform, is that

11   outside?

12   A.  Yes, sir.

13   Q.  And was there any indication that he did not know that

14   you were a police officer?  I think I'm asking double

15   negatives there.  Is it your sense that he understood you

16   were a police officer?

17   A.  Yes.

18          MR. MARTINEZ:  Your Honor, if you'll allow me a

19   moment, I'm going to try to get this tape going.

20          THE COURT:  All right.

21   Q.  Agent Hyland, when you go out to the platform for this

22   second time, approximately what time is it?  Do you know?

23   A.  It's approaching departure time, 12:55 p.m.

24   Q.  Does that mean anything to you?

25   A.  Yes.

1    Q.  What?

2    A.  I know the train is going to leave at 12:55 or

3    approximately that time.

4    Q.  And you had spoken of a car attendant earlier.  Do you

5    know where that car attendant is at this point?

6    A.  He's either in the fourth -- I can't recall

7    specifically, but he's around the platform or the 431 car.

8    Q.  From your previous experience, had you had individuals

9    who have cooperated with you when you go to talk with them

10   on the train?

11   A.  Yes, sir.

12   Q.  And have you also had individuals who have not

13   cooperated with you?

14   A.  Yes.

15   Q.  And in your opinion, when you say that Mr. McKenzie

16   became uncooperative, where do you rank him, from your

17   previous experience?

18            MR. PADILLA:  Your Honor, I'm going to object.  I

19   think it's irrelevant and asks essentially for this witness

20   to speculate, and I think it's improper.

21            THE COURT:  Well, I'll let him give some

22   perspective as to how uncooperative he was.

23   A.  Well, I asked if we could have a narcotic canine

24   inspect the cereal boxes at the platform, and he denied

25   that also.

1    Q.  Agent, I'm going to start the tape, where I think you

2    started at the platform.  Would you please let me know if

3    you're not at the platform, if you're still in the room?

4    A.  Sure.

5              CRD K'AUN WILD:  I don't have any feed on the

6    screens.

7              MR. MARTINEZ:  You won't need it.  It's audio.

8              CRD K'AUN WILD:  Oh, okay.  I'm sorry.

9              (Tape played.)

10             THE COURT:  Just a moment.  Let's make sure we

11   understand the record.  Ms. Goehl will probably not be able

12   to record that.

13             MR. MARTINEZ:  Yes, Your Honor.

14             THE COURT:  So we'll just have it for an exhibit.

15             MR. MARTINEZ:  Thank you, Your Honor.  What I'm

16   playing now is Government's Exhibit 2, which was initially

17   entered, earlier entered.

18             THE COURT:  Just so everybody understands, it's

19   not going to be part of the transcript.  We'll just listen

20   to it.

21             MR. PADILLA:  And we are talking about listening

22   to the entire tape?

23             MR. MARTINEZ:  No.  I was going to bring it in at

24   about minute, I think about minute:8:30, somewhere like

25   that on that counter.

1          MR. PADILLA:  A minute:8?

2          MR. MARTINEZ:  No, 8:minute:30.

3          MR. PADILLA:  I would prefer him to do the whole

4     tape, Your Honor, but I guess the Court could always listen

5     to that at a later time.

6          THE COURT:  All right.  What's your preference,

7     Mr. Martinez?

8          MR. MARTINEZ:  Well, Your Honor, I'm going to

9     introduce this for the purpose of showing what happened out

10    on the platform.

11         THE COURT:  Let me ask, Mr. Padilla, are you

12    going to want me to listen to the entire tape?

13         MR. PADILLA:  Yes, sir.

14         THE COURT:  So I can do it either way.  You can

15    play it all here and I can listen to it, or I can listen to

16    it back in the chambers.

17         MR. MARTINEZ:  Your Honor, for economies of

18    scale, we'll just play it now.

19         THE COURT:  All right.

20         MR. MARTINEZ:  It's 19 minutes.

21         THE COURT:  All right.

22         MR. MARTINEZ:  It becomes more audible as it goes

23    along.

24         THE COURT:  All right.  I don't mind it being

25    loud.

```
 1              MR. MARTINEZ:  It's on full volume.
 2     Q.  So Agent Hyland, just to set up this, from listening to
 3     this tape, when do you think you turned it on?
 4     A.  Probably approximately 12:50.
 5     Q.  In context of when you saw the defendant or in context
 6     of when you first arrived at the train station, could you
 7     please let the judge know when it was turned on?
 8     A.  I was returning from the bus and train terminal, and I
 9     saw Mr. McKenzie smoking a cigarette, and he was wearing a
10     white-collared shirt.  And that's why I turned it on and
11     recorded it as I approached him.
12     Q.  Officer Hyland, I'm going to just stop it right there.
13     You talked earlier about wind.  Do you think that's playing
14     a factor with this tape right now?
15     A.  I think so.  We're still outside.
16              (Tape played.)
17     Q.  Agent Hyland, the sound on the tape just changed.  Can
18     you identify what's going on at this point?
19     A.  We changed locations from the platform and now are in
20     Mr. McKenzie's room.
21              (Tape played.)
22     Q.  Agent Hyland, I'm stopping at the counter 5:15.  Where
23     are you at this point?
24     A.  I went to another car to find Amtrak personnel, to ask
25     them to wait a few minutes, that I was waiting for a canine
```

1    to come out on the platform.

2    Q.  And then did you go back to the room?

3    A.  No.  Mr. McKenzie is on the platform and had remained

4    on the platform, and I returned to Mr. McKenzie.

5    Q.  So at this point you're on the platform for the second

6    time.  When you returned from trying to find that

7    attendant, you go back to the platform for the second time?

8    A.  Yes.

9    Q.  Are you understanding my question?  Because you look --

10    did you understand my question?

11    A.  Yes, I did.

12              (Tape played.)

13    Q.  Agent, maybe I should have done this from the

14    beginning.  Do you recognize the voices on this tape?

15    A.  Yes, I do.

16    Q.  Who are the voices?

17    A.  It's myself and Mr. McKenzie.

18              (Tape played.)

19    Q.  Agent Hyland, I'm stopping this at 8:17.  Now, is it

20    fair to say that you're trying to reason with Mr. McKenzie?

21    A.  Yes, sir.

22    Q.  I'm stopping the tape at the counter 11:06.  At this

23    point, from what you're hearing, what is Mr. McKenzie's

24    demeanor?

25    A.  He's trying to control the conversation.  He's getting

1    less and less cooperative.

2    Q.  Agent Hyland, I'm now stopping the counter at 12:24.

3    That seems to be a new voice coming into the conversation?

4    A.  Yes.

5    Q.  Do you recognize that?

6    A.  It's Officer Garcia.

7    Q.  Who has been standing by you?

8    A.  He has returned with his canine.

9    Q.  Now, what is the canine doing at this point?

10   A.  The canine is on a leash, and Officer Garcia is holding

11   that leash.

12   Q.  Is the dog making any aggressive motions?

13   A.  Not that I can see, no.

14   Q.  At this point, is that your common experience?  I mean,

15   in comparing your conversation that we're listening to

16   right now, is this your common experience in speaking with

17   other individuals on the train when you're asking them

18   to -- when you're talking about handcuffing them?

19   A.  No.

20            (Tape played.)

21   Q.  I'm stopping the counter now at 13:42.  At this point

22   from what you are listening to, is he being compliant with

23   what you're asking?

24   A.  Yes.  I'm not sure I understand your question.

25   Q.  All right.  Let me withdraw that question, then.

1    What's his demeanor at this point?

2    A.  He's nervous.  He's moving around near me.  He's

3    smoking a cigarette.

4    Q.  I just heard you ask, according to the tape, if he had

5    a telephone number, someone to call?

6    A.  Yes.

7    Q.  Why did you ask that?

8    A.  That's another investigative technique that we have

9    used in the past.

10   Q.  That sounds like something just happened.  What's going

11   on here?  And for the record, the counter is at 15:20.

12   A.  Mr. McKenzie had a BlackBerry device, cellular phone,

13   and he dialed an individual that would confirm his family

14   reunion story for me.

15   Q.  And so it's you speaking on the phone right now?

16   A.  Yes.

17   Q.  To some other individual on the end of the line?

18   A.  Correct.

19          THE COURT:  Mr. Martinez, before we listen to

20   this next segment, could we take our morning break here and

21   give Ms. Goehl -- rest her for a second, and then we'll

22   come back in to continue the hearing?

23          MR. MARTINEZ:  Yes, Your Honor.

24          THE COURT:  All right.  We'll be in recess for a

25   few minutes.

1          (Recess from 10:30 a.m. until 10:50 a.m.)

2          THE COURT:  Mr. Hyland, I will remind you that

3    you're still under oath.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Mr. Martinez?

6          MR. MARTINEZ:  May I proceed, Your Honor?

7          THE COURT:  You may.

8    Q.  (By Mr. Martinez)  Agent, I believe when we went on

9    break, you were explaining that you, through Mr. McKenzie's

10   phone call, or through Mr. McKenzie's phone, you were

11   speaking to an individual; is that correct?

12   A.  Yes.

13         MR. MARTINEZ:  Actually, Your Honor, for the

14   record, before I start the tape again, there is something I

15   need to clarify.  I think when we started the proceedings

16   this morning, I identified the officer in the back of the

17   courtroom as Officer Davis.

18         THE COURT:  Yes.

19         MR. MARTINEZ:  It's Garcia.

20         THE COURT:  Okay.

21         MR. MARTINEZ:  So I was mistaken.

22         THE COURT:  I wasn't familiar with a Mr. Davis,

23   but I did know who Mr. Garcia is.

24         MR. MARTINEZ:  Neither am I, Your Honor,

25   Mr. Davis.

1                    (Tape played.)

2    Q.  Stopping counter at 17.  Agent Hyland, did this

3    telephone conversation mean anything as far as your

4    investigation?

5    A.  Yes.

6    Q.  What did it mean?

7    A.  The person that he contacted for me had no knowledge of

8    where he was this weekend or how he was returning.

9    Q.  What is Mr. McKenzie's demeanor at this point?

10   A.  He seems to be nervous and uncooperative as far as

11   searching the cereal boxes.

12                   (Tape played.)

13   Q.  I'm stopping the counter at 18:21.  What is the

14   defendant's demeanor at this point?

15   A.  He continues to be nervous.  He's trying to control the

16   conversation.  He's not cooperative.

17   Q.  Are you still on the platform?

18   A.  Yes, sir.

19   Q.  How many people around you?

20   A.  Myself, Mr. McKenzie, Officer Garcia.

21   Q.  Is -- I'm sorry.  I'm cutting you off.

22   A.  And his canine.

23   Q.  Is the train still there at that point?

24   A.  Yes, sir.  And also, the car attendant or the

25   conductor.  The conductor was still in the car, walking

1    around, I believe.

2    Q.  And what time is this approximately at?

3    A.  That would be approximately 1:00.

4    Q.  In the afternoon?

5    A.  Yes, 1:00 p.m.

6    Q.  I don't think I asked you about the weather conditions.

7    What was the weather like outside on this day?

8    A.  It was clear and warm.

9              (Tape played.)

10   Q.  Who was yelling "Help"?

11   A.  Mr. McKenzie.

12   Q.  What is he doing when he's yelling "Help"?

13   A.  He's running around in front of me on the platform as I

14   attempt to place handcuffs on him.

15   Q.  What are you doing?

16   A.  I'm chasing him.

17   Q.  What is Officer Garcia doing?

18   A.  He's with his canine.

19   Q.  Is he staying with his canine?

20   A.  Yes.

21   Q.  When Mr. McKenzie started yelling "Help," what had you

22   done at that point?  Or what were you doing?

23   A.  I had my handcuffs in my hand, and I was telling him

24   that I was going to place him into custody.

25   Q.  Had you drawn your weapon at that point?

1    A.  No.

2                (Tape played.)

3    Q.  Is that the end of the tape?

4    A.  Yes, sir.

5    Q.  So did Mr. McKenzie stay on the platform yelling

6    "Help"?

7    A.  For those -- for what you heard, yes.

8    Q.  And then did he do anything else?

9    A.  Yes.

10   Q.  What did he do?

11   A.  He reentered the Sleeper Car 431, ran up the stairs and

12   returned to Deluxe Sleeper A.

13   Q.  What did you do?

14   A.  I followed him or chased him.

15   Q.  What did Officer Garcia do?

16   A.  He stayed on the platform and came behind me, followed

17   me.

18   Q.  And did Mr. -- excuse me.  Did Mr. McKenzie run back to

19   his room?

20   A.  Yes.

21   Q.  Once he got there, what happened?  Or were you able to

22   enter his room?

23   A.  No.

24   Q.  Why?

25   A.  He locked the door.

1    Q.  I'm sorry.  I think I cut you off.

2    A.  Mr. McKenzie locked the door.

3    Q.  Were you able to get into his room?

4    A.  No.

5    Q.  What did you do?

6    A.  I was with the train conductor at that point, and the

7    train conductor left to get a crowbar to open the door.

8    Q.  Had the train conductor said anything?

9    A.  He had told Mr. McKenzie to get off the train.

10    Q.  How did he tell him that?

11    A.  He told him he no longer was welcome on the train, to

12    get off the train.

13    Q.  Did he say that to his face?

14    A.  He said that verbally once, and Mr. McKenzie started

15    saying, "Help."

16    Q.  Did you ever get the door open with a crowbar?

17    A.  No.

18    Q.  What happened?

19    A.  The door remained locked.  As we were attempting to

20    open the door, I was surprised that there was no pass key

21    that the conductor had to open a locked Amtrak door.  So as

22    we were sort of attempting to take the door off, another

23    Amtrak employee comes by and tells us that they see someone

24    limping eastbound on the ground and running from the

25    platform.

1    Q.  What did you do?

2    A.  Officer Garcia and I then went -- we couldn't see

3    eastbound from where we were standing, from Mr. McKenzie's

4    locked door, so we went downstairs and looked out a window,

5    and we saw Mr. McKenzie limping eastbound from the train

6    platform.

7    Q.  What did you do?

8    A.  Officer Garcia was going to return to his car and

9    headed that direction.  And I was going to remain with the

10   sleeper car until we could get the door unlocked.

11   Q.  Did you remain in the sleeper car?

12   A.  Yes.

13   Q.  Why did you remain in the sleeper car?

14   A.  Because that's where the cereal boxes were.

15   Q.  Were you concerned about the cereal?

16   A.  No.

17   Q.  What were you concerned about?

18   A.  The objects that were contained within the cereal

19   boxes.

20   Q.  Were you ever able to get into the compartment?

21   A.  Yes.

22   Q.  How?

23   A.  Another Amtrak employee climbed into the open window

24   that Mr. McKenzie had taken the glass off and had jumped

25   down, leaving the train, and then he unlocked the locked

1    door for us.

2    Q.  When you went into the cabin, what did you do?

3    A.  I saw Mr. McKenzie's two suitcases and his ticket on

4    the bed, his Amtrak ticket.

5    Q.  Did you take control of those suitcases?

6    A.  Yes, all of his personal property.

7    Q.  And what happened to the suitcases and the property?

8    A.  I maintained custody of those.

9    Q.  Where did Officer Garcia go?

10    A.  He returned to his vehicle with his canine and drove

11    eastbound, getting to approximately Broadway and Lead.

12    Q.  Did he ever encounter Mr. McKenzie?

13    A.  Yes, he did.

14    Q.  Where did he encounter him?

15    A.  He encountered him on the north side of the United

16    States Forest Service building at 333 Broadway, Southeast,

17    in Albuquerque.

18    Q.  At that point, what happened to Mr. McKenzie?

19    A.  He was taken into custody.

20    Q.  Did he -- what kind of condition was he in?

21    A.  He had a severe injury to his ankle, on his right

22    ankle.  He had been cut by concertina wire, so he had some

23    bleeding from his pants, ripped pants.

24    Q.  You testified just a few moments ago that he took the

25    window out of the compartment?

1    A.  Yes, sir.

2    Q.  How high is that window from the ground at the train

3    station?

4    A.  As I stated earlier, it's a double-decker train car, so

5    I would say approximately 10 to 12 feet.

6    Q.  So is it possible or probable that he hurt his ankle by

7    jumping out that window?

8    A.  Yes, sir.

9    Q.  And then you just mentioned concertina wire.  Can you

10   put that into context of the train station?

11   A.  East of the Amtrak train station there's a secured,

12   fenced-in parking lot for the United States Forestry

13   Service, and there's concertina wire on that chain link

14   fence.  And Mr. McKenzie climbed that fence and got caught

15   on the concertina wire and then went to the other side and

16   proceeded further east.

17   Q.  And that's where Officer Garcia arrested him?

18   A.  Yes.

19   Q.  Was he then taken to the hospital?

20   A.  Yes.

21   Q.  Did you do follow-up investigation on this case?

22   A.  Yes, I did.

23   Q.  Did you do it within the next -- within the days

24   following this incident?

25   A.  The next day.

1    Q.  Did you go back to the Forest Service office?

2    A.  Yes, I did.

3    Q.  Well, actually before we go there, you mentioned

4    earlier that Officer Garcia is a canine officer; is that

5    right?

6    A.  Yes.

7    Q.  And you also mentioned that him and his partner were

8    certified on that day?

9    A.  Yes.

10   Q.  On that day, July 7, did Officer Garcia and his canine

11   partner conduct a sniff of anything?

12   A.  Yes.

13   Q.  What did they sniff?

14   A.  The three cereal boxes.

15   Q.  What was the result?

16   A.  The canine, Sasja, alerted to each individual cereal

17   box.

18   Q.  What did you do as a result?

19   A.  I used that information and the other additional

20   information I had taken from the case in its totality, and

21   wrote a federal search warrant to the three cereal boxes.

22   Q.  I'm sorry?  You said you wrote a search warrant?

23   A.  Yes, I did.

24   Q.  With an accompanying affidavit?

25   A.  Yes, sir.

1    Q.  I'm handing you what is marked as Government's Exhibit

2    11.  Do you recognize this?

3    A.  Yes, I do.

4    Q.  Is that the search warrant that you're talking about?

5    A.  Yes, sir.

6         MR. MARTINEZ:  Move admission of Government's

7    Exhibit Number 11.

8              THE COURT:  Any objection?

9              MR. PADILLA:  No objection, Your Honor.

10             THE COURT:  Government's Exhibit 11 will be

11   admitted into evidence.

12       (Government's Exhibit 11 admitted into evidence.)

13   Q.  Did you have this search warrant signed by anybody?

14   A.  Yes, sir.

15   Q.  A magistrate judge?

16   A.  Yes.

17   Q.  And as a result of the judge signing the search

18   warrant, what did you do?

19   A.  I executed the search warrant later, on July 7.

20   Q.  What does that mean?  How did you execute it?

21   A.  I opened the cereal boxes at the DEA Albuquerque

22   office.

23   Q.  Did you find anything?

24   A.  Yes, I did.

25   Q.  What did you find?

1    A.  Each respective cereal box contained 1 kilogram of

2    cocaine.

3    Q.  I'm handing you what are marked as Government's

4    Exhibits 8-B and 8-C.  Do you recognize these photographs?

5    A.  Yes, sir.

6    Q.  How do you recognize these photographs?

7    A.  8-B is the top opening of the Fruit Spins cereal box,

8    showing a re-sealed plastic bag, further containing a brown

9    duct-taped object.

10    Q.  And what about the next photograph?  Do you recognize

11    that photograph, too?

12    A.  Yes, sir.  That is the same Fruit Spins cereal box with

13    the brown kilogram of cocaine removed.

14          MR. MARTINEZ:  Move admission of Government's

15    Exhibits 8-B and 8-C, please.

16          THE COURT:  Any objection, Mr. Padilla?

17          MR. PADILLA:  No objection.

18          THE COURT:  Government's Exhibits 8-B and 8-C

19    will be admitted in evidence.

20    (Government's Exhibits 8-B and 8-C admitted into

21    evidence.)

22    Q.  So I'm handing you what have been marked as

23    Government's Exhibits 8-E, 8-G, 8-H, 8-I.  Also, sir, do

24    you recognize these exhibits?  Would you take a look at

25    those?  Do you recognize these photographs?

1    A.  Yes, I do.

2    Q.  Were these also photographs as part of the search of

3    the cereal boxes?

4                THE COURT:  Yes, sir.

5                MR. MARTINEZ:  Move such exhibits into evidence,

6    Your Honor.

7                THE COURT:  Any objection, Mr. Padilla?

8                MR. PADILLA:  No objection.

9                THE COURT:  Government's Exhibits 8-E, 8-G, 8-H,

10   and 8-I will be admitted into evidence.

11       (Government's Exhibits 8-E, 8-G, 8-H, and 8-I admitted

12       into evidence.)

13   Q.  Agent, I'm showing you what is marked as Government's

14   Exhibit 9.  Is this a photograph of each of the three

15   packages that were pulled out of the cereal boxes?

16   A.  Yes, sir.

17               MR. MARTINEZ:  Move admission of Government's

18   Exhibit 9.

19               MR. PADILLA:  No objection, Your Honor.

20               THE COURT:  Government's Exhibit 9 will be

21   admitted into evidence.

22       (Government's Exhibit 9 admitted into evidence.)

23   Q.  Agent Hyland, did you field test these packages?

24   A.  One.

25   Q.  I'm sorry?

1     A.  One of the packages.

2     Q.  You field tested one of the packages.  I'm showing you

3     Government's Exhibits 10-A and 10-B.  Do you recognize

4     these photographs?

5     A.  Yes, sir.

6     Q.  Is this a photograph of the package that was field

7     tested?

8     A.  Yes.

9           MR. MARTINEZ:  Move admission of Government's

10    Exhibits 10-A and 10-B.

11          MR. PADILLA:  No objection, Your Honor.

12          THE COURT:  Government's Exhibits 10-A and 10-B

13    will be admitted into evidence.

14      (Government's Exhibits 10-A and 10-B admitted

15      into evidence.)

16    Q.  Did you receive a -- when you field tested it, did you

17    receive a result on the package?

18    A.  Yes.

19    Q.  What was that result?

20    A.  It field tested positive for cocaine.

21    Q.  Agent Hyland, I'm placing on the prompt Government's

22    Exhibit 8-C.  Is this a photograph of the package that came

23    out of the Fruit Spins box?

24    A.  Yes, sir.

25    Q.  Now I'm placing on the prompt Government's Exhibit 8-B.

1    Is this a photograph of how the bundle was located in the
2    cereal box?
3    A.  Yes, sir.
4    Q.  Agent Hyland, can you see what I put on the prompt as
5    Government's Exhibit 8-H?
6    A.  Yes.
7    Q.  Is that how the bundle looked in this cereal box or the
8    Express one with the train on it?
9    A.  Yes, sir.
10   Q.  And now I have on the prompt Government's Exhibit 8-G.
11   Is this the bundle taken out of the Apple Express cereal
12   box?
13   A.  Yes, sir.
14   Q.  And then I have on the prompt what is Government's
15   Exhibit 8-E.  Is this the way that the bundle was in the
16   cereal box, itself?
17   A.  Yes, sir.
18   Q.  I have placed on the prompt Government's Exhibit 9.  Is
19   this -- does this fairly represent the three bundles on the
20   scale?
21   A.  Yes.
22   Q.  And there's an amount on the scale?
23   A.  Yes.
24   Q.  And it's 3.40 kilograms?
25   A.  Yes, sir.

1    Q.  And this is consistent with a distributable amount?

2    A.  Yes, sir.

3    Q.  And then basically Government's Exhibit 10-A, which is

4    on the prompt right now, is a picture.  I assume that's

5    your knife, right?

6    A.  Yes.

7    Q.  And that's taking a sample from this bundle?

8    A.  Yes.

9    Q.  And now I'm placing on the prompt Government's Exhibit

10    10-B.  What did this prove positive for?

11    A.  Cocaine.

12    Q.  I am showing you what is marked as Government's

13    Exhibit 1.  Are you familiar with this exhibit?

14    A.  Yes, sir.

15    Q.  How are you familiar with this exhibit?

16    A.  This is a copy of the United States Forest Service

17    outdoor security video.

18    Q.  In preparation for this hearing, did you see this video

19    before?

20    A.  Yes.

21            MR. MARTINEZ:  Move admission of Government's

22    Exhibit 1.

23            THE COURT:  Any objection?

24            MR. PADILLA:  Yes, Your Honor.  I think it's

25    irrelevant.  I believe this is a videotape of where

1    Mr. McKenzie was arrested at the U.S. Department of Forest

2    Service, I guess is what it's called.  And I don't think

3    it's relevant to any of the issues that have been raised by

4    me, so I think it's irrelevant.

5            THE COURT:  Is it contemporaneous with this

6    arrest or something done later?

7            MR. MARTINEZ:  It's before his arrest, Your

8    Honor.  It's before Officer Garcia found him at the Forest

9    Service.  It's security video of him coming in.  There's

10   three clips in there, security video of him trying to get

11   in the door; security video of him leaving the door as

12   Officer Garcia is coming in; and then security video of him

13   being arrested.

14           THE COURT:  And what is the relevance of it to

15   the motion?

16           MR. MARTINEZ:  Well, it continues to show the

17   consciousness of guilt.  And the relevance is that --

18           THE COURT:  Consciousness?

19           MR. MARTINEZ:  Of guilt, and his uncooperative --

20   he wasn't cooperating with law enforcement.

21           THE COURT:  Well, I'm going to admit it.  I'm

22   still trying to figure out the issues, and it seems to be

23   part of the story here of what occurred that day, so I'll

24   admit it.  Government's Exhibit 1 will be admitted into

25   evidence.

1          MR. MARTINEZ:  Thank you, Your Honor.

2      (Government's Exhibit 1 admitted into evidence.)

3   Q.  Agent, I was asking you earlier if you did follow-up

4   investigation, and I believe you said the following day?

5   A.  Yes.

6   Q.  Did you go back to the Forest Service office?

7   A.  Yes, I did.

8   Q.  Did you speak with anybody?

9   A.  Yes, I did.

10  Q.  When you went back to the Forest Service office, was

11  anybody with you?

12  A.  Yes.  Officer Garcia was with me.

13  Q.  Did you speak with anybody from the Forest Service

14  office?

15  A.  Yes, I did.

16         MR. MARTINEZ:  Your Honor, if I may ask the Court

17  a question.  I'm thinking this is audio, and not video, but

18  it's actually video.  Is there a DVD player?  I assume

19  there's a DVD player.

20         THE COURT:  Yes.

21         CRD K'AUN WILD:  Yes, but the format will affect

22  whether it will play.

23         MR. MARTINEZ:  Your Honor, may I turn the video

24  around so that the Court can see it?  I can enlarge it to

25  the size of the pictures.  I'm going to turn it around.

1      Q.  Agent Hyland, would you please come off the stand.  So
2      are you familiar with what we're looking at here?
3      A.  Yes, sir.
4      Q.  Is that the individual that you saw on the train that
5      day?
6      A.  Yes, sir.
7      Q.  Is that consistent with the hurt ankle that you've
8      testified to before?
9      A.  Yes.
10     Q.  And this is him trying to get in the building?
11     A.  Yes.
12     Q.  Now, so this is a different angle from what we just
13     saw?  Is the parking lot that we're looking at in this
14     video unsecured?
15     A.  Yes.
16     Q.  So there is a fence here, so the secured part is there
17     on the other side?
18     A.  Right.
19     Q.  Do we see Mr. McKenzie in this video?
20     A.  Yes.
21     Q.  So this is just another angle of him coming into the
22     building?
23     A.  Correct.
24     Q.  Or trying to get in the building?
25     A.  Correct.

1    Q.  I'll move the counter here over to 4 here.  So the

2    angle that we have right now, can you give orientation?

3    A.  Sure.  This is north.  This area is north of the

4    building, the U.S. Forest Service.  West is -- west of it

5    is that chain link fence.

6    Q.  So would the train tracks be on the other side of the

7    chain link fence?

8    A.  Yes.  West of the chain link fence would be, and

9    further west is the Amtrak station.

10   Q.  There's something in this that I want to show you.  So

11   do you recognize that vehicle?

12   A.  No.

13   Q.  Do you know what Officer Garcia drives?

14   A.  Yes, a large black-and-silver Motor Transportation

15   Division marked unit.

16   Q.  So does it look like that vehicle that just showed up?

17   A.  Yes, it does.

18   Q.  Is Officer Garcia running with his lights on now?

19   A.  Yes.

20   Q.  So he's driving over there to get into the gate?

21   A.  Yes.

22   Q.  And for the purposes of the record, the count on the

23   video is at 4:20 right now.  Are those individuals coming

24   out of the door?  Do you know who those people are?

25   A.  One of them is Mr. McKenzie, and the other is a

1    contract security officer from the U.S. Forest Service.

2    Q.  So Officer Garcia went into the facility as

3    Mr. McKenzie was coming out with the security officer?

4    A.  Correct.

5            MR. MARTINEZ:  Thank you, Your Honor.

6    Q.  So Agent Hyland, did you speak to some of these

7    individuals at the Forest Service the next day?

8    A.  Yes, I did.

9    Q.  Who was the first person you spoke with?

10   A.  Special Agent Terry McGaha.

11   Q.  And what did this person tell you?

12   A.  He provided me copies of the security videos that we've

13   been observing.

14   Q.  Did you speak with anyone else over there?

15   A.  Yes, I did.

16   Q.  Who?

17   A.  I spoke to a security officer, Eloy Sanchez, who

18   escorted Mr. McKenzie from the building.

19   Q.  Did he tell you anything?

20   A.  Yes.

21   Q.  What did he say?

22   A.  He said he first observed --

23           MR. PADILLA:  Objection to hearsay, Your Honor.

24           THE COURT:  Well, it is hearsay, but I think I

25   would consider it for purposes of determining admissibility

1    of this evidence.  But I will note that it is hearsay in

2    determining and giving it weight.

3    Q.  (By Mr. Martinez)  What did he say, Agent Hyland?

4    A.  Security Officer Sanchez first encountered Mr. McKenzie

5    in the mail room of the U.S. Forest Service building, and

6    he saw that Mr. McKenzie was breathing heavily, was

7    bleeding, and was injured.  And he notified his dispatch,

8    and they called for an ambulance for Mr. McKenzie.  He then

9    escorted him from the building to the north side exit which

10   we just observed on the video.

11   Q.  Did you speak with anybody else?

12   A.  Yes, I did.

13   Q.  Who's that?  Was it male or female?

14   A.  It was a female employee, and she had just entered the

15   parking lot and got out of her car and was returning to the

16   building, to the U.S. Forest Service building.  And she saw

17   Mr. McKenzie standing by the doorway, and she asked -- he

18   said he had been injured and he had been jumped and mugged

19   and he needed help.  So she allowed him into the building

20   with her key card, and she sat him down at the top of the

21   stairwell, and she then left to go get security.

22          And when she returned, Mr. McKenzie had left that

23   stairwell area.

24   Q.  Based upon your investigation, were the statements by

25   these three individuals consistent with the videotape that

1   we just watched on Government's Exhibit 1?

2   A.  Yes, sir.

3           MR. MARTINEZ:  Your Honor, may I have a moment?

4           THE COURT:  You may.

5           MR. MARTINEZ:  Pass the witness.

6           THE COURT:  All right.  Thank you, Mr. Martinez.

7   Mr. Padilla, do you have cross-examination of Mr. Hyland?

8           MR. PADILLA:  Yes.  Do you want me to start?  I

9   know that you have a court hearing.

10          THE COURT:  Yes, why don't we go ahead.  We've

11  still got about 20 minutes.

12                      CROSS-EXAMINATION

13  BY MR. PADILLA:

14  Q.  It's my understanding, Agent Hyland, that you had been

15  working the train for at least ten years?  You said you

16  started with the DEA here in Albuquerque in 1999?

17  A.  I was transferred to Albuquerque, but I didn't start

18  working the train until 2000.

19  Q.  2000?  And back in 2000, were you able to obtain

20  information about passengers the same way you do that

21  today?

22          MR. MARTINEZ:  Objection; irrelevant.

23          THE COURT:  Overruled.

24  Q.  You may answer the question.

25  A.  Could you repeat it again?

 1    Q.  Sure.  The question is whether you were able to obtain,

 2    back in 2000, the same type of information that you're able

 3    to obtain today regarding passengers on the Amtrak train

 4    going through Albuquerque?

 5    A.  Yes.

 6    Q.  If I may ask counsel for Exhibit 2.  Now, I'm referring

 7    to Government's Exhibit Number 3.  I understand this is the

 8    information that you relied upon, targeting Mr. McKenzie as

 9    a person of interest that you wanted to talk to, correct?

10    A.  Yes.

11    Q.  When I talk about Exhibit 3, what I'm referring to is

12    the passenger name record?  Is that what that's called?

13    A.  Yes.

14    Q.  And the pass, as it has been referred to, is the

15    passenger manifest?

16    A.  It could be.

17    Q.  And sir, this information or this exhibit that we're

18    talking about provides a lot of information about an

19    individual who is traveling on Amtrak, does it not?

20    A.  Yes.

21    Q.  It provides their name; it provides their destination

22    in terms of where they're going to end their travel with

23    Amtrak; where they started to travel; everything you've

24    testified to in terms of that information, plus the cost

25    and whatever?  Correct?

1    A.  Yes.

2    Q.  And this also gives you specific information as to

3    whether or not the ticket that was purchased by the

4    individual was purchased with cash or with a credit card?

5    A.  Correct.

6    Q.  And in this case, it's clear that this ticket was

7    purchased with a credit card, correct?

8    A.  Yes.

9    Q.  And it was purchased at least a week or so before the

10   time of travel back to New York?

11   A.  Five days.

12   Q.  Five days?  And these are the types of things that

13   you're looking for, correct, when you're looking to see

14   whether or not a particular individual meets the profile of

15   someone that might be transporting drugs on an Amtrak

16   train?

17   A.  Yes.

18   Q.  But in other cases you've handled, would it be fair to

19   say that most of those individuals who you have targeted as

20   persons of interest purchased their ticket on the day of

21   travel?

22   A.  Sometimes.

23   Q.  Would it be the majority of times that it was purchased

24   the day of travel, sir?

25   A.  It's usually a few days before travel.

1    Q. And would you also agree that in the majority of cases

2    where you have been involved as an agent, that those

3    tickets are usually, again in the majority of cases,

4    purchased with cash?

5    A. Yes.

6    Q. And this is definitely one case that was an exception

7    to that, correct?

8    A. Correct.

9    Q. And I'm kind of curious. I think you either testified

10   or provided in your discovery or your report an indication

11   that you got to the train station after the train had

12   already arrived, correct?

13   A. Correct.

14   Q. And this train in fact was running late, from

15   information that you had received from Amtrak, correct?

16   A. Yes.

17   Q. Now, out of curiosity, you said you didn't get to the

18   train station until after the train had already arrived; in

19   fact, it looked like it was getting close to departing,

20   correct?

21   A. Yes.

22   Q. So you had to obtain this information by accessing a

23   computer terminal in your office at the DEA?

24          MR. MARTINEZ: Objection; irrelevant.

25          MR. PADILLA: I don't think it's irrelevant, Your

1    Honor.

2              THE COURT:  No, I think it's relevant.

3    Overruled.

4    A.   No.

5    Q.   Well, could you tell the Court how you accessed this

6    information on Mr. McKenzie prior to the train arriving in

7    Albuquerque.

8              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

9              THE COURT:  Overruled.

10   Q.   You may answer the question, sir.

11   A.   That document was sent to us.

12   Q.   Sent to you by Amtrak?

13   A.   Yes.

14   Q.   And when you say it was sent to you, could you tell the

15   Court, was it sent to you by e-mail?  Was it faxed to you?

16   Was it hand-delivered to you?  How exactly was it delivered

17   to you?

18   A.   Fax.

19   Q.   When you say it was faxed to you, who exactly from

20   Amtrak, to your knowledge, faxed this information to you?

21             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

22             THE COURT:  Overruled.

23             MR. MARTINEZ:  Your Honor?

24             THE COURT:  Yes?

25             MR. MARTINEZ:  I would cite United States --

1  Roviaro v. United States, which is United States Supreme

2  Court 353 U.S. 53.  Specifically, I think for this kind of

3  information, there needs to be a test.  There's is a

4  two-prong test that needs to be established.

5          THE COURT:  What is the objection?  I mean, what

6  are you asserting?  Are you asserting that this is a

7  confidential informant?

8          MR. MARTINEZ:  Yes, Your Honor.  And the need for

9  this information has not been established yet.

10          THE COURT:  Well, I understand that Mr. Padilla

11  is making perhaps a good faith challenge to the law here;

12  am I correct, Mr. Padilla?

13          MR. PADILLA:  Yes, Your Honor.

14          THE COURT:  Is that what you're doing?  And I've

15  got to allow him to establish the record.  So I think

16  there's some need for it, to understand the factual basis.

17  What's the other prong that needs to be met?

18          MR. MARTINEZ:  Your Honor, the --

19          MR. PADILLA:  Could I get a cite on that?

20          MR. MARTINEZ:  Sure.  Your Honor, I misspoke.  In

21  thinking about this, when I'm saying say two prongs,

22  there's language within this case that says -- what I was

23  thinking about was this language right here, and I'll read

24  it specifically into the record, is that:  Most of the

25  federal cases involving this limitation on the scope of the

1     informant's privilege has risen where the legality of the

2     search without a warrant is an issue and the communications

3     of an informer are claimed to establish probable cause.

4           So I'm invoking in this case for confidential

5     informant.  And when I'm talking about prongs, this is the

6     two parts that I was talking about.  So it wasn't a test,

7     exactly, what I was stating.  But my argument at this point

8     is that there is a warrant in this case.  And also, the

9     United States isn't claiming that based upon this

10    information, Government's Exhibit 3, that that establishes

11    probable cause, Your Honor.

12          THE COURT:  But the defendant is arguing that --

13    I mean, there's a number of arguments here the defendant

14    had, but I guess his first argument is that Amtrak

15    shouldn't have released this information at all.

16          MR. MARTINEZ:  Right, Your Honor.  And the United

17    States' position on the defendant's reply is that this

18    position is clearly established in the Tenth Circuit in

19    another case, which is --

20          MR. PADILLA:  The Jackson case.

21          MR. MARTINEZ:  Which is the Jackson case, U.S. v.

22    Jackson at 381 F.3d 984.

23          THE COURT:  Let me make sure, but I thought we'd

24    established that Mr. Padilla is going to attempt to use

25    this case to overrule that Tenth Circuit case.

1          MR. PADILLA:  That's correct.  In fact, I think

2    the Supreme Court has ruled otherwise in a case involving

3    Amtrak, and there was a split in the circuit in regard to

4    that on this very question.

5          THE COURT:  And so I don't know how I allow him

6    to do that without allowing him to get the factual basis

7    for it.

8          MR. MARTINEZ:  Your Honor, my sense is that you

9    have the facts that this information came from Amtrak.

10   Government's Exhibit 3 has been admitted.  But I don't

11   think that there's any argument concerning the facts

12   contained in Government's Exhibit 3.  Where Government's

13   Exhibit 3 came from, as long as it came from Amtrak,

14   establishes his record for purposes of argument.

15         MR. PADILLA:  I would still like the opportunity

16   to ask whatever the questions might be.

17         THE COURT:  I'm not as familiar with this

18   privilege law and what needs to be established.  If the

19   government is going to rely on it, maybe I need to have

20   some briefing on this, or at least the cases, so that I can

21   familiarize myself as to whether I ought to be overriding

22   that.

23         MR. MARTINEZ:  Your Honor, if the Court has a

24   hearing at 11:45, my sense is, if you want me to be more in

25   context with this argument after lunch, rather than being

1     rushed this morning --

2              THE COURT:  All right.

3              MR. PADILLA:  And just for the record, normally

4     when you refer to a confidential source or a confidential

5     informant, you know we're talking about an individual whose

6     identity is being protected to make sure that that

7     information doesn't get out to the wrong people.

8              Here, we're talking about an agency, what we

9     allege is an agency that the government will argue is a

10    corporation that's providing this information.  And I'm not

11    specifically asking for the name of a person that sent that

12    to this agent, but simply how that came about.

13             THE COURT:  Well, maybe --

14             MR. MARTINEZ:  Your Honor -- I'm sorry.  I'm

15    cutting you off.

16             THE COURT:  I think what we're thinking is the

17    same thing.  Why don't you go ahead and ask your question

18    and then see if Mr. Martinez objects.  Because I thought

19    you were asking for the name, too.

20             MR. MARTINEZ:  And I thought that's where he was

21    going, Your Honor.

22             MR. PADILLA:  We can ask for the title or the

23    source of the information.

24             THE COURT:  Why don't you go ahead and ask your

25    question and see if it elicits an objection and see if we

1    can get this information for you.

2            MR. PADILLA:  Yes, sir.

3    Q.  (By Mr. Padilla)  To backtrack again, the

4    information -- not so much the information, but the actual

5    exhibit that has been referred to as Government's Exhibit

6    Number 3, was received, first of all, by fax from your

7    office -- or to your office, right?

8    A.  Yes.

9    Q.  And my question is:  In terms of the person, it doesn't

10   have to be a named person, but a person with Amtrak who is,

11   I guess, working with DEA, is there information you can

12   provide as to -- not so much who, but the title of that

13   individual who I guess is faxing this information to

14   Amtrak?  If that's clear?

15           THE COURT:  Why don't we do this.  It's a "Yes"

16   or "No" question.  If you know who faxed it to you, why

17   don't you give that, and that will lay a foundation as to

18   whether we go any further.

19   A.  Yes.

20   Q.  And is it the same person every time, or is it possibly

21   a different person that faxes this information to you?

22   A.  That, I don't know.

23   Q.  And did this person, regardless of what their name is,

24   do they have a title with Amtrak in terms of working with

25   the ticket office or working with some part of the Amtrak?

1  A.  Yes.

2  Q.  And so again, without providing the name of that

3  individual, can you advise the Court who that -- or what

4  the title is of the person who sent that information to

5  DEA?

6  A.  Ticketing agent.

7  Q.  And that would be here in Albuquerque?  Or in Phoenix?

8        MR. MARTINEZ:  Objection, Your Honor.

9        THE COURT:  Well, why don't we reserve that

10  question until Mr. Martinez has a chance to look at it.

11  And do you have other questions?

12        MR. PADILLA:  Yes, sir.

13        THE COURT:  All right.

14  Q.  (By Mr. Padilla)  So it's clear from the answers that

15  you have given so far that before that train arrives at the

16  station, you have already received information similar to

17  what's in Government's Exhibit 3 regarding passengers,

18  correct?

19  A.  Yes.

20  Q.  And so someone at Amtrak, the person who is sending

21  this information to you, is in fact going through the list

22  of all the passengers and providing this information to

23  DEA, correct?

24  A.  Yes.

25  Q.  And sir, do you know if there is a contractual

1  relationship between the Drug Enforcement Administration

2  and Amtrak to provide this information on a daily basis?

3           MR. MARTINEZ:  Objection, Your Honor.

4           THE COURT:  Is it the same one?

5           MR. MARTINEZ:  Along the same grounds.

6           MR. PADILLA:  Yeah, I'm just asking if there's a

7  contractual relationship between the DEA.

8           THE COURT:  Well, why don't we hold that question

9  until after lunch.

10          MR. PADILLA:  Yes, sir.

11  Q.  (By Mr. Padilla)  Now, this has been introduced as

12  Exhibit Number 3, and this was a form or a document that

13  was generated the date that my client was arrested.  Could

14  you tell this Court how many other similar type reports you

15  received on that day for other passengers that were on that

16  Amtrak train?

17  A.  I can't specifically recall.

18  Q.  On a regular, normal basis would you get more than one?

19          MR. MARTINEZ:  Objection; irrelevant.

20          THE COURT:  Overruled.

21  A.  It's hard to tell.  Some days it could be many, and

22  some days there's nothing.

23  Q.  And so someone again -- this may be objected to, but

24  someone at Amtrak is reviewing the passenger list, making a

25  determination as to who you might be interested in, and

1    then forwarding that information to you by fax; is that

2    correct?  Is that a correct statement or a fair statement?

3    A.  Yes.

4    Q.  And is that individual, again without asking for a

5    name, and already established as a ticket agent, is that

6    person a law enforcement officer?

7              MR. MARTINEZ:  Objection, Your Honor.

8              THE COURT:  What's the basis?

9              MR. MARTINEZ:  It's irrelevant.  And also based

10   along the same objection I had before, Your Honor.

11             THE COURT:  All right.  Well, I'll allow that

12   question.  We'll deal with it after lunch.

13             MR. PADILLA:  Yes, sir.

14   Q.  (By Mr. Padilla)  And this question goes back to your

15   initial employment with the DEA here in Albuquerque.  Would

16   it be fair to say that when you first started at the Drug

17   Enforcement Administration here in Albuquerque in 1999,

18   2000, that the DEA did have a direct link to the Amtrak

19   computer to obtain this information?

20             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

21             THE COURT:  I don't think it's irrelevant.

22             MR. MARTINEZ:  And that has been asked and

23   answered.

24             THE COURT:  Overruled.

25   A.  I believe so, yes.

1     Q.  At that time, before changes were made, you could

2     actually get onto a computer in your office, get this

3     information, without having to rely on a ticket agent.  Is

4     that a fair statement, sir?

5     A.  Yes.

6     Q.  And sometime later -- and I don't know if you remember,

7     but that practice was stopped and it was at that point that

8     you started receiving information from the ticket agent,

9     correct?

10    A.  Correct.

11              MR. MARTINEZ:  Objection.

12              THE COURT:  Anything further on that,

13    Mr. Martinez?

14              MR. MARTINEZ:  He already answered, Your Honor.

15              THE COURT:  All right.

16    Q.  (By Mr. Padilla)  Again, it's fair to say that when

17    that train arrived in Albuquerque, you already knew who you

18    wanted to talk to?

19    A.  I had the reservation, yes.

20    Q.  And you went straight to Car 431 and went to the

21    sleeper compartment where you expected to find

22    Mr. McKenzie?

23    A.  Yes.

24    Q.  And he wasn't in the sleeper compartment?  In fact, let

25    me backtrack here.  Did you go directly to his sleeper

1    compartment to try to locate him?

2             Or did you talk to the conductor or someone else

3    that was employed by Amtrak regarding who this individual

4    was?

5    A.   I saw the car attendant and asked him if Deluxe

6    Sleeper A was occupied.

7    Q.   And he indicated that it was?

8    A.   Yes.

9    Q.   Did he give you a description -- did he or she give you

10   a description at that point?

11   A.   I asked what was he wearing, and he told me he had a

12   white golf shirt on.

13   Q.   And it's my understanding that in addition to telling

14   you what he was wearing, he also gave you a general

15   description of how old he was?

16   A.   Approximately, yes.

17   Q.   And sir, would it be fair to say that he also described

18   him as a Black gentleman?

19   A.   No, he didn't mention race.

20   Q.   Did you ask?

21   A.   No.

22   Q.   It's my understanding that at that point you went to

23   the Sleeper Compartment A to look for Mr. McKenzie?

24   A.   Yes.

25   Q.   The door was unlocked or actually opened?  How would

1    you describe the door when you got there?

2    A.  Open.

3    Q.  When you say "open," in other words, someone could have

4    looked into it or opened it further?  Or was it opened all

5    the way?

6    A.  It was opened three-quarters of the way, and it's a

7    glass -- the upper part of the door is glass.  There's a

8    glass part of the wall, so you could see inside.

9    Q.  But the door was actually open, according to your

10   testimony?

11   A.  Yes.

12   Q.  In your experience, you have also encountered

13   individuals on numerous occasions who are transporting

14   various types of narcotics that have a habit of remaining

15   in the sleeper compartment without ever leaving.  Would

16   that be a fair statement, sir?

17   A.  Some do.

18   Q.  Many do, in fact, do they not?

19   A.  I would say some do.

20   Q.  But that did not happen in this case?  In fact, not

21   only was he not in the sleeper, the door was actually open?

22   A.  Correct.

23   Q.  And you were able to look in, and you recall a brush on

24   the chair there, and other items to indicate that someone

25   had in fact been in that sleeper compartment?

1    A.  The brush was on the bed.

2    Q.  And you noticed other items of personal property?

3    A.  I saw some bottled water.

4    Q.  It was at that point that you then went out to look for

5  Mr. McKenzie?

6    A.  Yes.

7    Q.  And you went straight outside to the platform?

8    A.  No.

9    Q.  I think your testimony is, you went into the diner or

10  dining compartment?

11    A.  Yes.

12    Q.  And you didn't see him there?

13    A.  No.

14    Q.  And that's when you left to go to the bus station,

15  after not seeing anyone on the platform?

16    A.  Correct.

17    Q.  And when you came back, the individual that you noticed

18  in fact was pretty much the only individual at the platform

19  at that point?

20    A.  Correct.

21    Q.  And you saw he was wearing the white shirt after you

22  approached him?

23    A.  Yes.

24    Q.  When you approached Mr. McKenzie and identified

25  yourself as a police officer, is that something that you

 1     normally do in all your cases?

 2     A.  Yes.

 3     Q.  Did you actually show him your badge?

 4     A.  Yes.

 5     Q.  And you indicated that you were wearing a firearm and

 6     it was concealed.  Could you tell us where it was

 7     concealed?

 8     A.  On my hip.

 9     Q.  On your hip?  What was it concealed by?

10     A.  The outer short-sleeved collared shirt that I wear.

11     Q.  But it wouldn't be difficult to see a lump there that

12     is some type of firearm, if a person looked closely?

13     A.  No.  The shirt is not tucked in.

14     Q.  Right.  But in terms of it not being tucked in, it was

15     still covered, the firearm, and possibly could be seen by

16     somebody, correct?

17     A.  No.

18     Q.  Not at all?

19     A.  Not at all.

20     Q.  That you would be wearing that?  What was the

21     description of the firearm that you had?

22     A.  It's my standard issue Sig Sauer.

23     Q.  Excuse me?

24     A.  It's a Sig Sauer.

25     Q.  A 9 mm?

1    A.  It's a .40 caliber.

2    Q.  .40 caliber?  It's a pretty good-sized gun, correct?

3    A.  I don't know how to answer that question.

4    Q.  Now, just kind of jumping ahead -- I'll come back, but

5    when you finally seized the boxes of cereal and took them

6    to the DEA office, you sat down and prepared an affidavit

7    to obtain a search warrant, correct?

8    A.  Yes.

9    Q.  And in that search warrant, you did indicate, did you

10    not -- well, first of all, you prepared that under oath, I

11    assume?

12    A.  Yes.

13    Q.  And did you not indicate in that search warrant that

14    the ticket purchased by Mr. McKenzie had been purchased on

15    the day of travel?

16    A.  He received the ticket on the day of travel.

17    Q.  You never indicated in the affidavit that he purchased

18    the ticket that day?

19    A.  He took custody of the ticket that day.

20          MR. PADILLA:  May I approach the witness, Your

21    Honor?

22          THE COURT:  You may.

23    Q.  Let me hand you the exhibit, and I highlighted the

24    portion that I'm referring to.  Would you read that?  Would

25    you read that into the record, sir?

1   A.  Oh, I'm sorry.  The ticket was purchased the day of

2   travel, on July 7, 2008.

3           THE COURT:  Mr. Padilla, would this be a good

4   time for us to take our lunch break?

5           MR. PADILLA:  Sure.

6           THE COURT:  All right.  I'll see you all back at

7   1:00.

8           MR. MARTINEZ:  Your Honor, if I may, the test

9   that I'm viewing is the case that I cited from the Supreme

10  Court.  It's in Paragraph 8 on Page 628 of 353 U.S. -- I'm

11  sorry -- of 77 Supreme Court 623.  It's on Page 628,

12  Paragraph 8, is the test that I was referring to.

13          THE COURT:  All right.  I'll give it some thought

14  over the lunch hour, though.  It doesn't seem to be Amtrak

15  is very confidential, and a corporation only acts through

16  its agents and employees.

17          I'm wondering if there really is any confidential

18  informant basis here, because it's clear where he got this

19  information.  I'm just trying to get to the details of how

20  it comes.

21          MR. MARTINEZ:  And my only question is if Mr.

22  Padilla, defense counsel, wants to go further into specific

23  names.

24          THE COURT:  He has got three questions here that

25  we're reserving for the afternoon.

1        MR. PADILLA:  And I'm not specifically asking for

2    a name.  I'm just trying to get information about the

3    title, and I think most of that has already come in,

4    anyway.

5        THE COURT:  What else do you need at this point,

6    Mr. Padilla?  Why don't you give me the questions that you

7    want to ask.

8        MR. PADILLA:  The other question, Your Honor,

9    would have to do with what this witness' knowledge is

10    regarding a contract or a relationship between Amtrak and

11    the DEA to provide that information on a daily basis.

12        There may be some other questions.  I understand

13    at one point, and it still may be true, that if money is

14    seized from a passenger, that Amtrak, I assume by contract,

15    is entitled to 10 percent of the take.  So there are some

16    questions I need to get into regarding the relationship

17    between the Drug Enforcement Administration and Amtrak, and

18    it goes to my issue of whether or not the Privacy Act was

19    violated.

20        THE COURT:  Why don't you give that some

21    thought.  It's not going to be further identity of people;

22    it's just going to be the contractual relationship, if

23    any, between them.  And see if you're comfortable with

24    allowing that; if not, then what the basis for it would

25    be.

1           MR. MARTINEZ:  That's helpful, Your Honor.  Thank

2     you very much.  I'm sorry.  What time did you want us back?

3           THE COURT:  Did you have something today?

4           MR. PADILLA:  At 2:30 or 3:00.

5           THE COURT:  All right.  We'll just take a break.

6     Is 1:00 all right with everybody?

7           MR. PADILLA:  That's fine with me.

8           MR. MARTINEZ:  Yes, Your Honor.  I was going to

9     take the computer back.

10          THE COURT:  It's up to you.  All we're going to

11    do is have a sentencing here, and then I'm going to go to

12    lunch, so you can either leave it or take it.

13          MR. PADILLA:  I wouldn't leave it.  I don't need

14    it on cross.

15          MR. MARTINEZ:  So I'll just take it back for good

16    at this point.

17          MR. PADILLA:  I don't need it on cross.

18          MR. MARTINEZ:  Then I'll just take it back.

19          THE COURT:  All right.  See you back at 1:00.

20          (Recess from 11:49 a.m. until 1:05 p.m.)

21          THE COURT:  All right.  Mr. Hyland, I will remind

22    you that you are still under oath.

23          Mr. Padilla, do you have continuing examination

24    of Mr. Hyland?

25          MR. PADILLA:  Yes, Your Honor.

     1              CROSS-EXAMINATION (Continued)

     2    BY MR. PADILLA:

     3    Q.  I think when we ended, I was asking questions about the

     4    affidavit that you submitted to a magistrate for the search

     5    warrant that allowed you to open the cereal boxes.  Do you

     6    remember that?

     7    A.  Yes, sir.

     8    Q.  And I had asked you to look at the affidavit that you

     9    prepared, and I assume you prepared it that same day and

    10    soon after Mr. McKenzie was arrested, correct?

    11    A.  Correct.

    12    Q.  And in that affidavit, just to clarify the last

    13    question I was asking you, you did indicate, did you not,

    14    under oath, in the affidavit that the ticket purchased by

    15    Mr. McKenzie was purchased the day of travel, May 7?

    16    A.  That's what I wrote.

    17    Q.  And that is incorrect, correct?

    18    A.  Correct.

    19    Q.  And you never corrected the affidavit or allowed or

    20    gave that information to the magistrate?

    21    A.  No.

    22    Q.  You have to admit that in and of itself, the price of a

    23    ticket is not enough to provide you with probable cause?

    24    A.  Correct.

    25    Q.  Now, I want to get back into the information that was

1     provided to you by an Amtrak employee.  It will establish,

2     I think, that a ticket agent -- somebody within the Amtrak

3     system faxed that information to you, correct?

4     A.  Yes.

5     Q.  And that's something that's done on a regular basis?

6     A.  Yes.

7     Q.  And I think I asked this question, but let me ask it

8     again.  That person does not work for DEA?

9     A.  Correct.

10    Q.  And is not in law enforcement?

11    A.  Correct.

12    Q.  Sir, can you enlighten us as to whether or not there is

13    an administrative warrant or something that had been served

14    upon Amtrak, that requires Amtrak to provide that

15    information?

16            MR. MARTINEZ:  Objection, Your Honor; irrelevant.

17            THE COURT:  Are you talking about from the DEA?

18            MR. PADILLA:  Yes, sir.

19            THE COURT:  In this case?

20            MR. PADILLA:  In this case, yes, sir.  Or in any

21    case, for that matter.

22            THE COURT:  Well, I think that's relevant.

23    Overruled.

24    A.  No.

25    Q.  And I guess what I'm trying to get at is just where

```
 1    that relationship got started between Drug Enforcement

 2    Administration and Amtrak to provide that information.  Do

 3    you have any background information relating to that?

 4    A.  Not direct knowledge.

 5    Q.  Indirect knowledge would be knowledge of a possible

 6    contract between DEA and Amtrak?

 7    A.  I'm not familiar.

 8              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

 9              THE COURT:  Overruled.

10    A.  I'm not familiar with a specific contract between DEA

11    and Amtrak outside of an MOU.

12    Q.  How is it that the Amtrak ticket agent you referred to

13    is providing that information to DEA?

14    A.  They were our confidential source.

15    Q.  Right.  I think you have already testified to that, but

16    what is the basis for them providing that information, the

17    relationship between DEA and Amtrak?

18              MR. MARTINEZ:  Objection; asked and answered.

19              THE COURT:  Overruled.

20    A.  They were approached, and they have chosen to

21    participate.

22    Q.  And that has been at least since 2001 or 2002 when you

23    no longer could access that information directly?

24              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

25              THE COURT:  Overruled.
```

1    A.  I can't recall now.  It's been quite a while.

2    Q.  In terms of the source of this information, again

3    without asking for any specific name, is it the same person

4    on a day-to-day basis that provides that information to

5    Drug Enforcement?  Or is it a different person, depending

6    on who is working that particular day?

7              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

8              THE COURT:  Overruled.

9    A.  It could be different people.

10   Q.  And sir, to your knowledge, have these individuals met

11   with Drug Enforcement agents and been provided with the

12   type of information that they should look for, before they

13   release that information to the Drug Enforcement

14   Administration?

15             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

16             THE COURT:  Overruled.

17   A.  Yes.

18   Q.  There is some training involved or some kind of

19   contact, at least in the past, on learning the type of

20   information they should be looking for?

21   A.  I don't know specifically what they were told.

22   Q.  Were you ever involved in any meetings with any of

23   those individuals?

24             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

25             THE COURT:  Overruled.

1    A.  Not when they were signed up, no.

2    Q.  How about now?  Have you recently done any kind of

3    training or anything or met with any of these individuals

4    to tell them what they should be looking for?

5    A.  I'm no longer in that interdiction group.

6    Q.  Sir, when you were in that group, were you involved in

7    any kind of contact with Amtrak employees to essentially

8    train them in terms of what they should be looking for?

9               MR. MARTINEZ:  Objection, Your Honor; irrelevant.

10              THE COURT:  Overruled.

11   A.  No.

12   Q.  And were there other individuals in the local office of

13   the DEA that were in fact meeting with those ticket agents

14   and possibly training them?

15              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

16              THE COURT:  Overruled.

17   A.  Yes.

18   Q.  Can you recite the names of any of the individuals in

19   your office here that have provided training to those

20   individuals?

21              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

22              THE COURT:  Overruled.

23   A.  Special Agent Jay Perry and Task Force Officer John

24   Clayborn.

25   Q.  And again, based upon your knowledge of that

1    relationship, are there any kind of monetary rewards that

2    are provided to those ticket agents for providing

3    information that in fact turns out to be fruitful as far as

4    an arrest being made?

5              MR. MARTINEZ:  Objection, Your Honor; irrelevant.

6              THE COURT:  Overruled.

7    A.  Yes.

8    Q.  And that is the reward to Amtrak?  Or specifically for

9    the individual who provides the information?

10   A.  I believe it's to the individual.

11   Q.  Sir, again without asking you to name the individual

12   that provided that information on July 7, 2008, do you know

13   who that person is by name?

14   A.  No, sir.

15   Q.  It's just a matter of a ticket agent sending the

16   information to you, correct?

17   A.  Correct.

18   Q.  And I think I may have asked this question already, but

19   to your knowledge, is there a contract in existence between

20   the Drug Enforcement Administration and Amtrak regarding

21   the information that DEA receives on a daily basis?

22             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

23             THE COURT:  Well, I think we already have some of

24   this out, so I'll let him kind of complete the information

25   here.  Overruled.

1    A.   No.

2    Q.   There is no contract?

3    A.   No.

4    Q.   And are you aware, sir, of Amtrak also receiving

5    proceeds of cash that is seized from Amtrak passengers?

6    A.   Yes.

7    Q.   And would that be 10 percent of the seized amount?

8    A.   I don't know what the percentage is.

9    Q.   And is that money paid to Amtrak or to the individual

10   who contributed the information that resulted in the

11   arrest?

12   A.   That's paid to Amtrak.

13            MR. PADILLA:  Your Honor, at this point I'm going

14   to ask that the government make available the individual

15   who provided that information.  I believe this individual

16   was essentially acting as a quasi Drug Enforcement

17   Administration agent, providing information.  And that

18   information, be it in this case or other similar cases,

19   apparently is information that's relied upon by the field

20   agents in approaching people on Amtrak trains.

21            And I think I'm entitled to cross-examine the

22   specific individual that provided information to this agent

23   on July 7, 2008.

24            THE COURT:  Mr. Martinez?

25            MR. MARTINEZ:  Your Honor, at this time I would

1    ask to be able to brief this issue, based upon the request
2    of the Court.
3          THE COURT:  Well, I'm not requesting anything
4    yet, so it's the request of Mr. Padilla.  But you wish to
5    brief that issue?
6          MR. MARTINEZ:  Yes, Your Honor, I would.  Also,
7    in candor to the Court, I got down here pretty quick,
8    starting the 1:00 hearing.  I left my other briefcase in my
9    office, so what I was going to depend on to talk about is
10   in my office, which is another reason I would want to brief
11   it.
12         But Your Honor, as I stated this morning, what is
13   on Government's Exhibit Number 3 is not at issue in this
14   case.  And the United States, from the evidence that this
15   Court is hearing, is not going forward saying that the
16   United States has probable cause, based upon what is in
17   Government's Exhibit Number 3.
18         The probable cause, the reasonable suspicion, was
19   based upon what this agent observed in that cabin alongside
20   with the information he knew coming into this incident on
21   this date, Your Honor.
22         So again, the argument is that this is
23   irrelevant.  This discussion or this line of questioning
24   that this defense attorney is following is completely
25   irrelevant to the issue at hand.  And again, Your Honor, I

1     would point out that this issue that this attorney is

2     laying the foundation for, for his appeal, has already been

3     decided by the Tenth Circuit. And as a District Court, the

4     District Court is obligated to follow that case law.

5     THE COURT: Well, I don't disagree with that last

6     statement, but if Mr. Padilla wants to in good faith

7     challenge that on appeal, it seems I need to give him some

8     leeway.

9     Now, whether I allow further discovery than what

10    has taken place for today, I'm not quite convinced that

11    that's probably necessary for me to do my job, given that I

12    am bound by the Tenth Circuit. So I think that's a

13    separate issue, whether I start allowing or requiring

14    further witnesses on this. I think I may have allowed Mr.

15    Padilla some latitude to establish his case.

16    But I guess at the present time, it's a request.

17    I assume it's going to be denied. And the question is,

18    what I do about it.

19    If you want to supply further briefing on that to

20    enlighten the Court, then we can set up some time for that.

21    I assume you have no objection to that, Mr. Padilla?

22    MR. PADILLA: No.

23    THE COURT: Can we proceed that way?

24    MR. MARTINEZ: Your Honor, if I understand the

25    Court, the Court is denying his request at this point?

1           THE COURT:  No, I'm not denying it at this time.

2      I think I need to know more about it.  I mean, this came up

3      shortly before lunch, and I did have a chance to look at

4      the case that you referenced.  And I think Mr. Padilla

5      would agree that I'm bound by it.  I mean, it looks to me

6      like it does cover this issue.

7           But the question is how much leeway, in fairness

8      to the defendant, trying to set up an appellate issue.  I

9      do my task as a District Judge, trying to get the facts

10     ready for him.

11          But I think you're right on this issue, and I

12     don't think Mr. Padilla is disputing it.  And I looked at

13     the case and read the briefs, and I don't think there's any

14     dispute about it.

15          MR. MARTINEZ:  Your Honor, may I add something to

16     what you're saying?

17          THE COURT:  Yes.

18          MR. MARTINEZ:  There are two issues, and what I

19     said this morning, I'm not sure if I was clear enough, but

20     there are two issues going on here.  And I believe that

21     this question is crossing both issues without understanding

22     it, and that's why I'm arguing that one line of questioning

23     is completely irrelevant to the other issue.

24          THE COURT:  Well, I don't think Mr. Padilla

25     disagrees with that, and I don't disagree with it.

1          MR. MARTINEZ:  Then, Your Honor, I would say that

2     the latitude that you were going to give Mr. Padilla

3     concerning asking the question as far as, "Where did this

4     information come from?" at this point Mr. Padilla does

5     understand that it came from a CI; that that CI provided

6     the information on July 7; and that this agent acted upon

7     that information.

8          You have granted him that latitude, Your Honor,

9     and I would ask that the line of question be allowed to go

10    no further.

11         THE COURT:  Well, I'm inclined to agree with you.

12    And he has made a request for a witness, to set up a

13    witness who I think would only relate to the first issue;

14    that is, the Amtrak issue, and not to the probable cause

15    issue.  But before I deny it, if you would like to have a

16    chance to give the Court any further information, I would

17    grant that request.

18         MR. MARTINEZ:  And Your Honor, in candor to the

19    Court, here's where I'm going.  I would like time to --

20    again, because I think that the issues were confused, I

21    would like time to consider that and to supply the Court

22    with the appropriate law.  But I also think that if you

23    look at the flip side of what Mr. Padilla is arguing,

24    he's arguing that that Tenth Circuit case needs to be

25    revisited.

1          THE COURT:  Correct.

2          MR. MARTINEZ:  From the facts before the Court

3     right now, this applies to a CI as opposed to official

4     information coming from Amtrak at this point.  So the issue

5     that he's setting up for the appeal is moot.

6          MR. PADILLA:  That raises an interesting point.

7     Official information -- which I assume means information

8     given to the DEA by the corporation, Amtrak -- versus

9     information provided by the confidential informant who was

10    the employee who has a monetary interest in making sure the

11    information he provides is good so that he can make an

12    arrest.  So we are talking apples and oranges.

13          But if the government is arguing about the CI,

14    that that shouldn't be revealed, I think it's just the

15    opposite; that if that information was relied upon for this

16    agent to at least have reasonable suspicion to approach

17    Mr. McKenzie, then I'm entitled to cross-examine, to not

18    only have that individual identified, but to be able to

19    cross-examine him on that information; not just the

20    information he provided, but the training he received from

21    the Drug Enforcement Administration.

22          Because this really opened up a can of worms I

23    was actually not anticipating.  We're talking about a

24    corporation, Amtrak, allowing its employees, who are on its

25    payroll and working for Amtrak, to also provide information

1          to Drug Enforcement Administration in hopes that they will

2          be able to receive some type of monetary reward, is the

3          problem that I foresee that we need to look into further on

4          that.

5                    THE COURT:  Do you agree that the Amtrak employee

6          is a confidential informant, given the facts that we've

7          heard this afternoon?

8                    MR. PADILLA:  I do not.  What I think that we're

9          talking about is a quasi law enforcement individual who is

10         providing this information.

11                   THE COURT:  Let me ask the question a little more

12         precisely.  Do you agree that that body of the law that

13         relates to CIs is the one that the Court would apply in

14         determining whether that person should be produced?

15                   MR. PADILLA:  Yes, sir.  I think we have to look

16         at what the case law provides.

17                   THE COURT:  Yes.

18                   MR. PADILLA:  I'm not sure if the case provided

19         by the government is really much help to the government.

20         If anything, I think it's more helpful to a defendant who

21         needs that information.

22                   THE COURT:  Are you talking about the Amtrak

23         Privacy Act issue?

24                   MR. PADILLA:  No.  I'm talking about the Roviaro,

25         the case he cited.

1           MR. MARTINEZ:  The Supreme Court case, Your

2    Honor.

3           THE COURT:  I didn't bring my case down.  Why

4    don't you ask Helen to bring it down.  It's on my desk.

5           MR. PADILLA:  The spelling is R-O-V-I-A-R-O.

6           THE COURT:  What does this case relate to?

7           MR. PADILLA:  This is the case that was cited by

8    the government before lunch in terms of whether or not they

9    would be required to disclose the confidential informant.

10          THE COURT:  Just the basic CI?

11          MR. MARTINEZ:  Yes, Your Honor.

12          MR. PADILLA:  Yes, Your Honor.  And I think if

13   anything, this case is more supportive of my position than

14   it is the government's position because of the nature of

15   the confidential informant involved in this case.

16          THE COURT:  Well, it sounds to me -- and correct

17   me if I'm wrong -- but you're moving away from the Amtrak

18   issue, which the Tenth Circuit case that I looked at during

19   lunch hour seems to control the Privacy Act issue, and now

20   you're focusing more on the ticket agent and whether that

21   person is a CI; am I correct?

22          MR. PADILLA:  That's correct, but I disagree with

23   the government that those two issues kind of interlock in

24   some ways, and that obviously would be one of the issues I

25   would be raising, you know, if we lose at this stage.  You

1       know, the Tenth Circuit has ruled on that, but the Supreme

2       Court has also made it very clear that for purposes of the

3       First Amendment, Amtrak is in fact a federal agency.

4               And I guess the question that needs to be

5       presented to the Supreme Court is for purposes of the

6       Fourth Amendment:  Is Amtrak a government agency or not?

7               And I can't see how they come to a different

8       conclusion, and obviously there aren't a lot of cases where

9       cert is granted.  But I think this is certainly an issue

10      that I'm raising in good faith, Your Honor, and that's why

11      I'm trying to establish my record.

12              THE COURT:  Well, let me go back just to the CI

13      issue.  What would you want?  Why would further information

14      from the ticket agent be useful or necessary for laying

15      some foundation at the Tenth Circuit for relooking at their

16      prior decision on this?

17              MR. PADILLA:  Your Honor, to answer this question

18      in regard more to the facts in this case, rather than the

19      big picture in terms of the Tenth Circuit, what their

20      previous ruling was; and that is, the information that this

21      agent relied upon to have at least a reasonable suspicion

22      that Mr. McKenzie might fit the profile of a drug

23      courier -- because obviously he didn't do that on his own,

24      which was a surprise to me, that there actually was

25      information provided by someone else who is not a law

1    enforcement agent, but appears to be either acting in that

2    capacity or at least acting with the hope of receiving some

3    kind of monetary reward for the information provided.

4         And I think it certainly presents some

5    interesting issues as to whether or not a defendant in this

6    type of case would be entitled to cross-examine that

7    individual to determine how he made the determination or

8    how he decided to provide this information about

9    Mr. McKenzie, as compared to other passengers who he didn't

10   provide information.

11        THE COURT:  If Mr. Hyland didn't speak to him, if

12   all he got was this, what we call the PNR --

13        MR. PADILLA:  Yes, sir.

14        THE COURT:  -- but he never spoke to him, and he

15   just got the PNR, would you need to talk to the ticket

16   agent?

17        MR. PADILLA:  I personally feel that I would need

18   a chance to cross or to at least talk to him, find out who

19   he is, and then make a decision on whether or not I thought

20   I should subpoena him.  Because again, I didn't expect

21   this agent to answer the question the way he did.  I'm

22   surprised.

23        THE COURT:  But I guess Mr. Hyland is the one

24   that was developing reasonable suspicion and probable

25   cause, and all he got from the agent was the sheet, and he

1    didn't have any discussions with them.  Let's assume.  I

2    don't know if that's the case, but let's assume that were

3    the facts.

4         It would seem to me that it would be -- let's say

5    we had just a standard CI situation and that, you know, we

6    knew exactly what had been provided to the agent, police

7    officer, and that was it.  We had a box.

8         We wouldn't need to go back to the CI because the

9    police officer would then be using whatever he had to then

10   develop reasonable suspicion and probable cause.

11        So I guess what it might be useful to do is,

12   while we have Mr. Hyland here, ask him whether he had any

13   communication with the agent or had any more information

14   from Amtrak or the agent, other than what was on the PNR.

15   Let's see what his answer would be.

16        MR. PADILLA:  Okay.  I can ask him that.

17   Q. (By Mr. Padilla)  Either after or before you obtained

18   this information, did you have any communication with this

19   individual from Amtrak that provided the information?

20   A.  No.

21        MR. MARTINEZ:  I'm sorry, Your Honor.  May I have

22   clarification?  I heard him say "before or after."

23        MR. PADILLA:  I'll clarify.

24   Q.  After you received this printout, did you follow up

25   with any kind of communication to that individual to get

1   more information about Mr. McKenzie, or anyone else, for

2   that matter?

3   A.  No.

4   Q.  Have you in the past followed up with any kind of phone

5   call to a ticket agent who provided information to the Drug

6   Enforcement Administration?

7           MR. MARTINEZ:  Objection, Your Honor; irrelevant.

8           THE COURT:  I am trying to figure out whether the

9   CI needs to be disclosed, and it seems to me that if all

10  the DEA agent is going to get is this PNR and there's no

11  other communication, then it may very well be we don't need

12  to go any further.

13          MR. PADILLA:  To clarify for the record in terms

14  of any other communication, part of the problem, again

15  based upon an answer this witness gave, is that the DEA is

16  involved in training these individuals.  And again, I think

17  that it's something that a defense attorney should be

18  allowed to get into, in terms of what type of training they

19  received and what exactly were they asked to provide the

20  field agents on a daily basis regarding individuals that

21  were on that train.

22          Because we're not talking about a train that has

23  20 people, a bus that carries 60.  We're talking about a

24  train that carries hundreds of people at any given time.

25  And the agent has testified this was a very busy season,

1    Fourth of July, and I'm assuming there are a lot of other

2    persons that could have possibly been approached, and it

3    was only one person approached, and that was Mr. McKenzie.

4            And so I think that information is vital to my

5    defense.

6            THE COURT:  If you're interested in training, we

7    have Mr. Hyland here.  But still, I think to make the CI's

8    identity or knowledge or thought process relevant, it has

9    to be in some way communicated to Mr. Hyland.

10           MR. PADILLA:  It was.  What was communicated to

11   him was this form that he relied upon when he approached

12   Mr. McKenzie.

13           THE COURT:  But I mean, let's say he had the CI

14   out in the field that had been trained extensively by

15   Albuquerque Police Department, and then the CI called and

16   said, "I just had a drug transaction with this individual."

17           Would it be necessary to get into all the

18   training of the police department of that CI, to determine

19   whether the officer had probable cause relying upon that

20   person?

21           MR. PADILLA:  Actually, the example you gave, I

22   don't think at that point I need to talk to the people that

23   trained him, but I would need to talk to him because he was

24   actually involved in the drug transaction or provided more

25   information.  And I think that would be something that --

1          THE COURT:  I don't think that I'm in a

2     position -- I'm going to have to review the case law to

3     probably make a determination.  If we're in agreement

4     that's the body of law that applies and the United States

5     is saying that's the CI, then I probably need to determine

6     whether further production is necessary.

7          I'm inclined to think that it's not, but I

8     certainly will listen to arguments on that.

9          MR. PADILLA:  And I have no problem with briefing

10    that, Your Honor.

11         THE COURT:  All right.

12         MR. PADILLA:  I think it needs to be briefed.

13         MR. MARTINEZ:  Your Honor, if I could just

14    clarify?  First, I need to say that I really think that the

15    defense attorney is switching horses midstream here.  We

16    have two issues.  The one issue is what he brought up in

17    his reply brief.  The second issue is the confidential

18    informant issue.

19         And the facts that you have before you -- and the

20    reason I'm saying this, Your Honor, is because of what the

21    defense attorney keeps arguing.  The facts that you have

22    before you is that you have a consensual encounter issue,

23    and it's for the Court to determine that today, and based

24    upon the facts before this Court, is whether that

25    consensual encounter occurred.

1           And obviously the argument from the United States

2       is that it was a consensual encounter.  And what the Court

3       also has before it, as part of those facts, are the facts

4       that Agent Hyland talked about that corroborates this

5       initial Government's Exhibit 3.

6           For example, he saw the ticket, or the tickets.

7       I believe that's Government's Exhibit 4.  Certain things

8       were corroborated.  When he spoke to the conductor, there

9       was one person in that cabin, Your Honor.  And again, I go

10      back to this case which I cited this morning, if I may

11      borrow the defense counsel's book on this.  It says, "Most

12      of the federal" --

13           THE COURT:  It's been a while since I had

14      somebody bring a book into a courtroom.  Usually it's a

15      computer printout.  It's certainly sort of fun to see

16      again.

17           MR. PADILLA:  I didn't have time to print it.

18           MR. MARTINEZ:  Your Honor, I can actually cite

19      the technical page of the book.

20           THE COURT:  There you go.

21           MR. MARTINEZ:  The sentence here says, "Most of

22      the federal cases involving this limitation" -- I'm going

23      to the law of the CI, and I would say that this is the

24      Rosetta stone of cases for CI, is that, "Most of the

25      federal cases involving this limitation on the scope of

1     the informer's privilege have arisen where the legality of

2     a search without a warrant is in issue and the

3     communications of an informer are claimed to establish

4     probable cause."

5          In this case, you don't have either of those.

6     One, you have the search warrant that was established.

7     Two, we're not saying that Government's Exhibit 3

8     established the probable cause.

9          So I'm pointing out this case for the fact that

10    the defendant has a burden in what he's asking for, and he

11    hasn't even come close to establishing that.

12         THE COURT:  Well, that may be true.  I simply am

13    not prepared.  I don't know that area of law well enough.

14    You didn't brief it.  It's just totally kind of just risen,

15    and I'm not prepared to, of course, grant the request to

16    compel anybody from Amtrak to come over.  But I'm also not

17    prepared to rule it out, as well.

18         MR. MARTINEZ:  And again, Your Honor, I'm just

19    trying to clarify for the record on this, because I do

20    understand it's going to be appealed.  When I stated

21    earlier that I wanted to brief the issue, part of me saying

22    that was, I wanted to brief to make sure that these two

23    issues were not being viewed by the Court one and the same.

24         I wanted to make sure that there wasn't a

25    misrepresentation.  I wanted to make sure, I guess, that

1     the Court understood that there were two separate issues.

2               THE COURT:  Well, I certainly think there's two

3     issues on this, what I call the Amtrak issue, getting

4     information from Amtrak, and then this issue of probable

5     cause and reasonable suspicion.  I agree with you there.

6               I must say, I don't quite understand whether

7     there's one issue or two issues Mr. Padilla is trying to

8     raise with getting this information from Amtrak.  I don't

9     know if it's just a CI issue, or if we're getting back to

10    this Privacy Act issue that the Tenth Circuit has decided.

11              It sounds to me like he may be trying to split

12    that into a Privacy Act issue, which is the one the Tenth

13    Circuit controls on, which would be separate from perhaps a

14    CI issue.  And so there may be kind of three issues

15    exploding.

16              MR. MARTINEZ:  Thank you, Your Honor.

17              MR. PADILLA:  Thank you, Your Honor.

18              THE COURT:  All right.  Further

19    cross-examination, Mr. Padilla?

20              MR. PADILLA:  Yes, Your Honor.

21    Q.  (By Mr. Padilla)  I know this happened over a year ago,

22    and I may have somehow asked this question, but let me try

23    to clarify it.  To your recollection, was there anyone else

24    that you were planning to talk to on that date, that you

25    had received information from Amtrak on?

1        MR. MARTINEZ:  Objection; asked and answered.

2        THE COURT:  Well, I think it is, but I'll allow

3    the question.

4    A.  No.

5    Q.  No, you didn't approach anyone else?  And he was the

6    only individual you were provided information on, correct?

7    A.  Correct.

8    Q.  And I think you testified earlier that that is a very

9    busy season for Amtrak?

10    A.  Correct.

11    Q.  Based upon your experience, could you give us an idea

12    as to how many passengers might have been on that train on

13    that particular date?  I know you can't be specific, but

14    can you give us an idea as to how many passengers, on a

15    general basis, are on a train at that time of the year?

16    A.  I would say approximately 250.

17    Q.  I'm going to go back for just a second to Exhibit

18    Number 3, the fax that you received.  Can you recall,

19    thinking back, when you received that in relation to when

20    the train arrived at the station?

21        MR. MARTINEZ:  Objection; irrelevant.

22        THE COURT:  Can you -- I'm not quite certain,

23    from looking at the transcript, what the question is.

24    Q.  The question is:  Can you remember -- again, thinking

25    back to this incident that occurred over a year ago -- do

1    you recall when specifically you received that fax from

2    Amtrak?

3              THE COURT:  Overruled.

4              MR. MARTINEZ:  Objection.

5              THE COURT:  I think the timing of that is

6    relevant.  Overruled.

7    A.  No.

8    Q.  I'm sorry?

9    A.  No.

10   Q.  Sometime prior to 12:50?

11   A.  Correct.

12   Q.  And sir, when you received that information -- this is

13   a general question, not just that you asked Mr. McKenzie,

14   but any individual that's provided to you by Amtrak on a

15   given day, do you ever do a cross-check to see if there's

16   any criminal history on that individual?

17             MR. MARTINEZ:  Objection; irrelevant.

18             THE COURT:  Overruled.

19   A.  In order to do a criminal history, you need date of

20   birth, and the Amtrak information doesn't include that.

21   Q.  So what is your answer?

22   A.  No.

23   Q.  If you had that additional information, would you be in

24   a position to check to see if there is any criminal history

25   on a person?

```
 1              MR. MARTINEZ:  Objection; irrelevant.
 2              THE COURT:  Overruled.
 3    A.  If I had time.
 4    Q.  And you didn't do it in this case?
 5    A.  Correct.
 6    Q.  Now, when you first approached Mr. McKenzie on the
 7    platform, I understand you identified yourself as a police
 8    officer, asked him for his ticket.  Did you ever advise him
 9    at any time that he had the right to refuse to answer your
10    questions?
11    A.  No.
12    Q.  And when you asked him if you could look at his Amtrak
13    ticket, did you advise him that he wasn't obligated to show
14    his ticket to you?
15    A.  No.
16    Q.  My understanding is that when Mr. McKenzie indicated he
17    did not have his ticket with him, that it was back in his
18    room, that you asked him to go to his room to retrieve it?
19    A.  I asked him to do that, yes.
20    Q.  And you followed him back to his room?
21    A.  Correct.
22    Q.  During that period of time, he did not seem to be
23    nervous or give off any indication that he might have been
24    transporting narcotics?
25    A.  No.
```

1    Q.  In fact, I think you indicated on direct that he was

2    cooperative?

3    A.  Yes.

4    Q.  Now, even though the government made the point of

5    indicating that you had information about his travel on the

6    ticket that he produced, you already knew what that

7    information was, based on the information in Exhibit 3,

8    correct?

9    A.  Correct.

10   Q.  You didn't need to look at his ticket because you

11   already knew where he had gotten on the train and you knew

12   where he was going, correct?

13   A.  I don't know what Mr. McKenzie looks like.

14   Q.  No, but in terms of the information that you were

15   provided in the fax which has been marked as Exhibit 3, you

16   knew at that point where he got on the train; you knew how

17   much he paid for the ticket; and you knew his ultimate

18   destination, correct?

19   A.  Yes.

20   Q.  In listening to the tape that was played this morning,

21   it appears as though you just took a cursory look at the

22   ticket when he presented it to you.  Would that be a fair

23   statement?

24   A.  I can look at a ticket quickly and ascertain what I

25   need to see.

1    Q.  And it was during that period of time that you were

2    asking him for his consent to look through his luggage,

3    correct?

4    A.  After I returned his tickets to him, yes.

5    Q.  And it was not until out on the platform again -- this

6    goes back to the tape we listened to this morning -- it was

7    not until you went back out to the platform the second time

8    that you asked him to produce his driver's license?

9    A.  Correct.

10   Q.  And it was not until after you had already searched his

11   bags that this conversation came up about the family

12   reunion, correct, and why he was traveling from Phoenix?

13   A.  Mr. McKenzie had mentioned the family reunion as we

14   approached his room the first time.

15   Q.  But in terms of the following conversation that now

16   took place after you had already looked at at least the

17   first bag, if you recall?

18   A.  Correct.

19   Q.  Correct?  That is what you remember?

20   A.  From what I can recall, yes.

21           MR. PADILLA:  May I have just a moment, sir?

22           THE COURT:  Surely.

23   Q.  To go back a second to some of these issues that came

24   up earlier, my understanding is that Mr. McKenzie, from the

25   information you received, had purchased this ticket about

1    five days prior to his travel, correct?

2    A.  No.

3    Q.  Well, the ticket was purchased with a credit card?

4    A.  Right.

5    Q.  Someone's credit card about five days before he

6    traveled?

7    A.  And the reservation was made five days ago.

8    Q.  Using a credit card?

9    A.  Correct.

10   Q.  And when Mr. McKenzie showed up that morning to get his

11   ticket for travel, would he not have had to provide a

12   driver's license to the ticketing agent to confirm his

13   identity?

14   A.  Yes.

15   Q.  And his driver's license would have identified

16   information such as date of birth and Social Security

17   number?

18          MR. MARTINEZ:  Objection; calls for speculation.

19          THE COURT:  Well, if the agent knows.  Overruled.

20   A.  I know Mr. McKenzie had a photo ID from the state of

21   New York.

22   Q.  And you in fact observed that photo ID?

23   A.  Subsequently, yes.

24   Q.  And that would have been the same identification or

25   something similar that he would have had to present to be

1    able to get his ticket from Amtrak, right?

2    A.  Yes.

3    Q.  Now, when you followed Mr. McKenzie back to his room, I

4    think you indicated you went into the room while this

5    conversation was taking place and when you asked him if you

6    could look at his baggage, correct?

7    A.  I waited up the hallway and asked his permission to

8    enter the room.

9    Q.  And you entered.  And Officer Chavez, as I understand,

10   remained at the door?

11   A.  He was in the hallway.

12   Q.  And the hallway is pretty narrow, is it not, in an

13   Amtrak train like that?

14   A.  Yes.

15   Q.  And Officer Chavez, would you agree, is a pretty stout

16   gentleman?

17   A.  Yes.

18   Q.  Initially, Mr. McKenzie gave you permission to look

19   through his bags, and that's when you found or discovered

20   the cereal boxes, correct?

21   A.  Correct.

22   Q.  And you've testified earlier to the weight indicated on

23   the cereal boxes for that particular item?

24   A.  Yes.

25   Q.  Would it be fair to say that at the time that you

1    actually looked at the cereal boxes, that you didn't notice

2    the gram or weight, and it was not until you got back to

3    your office and started preparing the affidavit that you

4    knew what the weight was of each of those packages?

5    A.  No.  I know the general weight of a regular cereal box.

6    Q.  Just based on experience?  Common sense?  Or on

7    previous encounters with individuals that were

8    transporting?

9    A.  All three.

10   Q.  But you never, at least prior to that incident, had

11   been involved in an arrest where cereal boxes were used to

12   transport narcotics, correct?

13   A.  No, I've seen cereal boxes used.

14   Q.  Prior to this?

15   A.  Yes, sir.

16   Q.  But you weren't involved in that particular encounter?

17   A.  Not that I can recall, no.

18   Q.  You're talking about hearing from other agents what

19   they had found?

20   A.  Correct, here in Albuquerque.

21   Q.  And it's pretty clear that Mr. McKenzie's consent was

22   limited to just allowing you to look into the luggage and

23   did not go any further than that, correct?

24   A.  Correct.

25   Q.  In fact, you specifically asked him if you could bring

1   a canine unit in to sniff or maybe take it out to the

2   platform for that purpose, but he never did consent to do

3   that?

4   A.  Correct.

5   Q.  And since you did not arrest Mr. McKenzie in the

6   sleeper compartment -- he was still there after you

7   discovered the boxes -- would it be fair to say that as an

8   agent, at that point in time you did not feel you had

9   probable cause to make an arrest?

10  A.  Yes, I had probable cause.

11  Q.  But you did not arrest him?

12  A.  Right.

13  Q.  You went out to the platform and continued to have this

14  conversation with him, but it was pretty clear, from your

15  experience and your knowledge of what you had found in his

16  luggage, that you were not going to let him leave free,

17  correct?

18  A.  Correct.

19  Q.  That you had pretty much already made up your mind that

20  he was going to be detained and he was going to be off that

21  train when it left the station?

22  A.  Correct.

23  Q.  Again, you never indicated to him you were going to

24  place him under arrest until the very end, but you actually

25  were thinking of keeping his luggage and allowing him to

1    proceed on Amtrak?

2    A.  I just added that to the conversation.

3    Q.  But that was something that you did discuss with him?

4    A.  Yes.

5    Q.  And when the tape was played this morning, there's a

6    conversation that took place with this individual who was

7    his friend, I guess, that he had called?

8    A.  Yes.

9    Q.  The first words out of your mouth were that you were a

10   police officer, correct?

11   A.  Yes, sir.

12   Q.  He didn't know who you were?  In other words, he didn't

13   know why you were calling and why you were wanting to talk

14   to him, correct?

15              MR. MARTINEZ:  Objection; calls for speculation.

16              THE COURT:  Why don't you ask him if he knew.

17   Lay some foundation before you ask that question.

18   Q.  Let me try to rephrase and make more sense of it.  You

19   identified yourself immediately as a police officer?

20   A.  Yes.

21   Q.  And did not know who this individual was that you were

22   calling?

23   A.  Correct.

24   Q.  And there's no reason why he should provide any

25   information to you, particularly if he was aware he was

1    talking to a police officer, correct?

2    A.  I don't know.

3    Q.  Was it possible that he just didn't know who you were

4    and wasn't prepared to give you any information about

5    Mr. McKenzie until he was given the okay by Mr. McKenzie?

6    A.  That's possible.

7    Q.  And the property -- or obviously when Mr. McKenzie went

8    back into the sleeper and locked the door, you were

9    attempting to get in there with the conductor, correct?

10   A.  Yes.

11   Q.  After it was clear that Mr. McKenzie had left the train

12   and the door was opened, was there any reason why the

13   conductor didn't take possession of that property?

14   Wouldn't that be a possibility, for him to take possession

15   of items that were abandoned or left by passengers?

16   A.  That was never discussed.

17   Q.  You never asked him for permission?

18   A.  I didn't think I needed it.

19   Q.  Did he have -- as far as you know, did he have any

20   responsibility to take responsibility for lost items or

21   abandoned item on the train that he's working on?

22        MR. MARTINEZ:  Objection; calling for

23   speculation.

24        THE COURT:  Overruled.  He's asking whether he

25   knows.

     1    A.  I think the conductor collects abandoned belongings,

     2    property.

     3    Q.  But with regard to this property, you never asked the

     4    conductor's permission to take Mr. McKenzie's property off

     5    the train?

     6    A.  No, sir.

     7    Q.  And you didn't think you needed to?

     8    A.  Correct.

     9    Q.  And it was not seized?  In other words, the property

    10    that was on the train, Mr. McKenzie's luggage, at that

    11    point in time was not seized pursuant to a warrant you had

    12    obtained?

    13    A.  I considered it abandoned by Mr. McKenzie.

    14    Q.  But you didn't obtain a search warrant to take it off

    15    the train?

    16    A.  No.

    17    Q.  Did you provide any kind of receipt to the conductor

    18    for the luggage that you had taken off the train?

    19    A.  No.

    20    Q.  And you testified, based on your experience, that when

    21    you were looking for somebody that might be transporting

    22    narcotics, you're looking at a particular profile, correct?

    23    In other words, you're looking for certain factors in that

    24    particular case that would give you at least some reason to

    25    approach the person to ask further questions?

1    A.  Yes.

2    Q.  And again, based on your experience with Amtrak, those

3    factors include purchase of a ticket the day of travel?

4    A.  Or shortly before.

5    Q.  And in this case, it was five days before, correct?

6    A.  Yes.

7    Q.  And you also are looking for someone who purchased that

8    ticket with cash, correct?

9    A.  Any type of payment.

10    Q.  But primarily cash?

11    A.  It's primarily cash, yes.

12    Q.  And there's no question this was purchased with a

13    credit card?

14    A.  Correct.

15    Q.  And looking for people that reserve sleeper

16    compartments?

17    A.  Not necessarily.

18    Q.  But in this case, just to get to the point here, the

19    only factor that you were concerned about when you

20    approached Mr. McKenzie with the information you were

21    provided by Amtrak was that he had purchased what you

22    considered to be an expensive ticket for traveling from

23    Flagstaff to New York City?

24    A.  That's one of the factors.

25    Q.  And what was the other factor?  Isn't that the only one

1    that you really focused in on?

2    A.  No.  Also, that it was bought within a few days; that

3    it's a third-party payment.

4    Q.  Did you ever contact the third party that purchased

5    that ticket, question that individual?

6    A.  No.

7          MR. PADILLA:  If I may just have a moment, Your

8    Honor?

9          THE COURT:  You may.

10    Q.  A few more questions.  With regard to these factors

11    you're looking at to determine if a person might fit the

12    profile of a drug courier, is this information contained in

13    a booklet, say a standard operating booklet that DEA has

14    available for its agents?

15    A.  No.

16    Q.  So there's not any discussion of that, to your

17    knowledge, in anything that the DEA has put together in

18    terms of a standard operating procedure?

19    A.  Not to my knowledge, no.

20          MR. PADILLA:  I think that's all the questions I

21    have, Your Honor.

22          THE COURT:  All right.  Thank you, Mr. Padilla.

23    Mr. Martinez, do you have any redirect of Mr. Hyland?

24          MR. MARTINEZ:  I do, Your Honor.

25          THE COURT:  Okay.  Mr. Martinez.

REDIRECT EXAMINATION

BY MR. MARTINEZ:

Q.  Agent Hyland, you were just asked questions about
whether you gave a receipt to the Amtrak person when you
took Mr. McKenzie's clothes and baggage?

A.  Yes.

Q.  Do you remember those questions?

A.  Yes, sir.

Q.  After Mr. McKenzie jumped out the window and you were
able to get into his compartment, did you consider that
compartment a crime scene?

A.  Yes.

Q.  Did you consider that those clothes or the baggage or
luggage, the pictures that we've seen today in this court,
did you consider that that may be evidence for a case?

A.  Yes.

Q.  Now, you were being asked about the factors for the
profile.  Is it fair to say that the time in which the
ticket was bought, it was one factor?

A.  Yes.

Q.  Is it fair to say that it was a one-way ticket was
another factor?

A.  Yes, sir.

Q.  Earlier, you testified that there's a Ruby Johnson
who -- it's that credit card that bought the ticket for

1     this defendant?

2     A.  Yes.

3     Q.  Would that have been one of the factors?

4     A.  That indicates a third-party payment.

5     Q.  You also had testified that this information was

6     starting, originating in a source city, and going to a

7     destination city.  Was that one of the factors?

8     A.  Yes, sir.

9     Q.  You also testified earlier that this was a deluxe

10    compartment.  In testifying further about deluxe

11    compartment, you said that deluxe compartments get free

12    food three times a day; is that right?

13    A.  Yes.

14    Q.  Was that important when you were evaluating, looking at

15    the cereal boxes in this compartment?

16    A.  Yes.

17    Q.  Why?

18    A.  Because Mr. McKenzie would be getting a free breakfast

19    every morning he's on the train.

20    Q.  Also, did the information you had with Government's

21    Exhibit 3 -- did you corroborate this information by

22    speaking to, for example, the conductor?

23    A.  Yes.

24    Q.  I mean, specifically did you find out how many people

25    were staying in that room?

1    A.  Yes.

2    Q.  Did you corroborate this information, Government's

3    Exhibit 3, by looking at the ticket for Mr. McKenzie?

4    A.  Yes.

5    Q.  Did that basically confirm the same information?

6    A.  Yes.

7    Q.  You suspected earlier -- I mean, you suspected when you

8    went down there that he had two bags; is that correct?

9    A.  Yes.

10   Q.  Was that corroborated when you went into his room?

11   A.  Yes.

12   Q.  And asked him how many bags he had?

13   A.  Yes.

14   Q.  Agent Hyland, you heard the tape this morning, the

15   conversation that you taped between yourself, Agent Garcia,

16   and Mr. McKenzie, right?

17   A.  Yes, sir.

18   Q.  And you heard me stopping at the counter and asking

19   certain questions.  Is it fair to say that when you went

20   out to the platform the second time, you talked to Mr.

21   McKenzie for a while; at least approximately ten minutes?

22   A.  Yes.

23   Q.  Why did you talk to him that long?

24   A.  To see if I could procure any additional investigative

25   leads, other information that would help me in my

1    investigation.

2    Q.  Is that part of you making that phone call on his

3    BlackBerry?

4    A.  Yes.

5    Q.  Just to clarify, defense counsel was referring to

6    Officer Chavez.  When he was referring to Officer Chavez,

7    were you talking -- in answering that question, were you

8    talking about Officer Garcia?

9    A.  Yes.

10    Q.  You were asked a question about you didn't have to look

11    at the ticket.  Do you have a protocol when you go to the

12    train station?

13    A.  Yes.

14    Q.  As part of that protocol, do you sometimes ask to see

15    people's tickets?

16    A.  I always ask to see their ticket.

17    Q.  Why do you do that?

18    A.  So I can see what the person's name is; their origin;

19    destination cities; whether they're in coach cars or a

20    sleeper.

21    Q.  You were asked a question about profiling, specifically

22    whether this was all contained in a book.  When I asked you

23    questions about your education and experience, my question

24    to you is:  Is your understanding, when you're looking at

25    for example this manifest, which has been called a manifest

1    in Government's Exhibit 3, how much of your information

2    that you're looking at there is based upon your knowledge

3    of past experiences or your education from listening to

4    other officers in your DEA office?

5    A.  It's a starting point.

6    Q.  You were asked on cross-examination whether there was a

7    contract between DEA and other entities, or something to

8    that effect.  You said "No."  I want to be very clear here.

9    Are you familiar with whether there's MOUs between the DEA

10   and other agencies?

11   A.  Yes.

12   Q.  Were you distinguishing between the word "contract" and

13   "MOU"?

14   A.  Yes.

15   Q.  The DEA has a liaison with Amtrak, right?

16   A.  I don't understand the question.

17   Q.  Is there a liaison person with Amtrak that the DEA

18   deals with on this date in 2007?

19   A.  In Albuquerque?

20   Q.  Yes, in Albuquerque, a liaison person who worked for

21   Amtrak?

22   A.  You mean a task force officer?

23   Q.  Yes.

24   A.  Yes, we do.

25   Q.  On this date?

```
1    A.  Yes.

2    Q.  And from your experience, could you have received

3    information concerning passengers from this liaison?

4    A.  Yes.

5    Q.  On this date in 2007, you didn't receive information

6    from that liaison, did you?

7    A.  No.

8    Q.  The information you received was from a confidential

9    informant?

10   A.  Correct.

11   Q.  You were asked a question on cross-examination

12   concerning whether you knew who the person was who faxed

13   the information to you, I believe, and you answered "No";

14   is that correct?

15   A.  That's correct.

16   Q.  And I believe you answered "No" to the question of:

17   Did you know how many people were faxing information to

18   you?  Or I guess the question -- do you know the question

19   that I'm asking, that you answered earlier?  I'm just

20   trying to clarify that.

21   A.  I can't recall that specifically.

22          MR. MARTINEZ:  Your Honor, may I have a moment?

23          THE COURT:  You may.

24   Q.  Agent Hyland, you were asked a question about the

25   search warrant, and you admitted to a misstatement in that
```

1    search warrant, right?

2    A.  Yes, sir.

3    Q.  Is it fair to say that that search warrant was written

4    in the haste of the moment?  I guess, was there a lot of

5    stuff going on?

6    A.  Yes, sir.

7    Q.  But you wrote it?

8    A.  Yes.

9    Q.  And you admit that's a mistake now?

10   A.  Yes, I do.

11   Q.  But when you wrote that document, you believed that it

12   was the truth?

13   A.  Yes.

14   Q.  Let me go back to looking at the defendant's ticket.

15   When you asked him for a ticket, did you know for sure that

16   it was him up to that point?

17   A.  No.

18   Q.  Did that help confirm that it was him?

19   A.  Yes.

20   Q.  Officer, based upon your training and your experience,

21   you were asked -- well, let me back up.  You were asked a

22   question whether you thought you had probable cause when

23   you left the compartment and went out to the platform for

24   the second time.  Do you remember that question?

25   A.  Yes, sir.

1     Q.  Now, based upon your training and experience, do you

2     have to arrest immediately when you think you have probable

3     cause?  Or do you want to further the investigation and get

4     more evidence?

5     A.  That's my choice.

6     Q.  In this case, you decided to gather more evidence?

7     A.  Correct.

8              MR. MARTINEZ:  No further questions, Your Honor.

9              MR. PADILLA:  Your Honor, may I have one

10     follow-up?

11             THE COURT:  You may.

12                     RECROSS-EXAMINATION

13     BY MR. PADILLA:

14     Q. You were asked a question, sir, about whether any

15     contract existed between DEA and Amtrak, and you said "No,"

16     but that there were MOUs.  Can you tell us what you're

17     talking about?

18     A.  MOU is a memorandum of understanding.

19     Q.  And have you seen a copy of that?  Are we talking about

20     more than one MOU?  Or are we talking about just one that

21     has been in existence since DEA was no longer allowed to

22     access Amtrak information directly?

23             MR. MARTINEZ:  Objection; irrelevant.

24             THE COURT:  Overruled.

25     Q.  Would you answer my question.

    1    A.  It's in regard to mostly the agency and its

    2    relationship with the Drug Enforcement Administration.

    3    Q.  And we're talking about one contract that has been in

    4    existence for years?  That's my question.

    5    A.  I don't think so.

    6    Q.  But this MOU we're talking about, this memorandum of

    7    understanding, are we talking about just one memorandum of

    8    understanding?  Or are we talking about numerous ones, I

    9    guess is what I'm asking?

   10    A.  There's only one per year.

   11    Q.  One per year.  And you don't consider that a contract,

   12    then?  I know you're not an attorney, but I'm wanting it in

   13    terms of what the terms of that MOU are.

   14          MR. MARTINEZ:  Objection, Your Honor; irrelevant

   15    and calling for speculation.

   16          THE COURT:  Well, there are a number of questions

   17    there.

   18          MR. PADILLA:  Yeah.

   19          THE COURT:  Why don't you pick one and let's see

   20    what happens.

   21          MR. PADILLA:  Let me try to rephrase this.

   22    Q.  From what I understand, there is a memorandum of

   23    understanding that is executed every calendar year between

   24    the Drug Enforcement Administration and Amtrak.  Is that a

   25    fair statement?

1    A.  Yes.

2    Q.  And pretty much it remains the same every year?  Or are

3    there changes made, to your knowledge?

4    A.  I don't read those.

5    Q.  Have you seen the memorandum of understanding?

6    A.  Not recently.

7    Q.  But you have seen one in the past?

8    A.  Yes.

9    Q.  And in general terms, what does it obligate Amtrak to

10   provide?  Are we talking passengers that might be drug

11   couriers?

12             MR. MARTINEZ:  Objection, Your Honor; irrelevant.

13             THE COURT:  Overruled.

14   A.  I don't think the MOU addresses Amtrak and its

15   reservations.

16   Q.  What does it address if they pick and choose on this

17   MOU that you're talking about?

18   A.  It's between the employee and the agency.

19   Q.  Oh, you're talking about the employee -- the ticket

20   agent that's providing this information for monetary

21   rewards?

22   A.  No, the task force officer assigned to the DEA from

23   Amtrak.

24   Q.  I'm confused.  Okay.  You're saying that there's a task

25   force officer that is employed by Amtrak, or at least a law

1    enforcement officer employed by Amtrak, that is executing

2    this agreement on behalf of Amtrak with Drug Enforcement

3    Administration?

4                MR. MARTINEZ:  Objection, Your Honor; irrelevant.

5                THE COURT:  Well, I think we need to establish

6    who the MOU is between.  I think that's what we're trying

7    to get to.  Overruled.

8    A.  It's between the Amtrak police department and the Drug

9    Enforcement Administration.

10   Q.  And this MOU essentially is an agreement that Amtrak

11   agrees to provide information to the Drug Enforcement

12   Administration, correct?

13   A.  No.

14   Q.  No?  What exactly is the purpose of that MOU?

15   A.  It's about their assigned task force officer that's

16   assigned to us at the Drug Enforcement Administration.

17   Q.  Does it indicate what that officer's obligations are

18   under this contract?

19               MR. MARTINEZ:  Objection, Your Honor; irrelevant.

20               THE COURT:  Overruled.

21   A.  It's an agreement that the task force officer will

22   follow our rules, do things like go to the range and

23   qualify with us, assist in investigations.

24   Q.  To your knowledge, does the police officer employed by

25   Amtrak also receive monetary rewards based upon arrests

1    made by DEA?

2    A.  No.

3    Q.  Is there any reference in that MOU to employees of

4    Amtrak receiving monetary rewards for providing information

5    to DEA?

6            MR. MARTINEZ:  Objection, Your Honor; irrelevant.

7            THE COURT:  Overruled.

8    A.  No.

9    Q.  And who would have a copy of this MOU?

10    A.  The Drug Enforcement Administration or Amtrak.

11           MR. PADILLA:  Your Honor, at this point, for the

12    record, I would ask the government to produce a copy of the

13    MOU, at least the most recent MOU that has been executed

14    between this police officer of Amtrak and DEA.

15           THE COURT:  All right.  Your request is noted.

16    Q.  (By Mr. Padilla)  Just one more question on that line.

17    You're not aware of any other contracts, other than this

18    MOU that you just refused to, between the DEA and Amtrak?

19           MR. MARTINEZ:  Objection, Your Honor; irrelevant.

20           THE COURT:  Overruled.

21    A.  Correct.

22    Q.  And one last question, I think, with regard to your

23    experience with narcotics being transported in cereal

24    boxes.  I believe I received discovery from Mr. Martinez

25    after the fact regarding an incident that occurred on a

1    bus.  Was that provided by you?

2    A.  Yes, sir.

3    Q.  But that was after the arrest took place in this case,

4    correct?

5    A.  Correct.

6    Q.  So it wasn't anything you were aware of, at least at

7    the time that Mr. McKenzie was arrested?

8    A.  Correct.

9              MR. PADILLA:  No further questions, Your Honor.

10             THE COURT:  All right.  Thank you, Mr. Padilla,

11   Mr. Martinez, any further redirect?

12             MR. MARTINEZ:  Just a few clarifications, Your

13   Honor.

14             THE COURT:  Mr. Martinez.

15                    FURTHER REDIRECT EXAMINATION

16   BY MR. MARTINEZ:

17   Q. Agent Hyland, the last question that you were just asked

18   about concerning a bus, why did you provide that actually

19   to Assistant U.S. Attorney Larry Gomez?

20   A.  To just show that cereal boxes have been used to

21   transport narcotics.

22   Q.  And that was part of establishing a history that this

23   is a form of concealing narcotics?

24   A.  Correct.

25             MR. MARTINEZ:  Your Honor, may I have a moment?

1          THE COURT:  You may.

2          MR. MARTINEZ:  Thank you, Your Honor, for this

3    time.

4          THE COURT:  Sure.

5    Q.  Agent Hyland, I want to clarify something.  You were

6    asked a question -- I'm not sure when -- about:  Do you

7    know how many individuals are providing information?  And

8    you said "No," right?

9    A.  That's correct.

10   Q.  Now, in this case, this information is coming from a

11   specific location; is that right?

12   A.  Yes.

13   Q.  And do you know how many individuals are providing

14   information from this one location?

15   A.  Yes.

16   Q.  How many is that?

17   A.  Two.

18         MR. MARTINEZ:  No further questions, Your Honor.

19         THE COURT:  All right.  Thank you, Mr. Martinez.

20   All right.  Mr. Hyland, I have a couple of questions.

21   Mr. Martinez, would you put the exhibit up that has the

22   tag, the airline bag tag, would you put that one back up

23   and let me look at it, and then I might have a question of

24   Mr. Hyland.

25         MR. MARTINEZ:  Your Honor, I'm not sure what I'm

1    doing down here to the ELMO.  Your Honor, there are two.

2    This is 7-A that's on the prompt right now, and 7-B.

3           THE COURT:  Could you turn that sideways, please.

4    All right.  I think the exhibit answers my question.  My

5    other question -- and I think this is clear, but I'm not

6    sure it was expressly asked.  When you attempted to

7    handcuff Mr. McKenzie, you were unsuccessful; am I correct?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  When he went back into the train, he

10   was not handcuffed, correct?

11          THE WITNESS:  Correct.

12          THE COURT:  Are there any further questions as a

13   result of the Court's questions?  Mr. Martinez, do you wish

14   to ask?

15          MR. MARTINEZ:  No, Your Honor.

16          THE COURT:  Mr. Padilla?

17          MR. PADILLA:  No, sir.

18          THE COURT:  All right.  Mr. Hyland, you may step

19   down.  Thank you for your testimony.

20          All right.  Mr. Martinez, does the United States

21   have further witnesses or evidence it wishes to present?

22          MR. MARTINEZ:  No, Your Honor.

23          THE COURT:  All right.  Mr. Padilla, do you have

24   further witnesses or evidence that you wish to present?

25          MR. PADILLA:  No further.

1          THE COURT:  All right.  Do you want to leave the

2    hearing open, or do you want to go ahead and argue the

3    issues?  How would you like to proceed, Mr. Padilla?

4          MR. PADILLA:  At this point, Your Honor, I

5    actually would like to leave it open and be able to address

6    by briefing the issue as to the confidential informant and

7    whether or not the government would be required to produce

8    that.

9          I've also asked that the government produce the

10   MOU that was referred to by this agent, and I can also

11   address that.  My other problem is, I need to get to Judge

12   Johnson's hearing pretty soon.

13         THE COURT:  I forgot about that.

14         MR. PADILLA:  I wouldn't mind arguing it, but I

15   would prefer to have the Court address that issue, and the

16   government, too, and then either come back or even brief

17   the entire matter and put it in the Court's hands in that

18   fashion.

19         THE COURT:  What's your preference, Mr. Martinez?

20         MR. MARTINEZ:  Your Honor, Mr. Padilla keeps

21   speaking for me, and for the second time, I have to

22   respectfully disagree with his statements for me.  At this

23   point, I think the Court is well aware of the government's

24   position that there are two different issues out there.

25         And based upon Mr. Padilla's request, what I

1    would ask at this point is that he file motions and I

2    respond.  Because I think these two issues, again, are

3    either irrelevant, moot, or he hasn't established his

4    burden.

5            THE COURT:  It seems like that may be

6    appropriate.  It sounds like it's going to be a motion to

7    compel production of a person and a document, and maybe

8    that would be the best way, to set it up for a motion and

9    let them respond.

10           MR. PADILLA:  That would be fine, Your Honor.

11           THE COURT:  Do you think I ought to hold off any

12   further work on this until that motion is filed and has

13   been resolved, and then come back and maybe then argue your

14   motion to suppress after we've decided the discovery

15   issues?

16           MR. PADILLA:  I think that might be an

17   appropriate way to go, and I could try to get something

18   filed within the next 10 or 15 days, Your Honor.

19           THE COURT:  All right.  Does that sound like an

20   appropriate way to proceed, Mr. Martinez?

21           MR. MARTINEZ:  Yes, Your Honor.  I think that's

22   very reasonable.  In fact, I think that's probably the only

23   way the Court could probably proceed.

24           THE COURT:  All right.  I will hold off, then, on

25   issuing a ruling on the motion to suppress until we resolve

1   the forthcoming discovery motion.

2          All right.  Is there anything else that I can do

3   for you while we're together or anything else we need to

4   discuss?  Mr. Martinez?

5          MR. MARTINEZ:  Your Honor, what would the Court

6   want me to do with the exhibits that have been admitted at

7   this point?

8          THE COURT:  At some point, I'll want to take them

9   into custody so I can work on them.

10          CRD K'AUN WILD:  They're admitted.  I need them.

11          THE COURT:  Ms. Wild is saying because they are

12   admitted, we'd better go ahead and take them now.

13          MR. PADILLA:  I have no problem if the Court

14   wants to begin looking at some of these issues and looking

15   at the exhibits.

16          THE COURT:  Okay.

17          MR. PADILLA:  That's your call.

18          THE COURT:  We will take custody of the exhibits.

19          MR. PADILLA:  As far as a time frame, 15 days?

20          THE COURT:  That's fine with me.  Is that all

21   right with you, Mr. Martinez?

22          MR. MARTINEZ:  It's the Court's pleasure, Your

23   Honor.

24          THE COURT:  That's fine.

25          MR. PADILLA:  If I need more time, I'll contact

1    counsel and set up a motion on that point.

2              THE COURT:  All right.  Anything further, Mr.

3    Martinez?

4              MR. MARTINEZ:  No, Your Honor.  Thank you.

5              THE COURT:  Mr. Padilla?

6              MR. PADILLA:  No.

7              THE COURT:  All right.  Thank you.  I appreciate

8    your presentations today.  I'll get organized here since

9    I'll have to pick this up at a later point, so I'd better

10   get my notes organized.

11             MR. MARTINEZ:  Your Honor, may we be excused?

12             THE COURT:  Yes.  Good to see you all.

13   Appreciate your hard work.

14             (Proceedings concluded at 2:20 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES OF AMERICA

2   DISTRICT OF NEW MEXICO

3

4                    REPORTER'S CERTIFICATE

5        I, Julie Goehl, RDR, RPR, RMR, CRR, CCR #95,

6   Official Court Reporter for the United States of

7   America, do hereby certify that I did report in

8   stenographic shorthand the proceedings set forth

9   herein, and that the foregoing constitutes a true and

10  correct transcription of the proceedings.

11       In testimony whereof, I have hereunto set my hand

12  on this 25th day of August, 2009.

13

14

15       _____

16                    JULIE GOEHL
                     Registered Diplomate Reporter
17                   Registered Professional Reporter
                     Registered Merit Reporter
18                   Certified Realtime Reporter
                     NM Certified Court Reporter #95
19                   333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102
20                   Phone:  (505)348-2209
                     Fax:  (505)348-2215
21

22

23

24

25




            JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                 333 Lomas Boulevard, Northwest
                  Albuquerque, New Mexico 87102