# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. CR 08-1669 JB

RICHARD ANTHONY McKENZIE,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

  **THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence with Supporting Authorities, filed May 14, 2009 (Doc. 32).  The Court held evidentiary hearings on August 20, 2009, and February 18, 2010.  The primary issues are: (i) whether Defendant Richard Anthony McKenzie's encounter with Special Agent Mark D. Hyland was consensual up until the point at which Hyland had reasonable suspicion to detain McKenzie for suspected drug trafficking; and (ii) whether McKenzie voluntarily consented to Hyland's search of his luggage.  The Court finds that McKenzie's encounter with Hyland was initially consensual, McKenzie voluntarily consented to Hyland's search of his luggage, and, by the time McKenzie sought to revoke his consent, Hyland had developed reasonable suspicion to temporarily detain McKenzie.  The Court further finds that McKenzie's decision to flee, rather than be temporarily detained while Hyland sought to acquire a search warrant, raised Hyland's suspicion to the level of probable cause to believe McKenzie was engaged in drug trafficking.  The Court will deny McKenzie's motion to suppress.

## <u>FACTUAL BACKGROUND</u>

  Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, for example, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269-70.

1.      Hyland has been working for the United States Drug Enforcement Administration ("DEA") for approximately twenty-two years and working in Albuquerque, New Mexico since 1999.  See Transcript of Hearing at 7:14-25 (taken August 20, 2009)("Tr.")(Hyland).[1]

2.      Hyland has been a participant in the Albuquerque Interdiction Group, trying to intercept drugs on Amtrak trains and Greyhound buses, since fall of 2000.  See Tr. at 8:1-10 (Hyland).

3.      Hyland has been the lead agent and/or participant in many train and bus interdiction cases where various narcotics were discovered in a variety of containers.  See Tr. at 8:11-9:12 (Martinez, Hyland).

4.      The Albuquerque Interdiction Group has made seizures of drugs found in numerous

---

[1] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

types of containers, including detergent boxes, Ritz-brand cracker boxes, gift-wrapped presents, and an X-Box electronic-game box.  See Tr. at 8:25-9:12 (Martinez, Hyland).

5.      On Monday, July 7, 2009, Hyland and Task Force Officer ("TFO") Stephen Suprenant de Garcia reviewed an east bound Amtrak Passenger Named Record ("PNR") for a Richard McKenzie.  See Tr. at 9:13-18:16 (Martinez, Hyland)(explaining that Hyland went to the Amtrak station on July 7, 2008 because Hyland "had information on a passenger name record, a reservation showing one-way travel from Flagstaff, Arizona to New York City."); Government Exhibit 11, at 4 ("Warrant and Affidavit").

6.      An Amtrak ticketing agent sent the PNR by facsimile transmission to the DEA.  See Tr. at 76:3-82:4 (Padilla, Hyland).

7.      Amtrak ticketing agents regularly send PNRs by facsimile transmission to the DEA if the ticketing agent identifies, based on training that the DEA provides, a PNR with characteristics fitting the drug-courier profile.  See Tr. at 102:6-105:23 (Padilla, Hyland); See Transcript of Hearing at 12:6-18 (taken February 18, 2010)("Second Tr.")(Padilla, Hyland).

8.      Amtrak ticketing agents who provide information to the DEA which results in a narcotics-related arrest receive monetary rewards.  See Tr. at 106:6-13 (Padilla, Hyland).

9.      The ticketing agent who provided the PNR that Hyland and Garcia received on July 7, 2009 had provided reliable information to the DEA in the past, which resulted in an arrest and/or confiscation of drugs.  See Second Tr. at 11:4-23 (Padilla, Hyland).

10.     The PNR for McKenzie indicated one-way, credit-card travel from Flagstaff, Arizona to New York, New York.  See Tr. at 12:14-13:25 (Martinez, Hyland); Government Exhibit 3 ("PNR"); Government Exhibit 4 ("Amtrak Tickets"); Warrant and Affidavit at 4.

11.     The tickets were purchased with a credit card issued to a person named Rudy

-3-

Johnston.  See Tr. at 14:3-6, 18:12-14 (Martinez, Hyland); PNR at 1; Warrant and Affidavit at 4.

12.     McKenzie's PNR indicated a telephone reservation, five days in advance, for the most expensive sleeper accommodations Amtrak offers.  See Tr. at 14:22-17:20 (Martinez, Hyland); PNR at 1.

13.     The reservation was made on Wednesday, July 2, 2008, at a cost of $1,836.00 for Deluxe Sleeper Car 431/Room A.  See Tr. at 14:22-17:20 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1.

14.     Hyland's warrant affidavit stated that McKenzie purchased the tickets on the day of travel, July 7, 2008, but he admitted during the hearing that this date was incorrect.  See Tr. at 101:18-102:5 (Padilla, Hyland); id. at 143:6-20 (Martinez, Hyland); Warrant and Affidavit at 4.

15.     Hyland knew that early July is the busy summer vacation season and Amtrak fares increase accordingly.  See Tr. at 123:6-8 (Padilla, Hyland); Second Tr. at 15:12-23 (Padilla, Hyland).

16.     The PNR also indicated McKenzie picked up his ticket in Flagstaff at 5:56 a.m. on Monday, July 7, 2009.  See Tr. at 17:21-25 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1.

17.     The scheduled departure time for Amtrak Train Number 4 from Flagstaff was 5:11 a.m.  See Amtrak Tickets at 1.

18.     On July 7, 2008, McKenzie was a passenger on the eastbound Amtrak train.  See Tr. at 9:19-26:4 (Martinez, Hyland); Amtrak Tickets at 1.

19.     Amtrak Train Number 4 was running late.  See Tr. at 75:8-19 (Padilla, Hyland).

20.     McKenzie's travel itinerary indicated travel from Flagstaff to Chicago, Illinois and then to Washington, D.C., and finally to New York.  See Tr. at 9:19-21 (Hyland); id. at 11:2-12:11 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1; Warrant & Affidavit at 4.

21.     The first two legs of the trip were both in Deluxe Sleeper Cars, but the final leg, from Washington to New York, was in coach accommodations.  See Amtrak Tickets at 1.

22.     McKenzie had a scheduled arrival time in New York of 6:40 a.m. on Wednesday, July 9, 2008.  See Amtrak Tickets at 1.

23.     At approximately 12:40 p.m., Hyland and Garcia arrived at the Amtrak Station in Albuquerque to find Train 4 had already arrived.  See Tr. at 18:17-23 (Martinez, Hyland).

24.     Hyland and Garcia found the Sleeper Car 431 attendant and inquired if Deluxe Sleeper A had been occupied.  See Tr. at 18:21-19:11 (Martinez, Hyland).

25.     The attendant stated yes and further stated it was a male in his 20s or 30s, wearing a white shirt.  See Tr. at 18:21-20:14 (Martinez, Hyland).[2]

26.     Hyland and Garcia went to the second floor of Sleeper Car 431 and walked to Deluxe Room A.  See Tr. at 19:24-20:4 (Martinez, Hyland).

27.     Hyland found the door to Room A to be partially open with the curtain partially drawn.  See Tr. at 19:25-20:16 (Martinez, Hyland).

28.     Hyland knocked on the door, and there was no answer.  See Tr. at 19:25-20:4 (Hyland).

29.     Hyland could see that the bed had been pulled down and that there was a brown hair brush on it.  See Tr. at 20:5-7 (Martinez, Hyland).

---

[2] During the second hearing on this motion, Hyland testified that he spoke with the conductor, rather than the attendant, and that the conductor described McKenzie as somewhere between 30- and 35-years old.  The Court acknowledges that the difference between a conductor and an attendant may be lost on some people, and that 30- to 35-years old falls in the same range as one's "20s or 30s."  The Court thus does not find this discrepancy to significantly harm Hyland's credibility, and, because he was the only witness presented, the Court credits most of his undisputed testimony.

30.     Hyland first checked the dining car, which was attached to the sleeper car, but did not see anyone matching McKenzie's description.  See Tr. at 20:17-19 (Hyland).

31.     Hyland then checked the Greyhound/Amtrak snack bar across the platform for someone matching McKenzie's description, but did not find anyone matching that description.  See Tr. at 20:19-21:15 (Hyland).

32.     Hyland then returned to the platform to look for someone fitting McKenzie's description and spotted a man wearing a white golf shirt and smoking a cigarette standing next to Sleeper Car 431.  See Tr. at 21:16-20 (Martinez, Hyland).

33.     While Hyland looked for someone matching McKenzie's description, Garcia remained near Sleeper Car 431.  See Tr. at 20:15-21:1 (Martinez, Hyland).

34.     Amtrak Number 4's scheduled departure time was 12:55 p.m.  See Tr. at 21:2-9 (Martinez, Hyland); Amtrak Tickets at 1.

35.     The platform outside Sleeper Car 431 was sparsely occupied, because the scheduled departure time was approaching.  See Tr. at 21:2-9 (Martinez, Hyland); id. at 25:11-19 (Martinez, Hyland).

36.     Hyland approached the individual who was subsequently identified as McKenzie. See Tr. at 21:18-24 (Martinez, Hyland); Warrant and Affidavit at 4.

37.     Before engaging McKenzie in conversation, and without McKenzie's knowledge, Hyland turned on a small digital recorder to record the conversation he had with McKenzie.  See Second Tr. at 18:23-20:3 (Padilla, Hyland).

38.     Hyland identified himself as a law-enforcement officer, displayed his credentials and badge, and then returned the credentials to his left rear pocket.  See Tr. at 21:21-24:19 (Martinez, Hyland); Warrant and Affidavit at 5.

39.     Hyland asked in a conversational tone of voice for permission to speak to McKenzie. See Tr. at 23:9-24:19 (Martinez, Hyland).

40.     The law enforcement officers did not advise McKenzie that he had a right to refuse to cooperate. See Tr. at 125:5:10 (Padilla, Hyland).

41.     McKenzie agreed to speak with Hyland. See Tr. at 23:16-21 (Martinez, Hyland).

42.     Hyland asked McKenzie if they could see his ticket, and he responded that it was in his room. See Tr. at 25:20-23 (Martinez, Hyland); Warrant and Affidavit at 5.

43.     Hyland asked McKenzie if he would go and get his ticket for Hyland, to which McKenzie agreed. See Tr. at 25:20-26:4 (Martinez, Hyland).

44.     Nobody advised McKenzie that he could refuse to show his ticket to Hyland. See Tr. at 125:11-14 (Padilla, Hyland).

45.     McKenzie returned to his sleeper compartment to obtain his ticket to show to the officers. See Tr. at 26:1-19 (Martinez, Hyland); Warrant and Affidavit at 5.

46.     Hyland followed McKenzie to Deluxe Sleeper A, but did not go inside. See Tr. at 26:16-24 (Martinez, Hyland); Warrant and Affidavit at 5.

47.     Hyland remained in the hallway and did not block the doorway. See Tr. at 26:18-27:3 (Martinez, Hyland); Warrant and Affidavit at 5.

48.     McKenzie showed the tickets to the officers. See Tr. at 27:2-23 (Martinez, Hyland); Amtrak Tickets at 1-2; Warrant and Affidavit at 5.

49.     McKenzie provided Amtrak tickets in his name, indicating travel from Flagstaff to a final destination of New York.   See Tr. at 27:4-28:17 (Martinez, Hyland); Amtrak Tickets at 1.

50.     Hyland immediately returned the tickets to McKenzie. See Warrant and Affidavit at 5.

51.     Hyland asked McKenzie about his trip, to which McKenzie answered he was returning home from a family reunion.  See Tr. at 32:5-14 (Martinez, Hyland); Second Tr. at 25:10-25 (Martinez, Hyland); Warrant and Affidavit at 5.

52.     Hyland asked McKenzie if he was enjoying the train ride.  See Warrant and Affidavit at 5.

53.     McKenzie stated that he does not like to fly and that was why he was on the Amtrak. See Tr. at 32:5-14 (Martinez, Hyland); Second Tr. at 26:1-3 (Martinez, Hyland); Warrant and Affidavit at 5.

54.     Hyland then asked for permission to enter Deluxe Sleeper A, and McKenzie agreed. See Second Tr. at 25:10-25 (Martinez, Hyland); Warrant and Affidavit at 5.

55.     Hyland asked if McKenzie had any luggage with him.  See Tr. at 28:18-29:1 (Martinez, Hyland); Warrant and Affidavit at 5.

56.     McKenzie stated that he had two bags in his room.  See Tr. at 29:2-12 (Martinez, Hyland); Warrant and Affidavit at 5.

57.     Hyland then asked McKenzie for consent to search his luggage.  See Tr. at 29:21-30:3 (Martinez, Hyland); Government Exhibit 2 ("Hyland's Recording") at 01:15-01:30 (Hyland asking consent to search McKenzie's luggage); Warrant and Affidavit at 5.

58.     McKenzie knew that he could refuse to give consent.  See Hyland's Recording at 01:40-02:10 (McKenzie refusing Hyland's request to search inside one of the cereal boxes found in McKenzie's luggage); id. at 02:10-03:00 (McKenzie informing Hyland and Garcia that he knows his rights and is related to one or more attorneys); id. at 11:10-11:30 (McKenzie stating that he

should never have given Hyland permission to search in the first place).[3]

59.     McKenzie gave Hyland consent to search both bags.  <u>See</u> Tr. at 29:18-33:14 (Martinez, Hyland); Warrant and Affidavit at 5.

60.     McKenzie allowed the officers to view the contents of his baggage.  <u>See</u> Tr. at 29:18-33:14 (Martinez, Hyland); Warrant and Affidavit at 5.

61.     The first bag Hyland began to search was a brown Louis Vuitton bag.   <u>See</u> Tr. at 29:18-32:4 (Martinez, Hyland); Government Exhibits 5a & 5b; Warrant and Affidavit at 5.

62.     In the first bag, Hyland observed clothing and toiletries.  <u>See</u> Warrant and Affidavit at 5; Government Exhibit 5b.

63.     On the bottom of the first bag was one unopened Great Value Fruit Spins cereal box. <u>See</u> Tr. at 30:25-32:4 (Martinez, Hyland); Government Exhibits 8a & 8b; Warrant and Affidavit at 5.

64.     Hyland suspected the boxes of cereal might contain an illegal substance.  <u>See</u> Tr. at 30:25-32:4 (Martinez, Hyland); Government Exhibits 8a & 8b; Warrant and Affidavit at 5.

65.     Hyland removed the Great Value Fruit Spins cereal box and could hear the sound of loose cereal, but the Great Value Fruit Spins cereal box was heavier than the listed weight of 558 grams.  <u>See</u> Tr. at 31:3-25 (Martinez, Hyland); <u>id.</u> at 34:22-35:22 (Martinez, Hyland); Government Exhibits 8a & 8b; Warrant and Affidavit at 5.

66.     Hyland, while holding the cereal box, could feel that there was heavy center weight

---

[3] Upon first listening, much of the digital recording that Hyland made of his conversation with McKenzie was inaudible.  After the Court used the Noise Remover function of AVS Audio Editor 5.2 on the audio file, much of the conversation was understandable.  There are, however, several portions of the recording which are still incomprehensible because of background noise. Unfortunately, Hyland's initial contact with McKenzie is an incomprehensible portion.  <u>See</u> Hyland's Recording at 00:00-01:17.  The Court thus must rely on Hyland's testimony regarding the facts of that encounter.

inside the cereal box.  See Tr. at 31:3-25 (Martinez, Hyland); Warrant and Affidavit at 5.

67.     Hyland asked specific permission to search the Great Value Fruit Spins cereal box. See Tr. at 32:18-25 (Martinez, Hyland); Hyland's Recording at 01:40-02:10.

68.     McKenzie denied Hyland's request for permission to search inside the Great Value Fruit Spins cereal box.  See Tr. at 32:18-25 (Martinez, Hyland); Hyland's Recording at 01:40-02:10; Warrant and Affidavit at 5.

69.     Up until Hyland asked for permission to search the Great Value Fruit Spins cereal box, McKenzie did not appear nervous and was cooperative.  See Tr. 125:15-126:2 (Padilla, Hyland).

70.     After Hyland asked McKenzie for permission to search inside the cereal box, Hyland observed McKenzie's speech to increase in speed, and noted a change in his posture and motions. See Tr. at 41:22-42:3 (Martinez, Hyland); Warrant and Affidavit at 5.

71.     Hyland asked McKenzie whether he would allow a canine to sniff the Fruit Spins cereal box; McKenzie refused such request, stating, "You have a warrant?  You know, I understand my rights, man."  Hyland's Recording at 02:10-02:45.

72.     McKenzie removed his second bag from a shelf on the window side.  See Tr. at 33:4-34:7 (Martinez, Hyland); Government Exhibits 6a & 6b; Warrant and Affidavit at 5.

73.     Highland observed this bag to be a black, Forecast-brand suitcase.  See Tr. at 33:4-34:7 (Martinez, Hyland); Government Exhibits 6a & 6b; Warrant and Affidavit at 5.

74.     Hyland began searching the Forecast-brand suitcase. See Tr. at 33:4-34:7 (Martinez, Hyland); Government Exhibits 6a & 6b; Warrant and Affidavit at 5.

75.     At the bottom of the suitcase were a Great Value Apple Express cereal box and a Kellogg's Corn Pops cereal box. See Tr. at 33:4-37:1 (Martinez, Hyland); Government Exhibits 6a,

6b, 8d, & 8f; Warrant and Affidavit at 5.

76.     Both boxes appeared to be unopened.  <u>See</u> Tr. at 33:4-37:1 (Martinez, Hyland);
Government Exhibits 8d & 8f; Warrant and Affidavit at 5.

77.     Hyland pulled out the Great Value Apple Express cereal box and detected a heavy,
centered weight in the cereal box similar to the cereal box he had found in the first bag.  <u>See</u> Tr. at
33:4-37:1 (Martinez, Hyland).

78.     Hyland asked McKenzie how he had gotten to Phoenix to attend the family reunion,
to which McKenzie responded that he flew.  <u>See</u> Hyland Recording at 03:45-04:15.

79.     Hyland observed a US Airways checked baggage tag attached to the Forest-brand
suitcase.  <u>See</u> Tr. at 37:2-39:4 (Martinez, Hyland); Government Exhibits 7a & 7b; Warrant and
Affidavit at 5.

80.     Hyland noted, from the baggage tag, that McKenzie's US Airways travel was to
Phoenix on Thursday, July 3, 2008.  <u>See</u> Tr. at 37:2-39:4 (Martinez, Hyland); Government Exhibits
7a & 7b; Warrant and Affidavit at 5.

81.     Based on the US Airways baggage tags and Hyland's personal knowledge, Hyland
believed that McKenzie had flown to a "source city," Phoenix.  Tr. at 11:8-12:11 (Martinez,
Hyland); <u>id.</u> at 37:2-39:4 (Martinez, Hyland); Government Exhibits 7a & 7b.

82.     Hyland found having three cereal boxes somewhat unusual, given that passengers on
the Deluxe Sleeper Car were provided with free meals.  <u>See</u> Tr. at 16:23-17:1 (Martinez, Hyland);
<u>id.</u> at 39:6-40:9 (Martinez, Hyland).

83.     When Hyland asked McKenzie why he had cereal boxes in his bags, McKenzie
responded that he likes cereal.  <u>See</u> Tr. at 39:18-23 (Martinez, Hyland); Warrant and Affidavit at 5.

84.     Hyland saw no other evidence in McKenzie's cabin or luggage, such as bowls,

spoons, or milk, which would suggest McKenzie was particularly fond of cereal.  See Tr. at 39:28-40:7 (Martinez, Hyland).

85.     Hyland believed, based on his training and experience, that the three cereal boxes contained contraband.  See Tr. at 36:23-37:1 (Martinez, Hyland).

86.     Hyland believed that he had probable cause to detain McKenzie because McKenzie had denied him consent to search the cereal boxes after allowing him to search the luggage.  See Tr. at 40:10-13 (Hyland).[4]

87.     Hyland intended to detain McKenzie until he could obtain a search warrant for the cereal boxes.  See Tr. at 40:8-19 (Martinez, Hyland).

88.     Based on these factors: (i) the very expensive one-way travel by train; (ii) a third-party had purchased the tickets; (iii) the tickets were purchased five days before travel; (iv) McKenzie was traveling from a source city to which McKenzie had flown; (v) the train was taking McKenzie from a source city to a destination city; and (vi) the heavy, center-weighted cereal boxes being taken on a train ride in which all meals were provided, Hyland had reasonable suspicion that the boxes might contain contraband.  See Tr. at 137:15-141:2 (Martinez, Hyland); Second Tr. at 28:1-29:11 (Martinez, Hyland).

89.     McKenzie asked Hyland if he could go back outside the Amtrak car to smoke another cigarette.  See Tr. at 40:20-41:2 (Martinez, Hyland); Warrant and Affidavit at 5.

90.     McKenzie left his sleeping compartment and returned to the platform where Hyland had previously encountered him to smoke another cigarette.  See Tr. at 40:20-41:2 (Martinez,

---

[4] Hyland characterized the level of suspicion that he had as probable cause.  The Court's analysis at this point in the facts focuses on whether Hyland had reasonable suspicion to temporarily detain McKenzie's cereal boxes to confirm or deny that reasonable suspicion.

Hyland); Warrant and Affidavit at 5.

91.    Hyland followed McKenzie to the outside platform.  See Tr. at 41:4-5 (Martinez, Hyland); Warrant and Affidavit at 5.

92.    When Hyland approached McKenzie again, McKenzie was more agitated than he had previously been.  See Tr. at 41:16-18 (Martinez, Hyland); id. at 42:4-6 (Martinez, Hyland).

93.    Hyland then asked McKenzie if he could see McKenzie's driver's license to confirm his identity.  See Tr. at 127:4-8 (Padilla, Hyland).

94.    Although McKenzie was initially still cooperative when Hyland approached him the second time, McKenzie became less cooperative and more confrontational as the interaction continued.  See Tr. at 42:7-43:1 (Martinez, Hyland).

95.    Garcia went to get his Certified Drug Detection Canine Sasja from his government vehicle.  See Tr. at 48:20-49:6 (Martinez, Hyland).

96.    Garcia and Sasja were trained and certified through the United States Department of Homeland Security/Border Patrol Natural Canine Facility in January 2007.  See Warrant and Affidavit at 6.

97.    Garcia's and Sasja's latest certification was December 2007 for cocaine, heroine, marijuana, and methamphetamine.  See Warrant and Affidavit at 6.

98.    Sasja has proven reliable in previous investigations.  See Warrant and Affidavit at 6.

99.    When Hyland told McKenzie that he intended to bring Sasja onto the train to sniff the three unopened cereal boxes in his luggage, McKenzie repeatedly stated that he was not consenting to the dog sniff, to which Hyland told McKenzie that no warrant as needed for this investigative technique.  See Hyland's Recording at 05:45-06:05.

100.    McKenzie told Hyland that McKenzie did not want a dog in his space and that he did

not like dogs.  See Hyland's Recording at 07:00-07:20.

101.    Hyland asked McKenzie if he could bring a narcotics dog to inspect the cereal boxes on the platform, rather than in McKenzie's room; McKenzie refused.  See Tr. at 44:22-24 (Hyland); Warrant and Affidavit at 5 ("Affiant continued to talk to MCKENZIE about his trip and MCKENZIE would not allow TFO [Task Force Officer] Garcia's Canine permission to sniff the three (3) aforementioned cereal boxes.").

102.    Either Hyland or Garcia next suggested that McKenzie bring the cereal boxes out of the Deluxe Sleeper Car so that Sasja could sniff them without entering McKenzie's room; McKenzie refused this suggestion.  See Hyland's Recording at 11:05-11:30.

103.    Hyland then told McKenzie that he intended to detain McKenzie while he acquired a warrant; McKenzie told Hyland that he was an American citizen, knew his rights, and would not comply with Hyland's instructions.  See Hyland's Recording at 08:20-09:00.

104.    McKenzie stated that he allowed Hyland to enter his room on the Deluxe Sleeper Car and to search his luggage, and that he regretted doing so.  See Hyland's Recording at 11:05-11:30.

105.    During this discussion, Hyland asked McKenzie if anyone could confirm his story regarding his trip to attend a family reunion; McKenzie responded that he would call someone.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.

106.    McKenzie placed a call on his Blackberry cellular device and allowed Hyland to speak to the individual who answered.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.

107.    The individual initially denied seeing McKenzie that weekend, knowing where McKenzie was, or knowing what McKenzie was doing.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.

-14-

108.    After substantial coaching from McKenzie, the person on the other end of McKenzie's cellular telephone agreed that McKenzie was at a family reunion in Phoenix that weekend.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.

109.    The person on the other end of McKenzie's cellular telephone call was covering for McKenzie and would have agreed to whatever story McKenzie tried to give Hyland and Garcia.

110.    At this time, which was approximately 1:00 p.m., passengers were being called over the Amtrak public address system for their 1:15 p.m. lunch reservations.  See Hyland's Recording at 16:15-16:25.

111.    Shortly after this announcement, Hyland and Garcia explained to McKenzie that he would be detained, and that Hyland would prepare a search warrant for the cereal boxes.  See Hyland's Recording at 17:20-18:30; Warrant and Affidavit at 6.

112.    Shortly thereafter, Hyland attempted to place handcuffs on McKenzie who then resisted and started to scream "help" several times.  Tr. at 53:3-24 (Martinez, Hyland); Hyland's Recording at 17:20-19:00.

113.    McKenzie then ran in a semi-circle, re-entered Sleeper Car 431, and ran back to Deluxe Sleeper A.  See Tr. at 53:25-54:15 (Martinez, Hyland); Warrant and Affidavit at 6.

114.    Hyland and Amtrak Conductor Duone Chavez gave chase.  See Tr. at 53:25-54:15 (Martinez, Hyland); Warrant and Affidavit at 6.

115.    McKenzie returned to his sleeping compartment, locked the door, and refused to discuss the matter any further.  See Tr. at 54:2-21 (Martinez, Hyland); Warrant and Affidavit at 6.

116.    Chavez verbally stated to McKenzie that he was no longer welcome on Amtrak Train Number 4, and that he must get off the train.  See Tr. at 54:10-55:24 (Martinez, Hyland); Hyland's Recording at 18:45-19:30.

-15-

117.    McKenzie ignored all of Chavez' and Hyland's verbal orders to open the door.  See Tr. at 54:13-55:24 (Martinez, Hyland).

118.    Chavez stated to Hyland that he had no pass keys to open the locked Deluxe Sleeper Car door.  See Tr. at 55:11-18 (Martinez, Hyland); Warrant and Affidavit at 6.

119.    Failing to obtain a pass key to get into the sleeper, attempts were made to open the locked door.  See Tr. at 54:13-55:24 (Martinez, Hyland).

120.    Chavez left to get a crow-bar from the first floor of Sleeper Car 431.  See Tr. at 54:25-55:10 (Martinez, Hyland).

121.    McKenzie did not say anything while inside Deluxe Sleeper A.  See Tr. at 54:13-55:24 (Martinez, Hyland).

122.    A few minutes later, another Amtrak employee came to the hallway, and stated someone had removed a window and was limping eastbound towards Broadway Boulevard, SE.  See Tr. at 54:13-55:24 (Martinez, Hyland); Warrant and Affidavit at 6.

123.    The officers deduced that McKenzie had jumped from the train.

124.    McKenzie was seen leaving the area and heading in an easterly direction.   See Tr. at 54:13-55:24 (Martinez, Hyland); Warrant and Affidavit at 6.

125.    Based upon all of the facts that Hyland had collected, Hyland's conversation with McKenzie's friend who, at best, did not know what McKenzie had been doing that weekend, and McKenzie's decision to flee the train rather than allow Sasja to sniff his luggage, Hyland and Garcia had probable cause to believe McKenzie's luggage contained contraband.

126.    Garcia apprehended McKenzie a short time later.  See Tr. at 57:5-58:11 (Martinez, Hyland); Government Exhibit 1, Video 3; Warrant and Affidavit at 6.

127.    Hyland stayed on the train to obtain the cereal boxes, while Garcia gave chase for

-16-

McKenzie.  See Tr. at 56:1-57:6 (Martinez, Hyland); Warrant and Affidavit at 6.

128.     Garcia encountered McKenzie and took him into custody on the north side of the United States Forest Service Building at 333 Broadway, SE, in Albuquerque.  See Tr. at 57:5-12 (Martinez, Hyland); Warrant and Affidavit at 6.

129.     When Garcia apprehended McKenzie, McKenzie had severe injuries to his right ankle from dropping twelve feet out the window of his Amtrak Deluxe Sleeper Car compartment and being cut by razor wire as he climbed over a fence fleeing the train station.  See Tr. at 57:11-58:11 (Martinez, Hyland); Warrant and Affidavit at 6.

130.     Hyland worked with Amtrak personnel for several minutes until the locked sleeper car door was finally opened.  See Tr. at 54:13-57:1 (Martinez, Hyland); Warrant and Affidavit at 6.

131.     Hyland then removed the three unopened cereal boxes and all of McKenzie's personal property.  See Tr. at 56:23-57:1 (Martinez, Hyland); Warrant and Affidavit at 6.

132.     McKenzie was transported to Lovelace Hospital Downtown to have his ankle injuries treated.  See Tr. at 57:13-58:13 (Martinez, Hyland); Warrant and Affidavit at 6.

133.     Hyland and Garcia returned to the DEA Albuquerque Office, and Garcia presented the Great Value Apple Express cereal box, Great Value Fruit Spins cereal box, and the  Kellogg's Corn Pops cereal box to Sasja.  See Tr. at 58:14-59:10 (Martinez, Hyland); Warrant and Affidavit at 6.

134.     Garcia relayed to Hyland that Sasja gave a "paws-up" and alerted to all three cereal boxes.  Tr. at 58:14-59:10 (Martinez, Hyland); Warrant and Affidavit at 6.

135.     Sasja's alerting to the cereal boxes reinforced Hyland and Garcia's probable cause to believe the cereal boxes contained contraband.

136.     Hyland prepared a search warrant and accompanying affidavit based on his encounter

-17-

with McKenzie and Sasja's reaction to the cereal boxes.  See Tr. at 59:9-24 (Martinez, Hyland);
Warrant and Affidavit at 6.

137.    The officers obtained a warrant.  See Tr. at 59:12-60:10 (Martinez, Hyland); Warrant
and Affidavit at 1-2.

138.    The Honorable Alan C. Torgerson, United States Magistrate Judge, signed the federal
search warrant that Hyland prepared.  See Warrant and Affidavit at 1, 7.

139.    At approximately 7:50 p.m., Hyland and Garcia executed the search warrant, opened
the cereal boxes, and found three brown-taped rectangular bundles within the cereal boxes.  See Tr.
at 60:11-65:5 (Martinez, Hyland); Government Exhibits 8a-8i; Government Exhibit 9.

140.    Hyland tested the white powder inside one of the bundles and obtained a positive
reaction for cocaine.  See Tr. at 62:21-65:5 (Martinez, Hyland); Government Exhibits 10a-10b.

141.    The approximate weight of the three bundles was 3.45 gross kilograms or 7.6 pounds.
See Tr. at 64:11-20 (Martinez, Hyland); Government Exhibit 9.

## PROCEDURAL BACKGROUND

McKenzie moves the Court for an order suppressing evidence found in his luggage on
July 7, 2008.  Such evidence consists of approximately 3.45 kilograms of cocaine.  McKenzie's
position is that the entire encounter with Hyland and Garcia was an investigative detention or arrest,
and was justified by neither reasonable suspicion nor probable cause.  See Motion ¶¶ 5-7, at 4-7.
McKenzie's briefs, and his presentation of evidence at the hearing, all focus on demonstrating that
the information obtained from the Amtrak ticketing agent and the facts observed by Hyland up until
Hyland spoke with McKenzie did not create reasonable suspicion for an investigative detention or
search, and thus that the search of McKenzie's compartment and eventual attempted arrest of
McKenzie violated his Fourth Amendment rights.  The United States takes the position that much

of the encounter between McKenzie and Hyland, including Hyland's search of McKenzie's luggage, was consensual, and that, during the investigation, the officers developed reasonable suspicion to justify detaining McKenzie's cereal boxes until they could obtain a warrant to search them.  See United States' Response to Motion to Suppress at 9-10, filed June 1, 2009 (Doc. 34)("Response").

At the two hearings that the Court conducted, the United States developed evidence and testimony, and McKenzie sought to rebut that evidence and testimony, in support of each party's positions whether the Court should suppress the challenged evidence.  At the first hearing, on August 20, 2009, the Court heard from Hyland regarding the facts underlying his investigation and arrest of McKenzie.  At the second hearing, on February 18, 2010, Alonzo Padilla, McKenzie's attorney, asked Hyland a few more questions, and Assistant United States Attorney Damon Martinez asked a few additional questions in response.  Hyland was the only witness to testify during either hearing.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled by Mapp v. Ohio, 367 U.S. 643 (1961).  It is a well-settled principle that, under the Fourth Amendment, a search conducted without a warrant and without probable cause is unreasonable unless one of the recognized exceptions to the warrant requirement applies.  See Katz v. United States, 389 U.S. 347, 357 (1967); United States v. Burgess,

576 F.3d 1078, 1087 (10th Cir. 2009)("[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'")(quoting United States v. Ross, 456 U.S. 798, 825 (1982))(quotation marks and alterations in original).

### 1.    Consensual Encounters Between Citizens and Law-Enforcement Officers.

For purposes of analyzing Fourth Amendment seizures, the United States Court of Appeals for the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See id.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

An encounter between a law-enforcement officer and a citizen is no longer consensual when there has been a show of official authority that would cause a reasonable person to believe he or she is not free to leave.  See Florida v. Royer, 460 U.S. 491, 502 (1983)(plurality opinion); United States v. Maez, 872 F.2d 1444, 1450 (10th Cir. 1989).  On the other hand, where the individual could not or would not want to leave, even absent police presence, "the appropriate inquiry is whether a

reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 (1991). The Tenth Circuit in United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005), identified several factors to consider in determining whether an encounter is consensual:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

397 F.3d at 1283 (quoting United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993)). See United States v. Williams, 356 F.3d 1268, 1274 (10th Cir. 2004). Similarly, an encounter at a person's residence is no longer consensual if the officer persists in the encounter after the homeowner directs him or her to leave, or otherwise indicates that the officer is not permitted on the homeowner's property. See Rogers v. Pendleton, 249 F.3d 279, 288-90 (4th Cir. 2001).

The determination whether an encounter is no longer consensual "is based on how a reasonable person would understand the situation." United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir. 2004). "This reasonable person 'does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.'" Id. (quoting United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998)). See United States v. Williams, 356 F.3d at 1275 (emphasizing that the "reasonable person" test presupposes an innocent person). The suspect's and the questioning officer's subjective state of mind "is wholly irrelevant and plays no role in [the Court's] evaluation of the circumstances surrounding the encounter." United States v. Abdenbi, 361 F.3d 1282, 1292 (10th Cir. 2004). Thus, it is a "critical error" for a

district court to rely on the officer's or the suspect's subjective impressions.  United States v. Rogers, 391 F.3d at 1170.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc).

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. at 499.  Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause.

-22-

2.      **The Standard for Consent to Search.**

A search is constitutionally reasonable if the suspect voluntarily consents to the search.  See

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)("[O]ne of the specifically established

exceptions to the requirements of both a warrant and probable cause is a search that is conducted

pursuant to consent."); United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004)(quoting

Schneckloth v. Bustamonte).  The Supreme Court of the United States has held that "the question

whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion,

expressed or implied, is a question of fact to be determined from the totality of the circumstances."

Schneckloth v. Bustamonte, 412 U.S. at 227-28.  See United States v. McCurdy, 40 F.3d 1111, 1119

(10th Cir. 1994).  There can be no valid consent to a search by law-enforcement officers if the

person consents based upon the officers' assertion that they can make a search in any event, as

where they may possess a search warrant.  See Bumper v. North Carolina, 391 U.S. 543, 548 (1968).

The Tenth Circuit has recognized that, when officers rely on consent to justify the lawfulness of a

search, the government has the burden of showing that consent was freely and voluntarily given.

That burden is not met by merely showing acquiescence to an assertion of lawful authority.  See

United States v. Rodriguez, 525 F.2d 1313, 1316 (10th Cir. 1975)(holding that passengers did not

consent to search where they were ordered to get out of bus and then ordered to open suitcases).

Indeed,

> the Fourth and Fourteenth Amendments require that a consent not be coerced, by
> explicit or implicit means, by implied threat or covert force.  For, no matter how
> subtly the coercion was applied, the resulting "consent" would be no more than a
> pretext for the unjustified police intrusion against which the Fourth Amendment is
> directed.

Schneckloth v. Bustamonte, 412 U .S. at 228. See United States v. Thompson, 524 F.3d 1126, 1133

(10th Cir. 2008).

The Supreme Court and the Tenth Circuit have accumulated a non-exhaustive list of factors that district courts should consider when attempting to discern whether a defendant's consent was voluntarily given: (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's 'pleasant' manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii) ] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997). Furthermore, the defendant's age, education, experience, intelligence, and knowledge of the right to withhold consent are "highly relevant" in determining whether there was consent. See United States v. Mendenhall, 446 U.S. 544, 558-59 (1980).

### 3.     The Probable-Cause Standard for Seizures.

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995). "[T]he standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'" Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)(quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).

While a determination of probable cause is to be based upon the totality of the circumstances,

questions regarding the veracity, reliability, and basis of knowledge of witnesses remain "highly relevant." Illinois v. Gates, 462 U.S. 213, 230 (1983). Police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). Another relevant consideration regarding the probable-cause inquiry is whether officers have made a reasonable effort to "interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention.'" Id. at 1259 (quoting Romero v. Fay, 45 F.3d at 1476-77).

The probable-cause standard does "not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990)(quoting Adams v. Williams, 407 U.S. at 148-49). Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe 'an offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001)(quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)). Thus, for example, officers may have probable cause to believe that a suspect committed a robbery even though they do not yet know the identity of the victim, or officers may have probable cause to believe that property is stolen even though they do not yet know whether to charge the suspect with robbery or possession of stolen property. See id.

Probable cause is an objective standard, and thus the individual officer's subjective belief whether there is probable cause to arrest is not dispositive. See United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999)(citing Florida v. Royer, 460 U.S. at 507). Furthermore, "[t]hat an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by probable cause." United States v. Santana-Garcia, 264

-25-

F.3d 1188, 1192 (10th Cir. 2001)(citing Florida v. Royer, 460 U.S. at 507).  See United States v. Ceballos, No. 09-2021, 2009 WL 4642368, at *2 (10th Cir. Dec. 9, 2009)("The district court based its ruling, in part, on [the officer's] testimony that he was acting on a 'hunch' when he stopped Ceballos[, but his] subjective characterization of his actions is irrelevant.").

### 4.    The Probable Cause Standard for Searches.

"The probable cause standard does not require certainty or even a showing that it is more probable than not that contraband or evidence will be found." United States v. Villa, 348 Fed. Appx. 376, 379 (10th Cir. 2009)(citing Texas v. Brown, 460 U.S. 730, 742 (1983)).  Instead, probable cause "requires only a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Villa, 348 Fed. Appx. at 379 (quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Hatfield, 333 F.3d 1189, 1193 n.1 (10th Cir. 2003).

> As the Court frequently has remarked, probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162 . . . (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.  Brinegar v. United States, 338 U.S. 160, 176 . . . (1949).

Texas v. Brown, 460 U.S. at 742.  As the Supreme Court stated in Texas v. Brown regarding probable cause:

> The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers.  Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

460 U.S. at 742 (quoting United States v. Cortez, 449 U.S. at 418).

-26-

## LAW REGARDING THE EXCLUSIONARY RULE

If the police acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an exception to the exclusionary rule applies.  See United States v. Calandra, 414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The rule also demands exclusion of evidence that was obtained as a but-for result of the illegal search, unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no longer clings to it.  See Wong Sun v. United States, 371 U.S. 471, 484 (1963)("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").  On the other hand, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct. 695, 702 (2009).  Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements," suppression is not automatic and "any marginal deterrence" from suppression is often insufficient.  Id. at 702, 704.

"Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  United States v. Leon, 468 U.S. 897, 906 (citing Illinois v. Gates, 462 U.S. 212, 223 (1983))(internal quotes omitted).

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.  Of course this does not mean that the facts thus obtained

become sacred and inaccessible.  If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251

U.S. 385, 392 (1920)). The Tenth Circuit has acknowledged the rule as follows:

> [A] defendant may . . . suppress any . . . evidence deemed to be "fruit of the poisonous tree," (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence.  Once the defendant meets this burden, the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree.  According to the Supreme Court, the overriding issue in "fruits" cases is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.   The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006)(internal citations omitted).

Though the rule is simply stated, courts have been trying to hash out its scope for many years.

The exclusionary rule often results in suppression of reliable, probative, and otherwise-unobtainable evidence of the individual's guilt.  Sometimes a court must suppress all evidence in a case, even though the defendant's guilt is almost certain, because the unconstitutional search taints all the evidence.  In such circumstances, the prosecution often cannot convict the individual of the crime of which he is clearly guilty.  The Supreme Court has recognized time and time again, however, that limiting the powers of law enforcers and the concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth Amendment's protections.  As Justice Stevens noted in his concurring and dissenting opinion in United States v. Leon:

> It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt. But that price is one courts have often been required to pay to serve important social goals. That price is also one the Fourth Amendment

requires us to pay, assuming as we must that the Framers intended that its strictures
"shall not be violated."

United States v. Leon, 468 U.S. at 979 (Stevens, J., concurring and dissenting).  See Kolender v.
Lawson, 461 U.S. 352, 355 (1983)("The price of [law-enforcement] effectiveness, however, is
intrusion on individual interests protected by the Fourth Amendment."); United States v. Leon, 468
U.S. at 941 (Brennan, J., dissenting)("It is the loss of that evidence that is the 'price' our society
pays for enjoying the freedom and privacy safeguarded by the Fourth Amendment.").

## ANALYSIS

In this motion, the parties argue past one another.  McKenzie argues that Hyland and Garcia
lacked reasonable suspicion and/or probable cause initially to detain McKenzie or to search his
belongings, but make no substantial argument regarding whether the encounter might have been
consensual.  The United States, on the other hand, responds that the initial encounter and the search
of McKenzie's luggage was consensual, and all but ignores McKenzie's arguments whether Hyland
and Garcia had reasonable suspicion or probable cause when Hyland first encountered McKenzie
on the Amtrak station platform.  Ultimately, the Court finds that the initial police-citizen encounter
was consensual and that the search of McKenzie's luggage was pursuant to voluntary consent.  The
Court also finds that the officers developed reasonable suspicion, and then probable cause, to believe
that McKenzie's cereal boxes contained contraband.

## I.   THE INITIAL ENCOUNTER BETWEEN HYLAND AND MCKENZIE WAS CONSENSUAL.

The first question, and the one ultimately determinative of the outcome of this case, is
whether the initial encounter between McKenzie and Hyland, during which Hyland asked to see
McKenzie's ticket and asked to search McKenzie's luggage, was consensual, or, rather, was an
investigative detention.  If the encounter was consensual, the officers did not need reasonable

suspicion or probable cause to ask McKenzie the questions that they asked, and thus did not violate McKenzie's Fourth-Amendment rights through that line of questioning. See Oliver v. Woods, 209 F.3d at 1186. If, on the other hand, the encounter was an investigative detention, the Court must determine whether Hyland and Garcia had reasonable suspicion to make that detention and whether the detention was confined to the proper scope. See id. at 1186 (citing United States v. Cortez, 449 U.S. at 417-18).

The Tenth Circuit has held that all police-citizen encounters can be placed into one of three categories: (i) consensual encounters; (ii) protective or investigative detentions -- the traditional Terry stop; and (iii) arrests. See Oliver v. Woods, 209 F.3d at 1186. A consensual encounter, for constitutional purposes, is a non-event; it cannot be a Fourth-Amendment violation. See Oliver v. Woods, 209 F.3d at 1186. On the other hand, courts acknowledge that police-citizen encounters are often non-consensual, even where the officer may think or assert that the suspect consented. The burden of proving that a police-citizen encounter was consensual is therefore upon the United States, see United States v. Rodriguez, 525 F.2d at 1316, and it must show that "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," Florida v. Bostick, 501 U.S. at 436. See Florida v. Royer, 460 U.S. at 502; United States v. Maez, 872 F.2d at 1450.

The Tenth Circuit considers several factors in resolving this inquiry: (i) the location of the encounter, whether in an open public place, within the view of the public, or somewhere secluded; (ii) whether the officers touch or physically restrain the defendant; (iii) whether the officers are uniformed or in plain clothes; (iv) whether their weapons are displayed; (v) the number, demeanor and tone of voice of the officers; (vi) whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and (vii) whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent. See

-30-

United States v. Spence, 397 F.3d at 1283.  While two factors favor finding that the encounter was a detention, the greater weight of the evidence establishes that McKenzie and Hyland's encounter was consensual.  First, that there were two officers and only one McKenzie weighs marginally in favor of finding detention.  Second, neither Hyland nor Garcia informed McKenzie of his right to break off the encounter.  Mitigating this second factor, however, is the fact that McKenzie repeatedly stated to the officers that he knew his rights, implying that he was aware that he need not speak to them or at least that he did not have to consent to any search.

The remaining factors, to varying degrees, weigh in favor of finding that the encounter was consensual.  Although there were not many people immediately nearby, the bulk of the encounter took place out in the open, on a train platform beside a loaded passenger train, where several passengers could presumably see the encounter and where passengers could, at any moment, walk past.  During the only time Hyland took McKenzie's tickets, he immediately returned them after a brief inspection.  There is no evidence that Hyland retained possession of any other item belonging to McKenzie until he had determined to detain McKenzie and McKenzie fled.  Both officers were in plain clothes, with their weapons concealed, and looked relatively unassuming.  Until the point at which they informed McKenzie that they intended to detain him while they acquired a search warrant for the cereal boxes, neither of the officers touched, physically restrained, or threatened McKenzie.  Neither officer revealed his weapon during the entire episode, and Hyland maintained a gentle, conversational tone while talking with McKenzie.  Finally, Hyland asked permission to talk to McKenzie, asked permission to enter McKenzie's room, and asked permission to search McKenzie's luggage, and McKenzie acquiesced to each request individually.  The Court thus finds that the majority of the factors weigh in favor of finding that the encounter between McKenzie and Hyland was consensual, at least until Hyland determined that he was going to detain McKenzie and

the cereal boxes while the officers prepared a search warrant.

McKenzie's only response to the argument that this encounter was consensual appears to be statements that McKenzie did not know that he could refuse the officers' request, which are scattered throughout his motion and reply brief.  See Motion ¶ 1, at 2 ("Not feeling he had any choice but to comply with the officers request and not having been advised that he had a right to refuse to cooperate, Mr. McKenzie . . . obtain[ed] his ticket to show the officers."); id. ¶ 2, at 2 ("Not knowing that he could refuse to give consent, McKenzie allowed the officers to view the contents of his luggage."); id. ¶ 3, at 3 ("During this encounter Mr. McKenzie was not advised of his right to refuse to cooperate with the officers nor had the officers articulated any reasons why they suspected he might be transporting illegal substances."); Reply to the Government's Response to Motion to Suppress Evidence with Supporting Authorities ¶ 3, at 3, filed June 16, 2009 (Doc. 40) ("At no time during this encounter, prior to showing the agents his boarding pass did the agents ever advise Mr. McKenzie that he had a right to refuse their request . . . .")("Reply").  Yet, within the same briefing, there are admissions that McKenzie knew that he could refuse -- or at least try to refuse -- some of the officers' requests.  See Motion ¶ 2, at 2 ("When asked whether he would allow a canine to sniff the suspected cereal boxes, Mr. McKenzie refused such request . . . ."); Reply ¶ 3, at 3 ("After locating a cereal box in Mr. McKenzie's luggage which the agent felt may contain something other than cereal, Mr. McKenzie refused any further search of his luggage.").  Moreover, while advising a suspect that he or she does not have to cooperate, speak with the officer, or consent to a search is a factor to consider in determining whether the encounter was consensual, the case law does not suggest that such warnings are mandatory.  Furthermore, the question at this stage of the analysis is not whether McKenzie subjectively felt that he was being detained, but what a reasonable person who is not engaged in criminal activity would have thought, based on the factors set forth

in the case law.  See <u>Florida v. Bostick</u>, 501 U.S. at 436; <u>Florida v. Royer</u>, 460 U.S. at 502; <u>United States v. Spence</u>, 397 F.3d at 1283; <u>United States v. Maez</u>, 872 F.2d at 1450.  Based upon those factors, the Court finds that McKenzie was not seized when officers asked to see his ticket or when they asked to search his luggage; rather, the encounter remained consensual at those stages.[5]

## II.     <u>HYLAND OBTAINED MCKENZIE'S CONSENT TO SEARCH HIS LUGGAGE.</u>

McKenzie argues that neither reasonable suspicion nor probable cause support the search of his luggage.  The United States responds that McKenzie voluntarily consented to the search of his luggage,[6] and that the officers involved thus did not need probable cause or reasonable suspicion to conduct the search.  The Court ultimately agrees that the search was based upon voluntary consent. Accordingly, the encounter is beyond the Fourth Amendment's reach.

A search is constitutional if the suspect voluntarily consents to it.  See <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 219; <u>United States v. Kimoana</u>, 383 F.3d at 1221.  The Supreme Court has held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of the circumstances."  <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 227-28.  See <u>United States v.</u>

---

[5] The factors shift slightly more toward a finding of detention when the officers asked McKenzie for permission to search his luggage, given that the conversation had moved from the open railroad platform to the confines of the Deluxe Sleeper Car.  The Court is not convinced, however, that the shift would change the end result.  The remaining factors still sufficiently weigh in favor of finding that the encounter was consensual.  Hyland returned McKenzie's ticket and then asked for permission to search the bags, giving McKenzie another opportunity to assert his rights. Instead, McKenzie acquiesced to the initial search.

[6] When the Court refers to the search of McKenzie's luggage, it refers to the initial search that uncovered the suspicious cereal boxes, and not to the eventual, warrant-authorized search in which the officers opened those cereal boxes and found contraband.  The Court notes, after reading the briefing and listening to the parties' arguments, that there does not appear to be any challenge to the second, warrant-authorized search or to the validity of the warrant that authorized it.

McCurdy, 40 F.3d at 1119.  It is the United States' burden to show that the consent was voluntary and not coerced.  See United States v. Rodriguez, 525 F.2d at 1316.  In determining whether consent was freely and voluntarily given, the courts consider the following factors: (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's 'pleasant' manner and [] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" and (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d at 1314.  Other factors include: (vi) "the display of a weapon, [and (vii) ] physical touching by the officer." United States v. Anderson, 114 F.3d at 1064.  Furthermore, the suspect's age, education, experience, intellect, and knowledge of the right to withhold consent are relevant in determining whether there was consent.  See United States v. Mendenhall, 446 U.S. at 558-59.[7]  The majority of these factors weigh in favor of finding the search was consensual.

Three of the factors weigh slightly toward finding that the search was not consensual.  First, again, the two officers outnumbered McKenzie.  Garcia remained in the background, however, and did not speak to McKenzie until after the search of his luggage.  Second, the request to search McKenzie's luggage was made inside the Deluxe Sleeper Car, rather than out on the platform where

------

[7] The Supreme Court stated that knowledge of the right to withhold consent was "highly relevant" in this analysis, indicating that factor should be weighed particularly heavily.  United States v. Mendenhall, 446 U.S. at 558-59 ("Although the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' . . . such knowledge was highly relevant to the determination that there had been consent.")(quoting Schneckloth v. Bustamonte, 412 U.S. at 228).

Hyland had first approached McKenzie.  Finally, Hyland did not advise McKenzie that he could refuse to consent to the search, but McKenzie knew of this right, as he asserted his right to decline a request to search as soon as Hyland located the cereal boxes in McKenzie's luggage.

The remaining factors weigh in favor of finding that the search was consensual.  From the testimony and the audio recording of the incident, the Court concludes that Hyland did not use aggressive language or tone of voice; rather, his tone and language were conversational and pleasant. Hyland took McKenzie's tickets to confirm his identity and the facts in the PNR, but immediately returned the tickets to McKenzie.  Neither Hyland nor Garcia displayed a weapon; rather, both of them had their weapons concealed under their plain clothes.  Neither officer physically touched McKenzie or otherwise threatened him.  Finally, McKenzie is thirty-five years old, and has exhibited knowledge of the criminal justice system and the bounds of his constitutional rights,[8] making it likely that he was aware that he could refuse Hyland's request to search his luggage if he so desired.

Furthermore, in addition to the circumstantial factors that weigh in favor of finding that the search was consensual, there is direct evidence that McKenzie knew that he could refuse the officers' requests for consent to search his belongings.  After Hyland began to search McKenzie's

---

[8] Throughout the recording, after Hyland discovered the cereal boxes in his luggage, McKenzie repeatedly tells Hyland that he knows his rights, asks Hyland if he has a warrant, and asks Hyland to articulate the basis for his belief that McKenzie was involved in criminality.  See Hyland's Recording at 08:10-10:40.  McKenzie states, at one point on the recording, that he never should have allowed the officers to search his luggage in the first place.  See Hyland's Recording at 11:10-11:30.  Finally, at the second hearing on this motion, Mr. Padilla informed the Court that McKenzie was trying to convince his counsel to hold a hearing under Franks v. Delaware, 438 U.S. 154 (1978), to challenge the facts found in the warrant affidavit.  These facts demonstrate that McKenzie is intelligent and well-informed about his rights as a criminal defendant.  See Second Tr. at 34:1-23 (Padilla)("My client . . . has asked . . . that the Court consider conducting a Franks hearing in this particular matter.  I don't see the reason for that, Your Honor, . . . .").  The Court finds these facts weigh in favor of finding that McKenzie voluntarily consented to the search.

luggage, and located the suspiciously heavy cereal boxes, Hyland specifically requested McKenzie's permission to search inside those boxes.  At that point, McKenzie asserted his right to refuse the request and told the officers that they could not search those boxes.[9]  The Tenth Circuit has found that a restricted consent to search evidences the suspect's knowledge that he has the right to refuse to consent.  See United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993)("[T]he district court's finding that Mr. Manuel was aware of his right to refuse consent is supported by his steadfast exercise of that right with respect to the Christmas package.").  Furthermore, McKenzie commented later in the encounter that he should never have given Hyland consent to search his luggage, implying that he knew he could refuse the request.  See Hyland's Recording at 11:05-11:30.  The Court finds that McKenzie's refusal to allow Hyland to search the cereal boxes, and his comment that he should not have allowed Hyland to enter his room or search his luggage, is further evidence that McKenzie knew that he was free to deny Hyland's request to search.  This "highly relevant" factor thus weighs in favor of finding the encounter and search were consensual.  United States v. Mendenhall, 446 U.S. at 558-59.

To the extent that McKenzie asserts Hyland's failure to inform him of the right to refuse the search as a basis to find that the search violated the Fourth Amendment, the Court does not agree. An officer is not required to inform the suspect of the right to refuse to consent to a search as a prerequisite for a voluntary consent.  See United States v. Thompson, 524 F.3d 1126, 1134 (10th Cir. 2008)("[W]e reject Mr. Thompson's argument that Ms. Snell's consent was not voluntary because the police did not inform her of her right to refuse consent, as it is well established that knowledge of the right to refuse consent is not a necessary prerequisite to demonstrating a voluntary

---

[9] Both the testimony at the hearing and McKenzie's briefing in this matter establish that McKenzie refused Hyland's request to search the cereal boxes or to subject them to a dog sniff.

consent.")(quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 232-33)(internal quotation marks omitted); <u>United States v. Creech</u>, 221 F.3d 1353 (Table), 2000 WL 1014868, at *2 (10th Cir. July 24, 2000)("Notably for our purposes, an officer's failure to warn a suspect of the right to refuse does not alone establish that a consent to search was involuntary."). Furthermore, McKenzie knew of his right to refuse consent. Based on McKenzie's awareness that he could refuse consent to search and the weight of the other factors, the Court finds that McKenzie voluntarily consented to the search of his luggage.

**III.   THE AGENTS HAD PROBABLE CAUSE TO DETAIN THE THREE CEREAL BOXES WHILE THEY SOUGHT A SEARCH WARRANT.**

Somewhere between the point at which Hyland discovered the suspiciously heavy cereal boxes and when Hyland told McKenzie that they intended to detain the cereal boxes while the officers got a search warrant, the encounter with McKenzie became something other than consensual. The final question is thus whether the officers had reasonable suspicion or probable cause to detain the boxes while they sought to obtain that warrant. McKenzie argues that they did not have reasonable suspicion or probable cause; the United States argues to the contrary. The Court finds that Hyland had reasonable suspicion that McKenzie's cereal boxes contained contraband, justifying a temporary detention of the boxes, and that the reasonable suspicion eventually became probable cause.

When an officer has reasonable suspicion to believe that an individual may possess contraband, the law allows the officer to temporarily detain the property while endeavoring to confirm or to dispel the suspicion. <u>See</u> <u>United States v. Place</u>, 462 U.S. 696, 702-06 (1983)("[W]e conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of <u>Terry</u> and its progeny would permit the

-37-

officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion[.]").[10] Probable cause allows the officer to detain the goods and the individual for an even longer period of time, during which the officers may attempt to obtain a warrant.  With respect to reasonable suspicion, the officer need only have awareness of articulable facts from which one could believe that McKenzie was engaged in criminal activity or the cereal boxes could contain contraband.  See United States v. Place, 462 U.S. at 702 (finding "appropriate" the temporary seizure of a person's luggage "on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime"); United States v. Winder, 557 F.3d 1129, 1133 (10th Cir. 2009)("To justify a Terry stop the detaining officer must have, based on all the circumstances, a 'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'").  As to probable cause, the relevant inquiry is whether Hyland was aware of facts from which a judge could reasonably conclude that there is "a fair probability that contraband or evidence of crime will be found" in the cereal boxes.  United States v. Villa, 348 Fed. Appx. at 379 (quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Hatfield, 333 F.3d at 1193 n.1.  Both standards are met in this case.

At the time that Hyland determined that he would temporarily detain McKenzie's luggage, a number of facts gave rise to reasonable suspicion.  McKenzie fit many of the traditional indicia

---

[10] The Supreme Court reached its holding in United States v. Place by balancing the intrusion on the individual's Fourth-Amendment rights against the United States' interest in that intrusion. See 462 U.S. at 702-05 ("We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.").  The Supreme Court noted that, "[b]ecause of the inherently transient nature of drug courier activity at airports, allowing police to make brief investigative stops of persons at airports on reasonable suspicion of drug-trafficking substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels." Id. at 704.  The Court finds that the same policy applies in this case, which deals with transporting drugs aboard trains.

of a drug courier.[11]  He flew with a one-way US Airways airline ticket to a drug-source city --

Phoenix.  He then had a one-way ticket by train -- a form of travel with substantially less security

than an airplane -- from that drug-source city to New York, a drug-destination city.  A third party

purchased the ticket shortly before the scheduled travel.  McKenzie booked the most expensive

accommodations available for the majority of his journey.  These facts alone might not support

reasonable suspicion, but McKenzie allowed Hyland to look through his luggage and uncover more

facts.  McKenzie stated that he did not care to fly, but admitted that he went to Phoenix by way of

airplane -- a fact that the US Airways baggage tags on one of McKenzie's suitcases confirmed.

McKenzie had three boxes of cereal in his luggage.  The boxes appeared unopened, and Hyland

knew that all of McKenzie's meals would be provided on the train ride.  There would thus be no

particular reason why McKenzie would need cereal on the trip.  When asked why he had cereal in

his luggage, McKenzie could only respond that he liked cereal.  On the other hand, there was no

indication that he had eaten any of the cereal, nor that he had brought the necessary accouterments

to eat cereal at any point on his journey.  When Hyland lifted the cereal boxes, although he heard

cereal inside, he felt a peculiar, centered-weight to the boxes.  The boxes were heavier than the

weights listed on the outside, indicating that something other than cereal was being stored inside.[12]

---

[11] Mr. Padilla's briefing and questions of Hyland at the hearing showed that Mr. Padilla was attempting to draw distinctions between McKenzie's actions and the actions of one who fits the drug-courier profile to show that McKenzie did not quite fit the profile.  While the Court acknowledges that some of McKenzie's conduct does not fit the drug-courier profile, much of it does -- apparently enough to raise Hyland's suspicions and to cause him to try and make contact with McKenzie.  That there is not a perfect match does not impact the Court's decision on the constitutional issues whether the initial contact and search were consensual and voluntary, and the Court finds sufficient facts to support reasonable suspicion that McKenzie was transporting drugs.

[12] The combined weight of the three packages inside the three boxes was over seven pounds. The Court believes that almost any person lifting a cereal box would notice a weight discrepancy, regardless whether that person was looking for one, of over two pounds per box.

When Hyland asked McKenzie for permission to open the boxes, McKenzie refused, stating that he was not ready to eat the cereal yet and therefore did not want them to be opened. When Hyland proposed that they have a trained narcotics-detection dog sniff the boxes instead of opening them, McKenzie likewise refused, stating that he did not want the dog inside his compartment.  Hyland again tried to compromise and asked if he could bring the boxes outside the compartment to be sniffed, and McKenzie again refused.  Even if all of McKenzie's explanations were genuine and McKenzie could plausibly explain away the facts underlying Hyland's suspicion, the Tenth Circuit has held that "even ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminality depending on the totality of the circumstances." United States v. Treto-Haro, 287 F.3d 1000, 1005 (10th Cir. 2002)(quoting United States v. Hishaw, 235 F.3d 565, 569-70 (10th Cir. 2000)).  These facts provide a "basis of reasonable, articulable suspicion, premised on objective facts, that the" cereal boxes "contain[] contraband or evidence of a crime."  United States v. Place, 462 U.S. at 702.  When one adds to those facts McKenzie's suspicion behavior, his increased nervousness when Hyland asked to search the cereal boxes, the suspicious telephone call to McKenzie's friend, and McKenzie's decision to jump from the train and flee rather than to allow Sasja to sniff the cereal boxes, the Court finds that a reasonable law-enforcement officer would have a basis to believe that there was a fair probability that the boxes contained illicit drugs.  See United States v. Villa, 348 Fed. Appx. at 379; United States v. Hatfield, 333 F.3d at 1193 n.1.  The Court thus finds that Hyland and Garcia had probable cause to believe the boxes contained contraband.

One of McKenzie's apparent arguments for finding a constitutional violation is that the officers never "articulated any reasons why they suspected he might be transporting illegal substances."  Motion ¶ 3, at 3.  This argument fails.  First, the Court finds that the initial encounter was consensual, and therefore it is irrelevant whether the officers had any basis for the belief, or

indeed any belief, that McKenzie was transporting contraband when the encounter started. McKenzie points to no authority for the proposition that, even after the encounter became an investigative detention, Hyland was required to articulate for McKenzie the basis for his reasonable suspicion or probable cause.  Such a position is at odds with the Tenth Circuit's position that the reasonable-suspicion/probable-cause inquiry is an objective one.  See United States v. Fisher, --- F.3d ----, 2010 WL 809818, at *2 (10th Cir. Mar. 10, 2010)("In measuring an officer's actions under the Fourth Amendment, we look only at the objective facts, not the officer's state of mind.")(citing United States v. Neff, 300 F.3d 1217, 1222 (10th Cir. 2002)).  In United States v. Ledesma, 447 F.3d 1307 (10th Cir. 2006), the Tenth Circuit stated:

> The ultimate question [in determining if one has probable cause to search] is whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

447 F.3d at 1316 (quoting United States v. Edwards, 242 F.3d 928, 934(10th Cir. 2001))(internal quotation marks omitted).  Under that thinking, even if Hyland did not, himself, understand the basis for his reasonable suspicion, so long as he was aware of facts from which a reasonable officer could draw an inference that criminal activity might be afoot, reasonable suspicion is present.  The Tenth Circuit recently reiterated this concept in United States v. Ceballos.  In United States v. Ceballos, the Tenth Circuit reversed the district court's denial of a motion to suppress where the detaining officer testified that he was not suspicious of any crime, but where he testified to facts from which the Tenth Circuit panel found that a reasonable officer would have developed reasonable suspicion. See 2009 WL 4642368, at **2-3 (citing United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)).  The Tenth Circuit found that the officer's "subjective characterization of his actions is irrelevant"; rather, in making the reasonable suspicion inquiry, courts must look

objectively to the totality of circumstances of which the officer was aware.  United States v. Ceballos, 2009 WL 4642368, at **2-3.  If the law does not require Hyland to understand why he had reasonable suspicion, once he was aware of the facts that established it, it would not be reasonable to require him to explain it to the criminal suspect.  The Court finds that Hyland's failure to articulate, to McKenzie's satisfaction, the factual basis of his reasonable suspicion does not, in itself, constitute a Fourth-Amendment violation.

Neither party addresses the scope or duration of the detention of the cereal boxes and whether it somehow exceeded the permissible scope of a temporary detention to obtain a search warrant.  The Court notes, however, that the officers had probable cause to believe the boxes contained contraband and also had a reasonable basis to believe the boxes would not be there if they left McKenzie to his own devices while they sought a search warrant.  Under such circumstances, a container, such as a cereal box, may be detained so that the officer can have a magistrate judge review his probable-cause determination and issue a warrant.  As the Supreme Court stated in United States v. Place,

> Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it . . . .

462 U.S. at 701.  In Texas v. Brown, Justice Stevens wrote a concurring opinion, in which Justices Brennan and Marshall joined, stating that

> if there is probable cause to believe it contains contraband, the owner's possessory interest in the container must yield to society's interest in making sure that the contraband does not vanish during the time it would take to obtain a warrant.  The item may be seized temporarily. . . .   Once the container is in custody, there is no risk that evidence will be destroyed.  Some inconvenience to the officer is entailed by requiring him to obtain a warrant before opening the container, but that alone does not excuse the duty to go before a neutral magistrate.

460 U.S. at 749-50 (plurality opinion)(Stevens, J., concurring).  See United States v. Donnes, 947 F.2d 1430, 1436 (10th Cir. 1991)("Probable cause to believe that contraband is stored in a container will justify a warrantless seizure so that a law enforcement officer may preserve the potentially incriminating evidence for the period of time necessary to secure a warrant authorizing the search of the container.")(citing Texas v. Brown, 460 U.S. at 749-50 and United States v. Jacobsen, 466 U.S. 109, 121-22 (1984)).  Hyland and Garcia's seizure of McKenzie's cereal boxes while obtaining a search warrant thus appears constitutional under the circumstances.

Furthermore, the warrant was executed at 7:50 p.m. on the same day as the seizure of the goods, which apparently occurred shortly after 1:00 p.m.  This time span is less than seven hours after the cereal boxes were seized, and, during much of that time, McKenzie was in the hospital for the injuries he sustained while running from the DEA.  The Court has no basis for finding that a seven-hour detention of an individual's goods, once the officers have probable cause to believe they contain contraband, is excessive.  In sum, because the initial encounter between Hyland and McKenzie was consensual, because McKenzie consented to the initial search of his luggage, and because Hyland had reasonable suspicion, and then probable cause, to detain McKenzie's packages to investigate whether they contained contraband, the Court finds that Hyland did not violate McKenzie's Fourth-Amendment rights and thus denies McKenzie's motion to suppress.

IT IS ORDERED that the Defendant's Motion to Suppress Evidence with Supporting Authorities is denied.

_____
UNITED STATES DISTRICT JUDGE

-43-

*Counsel*:

Gregory J. Fouratt
   United States Attorney
Larry Gomez
Damon P. Martinez
   Assistant United States Attorneys
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*


Alonzo J. Padilla
   Assistant Federal Public Defender
Albuquerque, New Mexico

     *Attorney for the Defendant*