1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW MEXICO

3

UNITED STATES OF AMERICA,

4

          Plaintiff,

5

     vs.                    CRIMINAL NO. CR-08-1669 JB

6

RICHARD ANTHONY McKENZIE,

7

          Defendant.

8

9          Transcript of Suppression Hearing before The

10   Honorable James O. Browning, United States District Judge,

11   held in Albuquerque, Bernalillo County, New Mexico, commencing

12   on Thursday, February 18, 2010, at 1:38 p.m. and concluding at

13   2:46 p.m. Proceedings recorded by mechanical stenography;

14   transcript produced by computer-aided-transcription.

15   For the United States:

16       UNITED STATES ATTORNEY'S OFFICE
         District of New Mexico
17       201 Third Street, Northwest, Suite 900
         Albuquerque, New Mexico  87102
18       BY:  MR. DAMON P. MARTINEZ

19   For the Defendant:

20       FEDERAL PUBLIC DEFENDER'S OFFICE
         111 Lomas Boulevard, Northwest, Suite 501
21       Albuquerque, New Mexico  87102
         BY:  MR. ALONZO J. PADILLA

22

              Danna Schutte Everett, CRR, RPR, CCR 139
23                United States Court Reporter
              333 Lomas Boulevard, Northwest
24             Albuquerque, New Mexico  87102
                  Phone:  (505) 348-2283
25                 Fax:  (505) 348-2285

1          THE COURT:  Good afternoon, everyone.  I appreciate

2   everyone making themselves available to me this afternoon.

3          All right.  The Court will call United States of

4   America versus Richard McKenzie, Criminal Matter 08-1669 JB.

5          Counsel will enter their appearances.

6          MR. MARTINEZ:  Damon Martinez on behalf of the United

7   States.

8          THE COURT:  Mr. Martinez, good afternoon to you.

9          MR. PADILLA:  Good afternoon, Judge.  Alonzo Padilla

10   on behalf of Mr. McKenzie, who also appears.

11          THE COURT:  Mr. Padilla, good afternoon to you.

12          Mr. McKenzie, good afternoon to you.

13          THE DEFENDANT:  Good afternoon.

14          THE COURT:  All right.  Y'all have to give me some

15   direction here.  My recollection was that evidence was closed

16   by the parties after we had the suppression hearing but subject

17   to it being re-opened after I completed my work on the motion

18   to compel, and so I have dealt with that issue.

19          And I understand, Mr. Padilla, that you have evidence

20   that you wish to present.  Is that sort of the status of -- or

21   the posture of our suppression hearing today?

22          MR. PADILLA:  Yes, sir.  And this is -- I talked to

23   Mr. Martinez about this a couple of days ago, but testimony or

24   evidence I would want to submit are just some additional

25   questions for the agent, that should not take very long.  I

1    imagine I can conclude that fairly quickly.  But I just wanted

2    to clarify some matters that I think are important for the

3    Court's ruling in terms of the motion itself, the motion to

4    suppress, and wanted to make the record complete to make sure

5    that that information is before the Court.

6            THE COURT:  All right.  And, Mr. Martinez, I

7    understand you don't have any evidence to present.  Is that

8    correct?

9            MR. MARTINEZ:  No, Your Honor.

10            THE COURT:  Any additional?  All right.

11            Are you ready to --

12            MR. PADILLA:  Yes, sir.

13            THE COURT:  -- call Mr. Hyland?

14            All right.  Mr. Hyland, if you'll come up and stand

15   next to the witness box before you're seated, Ms. Wild will

16   swear you in.

17       (Witness sworn.)

18            MS. WILD:  Please be seated.  State your name for the

19   record, and spell your last, please.

20            THE WITNESS:  Mark Hyland, H-Y-L-A-N-D.

21            THE COURT:  Mr. Hyland.  Mr. Padilla.

22            MR. PADILLA:  Thank you.

23

24

25

1                        MARK HYLAND,

2        after having been first duly sworn under oath,

3        was questioned and testified as follows:

4                      DIRECT EXAMINATION

5    BY MR. PADILLA:

6    Q.   Now, Agent Hyland, I'm going to be asking you some

7    questions.   Hopefully, I won't be asking you anything that's

8    been covered, but if I do, I apologize both to the Court and

9    counsel.

10           The Court has made a ruling, as you know, regarding

11   the request I had made for the confidential source --

12   confidential informant that we referred to, but I wanted to ask

13   you some questions along that line, but not asking for

14   specifics.

15           First of all, when you testified, you indicated that

16   this investigation began as a result of the Passenger Name

17   Record that you received, what's been referred to as a PNR?

18   A.   Correct.

19   Q.   And it's my understanding, again referring back to your

20   prior testimony, that you or someone in your office received a

21   fax of that PNR?

22           MR. MARTINEZ:   Objection.   Asked and answered.

23           MR. PADILLA:   And I understand that, Your Honor.

24           THE COURT:   Well, it may be, but my memory is not

25   good enough to probably handle that, so I'll allow the

```
 1   question.

 2   Q.    Anyway, to begin with, was that fax directed specifically

 3   to you?  I don't think we covered that in the last hearing.

 4             MR. MARTINEZ:  Objection, irrelevant.

 5             THE COURT:  Overruled.

 6   A.    No.

 7   Q.  (By Mr. Padilla)  Do you remember if it was received in

 8   your office with a cover sheet?

 9             MR. MARTINEZ:  Objection, irrelevant.

10             THE COURT:  Overruled.

11   A.    I don't know.

12   Q.  (By Mr. Padilla)  And just in terms of a question about

13   the procedure, because I assume this happens on a pretty

14   frequent basis, as the DEA receives a PNR, is it faxed just

15   generally to the Drug Enforcement Administration and someone

16   at that point gives it to whoever is going to be working the

17   train that day?

18             MR. MARTINEZ:  Objection, irrelevant.

19             THE COURT:  Overruled.

20   A.    It comes to the interdiction group.  We have our own fax.

21   Q.  (By Mr. Padilla)  It goes directly to your group?

22   A.    Yes.

23   Q.    And did you specifically take that out of the machine that

24   morning, if you recall?

25             MR. MARTINEZ:  Objection.
```

1    Q.   (By Mr. Padilla)   If you recall.

2               THE COURT:   Overruled.

3    A.   I can't recall.

4    Q.   (By Mr. Padilla)   And you don't recall -- And you do not

5    recall whether it had a cover page or not?

6    A.   No.

7    Q.   And in regard to the source of this PNR, do you recall

8    whether that was sent to your office, the interdiction group,

9    from a fax number in Arizona or in the state of New Mexico?

10              MR. MARTINEZ:   Objection, Your Honor.   I'm not sure

11   how this is relevant to the issue of suppression.   It may have

12   been relevant to the issue that you've already decided.

13              MR. PADILLA:   Your Honor, my response would be that

14   our argument is that this was an investigative stop and not a

15   consensual encounter, so I think that all this information that

16   this agent or other agents relied upon is important for the

17   Court's determination to determine if it was, in fact,

18   consensual or whether it was an investigative stop.

19              THE COURT:   Well, I'm going to allow Mr. Padilla to

20   create some record here, and his theory is that it's an

21   investigative stop, so I need to allow him some leeway to

22   create a record here.   Overruled.

23   A.   Okay.   Could you rephrase it, please?

24   Q.   (By Mr. Padilla)   Yeah.   The question was whether the PNR,

25   the Passenger Name Record, was sent to you from a fax machine

1   in the state of New Mexico or the state of Arizona.

2           MR. MARTINEZ:  Objection, Your Honor, irrelevant.

3           THE COURT:  Overruled.

4   A.   I think it's Arizona.

5   Q.  (By Mr. Padilla)  So could we assume, had the individual

6   who had the initial encounter with Mr. McKenzie when he picked

7   up his ticket, which had been prepaid, that he was that person

8   that would have relayed that information to your office?

9           MR. MARTINEZ:  Objection, Your Honor.  Based upon the

10  prior case that was argued concerning your decision, this is

11  getting dangerously close of being able to identify certain

12  individuals.

13          THE COURT:  I think -- I'm going to sustain the

14  objection to that question.

15  Q.  (By Mr. Padilla)  Again, I don't know if this will -- I'm

16  sure there will be an objection to this next question, but, to

17  your knowledge, was this particular ticket agent conveyed that

18  information to your office trained by either Agent Claiborne

19  or Agent Perry?

20          MR. MARTINEZ:  Objection, Your Honor.  Asked and

21  answered.

22          THE COURT:  Overruled.

23  A.   Not to my knowledge.

24  Q.  (By Mr. Padilla)  The person was not trained by your

25  office?

1    A.    I don't know.

2    Q.    Because you recall from the last testimony -- or the last

3    hearing we had, that you testified that these ticket agents --

4    and I think that's what brought this issue to a head -- but

5    that those ticket agents were trained by Claiborne and Perry,

6    and they were trained to look for particular characteristics

7    that might meet the drug-courier profile.   Correct?

8    A.    They were controlled by those DEA employees, by Task Force

9    Officer Claiborne and Agent Perry.

10   Q.    What do you mean by "they were controlled by"?

11   A.    Those are their primary contacts.

12   Q.    So that the agents that you were referring to were dealing

13   directly with Perry and directly with Claiborne and not anyone

14   else in your office locally?

15            MR. MARTINEZ:   Objection, Your Honor.   This has

16   nothing to do with the type of stop that the defense says that

17   he's trying to establish a record for.

18            THE COURT:   Well, I think he's just clarifying what

19   was testified earlier, so I'll allow this.   Overruled.

20   Q.    (By Mr. Padilla)   Okay.

21   A.    Yes, they primarily have contact with that person.

22   Q.    And you're talking about someone other than whoever may

23   have faxed this to your office on that particular date?

24   A.    I don't understand that question.

25   Q.    Okay.   The question is whether the person -- And we're not

1    asking for their identity, but whoever faxed that information

2    to you, and, again, is the PNR that you relied upon when you

3    went to the train station -- could we conclude that that person

4    was not working directly with or in contact with Perry or

5    Claiborne?

6              MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

7              THE COURT:  Overruled.

8    A.   No, that -- that is that person.

9    Q.   (By Mr. Padilla)  Oh, okay.  Well, you're confusing me,

10   and probably the Court, too.  You're saying that person did,

11   in fact, convey this information to either Perry or Claiborne

12   and that was the intention when they sent it to your office?

13   A.   Yes, sir.

14   Q.   And again, you don't remember whether it was a cover page?

15   And that would have established whether or not it was sent to a

16   particular person.  Would you agree?

17   A.   To my knowledge, there was no cover page.

18   Q.   And if there had been, would you have provided that to the

19   Government to provide it to me in discovery?

20   A.   I don't know if I would have kept the cover page.

21   Q.   But your recollection is there was no cover page?

22   A.   Correct.

23   Q.   And this individual would have seen Mr. McKenzie in

24   person, correct?

25             MR. MARTINEZ:  Objection, Your Honor.

1          THE COURT:  Well, why don't you lay a foundation

2    question there, whether he would know the answer to that, and

3    then we'll decide whether the question is objectionable.

4    Q.  (By Mr. Padilla)  This ticket agent, or any other ticket

5    agent working for Amtrak, would have been the person that

6    Mr. McKenzie or anyone else came in contact with to get a

7    ticket.  Is that a fair statement?

8              MR. MARTINEZ:  Objection.  Calling for speculation.

9              THE COURT:  Well --

10             MR. PADILLA:  Well, he can answer that.

11             THE COURT:  Again, I think we need a foundational

12   question, whether he knows this or not, and then I think that

13   will probably take care of the objection.

14   Q.  (By Mr. Padilla)  Do you know one way or the other

15   whether -- that procedure for the ticket agent giving a

16   particular ticket to a person on a particular day?

17   A.   I don't know what would have happened at that station.

18   Q.   And I think to clarify -- not to ask you any questions

19   you've been asked again, but I don't have complete memory,

20   either, as to what happened -- but is it fair to say that you

21   never spoke to this individual, either before, during, or after

22   Mr. McKenzie's arrest?

23             MR. MARTINEZ:  Objection, Your Honor.  Asked and

24   answered.

25             THE COURT:  Overruled.

1    A.    Correct.

2    Q.  (By Mr. Padilla)  And to your knowledge, has this

3    particular ticket agent provided reliable information in the

4    past that resulted in either an arrest or seizure of

5    contraband?

6              MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

7              THE COURT:  Why don't -- Why don't we have a

8    foundational question whether he knows, and then I'll determine

9    whether he can answer this.

10   Q.  (By Mr. Padilla)  Again, without asking for the name of

11   this person, based on your employment at the DEA and the type

12   of work you do, including the drug interdiction actions at the

13   station, have you had any prior experiences with this ticket

14   agent?

15             MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

16             THE COURT:  Overruled.

17   A.    Yes.

18   Q.  (By Mr. Padilla)  And getting back to my previous

19   question, has this particular ticket agent provided reliable

20   information in the past that resulted in either an arrest

21   and/or confiscation of drugs or contraband?

22   A.    Yes.

23   Q.    And when you received that fax on that particular date,

24   would it be fair to say you felt this was a reliable source?

25   A.    Yes.

1   Q.   And that would be based on your prior experience with this

2   individual?

3   A.   Correct.

4   Q.   And I think we established in the last hearing that the

5   DEA no longer has direct access to information about the

6   passenger manifest or passengers on a particular train.

7   Correct?

8           MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

9           THE COURT:  I'll allow the question.  Overruled.

10  A.   Correct.

11  Q.   (By Mr. Padilla)  And again, not wanting to have you

12  testify to what you've already testified to, but it's

13  important for the questions I'm going to ask.  The procedure

14  in place when Mr. McKenzie was arrested is that the ticket

15  agents who had been trained by the Drug Enforcement

16  Administration would send information to your office regarding

17  the passengers that they felt might fit the profile of a drug

18  courier, correct?

19          MR. MARTINEZ:  Objection.  Asked and answered.

20          THE COURT:  Well, it probably has been, but I'll

21  allow it here, given the gap of time.

22  A.   Correct.

23  Q.   (By Mr. Padilla)  And, sir, in this particular case

24  involving Mr. Richard McKenzie, after receiving information --

25  that is, the information about Mr. McKenzie from the PNR --

1    did you run that name through NCIC?

2    A.    No.

3    Q.    And that has been a procedure used in the past, has it

4    not, by the Drug Enforcement Administration?

5    A.    Well, I know you need personal identifiers to run an NCIC

6    computer check.  You can't just run a name.

7    Q.    But it has been done in the past, has it not?

8    A.    I think it has been, yes.

9    Q.    Sir, do you recall testifying in the case of U.S. versus

10   Denny, found at 441 F.3d 1220?  This is a Tenth Circuit case in

11   2006.

12   A.    I remember testifying.

13   Q.    A traffic accident case.  Do you remember that case?

14   A.    Uh-huh.

15   Q.    And I think you were one of the main participants in that

16   particular case, but do you remember testifying in that

17   particular case that an NCIC was run on the individual who came

18   up on the passenger list who was suspected as being a drug

19   trafficker?

20   A.    I don't recall that specifically, no.

21            MR. PADILLA:  I'd ask the Court to take judicial

22   notice of this case and the fact that it does say that --

23   whatever -- it relies upon Hylander's testimony in explaining

24   how Amtrak interdictions were being performed at that

25   particular time, and in this particular case involving

1  Mr. Denning, it indicates that an NCIC report was run for the

2  defendant prior to the train arriving in New Mexico.

3  Q.   Does that refresh your memory?

4           MR. MARTINEZ:   I'm going to ask defense counsel, does

5  he have an extra copy of that case?

6  Q.   (By Mr. Padilla)   In other words, does that refresh your

7  memory as to the testimony in that particular case?

8  A.   A little bit.  I mean, that was quite a while ago.

9  Q.   And you also testified in that case -- and this would be

10  in footnote number 1 -- that oftentimes people, in your

11  opinion, as drug couriers will purchase a ticket immediately

12  before travel because they don't really know when they're going

13  to get their drugs from the source city and that they leave

14  their travel open so that they can go ahead and obtain their

15  drugs and then take the train shortly after that.

16  A.   That's a common occurrence that we see.

17  Q.   Okay.  And you, of course, would agree that that was not a

18  factor in this case, due to the fact that Mr. McKenzie had

19  purchased his ticket at least five days before travel, which

20  someone, as a family member, used on a credit card.  Do you

21  remember that?

22  A.   Yes, sir.  It was a third-party purchase.

23  Q.   And so this case doesn't really come within the type of --

24  it wasn't the type of factor that would have been applicable to

25  determining whether a person met the drug-courier profile?

1   A.   Well, there were other factors there.

2   Q.   Okay.  But in terms of that factor, that's not present in

3   this case?

4   A.   Correct.

5   Q.   And in terms of other factors, one would be originating

6   from a source city and going to a source city?

7   A.   Correct.

8   Q.   And --

9   A.   The cost.

10  Q.   And the cost.  Now, Amtrak, obviously, makes these

11  sleeper -- sleeper compartments available to the public or to

12  any other people that travel for whatever reason using the

13  sleeper compartment?

14  A.   Correct.

15  Q.   And there are people, obviously, willing to pay that

16  price?

17  A.   Well, he paid a high price because it was booked within

18  five or six days of travel during the summer busy season.

19  Q.   Right.  But in terms of the general public, that would

20  have been the price anyone would have paid if they would have

21  made their reservations --

22  A.   Correct.

23  Q.   -- late?

24       And other than those two factors, can you remember

25  any other factors that stuck out in your mind as to why

1    Mr. McKenzie should be approached?

2    A.    No.

3    Q.    Just those two factors?

4    A.    Yes.

5    Q.    And in terms of the source city, would you agree that's

6    pretty ambiguous, in terms of a source city could be pretty

7    much any city in the west?  Los Angeles, Las Vegas, Phoenix,

8    Tucson, Albuquerque, et cetera?

9    A.    And many of the cities in the western source cities, yes,

10   because we're so close to border.

11   Q.    But that in and of itself would not be enough.  Would you

12   agree?

13   A.    Correct.

14   Q.    Now, after arriving at the train station -- you already

15   testified about this, so I'll try to skip over this as quickly

16   as possible -- again, because of the information you

17   received -- maybe you can clarify this -- did you know

18   immediately what sleeper compartment and what car he would be

19   located in?

20   A.    Yes.

21   Q.    And so you went directly to him or to that sleeper, or did

22   you go talk to the conductor first?

23   A.    I went to the car first, and I found the conductor.

24   Q.    And, sir -- But you wanted to find out where Mr. McKenzie

25   was, correct?

1   A.    I wanted to see if Mr. McKenzie was even on the train.

2   Q.    And he verified that he was in, I think, 431 or whatever

3   the compartment was?

4   A.    Yes.

5   Q.    Did you talk to the conductor at length about

6   Mr. McKenzie, in terms of what he did during the train ride,

7   whether there was anything suspicious in the way of his

8   conduct, his questions, anything of that nature?

9   A.    I asked him was he in his room or was he -- what was he

10  wearing, was he acting as you've suggested, was there any

11  strange behavior, et cetera, and I probably spent only 15 or 20

12  seconds with the conductor.  He told me he was in -- probably

13  about 30 years old, 35 years old, and he was wearing a white

14  shirt, and he didn't know if he was in his car or not.

15  Q.    But he didn't indicate there was anything suspicious about

16  his conduct?

17  A.    No.

18  Q.    Didn't indicate that Mr. McKenzie appeared to be nervous?

19  A.    No.

20  Q.    Or that he wanted his privacy and didn't want anybody in

21  his room and just shut up in his room the whole time?  Never

22  said anything about that?

23  A.    No.

24  Q.    That was the extent of the information you received --

25  A.    Correct.

1    Q.    -- from the conductor?

2            Now -- And again, I think it's been testified to,

3    clearly, when you approached Mr. McKenzie, that he was on the

4    platform smoking a cigarette, that he didn't appear to be

5    nervous, to exhibit any kind of suspicious conduct.

6    A.    Not initially, no.

7    Q.    He was just smoking a cigarette, correct?

8    A.    Correct.

9    Q.    When you, I guess, were looking for Mr. McKenzie, from

10   what I recall, you were having a difficult time locating him

11   based on the -- well, the fact that he wasn't in the -- on the

12   train, he wasn't in the dining car, and he didn't appear to be

13   in the platform when you first went outside.   Correct?

14   A.    Correct.

15   Q.    But once you saw this individual who you thought to be

16   Mr. McKenzie, you did make up your mind to approach him

17   immediately, correct?

18   A.    Yes.

19   Q.    And in terms of the description you received from the

20   conductor, you indicated he was wearing a white T-shirt or --

21   A.    Or a white golf shirt.

22   Q.    About 30 years old?

23   A.    Thirty or 35.

24   Q.    African American?

25   A.    He didn't mention that, no.

1   Q.    He did not mention that he was African American?

2   A.    No.

3   Q.    As soon as you determined that this appeared to be

4   Mr. McKenzie, you did immediately turn on your belt recorder,

5   correct?

6   A.    I turned it on before I approached Mr. McKenzie.

7   Q.    Right.  In other words, before -- he wasn't aware that you

8   were turning it on?

9   A.    Correct.

10  Q.    And you didn't notify him that you had your belt recorder

11  running to record your conversation?

12  A.    No.

13  Q.    And you, obviously, didn't get his permission to record

14  the conversation either?

15  A.    No.

16  Q.    And would it be fair to say that the practice of the Drug

17  Enforcement Administration is to turn on the tape recorder as

18  soon as you find the target or the individual that you're

19  looking for based on the information you previously received?

20  A.    Yes.

21  Q.    And you don't turn on the belt recorder to talk to, let's

22  say, witnesses in a case.  You didn't have it on when the

23  conductor was answering your questions, correct?

24  A.    Correct.

25  Q.    And it's not your practice to have it on while you're

1    talking to other individuals who might have information about

2    someone you're investigating?

3    A.    No.

4    Q.    But your practice is to turn it on as soon as you know

5    that that's the target of your investigation, correct?

6    A.    I didn't know that was the target of my investigation.

7    Q.    But you did turn on your recorder at that time?

8    A.    Before I started any consensual encounter, yes.

9    Q.    Now, in addition to -- And I think maybe this is clear

10   from the information we've gotten from you so far, but the

11   person, the confidential source that provided this information

12   to you, did they provide any kind of physical description of

13   Mr. McKenzie, in terms of what he was wearing, his age, and his

14   nationality or ethnicity?

15            MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

16            THE COURT:  Overruled.

17   A.    I can't remember.

18   Q.  (By Mr. Padilla)  Okay.  So you might have spoken to this

19   person?  Is that how I can interpret that answer?

20   A.    No, I don't -- I never spoke to that individual.

21   Q.    But they might have -- But that individual might have

22   provided you information that you don't recall at this time?

23   A.    Possibly.

24   Q.    Okay.  Can you explain that?  You just stated you didn't

25   speak to this person, but it's possible that this person might

1   have provided you physical -- or some information to you about

2   his physical appearance?

3           MR. MARTINEZ:  Objection, Your Honor.  This is

4   irrelevant.

5           MR. PADILLA:  Well, it's confusing.

6           THE COURT:  I'll allow the question.  Let me have him

7   clarify it.  Overruled.

8   A.   I can't remember the specific case, but I know I didn't

9   talk to the individual.

10  Q.  (By Mr. Padilla)  But you might have received information

11  from this individual through some other source, through

12  another agent?

13  A.   No.

14  Q.   I guess -- I hope you understand why I'm confused, because

15  you said, I didn't talk to this person, but then you say this

16  person might have provided some information to you about the

17  physical appearance.

18  A.   He provided the PNR.

19  Q.   Is any training provided to agents, particularly in this

20  office, regarding the use of a tape-recorder, when you use it,

21  when you shouldn't use it, and things of that nature?

22  A.   On-the-job training.

23  Q.   And what exactly are you told about the use of the

24  tape-recorder when you're encountering persons like

25  Mr. McKenzie in this situation?

1  A.   Well, prior to me getting into interdiction in 2000, they

2  were already using tape-recorders, and we've -- I think they

3  continue to do that.

4  Q.   Right.  But in terms of any kind of training that you've

5  received, even on the job, as to when you should turn it on and

6  what point it should be turned on when you're approaching a

7  target, when it should be turned off, anything in the way of

8  training regarding that?

9  A.   I always turn it on before I start my consensual

10  encounter.  If I'm in a coach car, there are several

11  passengers, because the coach has many passengers, I'll turn it

12  on and start at one end and just continue to talk to people as

13  I go through the car.

14  Q.   But in this case that wasn't the case?  You had one person

15  and that was Mr. McKenzie, who you wanted to investigate or

16  question about his travels, correct?

17  A.   Correct.

18  Q.   And I think from the last hearing it was established that

19  there was probably about maybe 200 or 300 people on this train.

20  A.   Yes.

21  Q.   And this was the only report -- or the only PNL -- excuse

22  me -- PNR that you received regarding passengers in that train?

23  A.   I believe so, yes.

24  Q.   And there's no question that if Mr. McKenzie had purchased

25  that ticket immediately before travel, with cash, that he would

 1  have been -- he would have fit within the drug-courier profile

 2  that you look at as an agent?

 3          MR. MARTINEZ:  Objection, Your Honor.  Calling for

 4  speculation.

 5          THE COURT:  Well, if he can answer it.

 6  A.   Yes, I would have approached Mr. McKenzie.

 7  Q.  (By Mr. Padilla)  It would give you more reason to

 8  approach him if he had paid cash for that ticket immediately

 9  before travel?

10  A.   Correct.

11  Q.   This will be the last question.

12          Out of all the passengers, at least the ones that got

13  on the train in Flagstaff, do you know whether -- for a fact

14  whether any of those individuals paid for their ticket with

15  cash?

16          MR. MARTINEZ:  Objection, Your Honor.  Calling for

17  speculation.

18          THE COURT:  Well, it's a foundational question at

19  this point.

20  A.   I can't answer that question.

21  Q.  (By Mr. Padilla)  Why?

22  A.   I don't know.

23          MR. PADILLA:  I have no further questions, Your

24  Honor.

25          THE COURT:  All right.  Thank you, Mr. Padilla.

1              Mr. Martinez, do you have cross-examination of

2    Mr. Hyland?

3              MR. MARTINEZ:  Yes, Your Honor, I do.

4              THE COURT:  Mr. Martinez.

5              MR. MARTINEZ:  Your Honor, if I may have a moment?

6              THE COURT:  You may.

7                        CROSS-EXAMINATION

8    BY MR. MARTINEZ:

9    Q.   Agent Hyland, you were just asked about the case of United

10   States versus Denny.  Do you remember being asked about that?

11   A.   Yes, sir.

12   Q.   And isn't it true that you were actually involved -- or

13   let me ask -- Do you remember, if the case cites that there

14   were actually three DEA agents involved, Ron Deist, Mark

15   Hyland, and William Dorian, is that accurate?

16   A.   Yes.

17   Q.   And you stated on -- in response to the previous question,

18   that you didn't -- you didn't remember whether you did a

19   background check or not.

20   A.   Correct.

21   Q.   And have you read this case?

22   A.   That's many -- That's several years ago.  No, I haven't

23   read it.

24   Q.   Now, on page -- On page 1222, if it states, "Agents also

25   ran a criminal history check on Defendant and found prior

1    drug-related convictions," that doesn't indicate that you're

2    the one that ran the background check, right?

3    A.   Correct.

4    Q.   Now, on Footnote 1, do you remember in this case

5    testifying, "Explain the significance of a one-way ticket"?

6    A.   Yes.

7    Q.   And do we have a one-way ticket in this case?

8    A.   Yes.

9    Q.   Now, also in this case you have the defendant -- you have

10   the defendant's ticket being bought days before, right?

11   A.   Correct.

12   Q.   And it was five days before?

13   A.   Yes.

14   Q.   Now, as part of your thinking, you asked for permission to

15   go into his sleeping compartment.  Is that true?

16   A.   Yes.

17   Q.   And in his sleeping compartment you asked him where he was

18   coming from and going to, right?

19   A.   Yes.

20   Q.   And did he indicate to you why he was on the West Coast?

21           MR. PADILLA:  That goes beyond the questions that

22   were asked during my questioning of this witness.

23           THE COURT:  Well, I'll allow it, and I'll allow you

24   to redirect on that issue, Mr. Padilla.  Overruled.

25   Q.   (By Mr. Martinez)  Did he tell you why he was on the West

1    Coast -- or where he was?

2    A.    Yes.

3    Q.    What was that?

4    A.    It was a family reunion in Phoenix.

5    Q.    And when you were in the sleeping compartment did he

6    indicate whether he liked to fly or not?

7    A.    He told me he did not like to fly and that was why he was

8    on Amtrak.

9    Q.    Now, did you examine his luggage in the sleeping

10   compartment?

11   A.    Yes.

12          MR. PADILLA:  These were asked and answered at the

13   prior hearing, Your Honor.

14          THE COURT:  Well, I think they are, but I haven't had

15   a chance to review the transcript in full since then, so I'm

16   going to allow the question.  Overruled.

17   Q.    (By Mr. Martinez)  Did you examine his luggage in the

18   sleeping compartment?

19   A.    Yes.

20   Q.    And did you see a tag for an airline flight on his

21   luggage?

22   A.    Yes.

23   Q.    Now, put that in context with when this one-way ticket was

24   bought.

25   A.    It was -- He flew on July 3rd, 2008, and the baggage claim

1  ticket had his name on it, which is the same name that was on

2  the Amtrak ticket.

3  Q.   Now, was that important to you in your investigation of

4  this defendant?

5  A.   Yes.

6  Q.   How was that important to you?

7  A.   Well, Mr. McKenzie had already told me that he didn't like

8  to fly and that's why he was taking the Amtrak train, and yet

9  he had flown approximately five days before I'm encountering

10 him.

11 Q.   Did this evidence provide -- Did this -- Did these facts

12 provide evidence of a drug courier to you?

13 A.   Yes, sir.

14 Q.   Why?

15 A.   It's common for them to fly out to the source city, since

16 they're not carrying any contraband, to stay in the source city

17 until they get the contraband, and then to take Amtrak or the

18 bus to go back to their -- to their city.

19 Q.   Now I'm going to read you something from this case that

20 you were examined, United States versus Denny.  It's a

21 footnote, and it says, "Agent Hyland further explained the

22 significance of the timing of defendant's purchase."  This is

23 you talking.

24      Or let me ask if you remember saying this.  "Due to

25 my training, experience, narcotic couriers commonly -- they

```
 1   don't have control of their time.  They have to -- they may be

 2   waiting for narcotics to arrive at their city of origin, and

 3   they don't know how they're going to get back, and they make

 4   reservations at the last minute, they purchase tickets at the

 5   last minute."

 6           Now, when you said -- Do you remember saying this --

 7   A.   Yes.

 8   Q.   -- now that I'm reading this to you?

 9           When you say "last minute," do you remember literally

10   the last minute?

11   A.   Sometimes it is the last minute.

12   Q.   But what could you -- What exactly did you mean by the

13   "last minute," by that phrase?

14   A.   A short time between when they get the narcotics and when

15   they're going to depart to go back home.

16   Q.   Would that be a short time before they actually get on the

17   train?

18   A.   It could be.

19   Q.   Now, you asked -- When he was -- When you were being asked

20   questions about this case, and the defense counsel was trying

21   to distinguish this case from what happened in Mr. McKenzie's

22   case, you stated no, that you don't have the same circumstances

23   here in Mr. McKenzie's case, right?  Did you say that?

24   A.   Yes.

25   Q.   Well, I'm asking you, is purchasing a ticket, a one-way
```

1   ticket five days prior to getting on a train -- would you

2   consider that last minute?

3   A.    It's not -- Well, it's not last minute, but it's close.

4   Q.    Okay.  And what do you mean by that?

5   A.    That it's -- Well, it's within the time frame that a drug

6   courier could be planning on returning home.

7   Q.    So it is close in time?

8   A.    Yes.

9   Q.    And part of that consideration is it's a one-way ticket?

10  A.    And it is a one-way ticket, yes.

11  Q.    And in this case you had -- you had drug coming from a

12  source city?

13  A.    Yes, sir.

14  Q.    And had indications that the drug was being taken to a

15  destination city?

16  A.    Yes.

17  Q.    And is that part of the courier profile?

18  A.    Yes.

19  Q.    And in preparation for this hearing you did not read

20  United States versus Denny, did you?

21  A.    No, sir.

22        MR. PADILLA:  I'm sorry, what was the last question?

23        MR. MARTINEZ:  "In preparation for this hearing, you

24  did not read United States versus Denny?"

25        Your Honor, when defense counsel asked the Court to

1    take judicial notice of United States versus Denny.  I would

2    ask that if the Court does that, that it look for a specific

3    sentence in this case where it indicates that Officer Hyland is

4    the person who testified to the background being done.  I don't

5    believe it exists in this case.  I believe it states that NCIC

6    was done, but it doesn't indicate that Agent Hyland was the

7    person that did that.

8    Q.   Agent Hyland, you were asked about an NCIC check.  You

9    need personal identifiers to do that, right?

10   A.   Yes.

11   Q.   And in this case did you have those personal identifiers?

12   A.   No.

13            MR. MARTINEZ:  Pass the witness, Your Honor.

14            THE COURT:  Thank you, Mr. Martinez.

15            Mr. Padilla, do you have redirect of Mr. Hyland?

16                     REDIRECT EXAMINATION

17   BY MR. PADILLA:

18   Q.   You were asked questions about the Denny Travis case.  Do

19   you specifically remember what information as -- specific

20   information about Mr. Denny that you had or whether the agents

21   had to be able to run an NCIC?

22   A.   No, sir.

23   Q.   I'm sorry?

24   A.   No, I don't.

25   Q.   You don't recall?

```
 1    A.    No.
 2    Q.    But in this particular case -- that is, Mr. McKenzie's
 3    case -- from the PNR, you did have his full name, Richard
 4    McKenzie?
 5    A.    Yes.
 6    Q.    And you're indicating that you would need more than that?
 7    A.    Yes.
 8    Q.    Did you also -- Would you also include where he was
 9    residing?  Because in this case were you aware that he was from
10    New York and that was his residence?
11    A.    I wouldn't have known that until after speaking with
12    Mr. McKenzie.
13    Q.    And I'm not familiar with how the NCIC works.  I'm going
14    to ask you a question there.  If you were to just put in a
15    name, is it possible that you could get five hits on that name
16    add then narrow it down to a particular person?  Because I
17    don't know what happens when you run an NCIC.  If you could
18    explain that to the Court.
19    A.    Without personal identifiers, you wouldn't be able to get
20    anything.
21    Q.    What are the personal identifiers you're talking about?
22    A.    The date of birth or a Social Security number.
23    Q.    Now, in the past -- I know -- I think you testified that
24    it's not the procedure now, but in the past, have you
25    personally, as an agent, run an NCIC check on a passenger who's
```

1    arriving on a particular day?

2          MR. MARTINEZ:  Objection.  Asked and answered.

3          THE COURT:  Overruled.

4    A.   If I have a personal identifier with a name, I could run

5    it.

6    Q.  (By Mr. Padilla)  Okay.  That question is, have you ever

7    run an NCIC on a passenger who you were targeting as a part of

8    an investigation?

9    A.   Yes.

10   Q.   And you were asked questions about going into the sleeper

11   and seeing the luggage with the tag from the airline, correct?

12   A.   Yes.

13   Q.   But you didn't know that until you actually got into

14   Mr. McKenzie's sleeping compartment -- sleeper compartment?

15   A.   Correct.

16   Q.   So when you first approached him, you didn't know anything

17   about where he was coming from or how long he had been in

18   Phoenix or whether he'd even been in Phoenix, correct?

19   A.   Correct.

20   Q.   And I guess we could play games with the definition of

21   what a last-minute purchase is, but wouldn't you agree that in

22   the majority of the cases that you've dealt with over the years

23   a last-minute purchase means the person arrives at the train

24   station shortly before the train is leaving and purchases a

25   ticket with cash?

1          MR. MARTINEZ:  Objection.  Argumentative.

2          THE COURT:  Well, let him define this term.

3     Overruled.

4     A.   Many times it's closer than five days.

5     Q.  (By Mr. Padilla)  And usually the same day.  Would that be

6     a fair statement?

7     A.   Many times it is the same day, the day of travel.

8     Q.   And many times it's an hour or two hours before travel?

9     A.   Sometimes, yes.

10    Q.   And you've been doing this for how many years, in terms of

11    the drug interdiction and the training?

12    A.   About eight years.

13    Q.   Would you agree that it's very rare that a person who is

14    caught with drugs would purchase their ticket with a credit

15    card five days prior to that train leaving?

16    A.   It's rare, yes.

17    Q.   Thank you.

18          MR. PADILLA:  No further questions, Your Honor.

19          THE COURT:  Thank you, Mr. Padilla.

20          All right, Mr. Hyland, you may step down.  Thank you

21    for your testimony.

22          Mr. Martinez, do you have any further evidence that

23    you wish to present?

24          MR. MARTINEZ:  No, Your Honor.

25          THE COURT:  All right.  And, Mr. Martinez -- Did I

```
 1    say Mr. Padilla?
 2              I'm sorry, do you have any, Mr. Padilla?
 3              MR. PADILLA:  No, sir.
 4              THE COURT:  Do you have anything further,
 5    Mr. Martinez?
 6              MR. MARTINEZ:  No.
 7              MR. PADILLA:  If I may have --
 8         (A conference was held between the defendant and
 9         Mr. Padilla.)
10              MR. PADILLA:  My client had some legal materials that
11    were with him this morning, unfortunately, they were sent back
12    to the facility with the prisoners that were going back, so he
13    doesn't have that information with him.
14              He has asked -- this is also based on a conversation
15    we had earlier -- and it's again his request and not mine --
16    that the Court consider conducting a Franks hearing in this
17    particular matter.  I don't see the reason or the need for
18    that, Your Honor, and I don't know if my client wants to
19    address that, but I wanted to bring that to your attention.
20              But in terms of any other testimony or evidence, we
21    don't have anything else to present at this time.
22              THE COURT:  All right.  And you have nothing further,
23    Mr. Martinez?
24              MR. MARTINEZ:  No, Your Honor.
25              THE COURT:  All right.  Well, I'll not conduct a
```

1    Franks hearing at the present time.  If y'all decide that

2    that's appropriate, then we can resume and do that, but at the

3    present time why don't we take up the motion to suppress?

4             Is there any arguments -- anything further you wish

5    to say on the motion to suppress, Mr. Padilla?

6             MR. PADILLA:  Your Honor, I think we've covered that

7    in our suppression motion and reply we filed to the

8    Government's motion.  I think it just comes down to whether or

9    not this was an investigative stop or a consensual encounter.

10   We feel that it is not a consensual encounter, and that's bore

11   out by the fact that this agent, Agent Hyland, specially

12   targeted Mr. McKenzie.  That was based on information that he

13   received from a reliable source, that source being the

14   confidential source in -- I'm assuming Arizona -- provided

15   information to him, I think specifically went to Mr. McKenzie

16   to confront him, to question him, and to obtain information

17   that would support his determination that has already been made

18   that Mr. McKenzie was a drug courier -- was a drug courier.

19            And this is further supported by the fact that when

20   he was approached -- when -- or when he approached Mr. McKenzie

21   he immediately turned on his belt recorder and started to

22   record the conversation.

23            I do not feel that the encounter in this case was

24   consensual in any sense of the word, that it was definitely an

25   investigative stop from the very beginning, and that under the

1    circumstances in this case, based on the testimony and evidence

2    we've presented -- and there is sufficient evidence to support

3    the Court's granting of our suppression motion at this stage.

4            And I -- I was not prepared to argue much beyond that

5    because we've covered those issues.  If you wanted us to brief

6    that again, we can certainly do that, Your Honor, but I think

7    that is the crux of what this case comes down to from our

8    perspective.

9            THE COURT:  All right.  Thank you, Mr. Padilla.

10           Mr. Martinez, do you wish to argue in opposition to

11   the motion?

12           MR. MARTINEZ:  Yes, Your Honor.  And I will argue

13   briefly.

14           Your Honor, the facts in this case are extremely

15   simple.  The PNR was not relied upon in any way except initial

16   information.  The initial approach to the defendant,

17   Mr. McKenzie, by Special Agent Hyland, the facts that you have

18   before you, it was a conceptual encounter.  Agent Hyland from

19   the beginning was asking permission to speak to Mr. McKenzie,

20   and it wasn't only at that point, but he continuously asked

21   Mr. McKenzie for additional things, such as "May I see your

22   ticket?"  When they went back to his room, "Can I enter your

23   room?  Can I search the luggage?"  And at each point, at each

24   stage in this process Mr. McKenzie said that -- gave

25   authorization to do such things.

1          And I pointed this out in the last hearing and I'm

2     sorry to repeat myself, but I think the best example of why

3     this was consensual from the very beginning was, when they got

4     to those heavy cereal boxes, Special Agent Hyland asked to

5     search the cereal boxes themselves, those three boxes.  It was

6     at that point that Mr. McKenzie said no and Agent Hyland

7     respected that.

8          Now, one of the issues here, Your Honor, was at what

9     point should this have been -- reasonable suspicion or probable

10    cause established, and the United States' position is that when

11    Agent Hyland went back to the compartment room with

12    Mr. McKenzie and what he observed in that compartment room, it

13    was at that point that there was probable cause to believe that

14    a crime had been committed.  And Mr. McKenzie was not arrested

15    at that point.  Agent Hyland, in furthering his investigation,

16    allowed Mr. McKenzie to go out on the platform.

17         And if I may remind the Court of the specific facts

18    of this case, it was out there that Mr. McKenzie was allowed to

19    use the phone to call his friend.  It was obvious that his

20    friend was not aware of what was going on, was just trying to

21    go with the situation.  And, also, if I can remind the Court,

22    bring to its attention, it was about that time when Special

23    Agent Hyland had had enough and went to arrest Mr. McKenzie and

24    that's when he started chasing him around in a Keystone Kop

25    type of scenario around the platform of the train station

1   himself.

2          Your Honor, the facts of this case, again, are very

3   simple.  This was a consensual encounter and the probable cause

4   and reasonable suspicion were established.

5          And the last argument, that I'm not mentioning, but

6   it is mentioned in the brief, is that Mr. McKenzie abandoned

7   the luggage, too, by after -- not allowing Agent Hyland to

8   arrest him on the platform, he then ran to his room, busted out

9   the window and took off down the platform itself and crossed

10  the barbed wire fence.  It was at that point that the luggage

11  and the compartment were abandoned and also the search warrant

12  that Special Agent Hyland obtained was proper in this manner,

13  Your Honor.

14         And I'm open to any questions the Court may have.

15         THE COURT:  Let me -- Let me ask you to address a

16  couple of points that Mr. Padilla has raised.

17         One is, at what point would you say that the officers

18  had reasonable suspicion?

19         MR. MARTINEZ:  It was in the compartment, Your Honor.

20         THE COURT:  In the compartment?

21         MR. MARTINEZ:  Yes, Your Honor.

22         THE COURT:  At what point in the compartment?

23         MR. MARTINEZ:  Well, Your Honor, it was -- Let me

24  back up, because starting with the document that Agent Hyland

25  had received, he had certain information concerning a

1    Mr. McKenzie.  In approaching Mr. McKenzie, asking for his

2    consent, he was able to verify the information by speaking to

3    him, and that was outside and leading up to the compartment.

4    He was able to verify that it was Mr. McKenzie, that it was a

5    one-way ticket.  And that corroborated his information.

6            Now, by going to the compartment itself, there's

7    several things in there.  One, he was able to corroborate that

8    there were two pieces of luggage, and also in speaking to the

9    conductor, that it was a deluxe compartment.

10           Now, the important thing about the deluxe compartment

11   itself was with Agent Hyland.  He's aware of that compartment,

12   and he's also aware of the benefits that go with that

13   compartment.  Specifically, there being you get free food for

14   purchasing that compartment.  How is that important?  Because

15   there's three cereal boxes there, and when Agent Hyland asked

16   him in the compartment why so many cereal boxes, "I like

17   cereal."  Well, Agent Hyland knows that you get free food by

18   buying that compartment.  He didn't see any boxes -- I'm sorry.

19   He didn't see any cereal bowls, he didn't see any milk, he

20   didn't see anything to indicate that this person really liked

21   eating cereal.

22           Also, it was in the compartment where -- I'm taking

23   this out of order here, but he was able to feel the weight of

24   the three boxes, he was able to feel a heavy weight in the

25   center of the boxes, he was able to feel the heavy weight of

1    the boxes themselves.

2            It was also while in the compartment -- And this is

3    what I brought up in questioning today, Your Honor, and I was

4    trying to, I guess, remind the Court in the context of the

5    courier information.  But this defendant was asked while in the

6    compartment, "Where are you coming from?  Where are you going

7    to?"

8            He's coming from a -- from a source city here in the

9    west or southwest and he's going to a destination city.  But

10   part of what's so important about that is, he says he doesn't

11   like to fly, but, yet, Agent Hyland is able to observe on one

12   of the luggage bags a label from an airline showing that he

13   flew in the day after the tickets were reserved, which shows

14   that he's coming into the area and he's getting out of the area

15   real fast like, Your Honor.

16           THE COURT:  But, while he was corroborating

17   information and getting further information, I believe you

18   indicated that it was not -- it was not until they were at the

19   sleeper car itself that you believe the officers had reasonable

20   suspicion.  Correct?

21           MR. MARTINEZ:  Yes, Your Honor.

22           THE COURT:  And at what point -- what point of the

23   sleeper car did they have that?

24           MR. MARTINEZ:  Well, I would say that definitely once

25   Agent Hyland felt the weight of the boxes and felt the -- felt

1   the boxes themselves, the cereal boxes.

2           THE COURT:  So after he saw the boxes at the bottom

3   of the baggage and picked them up, shook them, that's when he

4   did?

5           MR. MARTINEZ:  Yes.  Yes, Your Honor.  And the point

6   there is, everything that I was mentioning that happened before

7   hand, that's part of the context of how he arrived at that

8   point.

9           THE COURT:  Of that reasonable suspicion?

10          MR. MARTINEZ:  And it was all consensual.  It was

11  consensual when he asked to speak to him, it was consensual

12  coming into the compartment, it was consensual looking at the

13  bags.  He feels the boxes, and it's consensual at that point,

14  and then he asks, "Can I search the boxes, the cereal boxes?"

15  That's when the defendant says no.

16          THE COURT:  At what point would you say that the

17  officers had probable cause?

18          MR. MARTINEZ:  Well, it was at that point, too.

19          THE COURT:  Same point?

20          MR. MARTINEZ:  Yes, Your Honor.

21          THE COURT:  So they developed reasonable suspicion

22  and probable cause at the same point?

23          MR. MARTINEZ:  Yes, Your Honor.

24          THE COURT:  Anything further, Mr. Martinez?

25          MR. MARTINEZ:  No, Your Honor.

1              THE COURT:  Thank you, Mr. Martinez.

2              Mr. Padilla, I'll give you the last word on the

3    motion to suppress.

4              MR. PADILLA:  Yes, sir.

5              I think the Government has conceded that the

6    reasonable suspicion may have started when that information was

7    conveyed from the confidential source to the DEA office to have

8    them, I guess, look at --

9              THE COURT:  Well, he's certainly saying that that's

10   information that was part of the reasonable suspicion.

11             MR. PADILLA:  Right.

12             THE COURT:  But I think he's conceding, and I don't

13   think he'd probably argue otherwise, that he didn't have

14   reasonable suspicion just when he got the PNR.

15             MR. PADILLA:  Probably not.  But it was still the

16   information he relied upon to go talk to Mr. McKenzie, and also

17   that it's clear that they would not approach Mr. McKenzie

18   otherwise.  The train goes through Albuquerque every day, and I

19   think the DEA is pretty much there every day, and so they

20   didn't just go there looking for whoever looks suspicious; they

21   actually targeted Mr. McKenzie, and again, when they came

22   close -- when he indicated that that is who he felt

23   Mr. McKenzie was when he saw him on the platform, that that's

24   why he turned on his belt.

25             And as far as coming from a source or destination

1    city, that's very vague.   I don't remember the cite of the

2    Supreme Court that talks about that and it's analyzing the

3    drug-courier profile, but that's probably the weakest factor

4    that the DEA should rely upon in determining whether or not a

5    person meets the drug-courier profile.   They need more than

6    that.

7             And I think it's clear from the testimony of the

8    agent this morning that they did not have enough information --

9    at least that would be the argument I would make at this

10   point -- to even conclude that he met the drug-courier profile

11   based on the fact that he had not purchased this ticket with

12   cash and he did not purchase it immediately before travel.

13            But all things said, Your Honor, I think the question

14   comes down to whether or not it was a consensual encounter or

15   investigative stop, and I think it's, again, clear from our

16   perspective and the testimony that came out, that it was

17   definitely an investigative stop, and if not consensual, other

18   than maybe the initial conversation, but other than that, Your

19   Honor, it was not consensual.

20            The agent, based upon his authority as the agent from

21   the DEA, asked to see Mr. McKenzie's ticket.   He did not advise

22   Mr. McKenzie he had a right to refuse, he did not advise

23   Mr. McKenzie he had a right to not answer any of his questions.

24   He made it very clear that he was from the Drug Enforcement

25   Administration and that Mr. McKenzie had to comply with his

1    request, and those requests included showing the ticket, which

2    meant he had to go back to his compartment to grab it, and that

3    none of that was consensual in any sense of the word, Your

4    Honor.

5              THE COURT:  What -- How do you respond to

6    Mr. Martinez's point that -- that Mr. McKenzie knew that he

7    could refuse and -- refuse consent because that's sort of the

8    third time, whether to use the dog-sniffing -- the

9    drug-sniffing dog on the boxes?  Mr. McKenzie did refuse there

10   and indicated that he knew his rights.

11             MR. PADILLA:  Well, again, Your Honor, the agent got

12   into the compartment by his authority as a Drug Enforcement

13   Administration, and I don't think he ever gave Mr. McKenzie a

14   choice or ever advised him that he had a right to refuse to

15   allow him into the compartment.

16             I think he felt compelled to cooperate with the DEA,

17   and that I guess at some point it went too far, and I think the

18   reason for him not consenting -- and I think even the agent

19   testified to this -- was that Mr. McKenzie made it clear that

20   he was afraid of dogs, he did not want a dog near his person,

21   and that was the reason why he refused, and not because he

22   had -- because he knew he had a right to refuse that encounter.

23   I think that was clear from the record, that he had indicated

24   he was afraid of dogs and that was the reason he wasn't

25   agreeing to that procedure.

1          THE COURT:  All right.  Anything further,

2  Mr. Padilla?

3          MR. PADILLA:  No, sir.

4          THE COURT:  All right.

5          MR. PADILLA:  Again, I just wanted to clarify with

6  regard to my client's request from a Franks hearing, it's

7  coming from my client.  I told him about that, but it may

8  present some conflict between me and my client, how we proceed

9  with that.

10         I think Mr. McKenzie wanted to address the Court

11  because he doesn't have legal papers with him, but I have to be

12  honest as a member of the court, I'm not sure if a Franks

13  hearing is warranted in this case, but I'll talk to my client

14  some more about that, Your Honor, but it could present some

15  conflict down the road between myself and Mr. McKenzie if he

16  insists that we should request a Franks hearing.

17         THE COURT:  All right.  Well, I'll not conduct a

18  Franks hearing today, but if at some point the defendant wants

19  to move for such, then we'll deal with the request at that

20  point.

21         Let me first -- Mr. McKenzie.

22         THE DEFENDANT:  May I address the Court?

23         THE COURT:  You may.

24         Mr. McKenzie, let me caution you -- and I'm sure

25  Mr. Padilla -- about talking here in open court in front of the

1    Court on the record and in front of the United States without

2    your counsel.  I'm concerned about that.  I mean, I'm not going

3    to preclude you from talking, but I'm not sure that it's wise

4    for you to do so without spending some time with Mr. Padilla,

5    and then maybe requesting at another time to do it.

6          THE DEFENDANT:  As I say, my paperwork is not here,

7    and the thing is that I'm in CCA and the law library is

8    inadequate, but somehow I've been able to research my case,

9    and, based on the opinion that you handed down, there was an

10   informant.  I won't speak about anything incriminating, but

11   going to the specific things about the informant.

12          I told Mr. Padilla that when I first got arrested,

13   July 7th I had a preliminary hearing the next day, and at that

14   preliminary hearing Officer Hyland came in and he was

15   questioned by Mr. Padilla.  After that I got the felony -- I

16   got the complaint, which is the DEA 6 forms, and after that got

17   the warrant, which is issued by the judge.

18          Nowhere on there -- And the attorney before

19   Mr. Martinez was Mr. Gonzales.  He put in a motion that we

20   replied; he put another motion and we replied to that motion.

21   Nowhere on there was there ever mentioned about confidential

22   source whatsoever.  Not until August 20th, when we had the

23   hearing and Mr. Padilla questioned the -- questioned

24   Mr. Hyland, that he first said "ticket agent."

25          Then the prosecutor directly objected and got up and

1    said -- he quoted Roviaro, but then couldn't explain the two

2    prongs.  And I'm just trying to explain to Your Honor, I know

3    why he couldn't explain the two prongs.  Because based on his

4    own testimony, he got the facts from a tipster, who isn't

5    supposed to be quoted during or after.

6           So my thing is, how could he qualify as an informant,

7    let alone as an agent skilled by an opinion on the report?

8    Wouldn't that be generic?  How would that qualify him as an

9    informant?

10          So my research, the only remedy for that would be a

11   Franks hearing.  I feel that to establish that, how could you

12   bring an informant to testify in the middle of a hearing when

13   he was never mentioned in the onset, during the middle -- I

14   mean -- pardon me -- during the beginning, then it came in only

15   upon a hearing on redirect by the prosecutor?  Because on

16   direct when asked him, "Who did you get it from?" he said,

17   "Ticket agent."  Then he objected and said, "Well, don't you

18   mean informant?" like he basically coached him to say

19   "informant."  As an officer, he would have known that it from

20   came a tipster, an informant.  To prove that it's generic, he

21   didn't know the person before or after.

22          So who is this person tipping Agent Hyland?  What

23   criminal information is he tipping to?  Then he said he never

24   spoke to him before, during or after, so how would he know he

25   was reliable?  There's two prongs, credibility and reliability.

1    How can he prove that if he never spoke to the person before,

2    during or after?  This is his testimony.  That's why I feel a

3    Franks hearing would be a remedy to that, to prove that this

4    person is not an informant.

5              THE COURT:  All right.  And have you been able to

6    talk to Mr. Padilla before today about this?

7              THE DEFENDANT:  The problem is that not only did I

8    speak to Alonzo Padilla, I spoke to his supervisor, and I

9    advised him that any paperwork that Alonzo was going to file I

10   would like to see before he presents it.

11             So when Mr. Martinez submitted -- well, he said that

12   this person was an informant, and then Alonzo argued that --

13   the fellow officer rule.  As soon as I seen it, I seen it was a

14   mistake.  Why would you offer a fellow officer?  I know you was

15   going to come back with an informant if this guy's under the

16   privilege that that usually protects him as the informant.  A

17   federal officer in reliance of another officer, like John

18   Claiborne or Joe Perry, if they gave him information, then

19   this -- he would classify him as fellow officer.

20             He said an informant.  He said this person is an

21   informant, a confidential source, a confidential informant.

22             So I figure he should attack that, not saying he's a

23   fellow officer, saying he doesn't even qualify to be an

24   informant because the information he gave is generic.  What is

25   he informing Agent Hylander (sic) to?

1          He said he went to the fax, got a fax.  All right.

2    No cover sheet.  How do you even know the fax's supposed to be

3    for you?  If Hylander (sic) -- If Perry -- If Joe Perry and

4    John Claiborne are the ones that trained these guys to look for

5    certain things, why wouldn't the fax have came to them?

6    Wouldn't it have been their informant or their tipster?  Why is

7    Hylander (sic) handling the paperwork?  If anything, he should

8    have investigated to see the authenticity of the paperwork.

9    Meaning that this is information based on a person's credit

10   card purchases, which is another issue I have, dealing with the

11   financial privacy act.

12          This ticket was paid for by credit card.  Does Amtrak

13   allow them to disseminate information to anybody, even the Drug

14   Enforcement Administration, without properly checking where

15   this information came from?

16          And for some reason he said that's not an issue.  I

17   feel it is an issue, that before he took the PNR report, came

18   out to the station to approach me or investigate, he should

19   have first questioned where the PNR report came from, that was

20   it even legal for him to have it?  Who is this person that sent

21   it, and how did they get the information?

22          And the fact that -- Another issue I have is the fax.

23   If you look at the PNR report -- I have paperwork.  I've

24   compared it with other people who's in the prison with me now,

25   paperwork that's been faxed to the DEA.  On the fax, it has to

1   the DEA interdiction group.  This tells you when the fax came,

2   what time -- what time it came.  On that PNR report, it has

3   nothing.  Like it just came out straight from a computer.

4   Like, where does PNR report come from?  He said the fax.  First

5   of all, there's no cover sheet, no PNR on the cover sheet.  If

6   you look at the lettering, it's all capitalized lettering, like

7   it came from the computer itself.  It doesn't look like it was

8   faxed from anyone.  It doesn't look like it came from a fax

9   machine.

10          That's another issue I have.  I spoke to the

11  investigator and I said the only -- all you have to do --

12  Flagstaff is about one-tenth the size of this room.  There's

13  only one person I dealt, an older person.  It has to be him.

14  It can't be nobody else.  Alonzo is saying it was somebody in

15  Albuquerque, the one that goes through the records and look and

16  decide whether -- the drug-courier profile.  And if that's

17  true, that person doesn't fit the tipster.  No way he could be

18  the tipster.  Like he said, I came here, I was on the train, I

19  only got off to smoke a cigarette, and I got back on the train.

20  Nobody in Albuquerque saw me whatsoever.  How could that person

21  qualify as a tipster?  The person at the Amtrak station, I gave

22  my ID.  The only thing I probably said to him is, "How are you

23  doing?"  He said, "I'm fine."  That's it.  How could he qualify

24  as a tipster?  What is he tipping to?

25          And that's the questions I have for my lawyer that I

1    wanted to put on my record, but he said that's moot, that's not

2    an issue.  And I feel it is an issue, and I have case law

3    backing it up.

4         I had a case -- oh, I can't remember offhand, but it

5    deals with a female who works for a person, a proper company.

6    What she does, she's a bookkeeper.  And what she did was that

7    she took the records and went to the FBI.  The FBI said he

8    couldn't accept it because he needed a subpoena.

9         I spoke to Mr. Alonzo.  They have a record of my

10   T-Mobile.  Based on the arrests, the fact they found the drugs,

11   they went and they got a warrant, then they subpoenaed my

12   T-Mobile bill.  They came back through the fax.  You could see

13   it was addressed to the DEA, per DEA interdiction group.

14        So wouldn't the same hold true for getting my credit

15   card information?  Excluding -- Not even arguing that, Amtrak

16   is a federal entity, is a private company.  Wouldn't the same

17   rules apply to get my PNR report if it was -- if it was

18   purchased by a credit card?  I could understand if I paid cash.

19   That's a person who's a tipster who would have firsthand

20   knowledge of the way I carried myself and the fact that I paid

21   with hundred-dollar bills, twenty-dollar bills, what I was

22   wearing.

23        That's another thing.  When he came to the Amtrak

24   station, he didn't know if I was on the train.  So how is this

25   guy definitely a tipster?  He would have tipped him with more

1    information.  Mr. McKenzie will definitely be on the train.

2    This is what he's wearing.  This is the color of his suitcase.

3    He probably saw the tag on the suitcase and relayed the

4    information --

5            MR. PADILLA:  I don't want him to go into too much of

6    that.

7            THE COURT:  Let's do this.  I see -- I see some of

8    your points, and I'm not going to preclude you from raising

9    those points, but let me do this.  Let me first work on the

10   suppression motion, and then after you see what I do on that,

11   then you and Mr. Padilla can look at -- look at the opinion and

12   decide whether these issues are still ones that you want to

13   pursue, and, if so, then I'm not precluding you from doing it,

14   but I think at the present time what I ought to do is take all

15   the evidence on a motion to suppress, give you a ruling, and

16   then y'all can meet and discuss where to go from there.  Okay?

17           THE DEFENDANT:  Thank you.  Thank you, Your Honor.

18           MR. PADILLA:  Thank you, Judge.

19           THE COURT:  All right.  Counsel, I appreciate your

20   assistance this afternoon, and I'll try to get this opinion and

21   order to you as soon as possible so that y'all can see maybe

22   where to go from there.

23           All right.  Y'all have a good afternoon.

24       (Court stood in recess at 2:46 p.m.)

25

53

1                         I N D E X

2       EXAMINATION                                PAGE

3   WITNESS:  MARK HYLAND

4       Direct Examination By Mr. Padilla           4
        Cross-Examination By Mr. Martinez          24
5       Redirect Examination By Mr. Padilla        30

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5         I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the City of Albuquerque, New Mexico, in the matter

10   therein stated.

11        In testimony whereof, I have hereunto set my hand on

12   this 4th day of August, 2010.

13

14            _____
              DANNA SCHUTTE EVERETT
15            Registered Professional Reporter
              Registered Merit Reporter
16            Certified Realtime Reporter
              NM Certified Court Reporter #139
17            333 Lomas Boulevard, Northwest
              Albuquerque, New Mexico  87102
18            Phone:  (505) 348-2283
              Fax:  (505) 348-2285
19

20

21

22

23

24   February 18, 2010, USA vs.McKenzie

25