1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4             Plaintiff,

5        vs.                    CRIMINAL NO. CR-08-1669 JB

6    RICHARD ANTHONY MCKENZIE,

7             Defendant.

8        Transcript of Motions Hearing before The Honorable

9    James O. Browning, United States District Judge, held in

10   Albuquerque, Bernalillo County, New Mexico, commencing on

11   Wednesday, December 1, 2010, at 9:05 a.m. and concluding at

12   11:23 a.m.  Proceedings recorded by mechanical stenography;

13   transcript produced by computer-aided-transcription.

14   For the United States:

15        UNITED STATES ATTORNEY'S OFFICE
          District of New Mexico
16        201 Third Street, Northwest, Suite 900
          Albuquerque, New Mexico  87102
17        BY:  MR. DAMON P. MARTINEZ

18   For the Defendant:

19        MR. ROBERT R. COOPER
          1011 Lomas Boulevard, NW
20        Albuquerque, New Mexico  87102

21   Also Present:  Mr. Mark Hyland

22

          Danna Schutte Everett, CRR, RPR, RMR, CCR 139
23             United States Court Reporter
             333 Lomas Boulevard, Northwest
24           Albuquerque, New Mexico  87102
              Phone:  (505) 348-2283
25             Fax:  (505) 348-2285

1          THE COURT:  Good morning, everyone.  I appreciate

2    everyone making themselves available to me this morning.

3          All right.  The Court will call United States of

4    America versus Richard McKenzie, Criminal Matter 08-1669 JB.

5          If counsel will enter their appearances.

6          MR. MARTINEZ:  Damon Martinez on behalf of the United

7    States, Your Honor.

8          THE COURT:  Mr. Martinez, good morning to you.

9          MR. COOPER:  Good morning, Your Honor.  Robert Cooper

10   on behalf of Mr. McKenzie.  Mr. McKenzie is present in the

11   courtroom today.

12         THE COURT:  Mr. Cooper, good morning to you.

13         Mr. McKenzie, good morning to you.

14         THE DEFENDANT:  Good morning, Your Honor.

15         THE COURT:  All right.  We're here on the portion of

16   the motion that Mr. McKenzie filed back in May, which was

17   partially to continue the trial setting, and then I think we

18   had a change of counsel, but we're here now on his request for

19   a Franks hearing and a request to reopen the suppression

20   hearing.

21         Mr. Cooper, it's your motion.  If you wish to speak

22   in support of it.

23         MR. COOPER:  Thank you, Your Honor.

24         Judge, today what I would do is I would like to call

25   Carlos Herrera, an investigator with the federal defender's

1  office, today.  Mr. Herrera went out to Flagstaff, he

2  interviewed the ticket agent, and I would like to put on some

3  testimony concerning what the ticket agent may have told

4  Mr. Herrera.  I would also like to put Agent Hyland on the

5  stand today to talk about what he previously had told this

6  Court, and then I would argue to the Court that what --

7  together what we learned from the ticket agent and from Agent

8  Hyland is sufficient to allow you to reopen the suppression

9  hearing to determine whether or not the information that comes

10  forth -- or whether or not there's sufficient information that

11  we have brought forth to actually have a Franks hearing, to set

12  that up, let us then subpoena ████████, the ticket agent,

13  Agent Hyland, and also perhaps John Claiborne, a task force

14  officer, at this motion hearing on a Franks hearing to give you

15  further testimony concerning whether or not the factors that

16  you considered would change given this new testimony.

17          So that's, I think, Your Honor, where I will -- I

18  believe we are today.

19          THE COURT:  Well, it seems to me that we may have an

20  issue as to Mr. Hyland, but as far as Mr. Herrera, I think

21  that's part of your motion, to put him on and let me hear that

22  testimony, so at least that aspect I think was part of the

23  motion.

24          Do you see any problem with Mr. Herrera testifying,

25  Mr. Martinez?

1            MR. MARTINEZ:  Yes, Your Honor.  The United States

2    objects to that testimony.

3            THE COURT:  What if Mr. Herrera had done an affidavit

4    here, which I would have almost expected?  How would that have

5    been different?  I mean, I understand Mr. Hyland may raise a

6    different issue for you, but Mr. Herrera, if he had done an

7    affidavit, I'd have his testimony in front of me.

8            MR. MARTINEZ:  Your Honor, the way that that would be

9    different is as already referenced in the record to date.  The

10   position of the United States is that this defendant has been

11   allowed to go beyond setting the foundation to the extent of

12   being able to identify who they believe to be the confidential

13   informant, and according to Roviaro, which the Court has

14   already cited in its pleadings -- or in its opinion, the United

15   States is entitled to keep a confidential informant's identity

16   confidential because of the public policy and aspects behind

17   that, and that has not -- if defendant is correct in

18   identifying this individual, that has not occurred in this case

19   and the extent or the effect of that identification could have

20   repercussions not only in this matter, but in future matters.

21            Now, what has already occurred this morning is that

22   defense counsel has named a specific individual who they want

23   to bring before this Court to testify as the cooperating

24   individual, Your Honor.  What that does is that puts -- and I

25   don't use this term lightly, but a chilling effect upon the

1    issue of the confidential informant.

2           Now, the issue before this Court has been a Fourth

3    Amendment issue, and this Court, in its opinion, had to

4    determine whether the initial encounter between Agent Hyland

5    and the defendant was an investigative stop or a consensual

6    encounter, and the Court has quite clearly ruled that this was

7    a consensual encounter.  Because of that ruling the Fourth

8    Amendment issue is not in play anymore, so any testimony by

9    this individual is irrelevant and immaterial to the issue that

10   was brought before this Court for suppression.

11          Your Honor, as the Court has already determined, the

12   confidential informant in this case was a tipster.  He did not

13   have -- He was not an active participant in this matter.

14          So getting back to your original question, why is

15   that testimony different today as opposed to just an affidavit?

16   The testimony is different because of the possible

17   ramifications that could occur through the testimony, through

18   all the information that could be let out, and at this point.

19   Obviously, this is in a public forum, this is a public record

20   right now, but I would ask that the reference to the name given

21   by defense counsel be stricken from the record, and an

22   affidavit is more of a way to keep information concerning a

23   possible confidential informant more secure and -- more secure

24   from public eyes and keep the identity of the individual more

25   safe and keep the individual from being harassed or

1   specifically targeted.  And I would say that that's in accord

2   with the public policy pursuant to Roviaro, which is U.S. 35 --

3   I'm sorry -- 353 U.S. 53, Your Honor.

4           Your Honor, may I also, while I'm up here --

5   Actually, I have a housekeeping matter, too, that I'd like to

6   correct from what I filed, but I want to keep that separate

7   from what the Court's hearing now.  I can go into it now or

8   later.

9           THE COURT:  It's up to you.  Let's take it up later,

10  if it doesn't matter to you.  Let me deal with this.

11          Mr. Cooper, would you have any problem, at the

12  present time, if Ms. Schutte Everett, the court reporter, were

13  to redact the name that you mentioned, or is that essential to

14  your presentation this morning?

15          MR. COOPER:  Your Honor, I'd have no objection to

16  that.  I think that's fair.

17          THE COURT:  All right.  I'll just have her, if this

18  is all right with you, indicate that you're redacting the name

19  at that point.  So we will redact the name that was mentioned.

20          MR. MARTINEZ:  Thank you, Your Honor.

21          THE COURT:  I think what I'm going to do at this

22  point, Mr. Cooper, is I am going to hear from Mr. Herrera, and

23  if it's not important to your presentation here, if you could

24  maybe have him discuss these facts without mentioning the name,

25  and then we'll see where we go after that.  I may -- I may

1    pause after that before I hear Mr. Hyland, depending on what

2    Mr. Martinez wants to do, but I think I will hear Mr. Herrera,

3    because I think you could have done an affidavit and it would

4    be the same testimony, so I think I can hear that.

5              Mr. Martinez.

6              MR. MARTINEZ:  Your Honor, I would just continue my

7    objection, because I believe, based on the facts, just like the

8    previous hearing in this matter, by -- with anticipated

9    questions being, Where did you speak to this individual, where

10   was this person working, how big is this place of employment,

11   those specific facts are so narrow, so specific that they will

12   be able to identify a confidential informant as possibly

13   identified by the defense counsel.

14             THE COURT:  Well, maybe Mr. Cooper can allay your

15   concerns by narrowing his questions.  I think there's a

16   particular -- there's particular testimony that I think we're

17   concerned about, whether the agent's -- he's attacking the

18   credibility of the agent, and maybe we can limit the testimony

19   to that, so I can decide whether we need to have a Franks

20   hearing and whether we need to reopen the motion for summary

21   judgment.

22             Let's see how far it goes.  If it gets far afield,

23   you can renew your request, Mr. Martinez, but let's go for a

24   while.

25             Mr. Herrera, if you'll come up and stand next to the

1  witness box before you're seated, Mr. Gonzales will swear you

2  in.

3         MR. GONZALES:  State your name for the record.

4         THE WITNESS:  Carlos Herrera.  H-E-R-R-E-R-A.

5     (Witness sworn.)

6         MR. COOPER:  Your Honor, before I begin, may I

7  briefly respond?

8         THE COURT:  Sure.  Sure.

9         MR. COOPER:  Judge, Roviaro says this Court is not

10  required -- or is not -- it's not necessary to compel the

11  disclosure of a confidential informant.  That's different than

12  the defense going out, doing their investigation, finding out

13  who may have had some information with regard to this issue.

14         All Roviaro says is, you can't make them disclose it.

15  And so I would object -- I have no problem with limiting the

16  disclosure and preventing the disclosure of the actual name,

17  but I think it's very important for me to elicit the facts as

18  to where he went, what he did, who he spoke with, and in what

19  capacity that person worked in order to perfect my record in

20  this case.

21         THE COURT:  Well, and I -- I tend to agree with you.

22  If you can -- If you can try to -- Since -- You can try to

23  minimize any damage to the confidential informant, and I think

24  everybody would appreciate that, but I tend to agree, you've

25  probably got to do what you've got to do here.

1          All right.  Mr. Herrera.  Mr. Cooper.

2          MR. COOPER:  Thank you, Judge.

3          **DEFENSE WITNESS CARLOS HERRERA,**

4     after having been first duly sworn under oath,

5     was questioned and testified as follows:

6                    DIRECT EXAMINATION

7  BY MR. COOPER:

8  Q.   Mr. Herrera, how are you employed?

9  A.   I'm an investigator with the Federal Public Defender's

10 Office.

11 Q.   And how long have you been so employed?

12 A.   About three years now.

13 Q.   And what are your duties typically as an investigator with

14 the Public Defender's Office?

15 A.   I am asked to go out and investigate certain portions of

16 cases, talk to witnesses, look at evidence, evaluate evidence,

17 write reports based on my findings.

18 Q.   Now, are you familiar with the case of United States of

19 America versus Richard McKenzie?

20 A.   Yes.  I was assigned to work that case.

21 Q.   Okay.  And that was prior to the time when I was appointed

22 to represent Mr. McKenzie; is that correct?

23 A.   Yes, sir, that is correct.

24 Q.   And who was the lawyer assigned to that case?

25 A.   Alonzo Padilla was the attorney.

1  Q.    Okay.  Did Mr. Padilla ever ask you to do anything in

2  connection with this particular case?

3  A.    Yes, sir.

4  Q.    And what was the task that was assigned to you?

5  A.    I was asked to travel to Flagstaff, Arizona, to

6  investigate the case.

7  Q.    Okay.  And did you, in fact, do that at some point in

8  time?

9  A.    I did.  I believe I traveled out there on May 6, 2009.

10  Q.    And when you traveled to Flagstaff, was that -- was that

11  2009 or 2010?

12  A.    May I refer to my report to refresh my memory?

13  Q.    You may.

14  A.    I'm sorry, that was 2010.

15  Q.    Okay.  Thank you.

16         Did you have occasion to interview a witness in

17  Flagstaff, Arizona?

18  A.    Yes, I did.

19  Q.    And without disclosing his name, would you tell me what

20  you learned from this individual?

21  A.    I learned that this individual had been working for Amtrak

22  for approximately 24 to 28 years.  At the same time, he was

23  also working with the National Guard as a -- I think at the

24  last duty station was a warrant officer with the National

25  Guard.

1 Q. And did he have any particular training, either with

2 Amtrak or with the Amy reserves?

3 A. Yes, he did have particular training with the Army and

4 Amtrak.

5 Q. Can you tell me what sort of training he had?

6 A. Observation techniques. Specifically, he was trained on

7 how to observe individuals for, I guess, any threats that they

8 may or may not be providing.

9 Q. Okay. And his last post in the Army reserves, what did --

10 what was -- what was he doing at that point in time, and what

11 did that particular unit do?

12 A. That particular unit was being trained by himself, as well

13 as to observe I guess what would be enemy insurgents for, I

14 guess, any threats that they may provide.

15 Q. Okay.

16 A. And it was basically just to identify mannerisms, anything

17 regarding their personal appearance or behavior that may or may

18 not pose a threat.

19 Q. Did he tell you what his hours of employment were?

20 A. He works the day shift there at -- in Flagstaff.

21 Q. And did you learn how many people were working the day

22 shift as ticket agents?

23 A. In speaking to him, I was identified that there were two

24 people that work as ticket agents at that particular office.

25 Q. And can you tell me a little more about those two

1  individuals?

2  A.    Yes.  One individual is a male, and the other individual

3  is a female.

4  Q.    Okay.  And did he work the day or night shift?  I'm sorry.

5  A.    The person I talked to worked the day shift.

6  Q.    Okay.  And was the person a male or a female?

7  A.    The person was a male.

8  Q.    Did this -- Did this individual talk to you about what he

9  would do in the event that he saw a suspicious person or a

10  suspicious package on the train?

11  A.    Yes, he did.

12  Q.    And what did he tell you was his normal course of conduct?

13  A.    His normal course of conduct in that case was to identify

14  the person or package -- he said it was red flagging it -- and

15  then he would send that information off to an Amtrak police

16  department person by the name of John Claiborne based here in

17  Albuquerque.

18  Q.    Okay.  Did he ever have any direct contact with other law

19  enforcement officers?

20  A.    In the course of my interview, no, he did not have any

21  direct contact with any other law enforcement officers.

22  Q.    And would he routinely review the passenger manifests?

23  A.    Absolutely.  That was part of his job.

24  Q.    And what was he looking for?

25  A.    Things out of the ordinary.  There were certain criteria

1    that he would look at and identify things that were out of the

2    ordinary there and red flag.

3    Q.    Was he looking at a drug profile?

4    A.    Yes.

5    Q.    Did he ever have any training from DEA?

6    A.    Yes, I believe he did undergo training through DEA and

7    through Amtrak.

8    Q.    Do you know who trained him, who from DEA might have

9    trained him?

10   A.    May I look at my report again?

11   Q.    You may.

12         Now, if it's not in your report --

13   A.    No, it's not in my report.  I don't see that.

14   Q.    Okay.  Now, when he would see something suspicious, what

15   would he do -- how would he transmit that information to

16   Mr. Claiborne?

17   A.    He would fax it to Mr. Claiborne.

18   Q.    And where was Mr. Claiborne's office located?

19   A.    Albuquerque, New Mexico.

20   Q.    Was that at the Amtrak station?

21   A.    I believe so.

22   Q.    Did he talk about when he had most recently sent anything

23   to Mr. Claiborne?

24   A.    From the time that I talked to him, his memory was he

25   hadn't sent anything to Claiborne in a year, maybe about a year

1    or so.

2    Q.    Okay.  Did he ever -- Did he tell you that he had ever had

3    any direct contact with a DEA agent?

4    A.    He had never had any contact directly with a DEA agent.

5    Q.    Had he ever heard of Agent Hyland?

6    A.    He had not heard of Agent Hyland.

7    Q.    Did you specifically ask him that?

8    A.    I did.

9    Q.    Did he ever tell you that he had, in his entire career,

10   ever faxed anything to Agent Hyland?

11   A.    He did not know Mr. Hyland, and, to his knowledge, he had

12   never faxed anything directly to Mr. Hyland.

13   Q.    What about to the agency itself?

14   A.    To the DEA, no.  Everything that he faxed was directly to

15   John Claiborne, part of Amtrak.

16   Q.    Did you get a sense as to whether he was being truthful to

17   you?

18   A.    Oh, yes, I thought he was being very truthful to me.

19   Q.    How did -- How did -- Tell me about what he said when you

20   first started talking to him and how he participated in this

21   interview with you.

22   A.    When I first spoke to him, he did not want to talk to me

23   about anything.  I just basically kept on asking questions

24   regarding some of his techniques that he had used, and he

25   stopped me and clarified some things for me, and that's when we

1   got into our actual interview.

2   Q.   Okay.  Did he ever hesitate at all when you asked him

3   whether or not he had faxed anything to DEA or to Agent Hyland?

4   A.   No, I don't think he hesitated at all.  He answered those

5   questions pretty directly at that point in time.

6   Q.   And do you think truthfully?

7   A.   Yes, I do.

8        MR. COOPER:  I have no further questions.  I pass

9   this witness, Your Honor.

10        THE COURT:  All right.  Thank you, Mr. Cooper.

11        Mr. Martinez, do you have cross-examination of

12   Mr. Herrera?

13                     CROSS-EXAMINATION

14   BY MR. MARTINEZ:

15   Q.   You've referred to your report twice now?

16   A.   Yes, sir.

17   Q.   May I see your report?

18   A.   Please.  It's an interoffice memo.

19        MR. MARTINEZ:  Your Honor, if I may have a moment to

20   go through the report?

21        THE COURT:  You may.

22   Q.  (By Mr. Martinez)  I assume you wrote this interoffice

23   memo from notes that you took?

24   A.   I don't think I actually took notes.  That's from my

25   memory.

1   Q.    This is from your memory?

2   A.    I believe so, yes.

3   Q.    And today your memory isn't completely -- you had to refer

4   to your notes a couple times?

5   A.    Yes.  It's been a while since I actually looked at this.

6   Q.    In fact, it's been a long time, hasn't it?

7   A.    It has.

8   Q.    And so your memory may not be completely clear on certain

9   things, and that's why you referred to this?

10  A.    Sure.

11          MR. COOPER:  Your Honor --

12          THE COURT:  Yes.

13          MR. COOPER:  -- my client would like to have his

14  right hand free from his handcuffs so that he may make some

15  notes.

16          THE COURT:  His right hand?  Any objections from the

17  marshals?

18          U.S. DEPUTY MARSHAL:  It's normal policy to keep the

19  cuffs on, unless it's all right with you.

20          THE COURT:  It's all right.  Why don't you let him

21  use his right hand.

22          THE DEFENDANT:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Appreciate it.

24          MR. COOPER:  Thank you, Judge.

25          MR. MARTINEZ:  May I proceed, Your Honor?

1        THE COURT:  You may, Mr. Martinez.

2        MR. MARTINEZ:  May I have this report and write on

3  it?

4        THE COURT:  If you need a copy made, I can have

5  Mr. Gonzales make a copy.  Do you want a copy?

6        MR. MARTINEZ:  May I please, Your Honor?

7        THE COURT:  You may.

8        MR. MARTINEZ:  Thank you.

9        Your Honor, if I may just have a moment to --

10        THE COURT:  You may.

11  Q.  (By Mr. Martinez)  Mr. Herrera, you just testified that

12  this individual who you're talking about said that he had

13  never heard of the Case Agent Hyland.

14  A.    Right.

15  Q.    And you also testified that he has never faxed anything

16  specifically to Case Agent Hyland?

17  A.    Right.

18  Q.    Now, from your testimony this morning, can you say that

19  this person was involved as the confidential informant in this

20  case?

21  A.    I do not know.

22  Q.    You do not know that?

23  A.    No.

24  Q.    In fact, you testified that -- Is it fair to say that you

25  wrote in your report that Amtrak has been proactive in

1   observing and reporting suspicious activity on the trains?

2   A.    That is in my report.

3   Q.    And so is it fair to conclude from that that -- it could

4   have been someone else at Amtrak who was the confidential

5   informant in this case?

6   A.    Possibly.

7   Q.    And it's in your testimony this morning that there were

8   two individuals that were working at this station?

9   A.    Yes, sir.

10  Q.    One is this individual that you spoke to?

11  A.    Yes, sir.

12  Q.    The other one is a female that works there at night; is

13  that right?

14  A.    Yes, sir.

15  Q.    And you did not speak to a female, did you?

16  A.    Did not.

17  Q.    So you don't know what she has to say or what she would

18  say to your questions?

19  A.    No, I do not.

20  Q.    So it could be the female who was the confidential

21  informant?

22  A.    It could be.

23  Q.    When you went to this place --

24  A.    Yes.

25  Q.    -- did you know that -- the fax number of DEA?

1    A.    No.

2    Q.    Did you ask this person you spoke to the fax number that

3    he sent to?

4    A.    No, I did not.  I just asked for the fax number that he

5    used, himself, to fax information.

6    Q.    And you have that?

7    A.    Yes, I do.

8    Q.    Okay.  Where is that in your report?

9    A.    It is the very last line on the first page of my report.

10   Q.    Okay.  So this is his fax number that he faxes from?

11   A.    That's what he provided me as the number that he uses to

12   fax information from.

13   Q.    But you did not ask him what number he faxed to?

14   A.    I did not.

15   Q.    And you do not have that information?

16   A.    I do not have that information.

17   Q.    And you did not have the information of the DEA fax

18   number?

19   A.    No.

20   Q.    Now, according to your testimony, this individual faxed it

21   to Mr. Claiborne, right?

22   A.    Yes, sir.

23   Q.    At the Amtrak office?

24   A.    Yes.  More specifically, I would say the Amtrak police

25   office here in Albuquerque, New Mexico.

1    Q.    Now, do you know Mr. Claiborne's position at this time,

2    when the case happened?

3    A.    I do not.

4    Q.    Do you know whether he was a liaison with the DEA?

5    A.    I do not know.

6    Q.    Do you know if he was stationed out of the DEA office?

7    A.    I do not know.

8    Q.    So you don't know whether Mr. Claiborne's -- if

9    Mr. Claiborne officed out of the DEA; is that correct?

10   A.    I do not know.

11   Q.    So you don't know whether a reference by this individual

12   to the Amtrak police office could actually be Mr. Claiborne

13   stationed at the DEA office?

14   A.    Possibly.  I don't know.

15   Q.    You just don't know?

16   A.    No, I do not know.

17            MR. MARTINEZ:    Your Honor, may I have a moment?

18            THE COURT:  You may.

19   Q.  (By Mr. Martinez)  Now, isn't it true that this individual

20   also told you that he did not know what the Amtrak police did

21   with this information?

22   A.    That's correct.

23   Q.    And so you don't know what happened to this information

24   once it was faxed, do you?

25   A.    No.  All that was told to me was that he faxed information

1  to John Claiborne and John Claiborne took it from there.

2  Q.    And when we're talking about this information, in this

3  case we're talking about the PNR; is that correct?

4  A.    The PNR, passenger manifest, anything that was being sent

5  through Amtrak, anything that was sent through that, that was

6  suspicious, that was flagged, sent to the Albuquerque Amtrak

7  office to John Claiborne.  What Claiborne did after that, he

8  did not know.

9  Q.    But you knew that it was faxed to Albuquerque?

10  A.    Yes.

11  Q.    Someplace in Albuquerque?

12  A.    The Amtrak police station, according to the person that I

13  talked to.

14  Q.    Now, let me go back to this individual telling you that

15  Amtrak has been proactive in observing or reporting suspicious

16  activity on the trains.  He told you that?

17  A.    Yes, he did tell me that.

18  Q.    And he also -- And he basically told you that because of

19  9/11 the main focus is terrorism; is that right?

20  A.    The main focus is terrorism, but with that is any other

21  criminal activity.

22  Q.    And that would include people transporting drugs?

23  A.    I think that falls into that category, yes.

24  Q.    Now, from the way he told you that, was it your sense that

25  that was basically a broad policy for Amtrak?

1    A.    Yes.

2    Q.    Now, in this case that we're talking about, this is a

3    train coming from Los Angeles; is that correct?

4    A.    I believe so.

5    Q.    And so there are a number of stops along the way from

6    Los Angeles; is that right?

7    A.    I believe so.  I've taken that train before, both coming

8    and going, and, yes, there are a number of stops.

9    Q.    And Flagstaff is one of these stops?

10   A.    Yes, it is.

11   Q.    And he told you about himself and another individual that

12   work in Flagstaff.  How many ticket agents are there in

13   Flagstaff?

14   A.    Two.

15   Q.    As far as you know?

16   A.    As far as I know, there are two.

17   Q.    Could there be more?

18   A.    There could be more, but when I asked him how many there

19   were, he said, "I work day shifts; the other person works the

20   night shift."

21   Q.    Did you ask if anyone had recently retired?

22   A.    No, I did not.

23   Q.    Did you ask if anyone had recently died?

24   A.    No, I did not.

25   Q.    So you don't know if there had been other people working

1   there, either?

2   A.   No, I don't.

3   Q.   So based upon your follow-up investigation, what

4   information do you have which leads you to conclude that this

5   individual you spoke to was involved in this case?

6   A.   This individual's been working that office for 24 to 28

7   years.  The only time he's not there is when he's off doing

8   training with Amtrak police or he's on vacation or he's doing

9   his National Guard duties.  He said that he's worked the day

10  shift exclusively for that time.  The other person works the

11  night shift during that time.  I don't know how long the other

12  person had been there, but I do know that the person that

13  Mr. McKenzie dealt with was a male.

14           And he purchased his ticket during the day, if I'm

15  not mistaken.

16  Q.   But wouldn't the factors you were told by this individual

17  lead you to conclude that he wasn't involved?

18  A.   No.  I think this individual was involved.

19  Q.   Based upon those factors that you just --

20  A.   Yeah.

21  Q.   -- articulated?

22           MR. MARTINEZ:  Your Honor, may I have a moment?

23           THE COURT:  You may.

24  Q.  (By Mr. Martinez)  Did you show him the PNR involved in

25  this case?

1   A.   I did not.

2   Q.   Why didn't you?

3   A.   I don't know.

4   Q.   Did you take the PNR with you to Arizona?

5   A.   I don't think I had it at the time.  That's just from my

6   thinking.  I don't know.

7   Q.   And so you did not give this individual a specific chance

8   to identify whether he was involved in this matter?

9   A.   No.  This individual just showed me what he did there at

10  the Amtrak office.  He wouldn't look at anything that I had.  I

11  was just able to ask him questions.  That was all.

12          MR. MARTINEZ:  Your Honor, may we approach?

13          THE COURT:  You may.

14      (Bench conference on the record.)

15          MR. MARTINEZ:  Your Honor, I just want to alert the

16  Court, I'm having some trouble with my questioning, and now I

17  believe in my -- in my response I want to alert the Court that

18  I think the in camera review may be -- you know, I brought it

19  to the Court's attention that the Court may want to do an

20  in camera review.

21          Here's what I want to alert the Court to.  And I

22  don't want to be disingenuous here.  On the PNR, I know that --

23  well, what I believe is the person that they spoke to I think

24  his number is on that PNR.  You know how we all have ways of

25  identifying ourselves in the system?  I believe his number is

1  on the PNR.

2          I also want to be completely candid with the Court,

3  and right now my position with the Court is, I don't know if

4  this person is the confidential informant.  I don't know.  And

5  I can only tell the Court that I think if the Court would do an

6  in camera review the Court would understand why I'm saying

7  that.

8          MR. COOPER:  An in camera review of what?

9          MR. MARTINEZ:  Of an agent who could answer these

10  questions.  But I guess my reason for approaching today is, I

11  want to be candid with the Court, that I just asked that

12  question of the witness, whether he knew for sure whether this

13  was the person involved in this case, and I'm bringing up the

14  fact that on the PNR I believe the person who he was

15  interviewing, the guy's identifier for the computer system was

16  on the PNR.  So I just want to alert the Court to that.  I

17  don't want to misrepresent.

18          THE COURT:  Well, do you have any thoughts on that

19  Mr. Cooper?

20          MR. COOPER:  Well, Your Honor, I think that we know

21  that our client dealt with a male ticket agent; we know that he

22  was employed by -- the individual that Mr. Herrera spoke with

23  was employed by Amtrak during that period of time.  We cannot

24  say with absolute certainty that he was the individual,

25  obviously, but I believe that if there are two ticket agents --

1  one's female, one's male -- we understand that he,

2  Mr. McKenzie, dealt with a male -- just by deduction I think it

3  had to have been this individual.

4        If there is -- I think that's why we ought to have a

5  hearing and bring that individual in, have him testify as to

6  whether or not he -- you know, show him that PNR, see if it is

7  his.

8        I think that -- Also, I think Officer -- Agent Hyland

9  has certainly been -- I mean, he said he dealt with a ticket

10  agent, so I don't think there's any question that it's another

11  employee at Amtrak.  It had to have been a ticket agent,

12  because that's his testimony throughout the suppression

13  hearing, so I think it had to have been one of two people, and

14  if that person was a male, I think it had to have been him,

15  but --

16        MR. MARTINEZ:  I'm sorry.

17        MR. COOPER:  -- but I think that, you know, that's

18  certainly a way to find out in an in camera hearing by someone

19  who has information from Amtrak.  I mean, I think it has to be

20  an Amtrak agent.  Not necessarily a DEA agent.

21        MR. MARTINEZ:  Your Honor, let me add to my candor in

22  front of the Court, because I don't want to be disingenuous

23  with my questions.  I have reason to believe that there are

24  more than two people, and I think that this in camera could

25  clarify for you the entire issue.

1        I also was concerned in asking questions of this

2   witness, because I believe that the information came from the

3   Flagstaff office, understanding that there's other offices

4   along the line, I believe it came from the Flagstaff office,

5   and I don't want to be disingenuous with that, either.  That's

6   why I can't go farther, I think, in asking my questions as far

7   as other possible options of where it came from.  But again,

8   I'm tied by the fact that I think that more information that

9   comes out on this will be giving up critical information on how

10  Amtrak gives intelligence.

11       THE COURT:  Do you have any problem with me doing an

12  in camera interview?  I mean, do I need to interview, or do you

13  want to do it by affidavit, or how do you want --

14       MR. MARTINEZ:  Well, Your Honor, I will have -- I

15  should have the agent who I'm thinking about available.  He

16  should be here at 10:30.  I hope you're aware of the issue with

17  him.

18       THE COURT:  Ms. Wild mentioned something about --

19       MR. MARTINEZ:  He said he would be here earlier, if

20  possible.  But I think this would clarify the entire issue for

21  Your Honor.

22       THE COURT:  Well --

23       MR. MARTINEZ:  What I was thinking, I could ask a

24  couple questions in camera of the witness.

25       THE COURT:  What's your thoughts on that, Mr. Cooper?

 1          MR. COOPER:  Where is this witness from?

 2          MR. MARTINEZ:  DEA.  Maybe an affidavit -- Maybe an

 3   affidavit would be cleaner.

 4          MR. COOPER:  I would rather he testify in person in

 5   front of you in camera than by affidavit, because I think you

 6   know the case, you know the issues, and if -- if who we say is

 7   not the right person, then --

 8          MR. MARTINEZ:  Well, I mean, I can't misrepresent --

 9          THE COURT:  It doesn't look like Mr. Cooper objects

10   to this.

11          MR. COOPER:  No.

12          THE COURT:  So I'll --

13          MR. COOPER:  I don't object to an in camera review of

14   this individual, or probably better still by somebody from

15   Amtrak, because I'm not sure if this guy -- I don't know how he

16   has the information to tell you this number belongs to █████

17   █████ or ████████████ or whoever.

18          MR. MARTINEZ:  Well, I don't want to misrepresent for

19   Mr. Cooper.  It's my thought that we will not be able to

20   determine who the confidential informant is.

21          THE COURT:  Well, let's do this.  Let's do the

22   in camera review.  We'll take his testimony -- I assume this is

23   what we'll do -- correct me if I'm wrong -- is that I'll take

24   the testimony, and this portion of the hearing will be sealed,

25   so it will still be recorded, it will be sealed, so it will be

1   ex parte if it's filed, and so then knowing that you can now

2   figure out what you want to do with Mr. Herrera, whether you

3   want to ask any more questions of him or let him go.

4        MR. MARTINEZ:  Well, I don't think I can -- I don't

5   think I can ask any more questions, Your Honor.  Again, part of

6   my attempt coming up here, I don't want to mislead the Court or

7   misrepresent.  I mean, I think I've told you what -- In other

8   words, it -- I don't want to start asking questions that would

9   lead the Court to think that the confidential informant came

10  from some other office or something when I believe that it

11  actually came from Flagstaff.

12       MR. COOPER:  Go ahead.  I'm sorry.

13       MR. MARTINEZ:  And the fact that -- I mean, I've

14  asked some questions about the one or two individuals that he

15  testified to, but I have information that I believe it's one

16  of -- I think -- I think it could be up to three people

17  involved.  I do think it's one of two people.  I don't think

18  it's necessarily what he identified.

19       THE COURT:  All right.  Well, why don't you finish up

20  with him and we'll see where we are, and then we'll plan on

21  taking in camera testimony when he arrives?

22       MR. MARTINEZ:  Yes, Your Honor.  We're probably about

23  35 minutes away from that.

24     (Open court.)

25       THE COURT:  All right.  Mr. Martinez.

1          MR. MARTINEZ:  Pass the witness, Your Honor.

2          THE COURT:  All right.  Thank you, Mr. Martinez.

3          Mr. Cooper, do you have redirect of Mr. Herrera?

4                    REDIRECT EXAMINATION

5     BY MR. COOPER:

6     Q.   It's your testimony that the ticket was picked up that

7     morning at the Flagstaff ticket office?

8     A.   I believe so.

9     Q.   And it was picked up from a male agent?

10    A.   I believe so, yes.

11    Q.   When you asked the individual that you interviewed how

12    many agents there were, what was his response?

13    A.   Two.

14    Q.   And he told you the other individual was a female?

15    A.   Yes, sir.

16    Q.   And he told you that he did not fax anything to Agent

17    Hyland?

18    A.   Right.

19    Q.   He didn't know Agent Hyland?

20    A.   Right.

21    Q.   He didn't fax anything to Agent Hyland --

22    A.   Right.

23    Q.   -- or to DEA office?

24    A.   Right.

25    Q.   And that all of his communications were through

1   Mr. Claiborne?

2   A.   Yes.

3   Q.   At the Amtrak police station?

4   A.   Yes, all of his communications were to Mr. Claiborne.

5   Q.   But he didn't know what Mr. Claiborne did after receiving

6   those communications?

7   A.   That's correct.

8            MR. COOPER:  I have no further questions, Your Honor.

9   Thank you.

10           THE COURT:  All right.  Thank you, Mr. Cooper.

11           Mr. Herrera, you may step down.  Thank you for your

12   testimony.

13           THE WITNESS:  May I be excused, Your Honor?

14           THE COURT:  Is there any reason that Mr. Herrera

15   cannot be excused from the proceedings, Mr. Martinez?

16           MR. MARTINEZ:  No, Your Honor.

17           THE COURT:  How about you, Mr. Cooper?

18           MR. COOPER:  No, Your Honor.  Thank you.

19           THE COURT:  All right, you're excused from the

20   proceedings.  Thank you for your testimony.

21           And you wish now to call Mr. Hyland?  Is that what

22   you wish to do?

23           MR. COOPER:  I do, Your Honor.

24           THE COURT:  What's your thoughts on that,

25   Mr. Martinez?

         1          MR. MARTINEZ:  Your Honor, if I -- I guess for the

         2   limited purpose of determining whether his testimony earlier --

         3   because I do believe that there's an issue of credibility

         4   concerning Mr. Hyland, and for that limited purpose, Your

         5   Honor, I do not object, because I think that needs to be

         6   clarified for the Court.

         7          Your Honor, if I may take at this time, though, to --

         8   I told you I had something I wanted to bring up to the Court

         9   earlier.

        10          THE COURT:  All right.

        11          MR. MARTINEZ:  In my response, which is document 96,

        12   Your Honor, I represented on the bottom of page 3 going into

        13   page 4 what the United States believed was the main issue.

        14   Specifically, I think I referenced in the first sentence:  "and

        15   he then obtained the PNR from the DEA fax machine," and then I

        16   said later on again in the next sentence "from the DEA fax

        17   machine again," and I think I repeated the thought in another

        18   sentence coming up on the top of page 4, "that being from the

        19   DEA fax machine."

        20          Now, in preparing for this hearing, I realize that it

        21   was my mistake and I concluded in my mind that that was the

        22   issue as far as whether this fax that we're talking about, the

        23   PNR, Agent Hyland had taken from the DEA fax machine.  The

        24   actual testimony at trial -- Agent Hyland's testimony at trial

        25   was -- and I'm referring to the transcript from August 20th,

1    2009 -- was that he did not remember whether he took it from

2    the fax machine.

3           MR. COOPER:  Page and line, Counsel?

4           MR. MARTINEZ:  Oh, I'm sorry.  It would be page 75.

5    It's starting --

6           I'm sorry, Your Honor, if I may have a moment to cite

7    specifics?

8           THE COURT:  You may.

9           MR. MARTINEZ:  Your Honor, for some reason I'm

10   failing to see it right now, but I've marked the page -- Oh,

11   I'm sorry, Your Honor.  I cited the wrong transcript.  The

12   transcript is actually document 94, the date is February 18,

13   2010, and it's reference page 5.  And I think the question was

14   from Mr. Padilla at the bottom of page 5 on this transcript.

15   "And did you specifically take that out of the [fax] machine

16   that morning, if you recall?"

17          I object at the top of page 6.  Mr. Padilla states,

18   "If you recall."

19          You overruled my objection, Your Honor.

20          And then:  And do you recall whether -- Okay.

21          And then line 3:  "I can't recall."

22          So I wrote the -- I wrote my response based upon the

23   fact that I thought the issue was that he took it off the fax

24   machine.

25          Now, from the transcript, he didn't remember.  In

1    speaking to Mr. Hyland now, just to be candid with the Court,

2    he now remembers that he didn't take it off the fax machine; he

3    actually took it off an envelope that's tied to the wall there,

4    and that's where he got it from.

5            Now, with that said, the point is still the same,

6    Your Honor.  The question is whether the fax was sent to DEA,

7    and I still stand by the fact that the fax was -- the PNR was

8    still sent to the DEA office.  I want to correct myself.  It

9    was that the agent didn't take it off the fax machine.  What he

10   did was he took it from an envelope that was in his office area

11   on the wall.

12           THE COURT:  All right.

13           MR. MARTINEZ:  And if the Court has any questions of

14   me concerning that --

15           THE COURT:  I don't believe I have any at the present

16   time.  And are you -- Are you calling Mr. Hyland for the

17   limited purpose that Mr. Martinez mentioned?

18           MR. COOPER:  Your Honor, I do want to test his

19   credibility as to how he received it, from whom he received it.

20   He has previously testified he received it from a ticket agent,

21   and I think that goes to the heart of our motion.

22           THE COURT:  All right.  Well, let's see how it goes.

23           All right, Mr. Hyland, if you'll come up to the

24   witness stand, and before you're seated, Mr. Gonzales will

25   swear you in.

1        MR. GONZALES:  Your whole name for the record, please

2   sir.

3        THE WITNESS:  Mark D. Hyland.  H-Y-L-A-N-D.

4      (Witness sworn.)

5        THE COURT:  Mr. Hyland.  Mr. Cooper.

6        MR. COOPER:  Thank you, Your Honor.

7        Counsel.

8                **DEFENSE WITNESS MARK D. HYLAND,**

9      after having been first duly sworn under oath,

10     was questioned and testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. COOPER:

13  Q.   Agent Hyland, it was the Amtrak ticket agent that provided

14  you with the PNR, correct?

15  A.   Yes, sir.

16  Q.   And Amtrak ticket agents are trained by DEA agents as to

17  what to look for when a passenger comes to their ticket -- to

18  the train station, correct?

19  A.   I don't know what that Amtrak ticket agent received from

20  us, if anything.

21  Q.   But, generally, ticket agents are trained by DEA agents as

22  to what to look for, are they not?

23  A.   They may be.

24  Q.   They may be?  Do you recall testifying at a motion to

25  suppress hearing on August the 20th, 2009 --

1   A.   Yes, sir.

2   Q.   -- in this courtroom?

3   A.   Yes, sir.

4   Q.   And do you recall being asked this question and giving

5   this response?

6          MR. COOPER:   Counsel, page 96 of that transcript,

7   line 10.

8   Q.  (By Mr. Cooper)  "Question:  And, sir, to your knowledge,

9   have these individuals met with drug enforcement agents and

10  been provided with the type of information that they should

11  look for before they release the information to Drug

12  Enforcement Administration?"

13          At that point an objection was lodged by

14  Mr. Martinez.  It was overruled.  And then you answered:

15  "Yes."

16          Do you recall that?

17  A.   Yes, sir.

18  Q.   Okay.  So they are trained by Drug Enforcement

19  Administration agents as to what to look for, are they not?

20  A.   Well, they met with DEA agents.  I don't know what

21  transpired.

22  Q.   At the suppression hearing, you testified that the Amtrak

23  ticket agent, you believe from Arizona, faxed the PNR to you.

24  Right?

25  A.   I know that.

1    Q.    You know that?

2    A.    Yes, sir.

3    Q.    Okay.  And you say that you did not pull it out of the fax

4    machine yourself, but you pulled it out of an envelope near the

5    fax machine?

6    A.    Yes, in my group, in the interdiction group.

7    Q.    Who would have pulled it out of the fax machine?

8    A.    I have no idea.

9    Q.    How many people are in the room where that fax machine is

10   located?

11   A.    At that time, the interdiction group would have been about

12   eight agents and task force officers total.

13   Q.    And what -- How is -- What's the purpose of that

14   particular envelope that it was put in?

15   A.    There were two envelopes.  One is labeled for train number

16   4 and one is labeled for train number 3, which is the westbound

17   train.

18   Q.    Okay.  And how often do you check that envelope?

19   A.    Well, if you are going to go to that train you'll go to

20   that envelope daily.

21   Q.    You testified that you had no communication with the

22   ticket agent either before or after the PNR was received.  Is

23   that correct?

24   A.    Correct.

25   Q.    And you had no follow-up with the ticket agent to get more

1    information about Mr. McKenzie, correct?

2    A.    Correct.

3    Q.    Now, did you have any communications with John Claiborne

4    before going to that train station that day?

5    A.    No.

6    Q.    Are you sure?

7    A.    Yes.

8    Q.    Do you know if anybody in the drug interdiction group,

9    those eight individuals, had any communications with John

10   Claiborne on that particular day after receiving that PNR?

11   A.    I couldn't say.

12   Q.    So the best person to ask that question likely would be

13   John Claiborne?

14   A.    I don't know, sir.

15   Q.    You don't know?

16          Did you have any communications that day after

17   receiving the PNR from any other Amtrak police agents about

18   Mr. McKenzie?

19   A.    No.

20   Q.    Or task force officers about contact with Mr. McKenzie?

21   A.    I'm sorry, could you repeat the question?

22   Q.    Did you have --

23          MR. COOPER:  Your Honor, at this time I would invoke

24   the rule.

25          THE COURT:  All right.  The rule will be invoked.

1   What that means is, any witnesses testifying before the Court

2   will need to stay outside of the courtroom until they are

3   called to testify.  The witnesses may not discuss with each

4   other their testimony, but they can discuss their testimony

5   with the attorneys.

6           MR. COOPER:  Thank you, Judge.

7   Q.  (By Mr. Cooper)  After receiving the PNR, pulling it out

8   of the envelope, did you have any communications with other

9   task force officers or any other drug interdiction unit agents

10  concerning Mr. McKenzie?

11  A.   On that day I was working with task force Officer Stephen

12  Garcia.

13  Q.   Okay.  And did you have any communications with him after

14  receiving the PNR?

15  A.   Well, we went to the number 4 train together.  Yes.

16  Q.   Did you do any investigative work prior to going to the

17  train with regard to Mr. McKenzie?

18  A.   No.

19  Q.   Do you know if Agent Garcia had done any?

20  A.   I don't believe so.

21  Q.   But you're not sure?

22  A.   He was with me the whole time there.

23  Q.   Did he give you any information that would indicate that

24  he had done any investigative work with regard to Mr. McKenzie?

25  A.   No.

1  Q.   We have talked about task force police officers and --

2  Strike that.

3          We have talked about Amtrak police officers, and

4  we've also talked about task force officers.  Can you tell me

5  what the difference is?

6  A.   Task Force Officer John Claiborne is a DEA task force

7  officer on this day in question.  He's also -- He's employed by

8  the Amtrak police department, but at this time he's a federal

9  task force officer working in the DEA interdiction group.

10 Q.   You say "at this time."

11 A.   I meant in 2008.

12 Q.   At the time -- Okay.  So at that time he was part of the

13 drug interdiction program -- or unit, I should say, of DEA?

14 A.   Yes, sir.

15 Q.   Was there any other document in that envelope that dealt

16 with Richard McKenzie?

17 A.   Just Mr. McKenzie's PNR.

18 Q.   Okay.  Was there a cover sheet that went along with that

19 PNR?

20 A.   No.

21 Q.   Now, I believe at the suppression hearing you testified

22 that you personally did not run an NCIC on Mr. McKenzie prior

23 to going to the train station.  Is that correct?

24 A.   Correct.

25 Q.   Do you know if anybody else did?

1    A.    No.

2    Q.    That's not the only method of obtaining one's criminal

3    history, is it?

4    A.    I don't understand the question.

5    Q.    You're a DEA agent, correct?

6    A.    Yes, sir.

7    Q.    And how long have you been so employed?

8    A.    At that time I was in my twenty-first year.

9    Q.    And a good part of every day you investigate people who

10   are accused of dealing drugs, correct?

11   A.    Yes, sir.

12   Q.    Okay.  And during the course of that investigation you

13   don't always have an identifier of an individual, do you?

14   A.    Correct.

15   Q.    Okay.  Like today, if you wanted to investigate me, you

16   know my name, Robert Cooper, but you don't know my date of

17   birth, do you?

18   A.    No.

19   Q.    You don't have my Social Security number, do you?

20   A.    No, sir.

21   Q.    But there are ways for you to find those identifiers, are

22   there not?

23   A.    I believe so, yes.

24   Q.    Okay.  And you know some of those ways?

25   A.    I've used them a few times.  Yes.

1  Q.    Okay.  And you know that there are ways to find one's

2  criminal history other than use of the NCIC, correct?

3  A.    That's the most common way I use it.

4  Q.    Okay.  But there are other ways?  If you don't have an

5  identifier, can you find somebody's criminal history?

6  A.    It could be done.

7  Q.    Okay.  Do you know if that was done prior to going to the

8  train station to visit with Mr. McKenzie?

9  A.    There wasn't time.

10  Q.    Okay.  What time did you receive the fax?

11  A.    Well, I went to the envelope on the wall after noon, maybe

12  12:20.

13  Q.    Now, DEA has a liaison with Amtrak, correct?

14  A.    We have Amtrak police officers assigned to our task

15  forces.

16  Q.    Okay.  And that, again, is John Claiborne?

17  A.    Correct.

18  Q.    Or was at that time.  Where is John Claiborne today?

19  A.    He's still working in Albuquerque, New Mexico.

20  Q.    In what capacity?

21        MR. MARTINEZ:  Objection, Your Honor.  Irrelevant.

22        MR. COOPER:  Your Honor, I think it may lead to

23  relevant evidence.

24        THE COURT:  Well, let's limit it to -- I'll sustain

25  the objection.

1           MR. COOPER:  Thank you, Judge.

2    Q.  (By Mr. Cooper)  Now, you say that you did not receive the

3    PNR from that task force officer, the officer assigned to --

4    or the Amtrak police officer John Claiborne, correct?

5    A.   Correct.

6    Q.   He did not fax that to you?

7    A.   I don't know who.  You know, it was in the -- in the

8    envelope.

9    Q.   But you testified --

10   A.   -- on the wall.

11   Q.   -- at the suppression hearing that the information was

12   received from a confidential informant, correct?

13   A.   Yes.  Yes, sir.

14   Q.   And you had previously stated that that confidential

15   informant was a ticket agent, correct?

16   A.   Yes, sir.

17   Q.   So it necessarily could not have been John Claiborne,

18   because he's not a ticket agent, right?

19   A.   Correct.

20           MR. COOPER:  May I have a moment, Your Honor?

21           THE COURT:  You may.

22           MR. COOPER:  Your Honor, I have no further

23   witnesses -- no further questions.  Thank you.

24           THE COURT:  All right.  Thank you, Mr. Cooper.

25           Mr. Martinez, do you have cross-examination of

1    Mr. Hyland?

2              MR. MARTINEZ:  Yes, Your Honor.

3              THE COURT:  Mr. Martinez.

4                          CROSS-EXAMINATION

5    BY MR. MARTINEZ:

6    Q.    One of the first questions you were asked by defense

7    counsel was -- and you answered "Yes," I believe -- "Was the

8    PNR faxed to you," and you answered "Yes"; is that correct?

9    A.    Yes.

10   Q.    Now, could you clarify "to you"?  Were you answering

11   specifically to you, or was it faxed to the DEA office?

12   A.    It was faxed to the group one interdiction fax.

13   Q.    So when you were answering the question, it faxed to you,

14   you meant, actually, this group one interdiction group?

15   A.    Correct.

16   Q.    Now, you heard me clarify for the Court here that you

17   originally testified that you don't remember if you took it off

18   the fax or not?

19   A.    Yes, sir.

20   Q.    Now you remember that you took it from this envelope?

21   A.    Yes.

22   Q.    And could you please describe for the judge what this room

23   is like, and specifically put in context the fax machine and

24   the envelope and what it looks like, if you can give a

25   description?

1   A.    Sure.  It's maybe a thousand-square-foot room.  There's

2   about -- Like I said before, there's about eight officers and

3   agents assigned to this interdiction group at the time, so

4   there's about maybe no more than eight or ten desks.  On the

5   east side wall are the two -- are two plastic bins that we've

6   been referring to as envelopes.  One is marked train number 4;

7   the other one is marked train number 3.  They were there before

8   I got into interdiction in the fall of 2000.  And our fax

9   machine would be located in about the center part of the group,

10  maybe 25 feet from that wall.

11  Q.    Now, in one of your responses to defense counsel's

12  question, you stated that there wasn't time, and I believe this

13  was in reference to running an NCIC check or something like

14  that.

15  A.    Yes, sir.

16  Q.    Now, are you part of the interdiction group now?

17  A.    No, sir.

18  Q.    So you've changed groups?

19  A.    Yes.

20  Q.    Now, on this date, do you specifically remember what you

21  did on this date?

22  A.    Yes.

23  Q.    Okay.  Can you just give the Court a general description

24  of what you did that morning, just a nutshell description,

25  please?

1    A.    Well, every morning there's an earlier Greyhound bus

2    that's eastbound, and I don't report to the office, I go

3    directly to the Greyhound station, and depending upon whether

4    the bus is on time or maintenance issues with the bus, Officer

5    Garcia and I met at the Greyhound bus station, like we had done

6    on prior days, and we worked the Greyhound eastbound bus.  We

7    don't get back to the Albuquerque office until about 12:15.

8    And then I go to the envelope, and that's when I see

9    Mr. McKenzie's PNR for the first time.

10    Q.    And that's what you did in this case?

11    A.    Yes.

12    Q.    Now, you were asked whether there was a sheet attached to

13    the PNR.  Could there have been a cover page attached to this

14    PNR?

15    A.    I very seldom saw a cover sheet in these envelopes -- or

16    in the plastic bin.

17    Q.    Do you remember whether or not there was a cover sheet in

18    this case?

19    A.    No, there was no cover sheet.

20    Q.    There was just a PNR?

21    A.    Correct.

22    Q.    Now, let me get to the heart of the question here.  The

23    allegation is that this PNR was picked up someplace other than

24    a DEA office.  On the date in question, did you go to the

25    Amtrak office to pick up the PNR?

1   A.   No.

2   Q.   Now, when I say "the Amtrak office," is there an Amtrak

3   office in Albuquerque?

4   A.   Yes.

5   Q.   Okay.  Is that at the train station?

6   A.   Yes, sir.

7   Q.   Okay.  Did you go to the Amtrak office at the train

8   station to pick up the PNR?

9   A.   No, sir.

10  Q.   You picked it up from the DEA office?

11  A.   Yes, sir.

12  Q.   From the envelope that you've testified to?

13  A.   Yes.

14  Q.   Let me also be very clear and try to clarify this for the

15  Court.

16          Once you picked up the PNR from that envelope and

17  when you were going to the train station, did you have any

18  other information concerning Mr. McKenzie when you went to the

19  train station?

20  A.   No, sir.

21  Q.   So you went to the train station based upon your

22  information from the PNR?

23  A.   Yes.

24          MR. MARTINEZ:  Pass the witness, Your Honor.

25          THE COURT:  All right.  Thank you, Mr. Martinez.

1          Mr. Cooper, do you have redirect of Mr. Hyland?

2          MR. COOPER:  I have no further questions, Your Honor.

3    Thank you.

4          THE COURT:  All right.  Thank you, Mr. Cooper.

5          All right, Mr. Hyland, you may step down.  Thank you

6    for your testimony.

7          All right.  Mr. Cooper, do you have further witnesses

8    or evidence you wish to present on your motion?

9          MR. COOPER:  I don't, Your Honor.

10         THE COURT:  All right.  Thank you, Mr. Cooper.

11         Mr. Martinez, do you have witnesses or evidence you

12   wish to present in opposition to the motion?

13         MR. MARTINEZ:  Only what we discussed at the bench,

14   Your Honor.

15         THE COURT:  All right.  Well, why don't -- Why don't

16   we do this?  Why don't I have Mr. Cooper and Mr. McKenzie

17   excused from the courtroom, and then we'll bring you back in at

18   the appropriate time.

19         MR. COOPER:  Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Cooper.

21      (Mr. Cooper and Mr. McKenzie left the courtroom.)

22      (Portion of transcript under seal.)

23      (Court stood in recess at 10:37 a.m. and resumed at

24       10:50 a.m. as follows, in open court:)

25         THE COURT:  Why don't I see counsel up here at bench.

1    (Bench conference on the record.)

2         THE COURT:  When we were up here at the bench, you

3    mentioned ███████████ and ████████.  Do we need to do anything

4    with those names, or at this point is it all right that those

5    be unredacted here at the bench conference?

6         MR. COOPER:  I don't mind -- ██████████ was just a

7    fictitious name, and Chester I don't mind redacting.

8         THE COURT:  We did it earlier in the case.  I'll tell

9    Ms. Schutte Everett to redact those two names.

10        MR. MARTINEZ:  Okay.  Thank you, Your Honor.

11   (Open court.)

12        THE COURT:  All right.  Mr. Martinez, does the United

13   States have further evidence it wishes to present in opposition

14   to Mr. McKenzie's motion?

15        MR. MARTINEZ:  Nothing further, Your Honor.

16        THE COURT:  All right.  Thank you, Mr. Martinez.

17        Anything further, Mr. Cooper, on -- evidentiarywise?

18        MR. COOPER:  Just a moment, Your Honor.

19        THE COURT:  You may.

20        MR. COOPER:  Just a moment, Your Honor.

21        THE COURT:  Certainly.

22        MR. COOPER:  My apologies, Your Honor.  I had not

23   intended to do this.

24        THE COURT:  That's fine.

25        MR. COOPER:  Your Honor, at this time, I would move

1  the admission of Defendant's Exhibit A for identification

2  purposes, and Defendant's Exhibit B.

3         THE COURT:  All right.  Any objection, Mr. Martinez?

4         MR. MARTINEZ:  Your Honor, no objection to A.  And --

5  I'm sorry.  No objection to B, but I think that A is

6  irrelevant, because I think it's after the fact and it concerns

7  a different group in the DEA organization.

8         THE COURT:  All right.  Well --

9         MR. COOPER:  And, Your Honor --

10        THE COURT:  If it just goes to relevance, let me go

11 ahead and accept both of them, and then I'll make a

12 determination as to the materiality.

13        MR. COOPER:  Thank you, Your Honor.

14        THE COURT:  So Defendant's Exhibits A and B will be

15 admitted into evidence.

16        MR. COOPER:  May I approach?

17    (Defendant's Exhibits A and B admitted into evidence.)

18        THE COURT:  All right.  Any further evidentiary

19 support for your motion that you wish to present today,

20 Mr. Cooper?

21        MR. COOPER:  No, Your Honor, nothing else.  Thank

22 you.

23        THE COURT:  All right.  If you wish now to argue in

24 support of your motion.

25        MR. COOPER:  If I may, Judge?

 1          THE COURT:  You may.

 2          MR. COOPER:  Judge, the motion initially was prepared

 3   by prior counsel, and in that there was an allegation that

 4   perhaps a Franks hearing should be held due to the false

 5   statement that was contained in the affidavit for the search

 6   warrant that was presented to Judge Torgerson.  There's one

 7   statement in there that says that the ticket was purchased the

 8   day of travel.  That is false.  The agent so testified in the

 9   motion to suppress hearing, I believe at the August motion

10   hearing.

11          Judge, my client would like you to conduct a Franks

12   hearing with regard to that to determine whether or not that

13   statement was, indeed, false, whether the agent knew it to be

14   so, and then whether or not there was probable cause that

15   existed after you excise that false statement.  So just kind of

16   as a housecleaning matter, that's -- that's one part of the

17   motion that had previously been filed, and my client wanted me

18   to argue that.

19          Judge, with regard to the motion -- or the portion of

20   the motion to reopen the suppression hearing and/or have a

21   Franks hearing with regard to the false statements by Agent

22   Hyland, today we testified -- or we brought forth evidence from

23   Mr. Herrera, who testified that he interviewed the ticket

24   agent; that the ticket agent in question never faxed anything

25   to the DEA agents or to Agent Hyland in particular.  He said he

1    always faxed any information that he had to the Amtrak police.

2            This agent was a male who worked the day shift.  The

3    other agent working the Flagstaff office, according to

4    Mr. Herrera, based on information he learned from the ticket

5    agent, was a female agent who worked the night shift.

6            So it's clear that, based on what we learned during

7    the course of that interview, that that ticket agent never

8    faxed anything to DEA or to Agent Hyland.  Agent Hyland, at the

9    hearings on the motion to suppress and today again testified

10   that the PNR came from the ticket agent.  He specifically said

11   it did not come from the Amtrak police, it did not come from

12   Claiborne, it came from the ticket agent, who he believed to be

13   in Flagstaff.

14           And, finally, Your Honor, the PNR that's in evidence

15   in the motion to suppress that was interviewed -- I mean,

16   introduced into evidence in the August hearing -- and the

17   exhibit number escapes me, but that PNR is in evidence; that

18   PNR has no fax numbers contained on it, Judge.  There's no

19   indication that that document ever came through a fax machine.

20           Today I introduced Exhibits A and B.  Those are two

21   documents, Your Honor, that were faxed to DEA.  One document is

22   from a phone company, and you'll note that on that document

23   there is indication that the document was faxed to DEA.

24           On the other document, that is a -- that's the

25   motion -- or the affidavit for the motion to suppress, Judge,

1  that, too, indicates that that machine -- that fax came through

2  a fax machine.  Those two documents are normally what we see

3  when we see a document that has been received by fax.

4        In the case of the PNR, there is no such entry,

5  there's nothing on the top or the bottom of that exhibit to

6  indicate that that document was ever received by anybody at

7  DEA.  So I don't know how Agent Hyland ever received that.  We

8  have some idea, and I think, based on that, what we would like

9  for this Court to do is order that we have a Franks hearing, we

10  have a hearing to reopen the motion to suppress to bring forth

11  the Amtrak ticket agent that was interviewed by Mr. Herrera;

12  that we bring forth John Claiborne to testify as to whether or

13  not he received it, because we know from the testimony here

14  today and in the suppression hearing that the Amtrak ticket

15  agent that we talked to said he never sent it by fax to DEA.

16        We also know that Agent Hyland said it never came

17  from Amtrak police or from John Claiborne, but it came from a

18  ticket agent.

19        Somebody's lying, Judge.  And I think that goes to --

20  those are issues that need to be resolved by this Court in

21  determining whether or not your initial decision concerning the

22  suppression -- concerning the -- whether or not this is an

23  investigative detention or a consensual encounter.  I think

24  those are factors that you should take into consideration, the

25  veracity, the truthfulness of Agent Hyland with regard to how

1    he received this, and then you make a determination as to

2    whether or not it was, indeed, an investigative detention or a

3    consensual encounter.

4              Thank you, Judge.

5              THE COURT:  All right.  Thank you, Mr. Cooper.

6              Mr. Martinez, if you wish to argue in opposition to

7    this motion.

8              MR. MARTINEZ:  Yes, I do, yes.

9              Your Honor, before I forget, I just want to address

10   something that Mr. Cooper brought you that, to my memory, was

11   not brought up as a question or as an answer during any of the

12   hearings.  Mr. Cooper's making reference to Government's

13   Exhibit 3, which is the PNR, specifically what's not at the

14   top.  In just speaking to the case agent, I would proffer to

15   the Court that the case agent would testify that he removed it

16   for discovery purposes, and he has memory of doing that, and he

17   did that to keep the issue of the confidential informant quiet.

18             So this is a new issue, I think, that came up, I

19   think, with the defendant's exhibits.  And, again, I'm

20   proffering to the Court what our knowledge of the top of the

21   page looked like and what happened to that information on it.

22   And it's my understanding that the information did show that it

23   was from Amtrak.

24             MR. HYLAND:  Yes, sir.

25             MR. MARTINEZ:  Now, Your Honor, the way that I can --

1    or, actually, let me stop there.

2          Does the Court have any questions it's concerned

3    with?

4          THE COURT:  Well, what this -- Defendant's Exhibit B,

5    who are these people and what is this exhibit?

6          MR. MARTINEZ:  My sense, Your Honor, I should let the

7    defense counsel answer that question.

8          MR. COOPER:  Your Honor, I believe that to be the

9    T-Mobile -- it's a fax that was received by DEA pursuant to

10   subpoena of my client's phone records, and today before I

11   introduced this document Agent Hyland confirmed that, indeed,

12   was the phone number -- a DEA fax number.  And same with the

13   other exhibit, Your Honor.  One is in the unit he's in now; one

14   is in the unit that he was in on the date in question.

15         THE COURT:  All right.

16         MR. MARTINEZ:  And just for clarification, Your

17   Honor, I believe Defendant's Exhibit 2 concerns group one, and

18   that was the fax that existed at the time of this case.

19         THE COURT:  All right.

20         MR. MARTINEZ:  Your Honor, the response that the

21   United States gave the Court to the defendant's motion, the way

22   that I'm looking at it is two part.  The first is very serious,

23   because an officer of the court has alleged that there was a

24   lie by the case agent at the suppression hearing, and I ask the

25   Court to consider that issue specifically, because right now

1   with that allegation there -- there's a cloud over this case

2   agent's head.

3           The second part that I was asking the Court to

4   consider was then -- if the Franks hearing or the suppression

5   hearing should be reopened.

6           The testimony has been consistent throughout the

7   suppression hearing and again today, that the PNR was faxed to

8   the DEA, Your Honor, and this agent has been consistent, that

9   he received and picked up that PNR there at the DEA office.

10  And we stand by that, Your Honor.

11          THE COURT:  I'll have to go back and look at the

12  testimony, but, I mean, is it possible that the -- that the --

13  that material -- I mean, he picks up the fax out of the

14  envelope and doesn't really care that much where it comes from,

15  whether it comes through the Amtrak police department or it

16  comes directly from someone else.  Is his testimony -- Is

17  Mr. Hyland's testimony consistent that he knows it came

18  directly from the ticket people?

19          MR. MARTINEZ:  Yes, Your Honor, I think that's clear.

20          THE COURT:  Okay.

21          MR. MARTINEZ:  And the spirit of his testimony, both

22  today and past days, is that this PNR was faxed by this

23  confidential informant to the DEA office, the DEA received it

24  there, somebody took that off the fax machine, put it into one

25  of these two envelopes, for either train three or four, and

1    then -- in this case, I believe it was train 3 -- and that is

2    where Agent Hyland then recovered the PNR, or took it from, was

3    that envelope on the wall.

4         So that's the main point of the testimony concerning

5    that issue, Your Honor, from the Government's perspective.

6         So, with the information that the Court had before, I

7    think that it's clear that this agent has testified truthfully

8    and that this cloud -- or this allegation that's been made

9    towards his testimony is not -- is not correct, it's just not

10   right.

11        And I'm not even going to go into the credibility of

12   this individual, this person who they're alleging is the

13   confidential informant.

14        Looking at the second issue, Your Honor, the main

15   issue that this Court has already dealt with is the Fourth

16   Amendment issue, and the Court, in making its determination, it

17   revolved around the issue of whether this was an investigative

18   stop or a consensual encounter, and this Court has already

19   ruled that it was a consensual encounter, and there's no reason

20   to backtrack on that decision.

21        Now, with that as the premise or the Rosetta stone,

22   then, whether the PNR was faxed to the DEA office is not

23   relevant or material to a consensual encounter at the train

24   station.  So for that reason the suppression issue --

25   suppression hearing should not be reopened.

1        Now, concerning the Franks hearing, under Franks

2   there's a three-prong test, and none of the prongs are

3   satisfied in this case, Your Honor.

4        In the motion, they don't -- defense counsel does not

5   even argue a misstatement in the affidavit itself.  He's

6   arguing something that is coming about as a result of the

7   hearing.  Now that's changing.  Defense counsel, today, is

8   talking about the date that this agent testified to in the

9   affidavit.  This agent testified in front of you that that was

10  inaccurate and that was a mistake, and that was a simple

11  mistake, Your Honor.  And I would argue that the case law, that

12  I'm sure this Court is very familiar with, in this circuit

13  shows that an agent who's writing a search warrant is sometimes

14  caught up in the heat of the moment and not everything is

15  correct, but they look at the spirit of what that agent was

16  doing, whether he was trying to intentionally mislead or not.

17  In this case, it's clear that this agent was not intentionally

18  trying to mislead in the affidavit.

19       And looking at the second prong, again, he did not

20  knowingly and intentionally write the wrong date in there.  He

21  did write the wrong date, but it wasn't knowingly or

22  intentionally.  And then, obviously, that one error would not

23  have been -- that it would not have changed the PC finding

24  within that search warrant itself, Your Honor, based upon the

25  other facts of the case.

1      And this Court is very well aware of the facts that

2 occurred, and I would just bring out a few of the facts that

3 the Court had to look -- in the search warrant.  Some of those

4 facts were the consensual encounter at the beginning, the fact

5 that happened in the stateroom itself with the cereal boxes,

6 what the agents' observations were in that stateroom; the -- I

7 think it's stated in the affidavit his resistance to being

8 arrested and then his fleeing.  So those would be issues that

9 the Court would look at.

10      Your Honor, based upon the facts that this Court has

11 before it, the United States asks that it deny a Franks

12 hearing, it deny a reopening of the hearing, and, clearly, the

13 cloud that's been placed over this agent's head.

14      And I stand before you ready to answer any questions

15 you may have.

16      THE COURT:  I don't believe I have any of you at the

17 present time.  Thank you, Mr. Martinez.

18      MR. MARTINEZ:  Thank you, Your Honor.

19      THE COURT:  Mr. Cooper, I'll give you the last word

20 on this motion.

21      Let me ask you while you're getting your papers

22 there, if you were to have a Franks hearing, just putting it

23 aside separately, what would be presented to the Court that's

24 different than what -- either different or additional to what

25 we've already done today and the prior two hearings?

1          MR. COOPER:  Your Honor, I think the live testimony

2     of the agent from Flagstaff, I think, would --

3          THE COURT:  That's the only thing that would be

4     additional?

5          MR. COOPER:  That would be additional, and I think at

6     that point --

7          THE COURT:  How would that go, then, to the statement

8     that you've identified as incorrect in the affidavit for the

9     search warrant?  How would the -- How would anybody from

10    Flagstaff shed any light on that?  We know it's incorrect.

11         MR. COOPER:  Your Honor, I did not prepare that

12    motion, and that motion --

13         THE COURT:  All right.

14         MR. COOPER:  -- I think melds a couple of -- probably

15    three different requests of the Court.

16         THE COURT:  Let me move you, then, to the motion to

17    suppress.

18         MR. COOPER:  Okay.

19         THE COURT:  Would your answer be the same, that you

20    would -- the one thing that would be additional would be the

21    agent from Flagstaff?

22         MR. COOPER:  Yes, Your Honor.  That, and probably

23    Agent Claiborne.  I think he is necessary to -- I think his

24    testimony would shed some light on whether or not the agent in

25    Flagstaff is telling the truth or whether or not Agent Hyland

1  is telling the truth, because, clearly, we have two different

2  versions.  The agent in Flagstaff is saying that he sent it to

3  the Amtrak police station and never had any dealings with DEA.

4  Agent Hyland said it did not come from Amtrak police, it did

5  not come Claiborne, it came from Flagstaff station agent.

6          THE COURT:  So those would be the two additional

7  witnesses?

8          MR. COOPER:  Yes, Your Honor.  And they go -- And

9  then I think the Court needs to make that -- it's a Franks-like

10 analysis in terms of --

11         THE COURT:  It's the credibility issue?

12         MR. COOPER:  The credibility evaluation, Your Honor.

13 I think that's what, perhaps --

14         THE COURT:  I think Mr. McKenzie wants to speak to

15 you.

16         MR. COOPER:  No doubt.  Thank you.

17         But those are -- That's how it would change, Your

18 Honor.  But in terms of the true Franks hearing, I wouldn't

19 bring any evidence.  I think you've already heard the evidence,

20 and the evidence is that a mistake was made, and so I don't

21 think there will be any need for an evidentiary hearing, but,

22 perhaps, argument that what's left is not probable cause,

23 but -- and Mr. McKenzie, I know, wants us to advance that

24 argument.

25         THE COURT:  All right.

1          MR. COOPER:  May I have just a moment, Your Honor?

2          THE COURT:  You may.

3      (A conference was held between the defendant and

4      Mr. Cooper.)

5          MR. COOPER:  Judge, back to the Franks hearing with

6   regard to the affidavit.  Franks also directs us to look at

7   omissions from the affidavit in addition to willful

8   misstatements, and we would bring forth argument, anyway, and

9   perhaps some testimony from Agent Hyland as to what he knew

10  about the PNR, how he had received it.  I think Mr. McKenzie

11  would ask that we advance those arguments, elicit that

12  testimony, advance those arguments.

13          THE COURT:  All right.

14          MR. COOPER:  Beyond that, I don't have anything else.

15  If the Court has any further --

16          THE COURT:  I don't believe so.  I think I have what

17  I need.  All right.  Thank you, Mr. Cooper.

18          MR. COOPER:  Thank you, Judge.

19          THE COURT:  All right.  I'll take this under

20  advisement and try to get you an opinion and order out as soon

21  as possible.  We've had this case around for a while, so I'll

22  try to -- now that I have this hearing and the information that

23  it's provided, I'll try to get something to you as soon as

24  possible.

25          MR. COOPER:  Your Honor?

1          THE COURT:  Yes.

2          MR. COOPER:  Mr. McKenzie has informed me that I did

3    not convey to you what he had told me about that particular

4    last issue, and I think he would like to address the Court.

5          THE COURT:  I'm sorry, what happened?

6          MR. COOPER:  When I -- When I took a moment and

7    talked to Mr. McKenzie and then went back up and told you

8    that's what he wanted me to convey to you, apparently I did not

9    do so correctly.

10          THE COURT:  Oh, okay.

11          MR. COOPER:  And I think he would like to address the

12    Court.

13          THE COURT:  All right.  You can do it from there,

14    Mr. McKenzie.

15          THE DEFENDANT:  What I wanted to say about the reason

16    to --

17          MS. SCHUTTE EVERETT:  I'm sorry.  Can you put the

18    microphone --

19          THE COURT:  Pull the microphone right over here, just

20    get it close to you.

21          THE DEFENDANT:  Thank you, Your Honor.

22          The reason why I asked for a Franks hearing is

23    because if you look at the affidavit and the Complaint and the

24    motion leading up to the hearings, there's no indication

25    anywhere that there is an informant, in that the term they use

1  is "reviewed by Amtrak reservation," that on -- before the

2  arrival of Amtrak train, affiant, which is the officer,

3  reviewed the Amtrak reservation.  There's no terms like "upon

4  receipt of information from" or -- he didn't even have to

5  mention the informant's name.  You could say CI1, 2 and 3,

6  whatever the case may be.  Nowhere does it even invoke that he

7  had -- he got the information from an informant or from

8  somebody else.

9       So the reason why I wanted a Franks hearing is

10  because, if you take away the first part of this, which is how

11  he got the information, that's what I'm trying to argue.  How

12  did you receive this information if you're not saying that it

13  was given to you by somebody else?  And that's why -- That's

14  what I mean by there's omission.  Because how later on down the

15  line, 14 months later you can invoke a informant, where -- I

16  believe that I wasn't properly prepared nor was I allowed to

17  properly prepare, because nowhere does it indicate that he got

18  the information from somebody else, but he's making it seem

19  like he's reviewing.  And my argument is, how are you reviewing

20  it?  How did you get this paperwork?

21       THE COURT:  All right.  I understand the point.  I

22  will address that in the opinion and order.

23       MR. COOPER:  Thank you, Your Honor.

24       THE COURT:  All right.  Is there anything else we

25  need to discuss while we're together?  Anything else I can do

 1    for you?

 2              Mr. Martinez?

 3              MR. MARTINEZ:  No, Your Honor.

 4              THE COURT:  Mr. Cooper?

 5              MR. COOPER:  No, Your Honor.  Thank you.

 6              THE COURT:  All right.  Thank you for your

 7    presentations this morning.  I have another proceeding, so I'm

 8    just going to stay on the bench.  Y'all have a good day.

 9              MR. MARTINEZ:  May we be excused, Your Honor?

10              THE COURT:  You may.  Y'all have a good day.

11        (Court stood in recess at 11:23 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2          EXAMINATION                              PAGE

3     DEFENSE WITNESS:  CARLOS HERRERA

4          Direct Examination By Mr. Cooper           9
           Cross-Examination by Mr. Martinez         15
5          Redirect Examination by Mr. Cooper        30

6     DEFENSE WITNESS:  MARK D. HYLAND

7          Direct Examination By Mr. Cooper          35
           Cross-Examination by Mr. Martinez         44
8

9                 EXHIBITS ADMITTED INTO EVIDENCE

10

      Defendant's Exhibits A and B                   50
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Danna Schutte Everett
Official United States Court Reporter
333 Lomas Boulevard, Northwest
(505) 348-2283

```
 1                    C-E-R-T-I-F-I-C-A-T E

 2   UNITED STATES OF AMERICA

 3   DISTRICT OF NEW MEXICO

 4

 5       I, Danna Schutte Everett, RPR, CCR, CRR, Official

 6   Court Reporter for the State of New Mexico, do hereby

 7   certify that the foregoing pages constitute a true

 8   transcript of proceedings had before the said Court held

 9   in the City of Albuquerque, New Mexico, in the matter

10   therein stated.

11       In testimony whereof, I have hereunto set my hand on

12   this 19th day of January, 2011.

13

14                    _____

                      DANNA SCHUTTE EVERETT
15                    Registered Professional Reporter
                      Registered Merit Reporter
16                    Certified Realtime Reporter
                      NM Certified Court Reporter #139
17                    333 Lomas Boulevard, Northwest
                      Albuquerque, New Mexico  87102
18                    Phone:  (505) 348-2283
                      Fax:  (505) 348-2285
19

20

21

22

23

24   December 1, 2010, USA vs. McKenzie

25
```