## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. CR 08-1669 JB

RICHARD MCKENZIE,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Opposed Motion to Continue Trial Setting; Request for Frank's [sic] Hearing; and Request to Reopen Suppression Motion Hearing, filed May 17, 2010 (Doc. 76)("Motion").  The Court held an evidentiary hearing on December 1, 2010.  The primary issues are: (i) whether Special Agent Mark D. Hyland falsely testified about the source of information he received about Defendant Richard McKenzie; (ii) whether the Court should grant McKenzie's request for a <u>Franks</u>[1] hearing; and (iii) whether the Court should reopen the suppression motion hearing.  The Court finds that Hyland did not falsely testify, and denies McKenzie's requests for a <u>Franks</u> hearing and to reopen the suppression hearing.[2]

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154, 164-65 (1978).

[2] McKenzie also asks the Court to continue the trial currently set for May 24, 2010 to give him an opportunity to present evidence that he believes will undermine the apparent legality of the search that ultimately led to agents discovering contraband in McKenzie's luggage.  The Court previously granted McKenzie request for a continuance.  <u>See</u> Memorandum Opinion and Order, filed May 21, 2010 (Doc. 81).

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The Court previously made factual findings in this matter.  See Memorandum Opinion and Order, filed April 13, 2010 (Doc. 70)("April 13, 2010 MOO").  The Court expands the factual findings based on the evidence presented at the December 1, 2010 hearing.  The findings of fact in the Court's April 13, 2010 MOO combined with the facts in this opinion shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, for example, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269-70.

In the Court's April 13, 2010 MOO, it made, in relevant part, the following findings of fact: On Monday, July 7, 2009, Hyland and Task Force Officer Stephen Suprenant de Garcia reviewed an east bound Amtrak Passenger Named Record ("PNR") for a Richard McKenzie.  See Transcript of Hearing at 9:13-18:16 (taken August 20, 2009)("Tr.")(Martinez, Hyland)(explaining that Hyland went to the Amtrak station on July 7, 2008 because Hyland "had information on a passenger name

record, a reservation showing one-way travel from Flagstaff, Arizona to New York City.");[3] Government Exhibit 11, at 4 ("Warrant and Affidavit").  An Amtrak ticketing agent sent the PNR by facsimile transmission to the DEA.  See Tr. at 76:3-82:4 (Padilla, Hyland).  Amtrak ticketing agents regularly send PNRs by facsimile transmission to the DEA if the ticketing agent identifies, based on training that the DEA provides, a PNR with characteristics fitting the drug-courier profile. See Tr. at 102:6-105:23 (Padilla, Hyland); Transcript of Hearing at 12:6-18 (taken February 18, 2010)("Second Tr.")(Padilla, Hyland).  Amtrak ticketing agents who provide information to the DEA which results in a narcotics-related arrest receive monetary rewards.  See Tr. at 106:6-13 (Padilla, Hyland).  The ticketing agent who provided the PNR that Hyland and Garcia received on July 7, 2009 had provided reliable information to the DEA in the past, which resulted in an arrest and/or confiscation of drugs.  See Second Tr. at 11:4-23 (Padilla, Hyland).

The PNR for McKenzie indicated one-way, credit-card travel from Flagstaff, Arizona to New York, New York.  See Tr. at 12:14-13:25 (Martinez, Hyland); Government Exhibit 3 ("PNR"); Government Exhibit 4 ("Amtrak Tickets"); Warrant and Affidavit at 4.  The tickets were purchased with a credit card issued to a person named Rudy Johnston.  See Tr. at 14:3-6, 18:12-14 (Martinez, Hyland); PNR at 1; Warrant and Affidavit at 4.  McKenzie's PNR indicated a telephone reservation, five days in advance, for the most expensive sleeper accommodations Amtrak offers.  See Tr. at 14:22-17:20 (Martinez, Hyland); PNR at 1.  The reservation was made on Wednesday, July 2, 2008, at a cost of $1,836.00 for Deluxe Sleeper Car 431/Room A.  See Tr. at 14:22-17:20 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1.  Hyland's warrant affidavit stated that McKenzie purchased the tickets on the day of travel, July 7, 2008, but Hyland admitted during the hearing that this date

---

[3] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

was incorrect.  See Tr. at 101:18-102:5 (Padilla, Hyland); id. at 143:6-20 (Martinez, Hyland); Warrant and Affidavit at 4.  The PNR also indicated McKenzie picked up his ticket in Flagstaff at 5:56 a.m. on Monday, July 7, 2009.  See Tr. at 17:21-25 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1.

      After finding McKenzie at the train, Hyland asked for permission to enter the Deluxe Sleeper in which McKenzie was traveling, to which McKenzie agreed.  See Second Tr. at 25:10-25 (Martinez, Hyland); Warrant and Affidavit at 5.  Hyland then asked McKenzie for consent to search his luggage.  See Tr. at 29:21-30:3 (Martinez, Hyland); Government Exhibit 2 at 01:15-01:30 ("Hyland's Recording")(Hyland)(asking consent to search McKenzie's luggage); Warrant and Affidavit at 5.  McKenzie knew that he could refuse to give consent.  See Hyland's Recording at 01:40-02:10 (McKenzie)(refusing Hyland's request to search inside one of the cereal boxes found in McKenzie's luggage); id. at 02:10-03:00 (McKenzie)(informing Hyland and Garcia that he knows his rights and is related to one or more attorneys); id. at 11:10-11:30 (McKenzie)(stating that he should never have given Hyland permission to search in the first place).  McKenzie gave Hyland consent to search both bags.  See Tr. at 29:18-33:14 (Martinez, Hyland); Warrant and Affidavit at 5.  McKenzie allowed the officers to view the contents of his baggage.  See Tr. at 29:18-33:14 (Martinez, Hyland); Warrant and Affidavit at 5.

      Hyland found in McKenzie's luggage three cereal boxes in which Hyland detected a heavy, centered weight.  See Tr. at 31:3-25, 33:4-37:1 (Martinez, Hyland); Warrant and Affidavit at 5.  Hyland asked specific permission to search the cereal box.  See Tr. at 32:18-25 (Martinez, Hyland); Hyland's Recording at 01:40-02:10.  McKenzie denied Hyland's request for permission to search inside the Great Value Fruit Spins cereal box.  See Tr. at 32:18-25 (Martinez, Hyland); Hyland's Recording at 01:40-02:10; Warrant and Affidavit at 5.  Hyland believed, based on his training and

experience, that the three cereal boxes contained contraband.  See Tr. at 36:23-37:1 (Martinez, Hyland). Based on these factors: (i) the very expensive one-way travel by train; (ii) a third-party had purchased the tickets; (iii) the tickets were purchased five days before travel; (iv) McKenzie was traveling from a source city to which McKenzie had flown; (v) the train was taking McKenzie from a source city to a destination city; and (vi) the heavy, center-weighted cereal boxes being taken on a train ride in which all meals were provided, Hyland had reasonable suspicion that the boxes might contain contraband.  See April 20, 2010 MOO ¶ 88, at 13.

McKenzie asked Hyland if he could go back outside the Amtrak car to smoke another cigarette.  See Tr. at 40:20-41:2 (Martinez, Hyland); Warrant and Affidavit at 5.  McKenzie left his sleeping compartment and moved to the platform to smoke another cigarette.  See Tr. at 40:20-41:2 (Martinez, Hyland); Warrant and Affidavit at 5.  Hyland followed McKenzie to the outside platform. See Tr. at 41:4-5 (Martinez, Hyland); Warrant and Affidavit at 5.

When Hyland told McKenzie that he intended to bring Sasja, a drug sniffing dog, onto the train to sniff the three unopened cereal boxes in his luggage, McKenzie repeatedly stated that he was not consenting to the dog sniff, to which Hyland told McKenzie that no warrant is needed for this investigative technique.  See Hyland's Recording at 05:45-06:05.  McKenzie told Hyland that McKenzie did not want a dog in his space and that he did not like dogs.  See Hyland's Recording at 07:00-07:20.  Either Hyland or Garcia next suggested that McKenzie bring the cereal boxes out of the Deluxe Sleeper Car so that Sasja could sniff them without entering McKenzie's room; McKenzie refused this suggestion.  See Hyland's Recording at 11:05-11:30.

During this discussion, Hyland asked McKenzie if anyone could confirm his story that he had traveled to attend a family reunion; McKenzie responded that he would call someone.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.  McKenzie placed a call on

his Blackberry cellular telephonic apparatus and allowed Hyland to speak to the individual who answered.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.  The individual initially denied seeing McKenzie that weekend, knowing where McKenzie was, or knowing what McKenzie was doing.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.  After substantial coaching from McKenzie, the person on the other end of McKenzie's cellular telephone agreed that McKenzie was at a family reunion in Phoenix, Arizona, that weekend.  See Tr. at 49:23-52:2 (Martinez, Hyland); Hyland's Recording at 13:30-16:50.  The person on the other end of McKenzie's cellular telephone call was covering for McKenzie, and would have agreed to whatever story McKenzie tried to give Hyland and Garcia.

Hyland and Garcia explained to McKenzie that he would be detained, and that Hyland would prepare a search warrant for the cereal boxes.  See Hyland's Recording at 17:20-18:30; Warrant and Affidavit at 6.  Shortly thereafter, Hyland attempted to place handcuffs on McKenzie who then resisted and started to scream "help" several times.  Tr. at 53:3-24 (Martinez, Hyland); Hyland's Recording at 17:20-19:00.  McKenzie then ran in a semi-circle, re-entered Sleeper Car 431, and ran back to his Deluxe Sleeper.  See Tr. at 53:25-54:15 (Martinez, Hyland); Warrant and Affidavit at 6.  Hyland and Amtrak Conductor Duone Chavez gave chase.  See Tr. at 53:25-54:15 (Martinez, Hyland); Warrant and Affidavit at 6.  McKenzie returned to his sleeping compartment, locked the door, and refused to discuss the matter any further.  See Tr. at 54:2-21 (Martinez, Hyland); Warrant and Affidavit at 6.  McKenzie jumped from the train and left the area, heading in an easterly direction.  See Tr. at 54:13-55:24 (Martinez, Hyland); Warrant and Affidavit at 6.  Garcia apprehended McKenzie a short time later.  See Tr. at 57:5-58:11 (Martinez, Hyland); Government Exhibit 1, Video 3; Warrant and Affidavit at 6.  Based upon all of the facts that Hyland had collected, Hyland's conversation with McKenzie's friend who, at best, did not know what McKenzie

had been doing that weekend, and McKenzie's decision to flee the train rather than allow Sasja to sniff his luggage, Hyland and Garcia had probable cause to believe McKenzie's luggage contained contraband. See April 20, 2010 MOO ¶ 125, at 17.

Hyland removed the three unopened cereal boxes and all of McKenzie's personal property from the AmTrak train. See Tr. at 56:23-57:1 (Martinez, Hyland); Warrant and Affidavit at 6. Hyland and Garcia returned to the DEA Albuquerque Office, and Garcia presented the Great Value Apple Express cereal box, Great Value Fruit Spins cereal box, and the Kellogg's Corn Pops cereal box to Sasja. See Tr. at 58:14-59:10 (Martinez, Hyland); Warrant and Affidavit at 6. Garcia relayed to Hyland that Sasja gave a "paws-up" and alerted to all three cereal boxes. Tr. at 58:14-59:10 (Martinez, Hyland); Warrant and Affidavit at 6. Sasja's alerting to the cereal boxes reinforced Hyland and Garcia's probable cause to believe the cereal boxes contained contraband. See April 20, 2010 MOO ¶ 135, at 18. Hyland prepared a search warrant and accompanying affidavit based on his encounter with McKenzie and Sasja's reaction to the cereal boxes. See Tr. at 59:9-24 (Martinez, Hyland); Warrant and Affidavit at 6.

The officers obtained a warrant. See Tr. at 59:12-60:10 (Martinez, Hyland); Warrant and Affidavit at 1-2. The Honorable Alan C. Torgerson, United States Magistrate Judge, signed the federal search warrant that Hyland prepared. See Warrant and Affidavit at 1, 7. At approximately 7:50 p.m., Hyland and Garcia executed the search warrant, opened the cereal boxes, and found three brown-taped rectangular bundles within the cereal boxes containing 3.45 gross kilograms of a white powder that tested positive for cocaine. See Tr. at 60:11-65:5 (Martinez, Hyland); Government Exhibits 8a-8i; Government Exhibit 9; Government Exhibits 10a-10b.

The Court makes the following findings of fact based on evidence presented at the December 1, 2010 hearing.

1.      On May 6, 2009, an investigator from the Federal Public Defender's Office, Carlos Herrera, interviewed a person McKenzie believes is the AmTrak ticket agent referred to as a confidential source and who was not named during any of the hearings conducted (hereinafter "AmTrak ticket agent").  See Transcript of Hearing at 9:21-10:12 (taken December 1, 2010)("Third Tr.")(Cooper, Herrera).[4]

2.      Herrera does not know if the AmTrak ticket agent is the confidential source.  See id. at 17:7-12 (Martinez, Herrera).

3.      The AmTrak ticket agent did not want to speak with Herrera.  See id. at 14:8-15 (Martinez, Herrera)("When I first spoke to him, he did not want to talk to me.").

4.      The AmTrak ticket agent stated he was one of two ticket agents that worked at the AmTrak station in Flagstaff; he worked the day shift and the other agent, a female, worked the night shift.  See id. at 11:8-21 (Cooper, Herrera); id. at 21:22-22:7 (Martinez, Herrera).

5.      McKenzie dealt with a male agent at the AmTrak ticket office in Flagstaff during the day.  See id. at 22:25-23:2 (Martinez, Herrera); id. at 29:15-19 (Cooper, Herrera).

6.      The DEA and AmTrak provided the AmTrak ticket agent training on identifying individuals meeting the "drug courier" profile.  Id. at 12:11-21 (Cooper, Herrera).

7.      The AmTrak ticket agent stated during his interview with Herrera that he did not provide any information regarding passengers to the DEA.  See id. at 12:7-10 (Cooper, Herrera).

8.      The AmTrak ticket agent stated that, instead of providing information to the DEA, he provides any information on suspicious persons that he reviews to the AmTrak Police Department.  See id. at 11:22-12:6 (Cooper, Herrera).

_____

[4] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

9.      The AmTrak ticket agent indicated that he sent by facsimile transmission the PNR to John Claiborne, a task force officer with the Amtrak police department in Albuquerque, New Mexico.  See Third Tr. at 12:2-6, 13:3-9, 30:9-12 (Cooper, Herrera).

10.      The AmTrak ticket agent further indicated that he had never sent by facsimile transmission McKenzie's PNR to the DEA or to Hyland.  See id. at 13:16-14:4, 29:25-30:7 (Cooper, Herrera); id. at 17:4-6 (Martinez, Herrera).

11.      The AmTrak ticket agent had never heard of Hyland.  See id. 13:19-20, 30:3-4 (Cooper, Herrera); id. at 17:1-3 (Martinez, Herrera).

12.      Herrera does not know what Claiborne's position was at the time of this case, if Claiborne was a liaison officer for the DEA, or if Claiborne had an office at the DEA at the relevant time.  See id. 19:15-23 (Martinez, Herrera).

13.      Claiborne was a DEA task force member at the time of McKenzie's arrest.  See id. at 39:9-17, 41:18-22 (Cooper, Hyland).

14.      Herrera did not learn what telephone number the AmTrak ticket agent used to connect to the facsimile transmission apparatus to which he would send information to Claiborne, and Herrera did not know the telephone number to connect to the DEA's facsimile transmission apparatus.  See Third Tr. 17:14-18 (Martinez, Herrera).

15.      Herrera did not show the AmTrak ticket agent McKenzie's PNR to learn if the AmTrak ticket agent was involved in processing the PNR.  See Third Tr. 23:12-14 (Martinez, Herrera).

16.      Hyland did not take the PNR off the DEA facsimile transmission apparatus; he took it from an envelope specific to the number four train on which McKenzie traveled, which was on the wall of the room in which the apparatus was located, and Hyland does not know who moved the

PNR from the facsimile transmission apparatus to the envelope.  See Third Tr. at 35:25-36:20 (Cooper, Hyland); id. at 43:25-44:14, 46:13-16 (Martinez, Hyland).

17.     A ticket agent sent the PNR to the DEA's Group One Interdiction Group, and Hyland did not communicate with the ticket agent before or after receiving the PNR by facsimile transmission.  See Third Tr. at 34:15-17. 36:24-37:5 (Cooper, Hyland).

18.     Hyland had no communication with Claiborne before going to the train station on July 7, 2009 -- the day of McKenzie's arrest.  See id. at 37:6-8 (Cooper, Hyland).

19.     DEA agent Jarrell Wayne Perry testified that he coordinated payment to the confidential source who provided McKenzie's PNR.  See Third Tr. at 50:1-17 (Martinez, Perry).

20.     Perry confirmed that the confidential source sent facsimile transmissions to Hyland's group at the DEA's office.  See Third Tr. at 54:16-22 (Martinez, Perry); id. at 56:11-57:12 (Court, Perry).

22.     After proceedings against McKenzie commenced, Perry contacted the person who is most likely the confidential source, and the person most likely to be able to determine who is the confidential source if not this person, and that person is unable to recall details regarding the specific facsimile transmission of McKenzie's PNR.  See Third Tr. at 51:16-52:2, 52:18-25, 54:9-15 (Martinez, Perry); id. at 56:6-10 (Court, Perry).

23.     In relation to McKenzie's PNR, the affidavit Hyland prepared in support of the search warrant states:

> Before arrival of the Amtrak train, Affiant reviewed an Amtrak reservation for a Deluxe Sleeper passenger name Richard MCKENZIE.  The reservation indicated one-way travel from Flagstaff, AZ to New York, New York, via Chicago, Illinois and Washington, D.C.  The Ticket was purchased the day of travel, Monday, July 7, 2008.  The third-party, credit card purchase cost a total of $1,836.00.  MCKENZIE had a Deluxe Sleeper A in Sleeper Car 431.

Warrant and Affidavit at 2.

24.     The telephone tolls show that four telephone calls were made from the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station to the telephone number associated with the facsimile transmission apparatus at the DEA's offices on July 7, 2008, between 5:54 am and 7:05 am.  See Government's Ex. 1, at 1, filed January 10, 2011 (Doc. 150-1)("Telephone Records").

25.     Hyland received McKenzie's PNR via facsimile transmission from an AmTrak ticket agent.

## PROCEDURAL BACKGROUND

McKenzie is charged by Indictment with one count of possession with intent to distribute 500 grams of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  On May 14, 2009, McKenzie filed a motion to suppress all evidence found as a result of what he considers to be an illegal search.  See Motion to Suppress Evidence with Supporting Authorities, filed May 14, 2009 (Doc. 32).  McKenzie asserted that the encounter with the DEA agent was not consensual, but was an investigative stop.  The Court relied upon testimony from Hyland at the hearing in denying McKenzie's requested relief.  The Court, after hearing testimony at two separate hearings, denied the motion to suppress, ruling that the encounter was consensual and that McKenzie had given the agent consent to search his luggage where the cocaine was found.  See April 13, 2010 MOO at 29.

Hyland testified, under oath, that he secured McKenzie's PNR from an AmTrak ticket agent via a facsimile transmission, which he received before McKenzie's arrival in Albuquerque.  See Tr. at 76:3-82:4 (Padilla, Hyland).  Hyland further testified that the AmTrak ticket agent routinely sends PNRs by facsimile transmission to the DEA if the ticket agent identifies, based upon training that

the DEA provides, characteristics fitting the drug-courier profile.  See Tr. at 102:6-105:23 (Padilla, Hyland); Second Tr. at 12:6-18 (Padilla, Hyland)

In his May 17, 2010 Motion, McKenzie requests a Franks hearing, asks the Court to re-open its suppression hearing, and, presumably, re-consider its April 13, 2010 ruling.  McKenzie represents that he is not attempting to delay a final disposition and is willing to waive his right to a jury trial. McKenzie represents, on the contrary, that he does not want to burden the Court or Plaintiff United States of America with having to go through a jury trial, as the primary issue to be resolved is whether the search of his luggage was illegal based upon improper information provided to the Magistrate Judge in obtaining a search warrant.[5]

McKenzie contends that the Court "may need to . . . conduct[]" a Franks hearing to determine if Hyland provided false or misleading information to the Magistrate Judge who issued the warrant to search the cereal boxes in McKenzie's luggage.  McKenzie contends that, even if the Court determines that a Franks hearing is not necessary, McKenzie's testimony regarding how the DEA received the PNR is relevant to the determination whether the initial contact with McKenzie was an investigative stop or a consensual encounter.

McKenzie contends that Herrera's interview with the AmTrak ticket agent shows that

_____

[5] McKenzie counsel stated:

For the reasons set forth above, counsel for Mr. McKenzie moves this Court for an Order continuing this case from the Court's May 24, 2010 trial docket and for the setting of a hearing to take additional evidence that Mr. McKenzie feels is relevant to his request that the Court reconsider it's previous denial of his Suppression Motion. Counsel also suggests that the Court set this matter for a status conference if unclear on what Mr. McKenzie is requesting. . . .  This is Mr. McKenzie's eleventh request to continue a trial setting.

Motion ¶¶ 7, 9, at 4.

McKenzie's PNR was sent to the AmTrak police and not to the DEA, which directly contradicts Hyland's testimony at the suppression hearing.  McKenzie feels strongly that the Court should consider such evidence and that the Court should reconsider its previous denial of his suppression motion.  McKenzie contends that his new evidence "would seem to indicate" that the agent who testified may not have testified truthfully and that he may have mislead the Court regarding his encounter with McKenzie.  Motion ¶ 2, at 2.  McKenzie wants the Court to consider his additional evidence regarding Hyland's testimony.

On September 14, 2010, the United States filed its Response in Opposition to Defendant's Request for Frank's [sic] Hearing and Request to Reopen Suppression Motion Hearing Filed May 17, 2010 (Doc. 76).  See Doc. 96.  The United States contends that the Court should deny McKenzie's Motion.  The United States asserts that Hyland testified truthfully.  The United States further contends that the Court should deny McKenzie's Motion, because his request for a Franks hearing is not properly supported with evidence.  The United States alternatively argues, however, that, if the Court wishes to follow up on this issues, it should hold an in camera hearing on the record with Perry, because he has information related to the confidential informant, and an in camera hearing would protect the identity of the confidential informant and also protect law-enforcement information to which McKenzie is not entitled.  The United States also contends that Hyland's testimony about receiving the facsimile transmission from the AmTrak ticket agent is irrelevant to the decision not to suppress evidence, because the Court found that the initial search of McKenzie's luggage was consensual.

At the hearing, the United States again proposed the Court conduct an in camera interview of Perry -- a DEA agent knowledgeable about how the DEA obtained information from AmTrak.  McKenzie's counsel did not object to the Court's in camera review.  See Third Tr. at 27:17-23

-13-

(Court, Cooper)("I don't object to and [sic] in camera review of this individual or probably better still by somebody from Amtrak . . . ."). The United States and the Court then examined Perry about the AmTrak ticket agent in camera, outside of McKenzie's and his counsel's presence.

On January 10, 2011, the United States filed its Sealed Supplement of Document to Defendant's Request for Frank's [sic] Hearing and Request to Reopen Suppression Motion Hearing Filed May 17, 2010 (Doc. 76). See Doc. 105. The United States attached the July 7, 2008, telephone records for the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station. The records show that four telephone calls were made from the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station to the telephone number associated with the facsimile transmission apparatus at the DEA's offices on July 7, 2008, between 5:54 am and 7:05 am. See Telephone Records at 1.

## LAW REGARDING FRANKS HEARINGS

In Franks v. Delaware, the Supreme Court of the United States held that a defendant could challenge the veracity of an affidavit submitted to obtain a search warrant. The Supreme Court emphasized that "the rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." Franks v. Delaware, 438 U.S. at 167. Accordingly, the Supreme Court stated that a hearing is warranted "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. at 155-56.

Under Franks v. Delaware and its progeny, the defendant is entitled to a hearing only if he makes a substantial preliminary showing that (i) the warrant affidavit includes a false statement or

material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause.  See United States v. Tisdale, 248 F.3d at 973 (citations omitted).  "The defendant bears the burden to demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence."  United States v. Tisdale, 248 F.3d 964, 973 (10th Cir. 2001).

The focus of a Franks hearing must be on the veracity "of the affiant, not of any nongovernmental informant."  Franks v. Delaware, 438 U.S. at 171.  With regard to the affiant's mental state in making a false statement, the Franks standard is a high one.  "Allegations of negligence or innocent mistake are insufficient."  Franks v. Delaware, 438 U.S. at 171.  Franks does not require that all statements in an affidavit be true; it requires only that the statements be believed or appropriately accepted by the affiant as true.  The same standards for false statements govern material omissions from an affidavit.  United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001).

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."  Franks v. Delaware, 438 U.S. at 171.  A defendant must make an offering of proof:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks v. Delaware, 438 U.S. at 171.  See United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004)("Affidavits of witnesses should be provided to the court or their absence satisfactorily explained.").  "If these requirements are met, then the defendant must show that the remaining

content of the warrant affidavit is insufficient to support a finding of probable cause." United States v. Artez, 389 F.3d at 1116.

## ANALYSIS

McKenzie contends that Hyland falsely testified about receiving McKenzie's PNR from the AmTrak ticket agent.  Based on that promise, McKenzie asserts that the Court should hold a Franks hearing, reopen its suppression hearing, and reconsider its decision not to suppress the evidence that McKenzie was in possession of 500 grams of a substance containing a detectable amount of cocaine. The Court finds that McKenzie has not shown that Hyland misled the Court about receiving McKenzie's PNR from the AmTrak ticket agent.  Moreover, neither the probable cause supporting the Magistrate Judge Torgerson's decision to issue the warrant nor the Court's decision not to suppress evidence relied on Hyland's testimony about receiving the PNR via facsimile transmission from the AmTrak ticket agent.  The Court therefore denies McKenzie's requests.

## I.    HYLAND DID NOT MISLEAD THE COURT ABOUT RECEIVING MCKENZIE'S PNR VIA FACSIMILE TRANSMISSION FROM AN AMTRAK TICKET AGENT.

The Court finds that Hyland did not falsely testify about receiving McKenzie's PNR from the AmTrak ticket agent.  McKenzie contends that Hyland did not testify truthfully when he stated that an AmTrak ticket agent sent him McKenzie's PNR via facsimile transmission.  McKenzie asserts that Herrera's interview with the AmTrak ticket agent shows that the AmTrak ticket agent sent McKenzie's PNR to the AmTrak police and not to the DEA, which evidence directly contradicts Hyland's testimony at the suppression hearing.  The Court, after carefully considering the testimony provided at the hearing on this matter, concludes that Hyland did not falsely testify. Hyland's recollection of the events on July 7, 2008 is crisper and fuller than the AmTrak ticket agent's, and the balance of the evidence corroborates his testimony.  The AmTrak ticket agent told

-16-

Herrera that he had never heard of Hyland, see Third Tr. 13:19-20, 30:3-4 (Cooper, Herrera); id. at 17:1-3 (Martinez, Herrera), and that he provides any information on suspicious persons that he reviews to Claiborne at the Amtrak police department in Albuquerque, see Third Tr. at 11:22-6, 13:3-9, 30:9-12 (Cooper, Herrera).  The AmTrak ticket agent further indicated that he had not sent by facsimile transmission McKenzie's PNR to the DEA or to Hyland.  See Third Tr. at 13:16-14:4, 29:25-30:7 (Cooper, Herrera); id. at 17:4-6 (Martinez, Herrera).

The AmTrak ticket agent's testimony is not clearly inconsistent with Hyland's testimony. The AmTrak ticket agent stated that he sent McKenzie's PNR to Claiborne, and Claiborne was a DEA task force member at the time of McKenzie's arrest.  See Third Tr. at 39:9-17, 41:18-22 (Cooper, Hyland).  The AmTrak ticket agent may not have realized that his facsimile transmissions were being sent to the DEA.  Herrera did not learn what telephone number the AmTrak ticket agent used access the facsimile transmission apparatus to which he would send information to Claiborne, and Herrera did not know the telephone number access the DEA's facsimile transmission apparatus. See Third Tr. 17:14-18 (Martinez, Herrera).  Contrary to McKenzie's apparent theory that Claiborne served as an intermediary between the AmTrak ticket agent and Hyland, the Telephone Records show that four telephone calls were made from the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station to the telephone number associated with the facsimile transmission apparatus at the DEA's offices on July 7, 2008, between 5:54 am and 7:05 am.  See Telephone Records at 1.  Hyland had no communication with Claiborne before going to the train station on July 7, 2009 -- the day of McKenzie's arrest.  See Third Tr. at 37:6-8 (Cooper, Hyland).

As to the AmTrak ticket agent's statement that he had never heard of Hyland, see Third Tr. 13:19-20, 30:3-4 (Cooper, Herrera); id. at 17:1-3 (Martinez, Herrera), Hyland did not testify that he

had direct contact with the AmTrak ticket agent. The facsimile transmission was sent to the DEA's Group One Interdiction Group, of which Hyland was a member, and Hyland did not communicate with the ticket agent before or after receiving the PNR by facsimile transmission. See Third Tr. at 34:15-17, 36:24-37:5 (Cooper, Hyland). Additionally, Hyland did not receive the facsimile transmission directly, but took it from an envelope specific to the number four train on which McKenzie traveled, which was on the wall of the room in which the apparatus was located, and Hyland does not know who moved the PNR from the facsimile transmission apparatus to the envelope. See Third Tr. at 35:25-36:20 (Cooper, Hyland); id. at 43:25-44:14, 46:13-16 (Martinez, Hyland).

Perry, who coordinated payment to the confidential source who provided McKenzie's PNR, see Third Tr. at 50:1-17 (Martinez, Perry), corroborated Hyland's testimony that the confidential source sent facsimile transmissions to Hyland's group at the DEA's office, see Third Tr. at 54:16-22 (Martinez, Perry); id. at 56:11-57:12 (Court, Perry). After proceedings against McKenzie commenced, Perry contacted the person who is most likely the confidential source, and the person most likely to be able to determine who is the confidential source if not this person, and that person is unable to recall details regarding the specific facsimile transmission of McKenzie's PNR. See Third Tr. at 51:16-52:2, 52:18-25, 54:9-15 (Martinez, Perry); id. at 56:6-10 (Court, Perry).

The Court finds that Hyland did not testimony falsely. While the AmTrak ticket agent told Herrera that he sent McKenzie's PNR to Claiborne at the AmTrak police department, Claiborne was a DEA task force member at the time of McKenzie's arrest, and the AmTrak ticket agent may have not understood where he was sending the facsimile transmission. The Telephone Records and Perry's testimony corroborate Hyland's testimony. The Court concludes, therefore, that the evidence does not support McKenzie's contention that Hyland testified falsely. Accordingly, the

Court will not reopen the suppression hearing or reconsider its denial of McKenzie's motion to suppress.

## II.    THE COURT WILL NOT REOPEN THE SUPPRESSION HEARING OR RECONSIDER ITS DECISION NOT TO SUPPRESS EVIDENCE.

The Court will not reopen the suppression hearing or reconsider its decision to deny McKenzie's motion to suppress.   Even if Hyland had falsely testified about the source of McKenzie's PNR, which the Court finds he did not, it would not have changed the Court's decision. The ultimate question decided at the suppression hearing was whether the McKenzie's Fourth Amendment rights were violated.   The source of McKenzie's PNR does not affect the Fourth Amendment issue that the Court has already decided.   In applying the Fourth Amendment to the relevant facts, the Court stated:

> The first question, and the one ultimately determinative of the outcome of this case, is whether the initial encounter between McKenzie and Hyland, during which Hyland asked to see McKenzie's ticket and asked to search McKenzie's luggage, was consensual, or, rather, was an investigative detention.   If the encounter was consensual, the officers did not need reasonable suspicion or probable cause to ask McKenzie the questions that they asked, and thus did not violate McKenzie's Fourth-Amendment rights through that line of questioning.   If, on the other hand, the encounter was an investigative detention, the Court must determine whether Hyland and Garcia had reasonable suspicion to make that detention and whether the detention was confined to the proper scope.

April 13, 2010 MOO at 29-30 (citations omitted).

The Court found that "the initial encounter was consensual, and therefore it is irrelevant whether the officers had any basis for the belief, or indeed any belief, that McKenzie was transporting contraband when the encounter started." April 13, 2010 MOO at 40-41.   Additionally, the Court recognized that "[a] consensual encounter, for constitutional purposes, is a non-event; it cannot be a Fourth-Amendment violation." April 13, 2010 MOO at 30 (citations omitted).   Because the Court has already ruled that the initial encounter was consensual, any further testimony

concerning the source of McKenzie's PNR does not have any tendency to make the existence of any fact that is of consequence to the determination of the Fourth-Amendment question more probable or less probable than it would be without the evidence.  Consequently, the source of McKenzie's PNR is irrelevant to the Court's analysis.

## III.      THE COURT WILL NOT HOLD A FRANKS HEARING.

The Court finds that McKenzie has not made "a substantial preliminary showing" that Hyland testified falsely, and consequently a Franks hearing is not justified.  In Franks v. Delaware, the Supreme Court held that a defendant could challenge the veracity of an affidavit submitted to obtain a search warrant.  The Supreme Court emphasized that "the rule . . . has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded."  Franks v. Delaware, 438 U.S. at 167.  Accordingly, the Supreme Court stated that a hearing is warranted "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause."  Franks v. Delaware, 438 U.S. at 155-56. Accordingly, McKenzie must make an offering of proof:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks v. Delaware, 438 U.S. at 171.  See United States v. Artez, 389 F.3d at 1116 ("Affidavits of witnesses should be provided to the court or their absence satisfactorily explained.").  McKenzie "bears the burden to demonstrate [Hyland's] falsity or reckless disregard for the truth by a

preponderance of the evidence."  United States v. Tisdale, 248 F.3d 964, 973 (10th Cir. 2001).

McKenzie has not shown that a sound basis exists in the facts of this case for the Court to hold a Franks hearing.  Under Franks v. Delaware and its progeny, McKenzie is entitled to a hearing only if he makes a substantial preliminary showing that (i) the warrant affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause.  United States v. Tisdale, 248 F.3d at 973 (citations omitted).  McKenzie fails to satisfy any of these factors.

On the first factor, McKenzie has not shown that the warrant affidavit includes a false statement.  First, the Court does not find that Hyland testified falsely.  Second, the affidavit in support of the search warrant makes no representations about the source of the PNR.  In relation to McKenzie's PNR, the affidavit Hyland prepared in support of the search warrant states:

> Before arrival of the Amtrak train, Affiant reviewed an Amtrak reservation for a Deluxe Sleeper passenger name Richard MCKENZIE.  The reservation indicated one-way travel from Flagstaff, AZ to New York, New York, via Chicago, Illinois and Washington, D.C.  The Ticket was purchased the day of travel, Monday, July 7, 2008.  The third-party, credit card purchase cost a total of $1,836.00.  MCKENZIE had a Deluxe Sleeper A in Sleeper Car 431.

Warrant and Affidavit at 2.  Because the warrant affidavit contains no indication of the source of McKenzie's PNR, it does not include a false statement about the source.  The source, moreover, is immaterial to determining whether Hyland had probable cause, so leaving out the source is not a material omission.  The PNR's content, and whether the description of McKenzie was consistent with a drug-courier profile, played a role in establishing reasonable suspicion and subsequently probable cause: it was the reason Hyland made contact with McKenzie.  Whether the PNR came directly from the AmTrak ticket agent or through Claiborne, however, is immaterial to determining

whether probable cause existed to issue a warrant to search the cereal boxes.  The source of

McKenzie's PNR played no role in the Court's determination that McKenzie consented to the search

of his bags, and, moreover, that reasonable suspicion and probable cause justified Hyland's searches:

> At the time that Hyland determined that he would temporarily detain McKenzie's luggage, a number of facts gave rise to reasonable suspicion.  McKenzie fit many of the traditional indicia of a drug courier.  He flew with a one-way US Airways airline ticket to a drug-source city -- Phoenix.  He then had a one-way ticket by train -- a form of travel with substantially less security than an airplane -- from that drug-source city to New York, a drug-destination city.  A third party purchased the ticket shortly before the scheduled travel.  McKenzie booked the most expensive accommodations available for the majority of his journey.  These facts alone might not support reasonable suspicion, but McKenzie allowed Hyland to look through his luggage and uncover more facts.  McKenzie stated that he did not care to fly, but admitted that he went to Phoenix by way of airplane -- a fact that the US Airways baggage tags on one of McKenzie's suitcases confirmed.  McKenzie had three boxes of cereal in his luggage.  The boxes appeared unopened, and Hyland knew that all of McKenzie's meals would be provided on the train ride.  There would thus be no particular reason why McKenzie would need cereal on the trip.  When asked why he had cereal in his luggage, McKenzie could only respond that he liked cereal.  On the other hand, there was no indication that he had eaten any of the cereal, nor that he had brought the necessary accouterments to eat cereal at any point on his journey. When Hyland lifted the cereal boxes, although he heard cereal inside, he felt a peculiar, centered-weight to the boxes.  The boxes were heavier than the weights listed on the outside, indicating that something other than cereal was being stored inside.  When Hyland asked McKenzie for permission to open the boxes, McKenzie refused, stating that he was not ready to eat the cereal yet and therefore did not want them to be opened. When Hyland proposed that they have a trained narcotics-detection dog sniff the boxes instead of opening them, McKenzie likewise refused, stating that he did not want the dog inside his compartment.  Hyland again tried to compromise and asked if he could bring the boxes outside the compartment to be sniffed, and McKenzie again refused.  Even if all of McKenzie's explanations were genuine and McKenzie could plausibly explain away the facts underlying Hyland's suspicion, the Tenth Circuit has held that "even ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminality depending on the totality of the circumstances." United States v. Treto-Haro, 287 F.3d 1000, 1005 (10th Cir. 2002)(quoting United States v. Hishaw, 235 F.3d 565, 569-70 (10th Cir. 2000)).  These facts provide a "basis of reasonable, articulable suspicion, premised on objective facts, that the" cereal boxes "contain[] contraband or evidence of a crime." United States v. Place, 462 U.S. [696,] 702 [(1983)]. When one adds to those facts McKenzie's suspicion behavior, his increased nervousness when Hyland asked to search the cereal boxes, the suspicious telephone call to McKenzie's friend, and McKenzie's decision to jump from the train and flee rather

> than to allow Sasja to sniff the cereal boxes, the Court finds that a reasonable law-
> enforcement officer would have a basis to believe that there was a fair probability
> that the boxes contained illicit drugs.  See United States v. Villa, [348 F. App'x 376,
> 379 (10th Cir. 2009)]; United States v. Hatfield, 333 F.3d [1189, 1193 n.1 (10th Cir.
> 2003)].  The Court thus finds that Hyland and Garcia had probable cause to believe
> the boxes contained contraband.

April 20, 2010 MOO at 38-40 (footnotes omitted).  The Court thus found probable cause independent of the source of McKenzie's PNR.  Cf. Franks v. Delaware, at 156 (holding that a defendant must show that "the allegedly false statement is necessary to the finding of probable cause"); United States v. Artez, 389 F.3d at 1116 ("If these requirements are met, then the defendant must show that the remaining content of the warrant affidavit is insufficient to support a finding of probable cause.").  McKenzie, therefore, has not shown that the warrant affidavit includes a false statement or material omission.

On the second factor, McKenzie has not shown that Hyland made statements knowingly and intentionally, or with reckless disregard for the truth.  See Franks v. Delaware, at 156; United States v. Tisdale, 248 F.3d at 973.  The Court, on the contrary, finds that Hyland testified truthfully about the source of the McKenzie's PNR.  The essence of McKenzie's allegation is that Hyland gave false testimony that the AmTrak ticket agent sent McKenzie's PNR via facsimile transmission to the DEA office.  The Court finds that the evidence does not support this contention.

Finally, even if the AmTrak ticket agent did not send the facsimile transmission directly to the DEA, McKenzie has not shown that the allegedly false statement is necessary to a finding of probable cause.  See Franks v. Delaware, at 156; United States v. Tisdale, 248 F.3d at 973.  Just as it was immaterial to omit the source of McKenzie's PNR, it would not defeat Hyland's probable cause if Hyland had falsely stated the source of the PNR.  It is not enough to show that the warrant affidavit contained a false statement; McKenzie "must show that the remaining content of the

warrant affidavit is insufficient to support a finding of probable cause." United States v. Artez, 389 F.3d at 1116. See Franks v. Delaware, at 156 (holding that a defendant must show that "the allegedly false statement is necessary to the finding of probable cause"). Because the Court finds that the warrant affidavit provided probable cause to issue the warrant without reference to the source of the PNR, even if Hyland provided in the warrant affidavit a representation about the source of the PNR -- which he did not -- and even if the representation was false -- which it was not -- the warrant affidavit would still provide probable cause for issuing the warrant.

At the hearing, McKenzie indicated that he also challenged the warrant affidavit on the basis that it misstates the date he purchased his ticket. As the Court noted in its April 20, 2010 MOO, "Hyland's warrant affidavit stated that McKenzie purchased the tickets on the day of travel, July 7, 2008, but [Hyland] admitted during the hearing that this date was incorrect." April 20, 2010 MOO ¶ 14, at 4 (citing Tr. at 101:18-102:5 (Padilla, Hyland); id. at 143:6-20 (Martinez, Hyland); Warrant and Affidavit at 4). "The reservation was made on July 2, 2008." April 20, 2010 MOO ¶ 13, at 4 (citing Tr. at 14:22-17:20 (Martinez, Hyland); PNR at 1; Amtrak Tickets at 1). The Court recognized Hyland's error in its finding of facts, and took the error into account when the Court found that probable cause supported issuing the warrant and decided to deny McKenzie's motion to suppress evidence. See April 20, 2010 MOO at 39 ("A third party purchased the ticket shortly before the scheduled travel."). Consequently, McKenzie's challenge based on the errant date is unavailing. United States v. Artez, 389 F.3d at 1116 ("[T]he defendant must show that the remaining content of the warrant affidavit is insufficient to support a finding of probable cause.").

**IT IS ORDERED** that: (i) McKenzie's Opposed Motion to Continue Trial Setting; Request for Frank's [sic] Hearing; and Request to Reopen Suppression Motion Hearing, filed May 17, 2010 (Doc. 76) is denied in part and granted in part; (ii) the Court previously granted Defendant Richard

-24-

McKenzie's request for a continuance; (iii) the Court denies McKenzie's request for a <u>Franks</u> hearing; (iii) the Court denies McKenzie's request that the Court reopen its suppression hearing; and (iv) the Court denies McKenzie's apparent request that it reconsider its decision no to suppress evidence in this case.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Damon P. Martinez
Samuel A. Hurtado
  Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Robert R. Cooper
Albuquerque, New Mexico

      *Attorney for the Defendant*