1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4           Plaintiff,

5        vs.              CRIMINAL NO. CR-08-1669 JB

6    RICHARD ANTHONY MCKENZIE,

7           Defendant.

8        Transcript of Motion Hearing before The Honorable

9    James O. Browning, United States District Judge, held in

10   Albuquerque, Bernalillo County, New Mexico, commencing on

11   Thursday, February 10, 2011, at 10:08 a.m. and concluding at

12   10:55 a.m.  Proceedings recorded by mechanical stenography;

13   transcript produced by computer-aided-transcription.

14   For the United States:

15       UNITED STATES ATTORNEY'S OFFICE
         District of New Mexico
16       201 Third Street, Northwest, Suite 900
         Albuquerque, New Mexico  87102
17       BY:  MR. DAMON P. MARTINEZ

18   For the Defendant:

19       MR. ROBERT R. COOPER
         1011 Lomas Boulevard, NW
20       Albuquerque, New Mexico  87102

21

22

         Danna Schutte Everett, CRR, RPR, RMR, CCR 139
23              United States Court Reporter
              333 Lomas Boulevard, Northwest
24            Albuquerque, New Mexico  87102
                Phone:  (505) 348-2283
25                Fax:  (505) 348-2285

 1          THE COURT:  Good morning, everyone.  I appreciate
 2   everyone making themselves available to me this morning.
 3          All right.  The Court will call United States of
 4   America versus Richard Anthony McKenzie, Criminal Matter
 5   08-1669 JB.
 6              If counsel will enter their appearances.
 7          MR. MARTINEZ:  Good morning again, Your Honor.  Damon
 8   Martinez on behalf of United States.
 9          THE COURT:  Mr. Martinez, good morning too you.
10          And for the defendant?
11          MR. COOPER:  Good morning.  Robert Cooper on behalf
12   of Mr. McKenzie, and he is present this morning.
13          THE COURT:  All right.  Mr. Cooper, good morning to
14   you.
15          Mr. McKenzie, good morning to you.
16          THE DEFENDANT:  Good morning, Your Honor.
17          THE COURT:  All right.  We're here on the defendant's
18   motion to compel NCIC records.
19          Mr. Cooper, if you wish to speak in support of that
20   motion.
21          MR. COOPER:  Thank you.  Before we begin, may we have
22   the marshal remove the right hand --
23          THE COURT:  Any problem with that?
24          All right.  We'll do that, then.
25          Thank you.  Appreciate it.

1          MR. COOPER:  Thank you, Your Honor.

2          THE COURT:  Mr. Cooper.

3          MR. COOPER:  May it please the Court?

4          THE COURT:  Mr. Cooper.

5          MR. COOPER:  Thank you, Judge.

6          Counsel.

7          Judge, the Court has already ruled on our motion to

8    suppress.  Subsequent to that, we filed a motion to reopen the

9    suppression hearing and we requested a Franks hearing.  This

10   morning I understand the Court has submitted a memorandum with

11   regard to that, so that matter has been resolved.

12          When we filed this motion to compel production of

13   NCIC records, what we were seeking was any requests that were

14   made to NCIC between the dates of July 2nd, 2008, through

15   July 7th, 2008.  We wanted the requests made of NCIC so that we

16   could determine whether or not when Agent Hyland went to the

17   train station he had already received information that

18   Mr. McKenzie had a criminal history.

19          And we did that for two reasons.  We filed the motion

20   for two reasons, Your Honor.  It's stated in our motion that,

21   one, we wanted to -- the motion to reconsider the suppression

22   hearing and the motion for a Franks hearing had not been

23   decided yet.  We wanted to supplement the record with regard to

24   this particular issue with regard to that motion, and we also

25   wanted to obtain that information because we felt that it was

1  material to the issues at trial.  In particular to the

2  impeachment of Agent Hyland.

3      Judge, during the February 18th, 2010, suppression

4  hearing, Agent Hyland testified that he did not run an NCIC

5  check on Mr. McKenzie.  The Government referred to that portion

6  of the testimony in its -- in its response.  That was at page

7  12, lines 23 through 25, page 13, lines 1 through 8.

8      Furthermore, there was testimony during the

9  February 18th, 2010, suppression hearing about the case of

10  United States of America versus Travis Denny.  In that case,

11  Your Honor, Agent Hyland and two other agents received

12  information that on March -- well, on March 17th, 2004,

13  defendant in that case, Mr. Denny, was a passenger aboard an

14  Amtrak train arriving in Albuquerque from Los Angeles.  Prior

15  to their encounter with the defendant, the agents checked his

16  reservation information, much as they did with Mr. McKenzie.

17  The check revealed that on the day prior to the train's

18  departure the defendant purchased a one-way ticket from

19  Los Angeles to Newark, New Jersey.

20      Agents also ran a criminal history check on the

21  defendant and found prior drug-related convictions.  According

22  to the NCIC report, the defendant had been released from the

23  New Jersey prison system in 1998.  Based on the foregoing

24  information, the agents believed that the defendant might be a

25  drug courier and decided to contact him.

1          That happened in the Denny case in 2004, Your Honor.

2     We think that someone at DEA ran an NCIC on Mr. McKenzie prior

3     to any contact with him at the bus station here in Albuquerque.

4          At the hearing on February the 18th, 2010,

5     Mr. Padilla, his then-counsel, never asked if anyone else ran

6     an NCIC on Mr. McKenzie prior to Agent Hyland going to the bus

7     station.  As such, Your Honor, I think the Court might have

8     been left with the impression that the NCIC was not run on

9     Mr. McKenzie that day.

10          Judge, credibility is not measured only by what is

11    said in court, but also what is not said.  And I think in part

12    the question -- the question just was not asked as to whether

13    or not an NCIC was run.  We believe it was run.  We believe it

14    has been the practice of DEA since at least the Travis Denny

15    days to run an NCIC to determine whether or not someone who

16    purchases a ticket with cash or just prior to the date of

17    travel, someone who purchases a ticket that is much more

18    expensive than otherwise, those people -- not all of those

19    people are contacted at the bus station, but we believe those

20    people, if they have prior drug convictions, are.

21          So, Judge, that's why we filed the motion to compel

22    the production of the NCIC records.  We would like for this

23    Court to issue an order compelling the United States not to

24    determine whether or not it was filed, but actually to --

25    themselves to obtain the request of -- or the documentation for

1   any requests during the relevant period, or, alternatively, to

2   order NCIC to provide that information to us, Judge.

3         We want that information, again, to supplement the

4   record on the motion to suppress.  We understand that the

5   decision has been filed.  I have not read it, but we would like

6   to supplement that record.

7         And additionally, Agent Hyland is the chief witness

8   at trial in this matter, and I believe the information that we

9   may obtain from NCIC regarding the requests that were or were

10   not made are relevant and material to Mr. McKenzie's trial.  I

11   think they will allow us to perhaps impeach Agent Hyland.

12         Thank you, Judge.

13         THE COURT:  Thank you, Mr. Cooper.

14         Mr. Martinez, if you wish to respond to the motion.

15         MR. MARTINEZ:  Yes, Your Honor.

16         THE COURT:  Mr. Martinez, let me ask you this.  I'm

17   inclined, given-- given the way I have denied the request for a

18   Franks hearing and to reopen the suppression hearing, not to

19   think that this material is relevant to those issues or to

20   anything else we're doing at trial, but I think Mr. Cooper,

21   without using the words, is also saying that it may be Giglio

22   material, if, in fact, the information turns out that the

23   DEA -- or that Mr. Hyland did do an NCIC request.

24         Would you be willing to do this?  Would you be

25   willing to look at the NCIC to see if any requests were made

1 during this period of time, and then if, in fact, something was

2 done, produce that as part of your obligations to produce

3 Giglio material?

4          MR. MARTINEZ:  Your Honor, if that's the Court's

5 wish.

6          THE COURT:  Do you see a flaw in my analysis?

7          MR. MARTINEZ:  Well, Your Honor, if I can back up.  I

8 understand what the Court is saying, I understand the Court's

9 request.  The core of my standing before you today is that I am

10 an officer of the court and I, hopefully, appreciate that

11 responsibility every time I stand before a judge in one of

12 these courts.

13          Your Honor, at this point, I have no indication that

14 Agent Hyland testified wrongly, falsely when he testified at

15 this hearing.

16          I will proffer to the Court right now that it's my

17 understanding that not only did Agent Hyland not do an NCIC

18 check, that an NCIC check was not done.  If it's the Court's

19 wish that I further investigate this, obviously, I will be

20 compliant with that wish, Your Honor.

21          THE COURT:  Well, is your ability to make the

22 representations based upon conversation with Mr. Hyland --

23          MR. MARTINEZ:  Yes, Your Honor.

24          THE COURT:  -- your own sort of investigation, or did

25 Mr. Hyland go back and look at the NCIC, talk to people?  Have

1   you and Mr. Hyland exhausted this issue?

2          MR. MARTINEZ:  My sense of the way you're saying

3   "exhausted," no, Your Honor.  My understanding is in speaking

4   to Mr. Hyland.

5          Your Honor, there is a basic trust that I have in

6   conversations with this case agent and I try to have with all

7   case agents.  Unless I see something which causes a flag for

8   me, I believe in that trust.

9          At this point, there's nothing to indicate that what

10   we have represented to this Court is wrong.

11          Now, the hesitation I have, Your Honor, is, what I

12   see possibly developing here is a slippery slope, where -- If

13   the defendant gets his foot in the door on this, where does

14   that stop in looking for possible cross-examination material

15   going into trial?

16          And let me just use -- Let me take this -- Let me

17   take this slippery slope to an extreme, Your Honor.  Agent

18   Hyland testified that he'd been an agent for so many years.

19   That testimony is as relevant as this issue here today.  Going

20   to trial, this is not one of the things that's going to lead to

21   one of the elements -- decisions in one of the elements.  It's

22   something that has been said in court.  But concerning the

23   issue that's before this Court and what was decided this

24   morning as far as the motion to suppress, the Franks issue, can

25   the defendant then ask for his transcripts from school to

1  determine whether he testified correctly about his

2  law-enforcement experience, about his training?  Where does it

3  stop, Your Honor?

4  THE COURT:  Do you know if Mr. Hyland is stating --

5  and I think he really said it in the suppression hearing, as

6  well -- that he didn't order the -- any NCIC search?  What has

7  he done, if you know, to make, also, the representation that no

8  one else at DEA did the search arrest?

9  MR. MARTINEZ:  Well, it's my sense, Your Honor, was

10  that he was the person that was, for lack of a better word, in

11  charge of this case at that time.

12  THE COURT:  So he doesn't know of anybody -- He was

13  never told somebody else has done a search and what the

14  contents of it were?

15  MR. MARTINEZ:  No, Your Honor.

16  Now, Your Honor, if I -- I'm sorry.  I want to make

17  sure that I answer the Court's question.

18  THE COURT:  Well, I think you did.  I guess I might

19  ask another question.  You may or may not want to answer it.

20  But has he done something since this issue about the NCIC

21  search was brought in this motion -- has he done anything

22  further to make determination?

23  MR. MARTINEZ:  No, Your Honor.  I did not request him

24  to look into it further.  Basically, I confirmed that what we

25  were representing is accurate, and that's the way we walked

1    into today's hearing.

2              THE COURT:  All right.  All right.  Anything further

3    in response to the motion, Mr. Martinez?

4              MR. MARTINEZ:  Yes, if I could, Your Honor.

5              THE COURT:  You may.

6              MR. MARTINEZ:  I guess if I could just respond to the

7    defense counsel's argument.

8              As I stated in the motion, and the way that the

9    United States views this, is this is basically just a fishing

10   expedition, and there's no basis for it.  The defense counsel

11   says that the question wasn't asked by the previous defense

12   counsel whether somebody else asked -- whether someone else did

13   this search -- this NCIC search, but, Your Honor, I can't tell

14   you how many hearings I've flipped back on and I've reviewed

15   and I wished that I would have asked one more question or a

16   series of questions.  This is just a regret after the action.

17             Right now where this case stands, the Court has

18   clearly stated that the issue concerning suppression is over.

19   As of the opinion this morning, the Court has definitely ruled

20   on the Franks issue, too.

21             And, Your Honor, these matters have been put to bed

22   at this point and it's time to move forward to the trial.

23             Now, in making this request that the defense counsel

24   has made, I would just point the Court to Rule 16.  Aside from

25   the Giglio issue, aside from the Jencks issue, Rule 16 governs

1   what the defendant is entitled to.  Now, in the -- under the

2   (a) subsection, this is -- in no way entitles him to this under

3   Rule 16, and, in fact, I would point the Court to information

4   not subject to disclosure, and that specifically would be

5   (a)(2), which is except as provided previously, this rule does

6   not authorize a discovery or inspection of reports, memoranda

7   or other internal government documents made by an attorney for

8   the Government or other government agencies.

9           So, getting to the point of arguendo, Your Honor,

10  even if this had been done, which I'm not saying it was, it is

11  irrelevant, it is irrelevant to the trial that is upcoming, and

12  the only way that it would be relevant is if I believed that

13  Agent Hyland had not been truthful on the stand, and then I

14  would have a duty, an affirmative duty to turn that over to

15  defense counsel.

16          So what he is requesting, he has no proper basis for

17  the request, and we respectfully ask that this Court deny it.

18              THE COURT:  All right.  Thank you, Mr. Martinez.

19              Mr. Cooper, anything further on your motion?

20              MR. COOPER:  If I may, Your Honor.

21              THE COURT:  Mr. Cooper.

22              MR. MARTINEZ:  Your Honor, may I just point -- I'm

23  sorry.  If I could just real quickly point out a distinction.

24              THE COURT:  Sure.

25              MR. MARTINEZ:  I'm sorry I forgot this.  Defense

1 counsel brought up the issue of Travis Denny, the case in which

2 Agent Hyland testified -- or was involved before and was asked

3 questions about at the suppression hearing.  The way that that

4 case can be distinguished from this case is, in that case Agent

5 Hyland had NADDIS information and he also had time to do that

6 background check.  And that's what's different from this case.

7 　　　　　　THE COURT:  You said had what?

8 　　　　　　MR. MARTINEZ:  The NADDIS information, which is

9 the -- I'm not even sure what the acronym stands for, but it's

10 the law enforcement database.

11 　　　　　　THE COURT:  All right.  And was that case -- Did that

12 involve a stop based upon the profile, or was it a consensual

13 stop?

14 　　　　　　MR. MARTINEZ:  Your Honor, if I may have a moment?

15 　　　　　　THE COURT:  All right.

16 　　(A conference was held between Mr. Martinez and Agent

17 　　Hyland.)

18 　　　　　　MR. MARTINEZ:  Your Honor, it was a train case, and

19 it was a consensual encounter.  Again, I would just proffer

20 that because the person had been in the criminal system before

21 he was in the computer database, there was information on that

22 person, Mr. Travis Denny, and I would proffer that Agent Hyland

23 had the time to do that background check before going to the

24 train station.

25 　　　　　　THE COURT:  I guess I've gotten a little lost in what

1  the relevance of this case is.  And I guess I can ask

2  Mr. Cooper this.

3           Are they arguing that in that -- in that case, the

4  Tenth Circuit or whatever the opinion was, indicated that

5  Mr. Hyland did a background check, and then Mr. Cooper and

6  Mr. McKenzie are using that to say that shows that it may have

7  occurred in this case?  Is that the relevance of the case?

8           MR. MARTINEZ:  Well, that's the way we're

9  understanding it, Your Honor.  That's the understanding I'm

10  taking from defense counsel's argument.  But again, our

11  position is it's not relevant.

12           THE COURT:  And your saying that Mr. Hyland did it in

13  that case because he had time to do it?

14           MR. MARTINEZ:  And because that defendant had

15  previously been in the criminal justice system, so his

16  information was in NADDIS, National --

17           Do you know what it stands for?

18           NADDIS, Narcotics and Dangerous Drugs Information

19  System.

20           THE COURT:  All right.  And is that a simpler -- Is

21  that a simpler database that DEA has quick access to; it

22  doesn't have to go through NCIC?  Is that --

23           MR. MARTINEZ:  My understanding is that it's a

24  subcomponent of NCIC.

25           Can it be looked at that way?

1          MR. HYLAND:  It's just another database.

2          MR. MARTINEZ:  Okay.  So I stand corrected.  It's

3    another database from NCIC, Your Honor.

4          THE COURT:  And is it something that just the DEA

5    has, for example?

6          MR. HYLAND:  I think other agencies do, also.

7          MR. MARTINEZ:  I would assume that agencies within

8    the Department of Justice, Your Honor.  I'm not sure Homeland

9    Security would be privy to it.

10          THE COURT:  Anything further, Mr. Martinez?

11          MR. MARTINEZ:  No, sir.  I'm sorry to take some time

12    away from defense counsel.

13          THE COURT:  All right.  Mr. Cooper.

14          MR. COOPER:  Thank you, Judge.

15          Mr. McKenzie's been in the criminal justice system

16    previously, as well.

17          Back to the Travis Denny case, that's exactly why I'm

18    using it, Judge.  In that case, they received information that

19    Mr. Denny was traveling from Los Angeles to Newark, and they

20    received -- he -- the agents checked his reservation

21    information.  They learned that on the day prior to departure

22    he purchased a one-way ticket from Los Angeles to Newark.  They

23    had that information from looking at his ticket information.

24    When they saw that, they then said, Ah-hah, let's run a

25    criminal history check on the defendant.

1              Mr. Hyland -- Agent Hyland testified, Your Honor,

2    that they had that information, but when you read the Travis

3    Denny case you can't tell whether or not he, himself, requested

4    it, but it's clear that -- from the opinion, that the agents in

5    Travis Denny had run a criminal history check on the defendant.

6    It doesn't say that they had an NCIC, it doesn't say that they

7    had NADDIS.  We don't know what sort of criminal history check,

8    but they ran a criminal history check on this individual, and

9    all they had was his reservation information.

10             At the hearing on February the 18th, 2010, at page

11   12, Counsel, line 23, Mr. Padilla asks this question -- number

12   of questions, and the answers were given by Agent Hyland.

13   "Question:  And, sir, in this particular case involving

14   Mr. Richard McKenzie, after receiving information -- that is,

15   the information about Mr. McKenzie from the PNR -- did you run

16   the name through NCIC?

17             "No.

18             "And that has been a procedure used in the past, has

19   it not, by Drug Enforcement Administration?

20             "Answer:  Well, I know you need personal identifiers

21   to run an NCIC computer check.  You can't just run a name.

22             "But it has been done in the past, has it not?

23             "Answer:  I think it has been, yes."

24             At that hearing, Your Honor, we were led to believe,

25   from Mr. Hyland's testimony, that you needed personal

1    identifiers to run an NCIC computer check.  But it had been

2    done in the past.  We think it had been done, according to the

3    opinion, in United States versus Travis Denny at 441 F.3d 1220.

4            So, Judge, what we're asking for is that information

5    to show whether or not that request was made.  I think it's not

6    going to cost anything, it's not going to cost -- or take a lot

7    of time.  It is a very easy request to make.  They make that

8    request, and they can then be told who made any requests during

9    the applicable time period.  And, Your Honor, that, you're

10   absolutely, correct, would be Giglio material.

11           I think it's going to show that you can run an NCIC

12   with just the name, as they did, perhaps, in Travis Denny and

13   we think in this case.

14           So, again, I would ask that that information be

15   produced.

16           And while we're at it, maybe I should have framed

17   this motion to ask for any NADDIS inquiry that may have been

18   made prior to having contact that day at the train station,

19   with Mr. McKenzie, because it's -- it's clear to us that they

20   had some criminal -- they had some criminal history -- some

21   information concerning Mr. McKenzie's criminal history when

22   they went to the train station.

23           Thank you, Judge.

24           THE COURT:  What is it that makes that clear to you?

25           MR. COOPER:  Judge, there are -- According to the

1　Travis Denny testimony -- or Agent Hyland's testimony in Travis

2　Denny, DEA agents make 80 to a hundred drug interdictions on

3　Amtrak per year.  We believe that there are a lot of tips that

4　come to DEA, and the way they ferret out who they're going to

5　go down and talk to is by running that criminal history.  A lot

6　of people buy tickets in Los Angeles and Flagstaff, all along

7　the way to the East Coast, and we -- we just -- we believe,

8　Your Honor, that that is what happened, and DEA has to have

9　some way to ferret out the cases that are going to yield some

10　drugs, and I think that's how they do it.

11　　　　　THE COURT:  All right.

12　　　　　MR. COOPER:  I'm not sure that really answered your

13　question, but thank you, Judge.

14　　　　　THE COURT:  All right.  Thank you, Mr. Cooper.

15　　　　　Well, I'll take this under advisement, but I'm

16　inclined to agree with the United States, that there just

17　doesn't seem to be any evidence that Mr. Hyland lied on this

18　point or any other to call into question his credibility.  You

19　know, if I thought there was some reason to doubt his veracity

20　on this point, then I might ask the United States to

21　double-check to just make sure this doesn't become Giglio

22　material, but I think Mr. Martinez makes a good point, that

23　people testify to a lot, and it begins to be just fishing to

24　try to uncover some exculpatory evidence, and so I'm inclined

25　not to make that request.

The Government's on notice that this is an issue for the defendant, and if it turns out down the road that there was some NCIC check, then -- and they didn't produce it, then it may be cross-examination material that wasn't produced, but I don't think that on this record I can really begin to require the Government to start checking out every statement that Mr. Hyland made to see if there's some support or basis for it.

I continue to think this information isn't relevant. I will run it through my head again, but I think that I still -- after working through the material that we had on the motion for the Franks hearing, it appears to me that the track the Court has gone is that this was a consensual stop, and so it's all kind of interesting how we got there, but police all the time do investigations and then develop their evidence from a consensual stop, so I'm not sure that this evidence would be relevant at trial.

I don't think it would be relevant at the suppression hearing. I don't think we need a Franks hearing, and so on the basis of the record before the Court it just doesn't appear to be relevant to anything we're doing. So I'm inclined to deny it, but I'll take a look at it.

I may look at the Denny case -- I will look at the Denny case before I issue my opinion just to see if that influences me to think that there's some doubt as to Mr. Hyland's testimony, but I don't think that's going to be

1  enough, given that every case is somewhat different.  They

2  might order an NCIC or some other criminal background in one

3  case but not another.

4          All right.  Is there anything else that we need to

5  discuss while we're together?  Is there anything else I can do

6  for you?

7          Mr. Martinez?

8          MR. MARTINEZ:  No, Your Honor.

9          THE COURT:  All right.  Mr. Cooper?

10         MR. COOPER:  I don't have anything else, Your Honor.

11         THE COURT:  All right.  All right.

12         Mr. McKenzie, did you want to say something to the

13  Court?

14         THE DEFENDANT:  Yes, I do.  May I sit down?

15         THE COURT:  You may.

16         THE DEFENDANT:  The issue that I want to bring up,

17  that I've always wanted to bring up, when I had Alonzo Padilla

18  as my attorney and now Mr. Cooper and at the December 1st

19  hearings, which should make it more relevant, is that I always

20  want to attack the PNR report on its own.

21         THE COURT:  The what?

22         THE DEFENDANT:  PNR report.  My contention is that my

23  Fourth Amendment violation didn't start with the initial

24  encounter with Officer Hylander (sic).  I've always contested

25  that my Fourth Amendment violation started the way in which he

got the PNR. And the reason why I say that is because, based on my investigation, I've seen that over the years -- well, the cases that I have seen -- oh, have come across this case that's been argued in front of Judge Parker, and one of the issues that came up in the 1992 case involving Santana Romero Dottery was that at one time that the task force officers was using an administrative warrant to get copies of the training manifest.

And then after more research I found an article entitled "Amtrak Helps DEA Hunt Drug Couriers," and in that article it speaks about how the DEA had direct access -- well, had a computer on their desk that had a direct access to the terminal at Amtrak.

And what I wanted my investigator to do, as well as my attorneys, is that to investigate and see why that practice stopped. Because in the memo it speaks of the DEA agent is speaking directly on how they did have ties directly to the computer, and at some point in time that has stopped.

And my point is that if you use -- if you take away the information in the PNR, we've got to deal with probabilities. And what would the probabilities be of Agent Hylander (sic) seeking me out that day in a train that had over 360 people in it and I was in the sleeper car?

And during the hearings when asked about the tape recorder, what he said is that he would cut his tape recorder on and he would start in the coach and start from the beginning

1    and walk through and ask questions.  I understand that.

2            Now, in my situation, in all the cases that's been

3    used against me as far as the drug-courier profile, all the DEA

4    agents, whether it's the airport or the train station, was in a

5    remote location and they seen the characteristics of the

6    defendant and then they approached them, and then later on they

7    subpoenaed, or whatever they did, they found out the travel

8    itinerary.

9            My case is totally different from all those cases.

10   One, I never paid for my ticket.  As stated in my own warrant,

11   as well as their own -- as well as the hearing, my ticket was

12   paid for by a third-party person, which her name was Ruby

13   Johnson.  She paid for the ticket.  The only thing I did was

14   secure my ticket; meaning that once the ticket agent -- gave my

15   ID, and then I gave -- I was given my reservation.  There was

16   no conversation ever said.

17           Now, the point I'm trying to make is that in the case

18   that you presided over, which was U.S. versus Sanchez, you gave

19   the opinion of what constitutes a confidential source or

20   tipster, and one of the things -- the word that you used was

21   "generic."  And I believe that the reason why you're denying --

22   or you're considering the fact that this was a casual encounter

23   is because you're giving weight to the PNR.  Because the

24   factual findings, the first three or four pages, all it goes

25   to -- it goes into detail of how I paid for my ticket and the

1   one-way travel and the car and the fact that Officer

2   Hylander (sic) spoke to a ticket agent.  Without the PNR

3   report, he never would have known who I was.

4           THE COURT:  Well, I think everybody agrees with that.

5           THE DEFENDANT:  So my thing is that in dealing with

6   the Fourth Amendment, I feel as though my violation is

7   occurring on the fact on how he obtained his PNR report,

8   because how would you be able to -- or how could we test the

9   veracity, which is the credibility or reliability of an

10  informant when he doesn't even himself know who the informant

11  is?

12          Then you have an officer, by the name of Gerald

13  Perry, who comes in and tries to give credibility to the PNR

14  report when he is tainted.  I have a case right here of People

15  versus Rangel, where he is now going through a situation where

16  he's committed perjury.  It's a big motion, where the person

17  did a 2255, was that Officer Perry, that he deliberately lied,

18  it was proven that he lied.  So what relevant credibility could

19  this Officer Perry have given to the weight of this PNR report?

20          And you heard testimony from my investigator where he

21  says that the ticket agent does not deal with the DEA directly.

22  Not only that, I have contacted on my own, through my own

23  research, a lady by the name of Mrs. Kimberly Hill, who was the

24  assistant attorney who works at the head corporation for the

25  Amtrak.  And what she says is right or wrong, but what I'm

1    saying right now is that the ticket agents have protocols, they

2    have numbers of people who to contact if something is afoot.

3    And these people are internal Amtrak agents.

4           I'm going to concede the argument that Alonzo first

5    put up about Amtrak being a federal entity.  I want to give it

6    the status of being a corporation.  And in doing so, how does

7    an officer -- not only my information, but by your stipulation,

8    which is paid by credit card -- how does he receive that

9    without an administrative warrant, which is at least a subpoena

10   or warrant?

11          Because, like I said, I want to go to probabilities.

12   Without that he would never have known I was coming through

13   Albuquerque, New Mexico.  I was on the second floor in a

14   sleeper car with 360 people, so without that PNR report he

15   would never have discovered me, let alone known who I was that

16   day.  And what I'm saying right now is that that was

17   obtained -- Now he's moving further and further away from it by

18   saying that it was in an envelope.

19          So what I'm saying is that, how does my or my

20   friend's personal information get into an envelope in the DEA's

21   office when the only means that it could have got there was by

22   the agent that I dealt with, and he says he didn't deal with

23   the DEA.

24          And even if he was to see any type of characteristics

25   of a drug-courier profile he has a contact number that he is

1  authorized to contact.  It's not the DEA.  It's the Amtrak

2  police.

3           And in the same argument with Judge Parker, it says

4  that usually Amtrak police accompanies the DEA if something's

5  afoot.  I was never -- I was never approached by the Amtrak

6  police.  I was approached strictly by the DEA, who says that he

7  used -- in his own words -- he got a PNR report.  He doesn't

8  know who he got the PNR report from.  So how can we even begin

9  to give credibility to the PNR report?

10           And that's why I feel that my Fourth Amendment

11  violation was violated at and the way and the means in which he

12  got the PNR report without a warrant, a subpoena, let alone an

13  administrative warrant.

14           That was my contentions.  I always want to attack

15  that as a basis of my violation.  Not the encounter, not the --

16  not starting from me smoking a cigarette on the platform, but

17  for me -- but for the fact that he obtained information

18  illegally.  I believe that the PNR report he obtained was

19  obtained illegally.

20           The warrant starts off with information from the PNR

21  report.  And without that you have nothing else.  Without the

22  PNR report, you don't have the probabilities of him finding me

23  or talking to a ticket agent or seeing me on the platform.  And

24  like he said, he cut the tape recorder on before he saw me.

25  That's why I believe that he did an NCIC on me, because the

1 train --

2        Another thing I want my investigator to do, because

3 on that train there was a family reunion and the majority of

4 people on that train were African American, especially in my

5 car.  And if my investigator would have did his job, that would

6 be relevant, too.  Because how do you pick me out of 360

7 people, saying that I had a golf shirt, when I in actuality had

8 a T-shirt.  A golf shirt has three buttons, and I had a T-shirt

9 on.

10        You approach me, you cut the tape recorder on, and

11 then you engage in a conversation based on the PNR report that

12 I feel was obtained illegally.

13        And during the hearing was, when asked about the PNR

14 report, you move further and further away.  At first you said

15 you reviewed the passengers' name manifest.  Then when asked,

16 "How did you get it?" you said you got it from a ticket agent.

17 That's his words in the transcription.

18        Then the prosecutor stood up and objected and said

19 that -- a confidential source.  He tried to stick verbatim, but

20 couldn't state it.  How does a prosecutor know better than the

21 officer how he obtained a PNR report?

22        And then when asked about getting it directly from

23 the fax machine, when my investigator gets on the stand and

24 speaks about the fact that there's no way in the world that

25 this person who I dealt with, which I know who I dealt with,

1  never sent it.

2          Now you say you got it from an envelope.  That's --

3  How does -- I can't -- With no cover sheet, with no note, not

4  even -- All right.  Even if this confidential source is getting

5  monetary value, how would you seek him out to pay him if you

6  never spoke to him before, during or after?  You don't know who

7  it is.  How would you pay this guy?  How would you refund him

8  or reward him for information that he sent when you, yourself,

9  don't even know who he is?

10          That's why I'm so eager to go to trial.  I'm not

11  scared to go trial.  I want to go to trial, because I want to

12  see who the Government puts on this stand as this person who is

13  credible, who sends the information.  And not that -- Let

14  alone, you said the piece of paper -- that the piece of paper

15  is a printout.  There's no note attached to it that my name is

16  such and such, this is what I saw, this is what I believe, on

17  how I was trained to look for.  You have no indication of

18  anything.  No notes, nothing attached to the PNR report.  The

19  subpoena by itself.  That's always been my argument.

20          And for some reason my lawyers have not -- was not --

21  I guess was not understanding me or I guess they didn't -- they

22  seen it wasn't relevant.  I think it's very relevant.  I feel

23  as though my Fourth Amendment violation started from obtaining

24  this PNR report that he can't explain how he got it.

25          THE COURT:  Let me do this.  You've raised -- You've

1   pointed out a number of legal authorities.  Before I issue my

2   opinion and order on this request, I will review these.  I'll

3   get a transcript from Ms. Schutte Everett and get those

4   authorities and take a look at them before I issue the opinion

5   and order.

6        THE DEFENDANT:  The only reason I bring this up is

7   because I see that you're -- the reason why you're ruling

8   against me, because you give credence to this PNR report.  And

9   I don't understand how you can have an informant or

10  confidential source that you can't even check.  And even if --

11  The prosecutor says in his own -- one of his replies that, Your

12  Honor, give credence to this informant, trust the fact that we

13  have an informant, but we're not going to bring him to court

14  anyway.

15       Now you're going to violate my Fifth Amendment

16  rights, my rights to face my accuser, but now I can't face the

17  person who says that I fit some type of profile?  That's

18  basically what you're saying.  You're saying that, give

19  credence to the fact that there is an informant on this case,

20  even though Hylander (sic) doesn't know who it is.  Just give

21  credence to the fact that there is an informant.  As a matter

22  of fact, if McKenzie does go to trial, we're not going to bring

23  him, anyway.

24       THE COURT:  Well, we're certainly going to -- the

25  Court's going to do everything it can to protect your right to

1  confrontation at the trial, so I'll work -- I'll keep these

2  comments in mind, and, you know, I can't really do a whole lot

3  on that until I see what the Government's going to call -- who

4  it's going to call, and we'll certainly -- the Court will do

5  everything, I'm sure Mr. Cooper will, too, to protect your

6  rights at trial.

7          I think we're -- at this stage, though, we're just

8  trying to determine whether this information is relevant to any

9  issue at trial, and also whether it's relevant to the issues

10  of, you know, a Franks hearing or reopening the suppression

11  hearing, those sorts of things.

12          Take a look at my opinion.  I'll take a look at your

13  authorities that you've given here.  I'll get a transcript from

14  Ms. Schutte Everett, and before I issue the opinion I'll take a

15  look at it.

16          THE DEFENDANT:  Yes.  The only thing I want to say is

17  that, my contention has always been that I wanted to attack the

18  PNR report by itself.  Like I said, I'll tell you right now, I

19  could scream from the mountain tops what happened.  I'm not

20  trying to challenge was it a consensual encounter or whether it

21  was an investigative stop.

22          I know that if you give credence to PNR report, then

23  that goes either way, whether you rule on that the way which

24  you did or how it was.  That's not my argument.  My argument is

25  that I want to do a probabilities, the fact that PNR report

that was used in this situation was illegally obtained.  I
don't have to -- It's not an SNL letter, which is a security
letter, that he handed to the Amtrak and then they released my
information.  Because I don't understand -- I was arrested.  I
had a phone on me, a BlackBerry.  They used a subpoena or
warrant, which I have in my discovery, to obtain my phone
records.  And if T-Mobile is a private company, why wouldn't
the same hold true for my personal records dealing with Amtrak?

Just now Hylander (sic) used an affidavit warrant to
get the phone records from Amtrak about whether the
confidential source or informant sent the PNR report to the
DEA.  If that's -- Why wouldn't he just call his informant and
have the informant send that?  Why did he have to use a warrant
or subpoena to get that information, but when it comes to my
personal information, which, like I say, was used by a credit
card -- my ticket was secured by a credit card and -- All you
have is the computer readout.

I mean, if this ticket agent, who I dealt with,
didn't send it, who else illegally accessed this computer?
Because they had to have accessed it illegally to get my travel
information or how I paid for my ticket, which I didn't pay
for.  Why wasn't Ruby Johnson, the person who paid for the
ticket -- why wasn't she investigated?  Because I didn't pay
for it.  All I did was use my ID to secure the ticket.

Another thing I asked my investigator to do, as well

as my lawyer, is to look into Amtrak's announcement and
monitoring policy.  Like, what is their policy with somebody
who purchases a ticket over the phone or by credit card?  Is
there a safeguard?  Can anybody just look at the computer and
get that information?

Because it seems like if he did, he just grabbed the
information without a subpoena or warrant.  What is Amtrak's
announcement policy or monitoring policy when somebody buys a
ticket over the -- on the computer?  Because, evidently, the
person who could qualify as the informant didn't send that PNR
report.  He testified to that.

And, like I said, I spoke to Kimberly Hill.  She's in
charge of corporate.  I've got her number right here if you
need it.  She says that there is a policy or there is checks
and balance.  What they do, they have contact numbers that
these ticket agents use when something's afoot, and one of
those numbers is not the DEA.

And you heard from my own -- from my own -- from my
own -- excuse me -- from my own -- from my investigator, which
all adds up.

Another thing, too.  How is an -- Arizona is in the
Ninth District.  Why are DEA agents in Albuquerque arresting
people who are buying tickets in Arizona and coming through
here?  Why wouldn't Arizona have wanted that arrest?  They had
enough time to approach me in Arizona.  Why are they

1  approaching me in a whole other state or a whole other

2  jurisdiction?

3       Which I think a whole other argument comes into

4  place.  Interstate commerce.  How is my information being faxed

5  over a computer to a whole other state?  And you're using that

6  information as a precursor, as a cornerstone, a foundation to

7  approach me.

8       And my attorneys are not -- are failing to bring this

9  up.  They act like this whole thing started from me being on

10  the platform smoking a cigarette.  No.  It was a chain of

11  events that happened before that.  And they all advised -- I

12  feel it was a violation of my Fourth Amendment rights based on

13  how they got this information, which is the PNR report, which

14  they can't account for.

15       THE COURT:  Okay.  I think I understand your

16  position, and I'll look at the authorities you've given before

17  I issue the Memorandum Opinion and Order.

18       THE DEFENDANT:  Thank you, Your Honor.

19       THE COURT:  All right.

20       MR. MARTINEZ:  May I be excused, Your Honor?

21       THE COURT:  Mr. Martinez?

22       MR. MARTINEZ:  May I be excused?

23       THE COURT:  Yes.  I appreciate everyone's assistance,

24  and y'all have a good afternoon.

25       (Court stood in recess at 10:55 a.m.)

1              C-E-R-T-I-F-I-C-A-T E

2  UNITED STATES OF AMERICA

3  DISTRICT OF NEW MEXICO

4

5       I, Danna Schutte Everett, RPR, CCR, CRR, Official

6  Court Reporter for the State of New Mexico, do hereby

7  certify that the foregoing pages constitute a true

8  transcript of proceedings had before the said Court held

9  in the City of Albuquerque, New Mexico, in the matter

10 therein stated.

11      In testimony whereof, I have hereunto set my hand on

12 this 14th day of March, 2011.

13

14      _____
            DANNA SCHUTTE EVERETT
15          Registered Professional Reporter
            Registered Merit Reporter
16          Certified Realtime Reporter
            NM Certified Court Reporter #139
17          333 Lomas Boulevard, Northwest
            Albuquerque, New Mexico  87102
18          Phone:  (505) 348-2283
            Fax:  (505) 348-2285
19

20

21

22

23

24 February 10,  2011, USA vs. McKenzie

25