## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                        No. CR 08-1669 JB

RICHARD ANTHONY MCKENZIE,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence Based on Illegal Seizure of Passenger Named Report PNR and to Reconsider, in Part, Factual Findings Relating to the Seizure of the PNR, filed March 30, 2011 (Doc. 124)("Motion").  The Court held a hearing on April 1, 2011.  The primary issue is whether the Court should suppress evidence based on DEA Special Agent Mark D. Hyland's allegedly illegal seizure of the Defendant Richard Anthony McKenzie's passenger named report ("PNR").  Because McKenzie presents no new factual allegation or legal authority that tends to undermine the Court's decision, and because the United States Court of Appeals for the Tenth Circuit has held that AmTrak's disclosure of a passenger's PNR to the Drug Enforcement Agency ("DEA") does not violate the passenger's Fourth Amendment rights, the Court denies McKenzie's Motion.

## FACTUAL BACKGROUND

The Court previously made factual findings in this matter.  See Memorandum Opinion and Order, filed April 13, 2010 (Doc. 70)("April 13, 2010 MOO"); Memorandum Opinion and Order, filed February 10, 2011 (Doc. 116)("February 10, 2011 MOO")(incorporating and expanding on the

findings in the April 13, 2010 MOO).   McKenzie relies on the Court's prior findings of fact.  See Motion ¶ 1, at 1 ("Mr. McKenzie incorporates by reference as though fully stated herein the apt factual recitation made by this Court in the Memorandum Opinion and Order Denying Defendant's Motion to Suppress [Doc. No. 116], pp. 2-7.").  The Court will not recite its findings here, but incorporates these findings by reference.

## PROCEDURAL BACKGROUND

McKenzie is charged by Indictment with one count of possession with intent to distribute 500 grams of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  On May 14, 2009, McKenzie filed a motion to suppress all evidence found as a result of what he considers to be an illegal search.  See Motion to Suppress Evidence with Supporting Authorities, filed May 14, 2009 (Doc. 32).  McKenzie asserted that the encounter with Hyland was not consensual, but was an investigative stop.  The Court relied upon testimony from Hyland at the hearing in denying McKenzie's requested relief.  The Court, after hearing testimony at two separate hearings, denied the motion to suppress, ruling that the encounter was consensual and that McKenzie had given Hyland consent to search his luggage where the cocaine was found. See April 13, 2010 MOO at 29.

Hyland testified, under oath, that he received McKenzie's PNR from an AmTrak ticket agent via a facsimile transmission, which he received before McKenzie's arrival in Albuquerque, New Mexico.  See Transcript of Hearing at 76:3-82:4 (taken August 20, 2009)("Tr.")(Padilla, Hyland).[1] Hyland further testified that the AmTrak ticket agent routinely sends PNRs by facsimile transmission to the DEA if the ticket agent identifies, based upon training that the DEA provides,

---

[1] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

characteristics fitting the drug-courier profile.  See Tr. at 102:6-105:23 (Padilla, Hyland); Transcript

of Hearing at 12:6-18 (taken February 18, 2010)("Second Tr.")(Padilla, Hyland).

On May 17, 2010, McKenzie filed his Opposed Motion to Continue Trial Setting; Request

for Frank's [sic] Hearing; and Request to Reopen Suppression Motion Hearing, see Doc. 76

("Franks Motion"), requesting the Court to conduct a  Franks[2] hearing, re-open its suppression

hearing, and, presumably, re-consider its April 13, 2010 ruling.  McKenzie contended that the Court

"may need to . . . conduct[]" a Franks hearing to determine if Hyland provided false or misleading

information to the Magistrate Judge who issued the warrant to search the cereal boxes in

McKenzie's luggage.  McKenzie further contended that, even if the Court determined that a Franks

hearing is not necessary, Hyland's testimony regarding how the DEA received the PNR is relevant

to the determination whether the initial contact with McKenzie was an investigative stop or a

consensual encounter.

On January 10, 2011, the United States filed its Sealed Supplement of Document to

Defendant's Request for Frank's [sic] Hearing and Request to Reopen Suppression Motion Hearing

Filed May 17, 2010 (Doc. 76).  See Doc. 105.  The United States attached the July 7, 2008,

telephone records for the telephone number associated with the facsimile transmission apparatus at

the Flagstaff AmTrak station.  The records showed that four telephone calls were made from the

telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak

station to the telephone number associated with the facsimile transmission apparatus at the DEA's

offices on July 7, 2008, between 5:54 am and 7:05 am.  See Government's Ex. 1, at 1, filed January

---

[2] Franks v. Delaware, 438 U.S. 154, 155-56 (1978)(stating that a hearing is warranted "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause").

10, 2011 (Doc. 150-1)("Telephone Records").  On February 20, 2011, the Court denied McKenzie's

Franks Motion.   See Memorandum Opinion and Order, filed February 20, 2011 (Doc.

116)("February 20, 2011 MOO").

McKenzie again moves the Court to suppress the evidence against him.  He argues that the

evidence he presented in support of his Franks Motion in combination with discrepancies in

Hyland's testimony support the Court's reconsideration of its decision not to suppress the evidence

against him.  At the April 1, 2011 hearing, the United States argued that McKenzie has no

expectation of privacy in his PNR or standing to challenge Hyland's obtaining the PNR from

AmTrak.

## ANALYSIS

McKenzie argues AmTrak's disclosure of his PNR to Hyland violated his Fourth

Amendment rights.  The Tenth Circuit has rejected this line of reasoning.  McKenzie's Motion also

restates arguments that the Court rejected in its February 10, 2011 MOO without setting forth new

factual allegations or authorities that controvert the Court's analysis.  The Court, therefore, denies

McKenzie's Motion.

## I.   AMTRAK'S DISCLOSURE OF MCKENZIE'S INFORMATION TO THE DEA DID NOT VIOLATE MCKENZIE'S FOURTH-AMENDMENT RIGHTS.

At the April 1, 2011 hearing, McKenzie indicated that the heart of his argument is that

Hyland illegally seized his PNR.  McKenzie appears to advance two arguments: (i) AmTrak's

disclosure of McKenzie's PNR to Hyland violated McKenzie's Fourth-Amendment rights; and (ii)

Hyland seized McKenzie's PNR from AmTrak without a warrant, violating McKenzie's Fourth-

Amendment rights.  The Tenth Circuit has addressed and rejected both of these arguments in other

cases involving DEA agents interdicting defendants on AmTrak trains.  The Court thus concludes

that McKenzie's argument is unavailing.

### A.   AMTRAK'S DISCLOSURE OF MCKENZIE'S PNR DID NOT VIOLATE HIS FOURTH-AMENDMENT RIGHTS.

McKenzie contends AmTrak's disclosure of his PNR violated his Fourth-Amendment rights.

The Tenth Circuit has held, however, that AmTrak may share passenger information with the DEA.

In United States v. Jackson, 381 F.3d 984 (10th Cir. 2004), the Tenth Circuit rejected a defendant's

contention that AmTrak's disclosure of his PNR violated his Fourth-Amendment rights.

> On March 24, 2003, DEA agent Jarrell Perry obtained a Passenger Name Record ("PNR") from Amtrak which showed that Jackson had paid cash for a one-way coach train ticket from Los Angeles, California to Akron, Ohio.  Perry testified that, based on his experience, he determined that Jackson's travel arrangements were consistent with those of drug couriers.  As a consequence, Perry approached Jackson on the Amtrak train when it stopped in Albuquerque, New Mexico.

381 F.3d at 987 (footnote omitted).  During a consensual search, the DEA found cocaine concealed

in the defendant's luggage and arrested the defendant.  The Tenth Circuit rejected the defendant's

argument that AmTrak's disclosure of his information to the DEA agent violated his Fourth-

Amendment rights:

> Jackson argues that Amtrak is a government agency whose disclosure to Perry of the information surrounding his travel plans violated his rights under the Privacy Act, 5 U.S.C. § 552a, and the Fourth Amendment.  As a result, Jackson argues, he is entitled to suppression of all the evidence seized during his encounter with Perry.
>
> Assuming, without deciding, that the Privacy Act can create a reasonable expectation of privacy that could support suppression of evidence, Jackson's argument fails because Amtrak is not an agency within the meaning of the Privacy Act.  The Fifth Circuit has held that Amtrak is not subject to the Privacy Act.  See Ehm v. Nat'l R.R. Passenger Corp., 732 F.2d 1250, 1251-53 (5th Cir. 1984).  Noting that Amtrak's charter, 45 U.S.C. § 541, specifically provides that Amtrak "will not be an agency or establishment of the United States Government," the Ehm Court held that Amtrak was not an "agency" within the meaning of the Privacy Act.  Ehm, 732 F.2d at 1252-53.  In Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 392 . . . (1995), the Supreme Court specifically noted that Amtrak's charter is dispositive of Amtrak's status as a government entity for the purposes of the

Administrative Procedure Act because Congress controls whether Amtrak is subject to the provisions of the statutes which it enacts. The Privacy Act is part of the Administrative Procedure Act. 5 U.S.C. § 552a. As a consequence, we find the Ehm Court's reasoning persuasive and hold that Amtrak is not a governmental agency within the meaning of the Privacy Act. Because the Privacy Act does not apply to Amtrak, Jackson's argument necessarily fails.

381 F.3d at 989-90.

Similarly, McKenzie asserts that Hyland violated his-Fourth Amendment rights when he obtained McKenzie's PNR from AmTrak. The Tenth Circuit opinion in United States v. Jackson refutes his argument. McKenzie's argument is therefore without a sound basis in the law, and the Court will not therefore suppress the evidence that flows from Hyland's obtaining McKenzie's PNR from an AmTrak ticket agent.

**B.      EVEN IF HYLAND ILLEGALLY SEIZED MCKENZIE'S PNR FROM AMTRAK, MCKENZIE DOES NOT HAVE STANDING TO CHALLENGE THE SEIZURE.**

McKenzie may also be arguing that Hyland seized his PNR from AmTrak without a warrant. This argument is also unavailing. First, the Court has found based on the facts in the record that an AmTrak ticket agent sent McKenzie's PNR to Hyland.[3] Moreover, even assuming Hyland somehow seized McKenzie's PNR, McKenzie "has no reasonable expectation of privacy in the information on the train manifest -- a business record of Amtrak." United States v. Moffett, 84 F.3d 1291, 1293 (10th Cir. 1996). Because a PNR is AmTrak's business record, McKenzie does not have standing to challenge Hyland's seizure of his PNR. In United States v. Moffett, a DEA agent "obtained an

---

[3] At the April 1, 2011 hearing, McKenzie stated that "the only way the Government could have obtained [his PNR] . . . is if they were able to access AmTrak's computer." The Court has found, however, that the AmTrak ticket agent sent the facsimile transmission to Hyland, which the telephone records corroborate.

administrative subpoena commanding AmTrak to produce passenger lists and reservations[4] for certain trains stopping in Albuquerque, New Mexico during December 1993." 84 F.3d at 1292. A defendant found with 162 pounds of baled marijuana challenged the DEA's subpoena of his reservation. "[T]he district court found defendant had no standing to challenge the administrative subpoena . . . ." 84 F.3d at 1292. The Tenth Circuit affirmed the district court's ruling, stating that the court's "supervisory power does not authorize [it] to order suppression of 'otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court.'" 84 F.3d at 1292 (quoting United States v. Payner, 447 U.S. 727, 735 (1980)(holding "respondent lacks standing under the Fourth Amendment to suppress the documents illegally seized from" foreign bank officer). Similarly, McKenzie does not have standing to challenge Hyland's alleged seizure of his PNR, which he appears to argue was "seized unlawfully from a third party not before the court." United States v. Payner, 447 U.S. at 735. The Court will, therefore, not suppress the evidence against McKenzie on this basis.

## II. THE COURT WILL NOT RECONSIDER ITS FEBRUARY 10, 2011 MOO, BECAUSE THE COURT HAS ALREADY CONSIDERED AND REJECTED THE ARGUMENTS MCKENZIE ADVANCES.

For the most part, McKenzie's Motion sets forth arguments the Court has previously rejected. McKenzie argues:

> In [its February 10, 2011 MOO], the Court found that Agent Hyland received the PNR via facsimile transmission from an Amtrack [sic] ticketing agent. However, Mr. McKenzie presented evidence that the only ticketing agent who could have sent it to Agent Hyland, did not send it. In addition, Mr. McKenzie contacted Amtrak's corporate offices, and was informed that Amtrak's policy is to never send any

---

[4] The Tenth Circuit uses the term "reservation" to refer to a PNR. See United States v. Moffett, 84 F.3d at 1292 ("Candelaria reviewed the reservation information looking for passengers who paid cash, booked sleeping cars, and purchased tickets on the day of departure, all of which in his experience suggested possible drug trafficking.").

information to local, state, or federal law enforcement, but instead to send it to Amtrak police. Although the Court found that the Agent Hyland received the PNR from an Amtrak ticket agent, Mr. McKenzie submits that the facts of the case were not correctly argued and the Court should reconsider the facts before it.

First, Hyland testified that he received the PNR directly from the ticket agent. Upon questioning, during the first suppression hearing, he said that he received it by facsimile. Agent Hyland later testified that he received the PNR from an envelope. Based on these discrepancies, and the evidence Mr. McKenzie presented at the hearing on the Motion for Franks Hearing, that being that the ticket agent said he did not send it to the DEA, Mr. McKenzie submits that Agent Hyland illegal[ly] seized the PNR in violation of the Fourth Amendment to the United States Constitution.

Because the PNR was seized illegally, it must be suppressed. In addition, any evidence derived from the PNR is subject to suppression under the fruits of the poisonous tree doctrine. This constitutes the United States' entire case, as the PNR is what led Agent Hyland to find Mr. McKenzie, speak to him, and ultimately to search his luggage and find the drugs for which Mr. McKenzie is on trial. In essence, without the PNR, Mr. McKenzie does not exist, and there would be no case against him.

Motion ¶¶ 2-12 (citations to the record and paragraph numbers omitted). The Court considered and

rejected McKenzie's arguments in its February 10, 2011 MOO. McKenzie presents no basis for the

Court to reconsider its prior decisions.

### A. MCKENZIE DOES NOT CONTROVERT THE COURT'S FINDING THAT HYLAND RECEIVED MCKENZIE'S PNR FROM AN AMTRAK TICKET AGENT.

McKenzie's first point is that he "presented evidence that the only ticketing agent who could

have sent it to Agent Hyland, did not send it." Motion ¶ 3, at 1 (citing February 10, 2011 MOO ¶¶

1-11, at 8-9). In the passages of the Court's February 10, 2011 MOO that McKenzie cites, the Court

found that, on May 6, 2009, an investigator from the Federal Public Defender's Office, Carlos

Herrera, interviewed a person who McKenzie believes is the AmTrak ticket agent referred to as a

confidential source and who was not named during any of the prior hearings (hereinafter "AmTrak

ticket agent"). See Third Tr. at 9:21-10:12 (Cooper, Herrera). Herrera did not know if the AmTrak

-8-

ticket agent was the confidential source, see id. at 17:7-12 (Martinez, Herrera), and the AmTrak ticket agent did not initially want to speak with Herrera, see id. at 14:8-15 (Martinez, Herrera)("When I first spoke to him, he did not want to talk to me.").

The AmTrak ticket agent told Herrera that he was one of two ticket agents who worked at the AmTrak station in Flagstaff; he worked the day shift and the other agent, a female, worked the night shift. See id. at 11:8-21 (Cooper, Herrera); id. at 21:22-22:7 (Martinez, Herrera). McKenzie dealt with a male agent at the AmTrak ticket office in Flagstaff during the day. See id. at 22:25-23:2 (Martinez, Herrera); id. at 29:15-19 (Cooper, Herrera). The AmTrak ticket agent stated during his interview with Herrera that he did not provide any information regarding passengers to the DEA, but that he provided any information on suspicious persons that he reviewed to the AmTrak Police Department. See Third Tr. at 11:22-12:10 (Cooper, Herrera). Specifically, the AmTrak ticket agent indicated that he sent by facsimile transmission the PNRs of suspicious passengers to John Claiborne, a task force officer with the AmTrak police department in Albuquerque. See Third Tr. at 12:2-6, 13:3-9, 30:9-12 (Cooper, Herrera). The AmTrak ticket agent further indicated that he had never sent by facsimile transmission McKenzie's PNR to the DEA or to Hyland, and that he had never heard of Hyland. See Third Tr. at 13:16-14:4, 29:25-30:7 (Cooper, Herrera); id. at 17:1-6 (Martinez, Herrera).

What McKenzie fails to address in his Motion is that the United States presented evidence that contradicted McKenzie's evidence. First the AmTrak ticket agent testified he sent the facsimile transmissions to Claiborne, and he was a DEA task force member at the time of McKenzie's arrest. See Third Tr. at 39:9-17, 41:18-22 (Cooper, Hyland). A ticket agent sent the PNR to a facsimile transmission apparatus that the DEA's Group One Interdiction Group shared. See Third Tr. at 34:15-17. 36:24-37:5 (Cooper, Hyland). The telephone records show that four telephone calls were

made from the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station to the telephone number associated with the facsimile transmission apparatus at the DEA's offices on July 7, 2008, between 5:54 am and 7:05 am.  See Telephone Records at 1.

The United States also presented testimony from DEA agent Jarrell Wayne Perry, who testified that he coordinated payment to the confidential source who provided McKenzie's PNR. See Third Tr. at 50:1-17 (Martinez, Perry).  Perry confirmed that the confidential source sent facsimile transmissions to Hyland's group at the DEA's office.  See Third Tr. at 54:16-22 (Martinez, Perry); id. at 56:11-57:12 (Court, Perry).  After proceedings against McKenzie commenced, Perry contacted the person who is most likely the confidential source, or the person most likely to be able to determine who is the confidential source if not this person, and that person is unable to recall details regarding the specific facsimile transmission of McKenzie's PNR.  See Third Tr. at 51:16-52:2, 52:18-25, 54:9-15 (Martinez, Perry); id. at 56:6-10 (Court, Perry).  Based on the evidence before it, the Court found that the evidence supported finding that "Hyland received McKenzie's PNR via facsimile transmission from an AmTrak ticket agent."  February 10, 2011 MOO ¶ 25, at 11.  McKenzie presents no new evidence to controvert this finding.

In its February 10, 2011 MOO, the Court rejected McKenzie's contention that the AmTrak ticket agent's statements to Herrera refuted Hyland's testimony:

> McKenzie asserts that Herrera's interview with the AmTrak ticket agent shows that the AmTrak ticket agent sent McKenzie's PNR to the AmTrak police and not to the DEA, which evidence directly contradicts Hyland's testimony at the suppression hearing.  The Court, after carefully considering the testimony provided at the hearing on this matter, concludes that Hyland did not falsely testify.  Hyland's recollection of the events on July 7, 2008 is crisper and fuller than the AmTrak ticket agent's, and the balance of the evidence corroborates his testimony.  The AmTrak ticket agent told Herrera that he had never heard of Hyland, see Third Tr. 13:19-20, 30:3-4 (Cooper, Herrera); id. at 17:1-3 (Martinez, Herrera), and that he provides any

-10-

information on suspicious persons that he reviews to Claiborne at the Amtrak police department in Albuquerque, see Third Tr. at 11:22-6, 13:3-9, 30:9-12 (Cooper, Herrera). The AmTrak ticket agent further indicated that he had not sent by facsimile transmission McKenzie's PNR to the DEA or to Hyland. See Third Tr. at 13:16-14:4, 29:25-30:7 (Cooper, Herrera); id. at 17:4-6 (Martinez, Herrera).

The AmTrak ticket agent's testimony is not clearly inconsistent with Hyland's testimony. The AmTrak ticket agent stated that he sent McKenzie's PNR to Claiborne, and Claiborne was a DEA task force member at the time of McKenzie's arrest. See Third Tr. at 39:9-17, 41:18-22 (Cooper, Hyland). The AmTrak ticket agent may not have realized that his facsimile transmissions were being sent to the DEA. Herrera did not learn what telephone number the AmTrak ticket agent used to access the facsimile transmission apparatus to which he would send information to Claiborne, and Herrera did not know the telephone number access the DEA's facsimile transmission apparatus. See Third Tr. 17:14-18 (Martinez, Herrera). Contrary to McKenzie's apparent theory that Claiborne served as an intermediary between the AmTrak ticket agent and Hyland, the Telephone Records show that four telephone calls were made from the telephone number associated with the facsimile transmission apparatus at the Flagstaff AmTrak station to the telephone number associated with the facsimile transmission apparatus at the DEA's offices on July 7, 2008, between 5:54 am and 7:05 am. See Telephone Records at 1. Hyland had no communication with Claiborne before going to the train station on July 7, 2008 -- the day of McKenzie's arrest. See Third Tr. at 37:6-8 (Cooper, Hyland).

As to the AmTrak ticket agent's statement that he had never heard of Hyland, see Third Tr. 13:19-20, 30:3-4 (Cooper, Herrera); id. at 17:1-3 (Martinez, Herrera), Hyland did not testify that he had direct contact with the AmTrak ticket agent. The facsimile transmission was sent to the DEA's Group One Interdiction Group, of which Hyland was a member, and Hyland did not communicate with the ticket agent before or after receiving the PNR by facsimile transmission. See Third Tr. at 34:15-17, 36:24-37:5 (Cooper, Hyland). Additionally, Hyland did not receive the facsimile transmission directly, but took it from an envelope specific to the number four train on which McKenzie traveled, which was on the wall of the room in which the apparatus was located, and Hyland does not know who moved the PNR from the facsimile transmission apparatus to the envelope. See Third Tr. at 35:25-36:20 (Cooper, Hyland); id. at 43:25-44:14, 46:13-16 (Martinez, Hyland).

Perry, who coordinated payment to the confidential source who provided McKenzie's PNR, see Third Tr. at 50:1-17 (Martinez, Perry), corroborated Hyland's testimony that the confidential source sent facsimile transmissions to Hyland's group at the DEA's office, see Third Tr. at 54:16-22 (Martinez, Perry); id. at 56:11-57:12 (Court, Perry). After proceedings against McKenzie commenced, Perry contacted the person who is most likely the confidential source, and the person most likely to be able to determine who is the confidential source if not this person, and that person

is unable to recall details regarding the specific facsimile transmission of McKenzie's PNR. See Third Tr. at 51:16-52:2, 52:18-25, 54:9-15 (Martinez, Perry); id. at 56:6-10 (Court, Perry).

The Court finds that Hyland did not testify falsely. While the AmTrak ticket agent told Herrera that he sent McKenzie's PNR to Claiborne at the AmTrak police department, Claiborne was a DEA task force member at the time of McKenzie's arrest, and the AmTrak ticket agent may have not understood where he was sending the facsimile transmission. The Telephone Records and Perry's testimony corroborate Hyland's testimony. The Court concludes, therefore, that the evidence does not support McKenzie's contention that Hyland testified falsely. Accordingly, the Court will not reopen the suppression hearing or reconsider its denial of McKenzie's motion to suppress.

February 10, 2011 MOO at 16-19.

Moreover, as the Court noted in its February 10, 2011 MOO, even if Hyland had falsely testified about the source of McKenzie's PNR, which the Court finds he did not, it would not have changed the Court's decision. The ultimate question decided at the suppression hearing was whether McKenzie's Fourth-Amendment rights were violated. The source of McKenzie's PNR does not affect the Court's analysis of the Fourth-Amendment issues in this case.

## B. HYLAND DID NOT FALSELY TESTIFY ABOUT RECEIVING MCKENZIE'S INFORMATION.

McKenzie's argues that discrepancies in Hyland's testimony require the Court to suppress evidence against McKenzie. McKenzie contends that Hyland first testified at the February 18, 2010 suppression hearing that he received McKenzie's PNR by facsimile transmission, but at the December 1, 2010 evidentiary hearing, Hyland testified "that he received the PNR from an envelope." Motion ¶¶ 6-8, at 2. McKenzie asserts that, based on these discrepancies and the evidence McKenzie presented at the December 1, 2010 evidentiary hearing, Hyland illegally "seized the PNR in violation of the Fourth Amendment to the United States Constitution." Motion ¶ 9, at 2.

McKenzie again presents no new evidence or authority for the Court to reconsider its

February 10, 2011 MOO.  First, Hyland's testimony was not inconsistent.  At the August 20, 2009,

Hyland testified on examination by McKenzie's counsel at the time:

> A.  [The PNR] was sent to us.
>
> Q.  Sent to you by AmTrak?
>
> A.  Yes.
>
> Q.  And when you say it was sent to you, could you tell the Court, was it sent to you but e-mail?  Was it faxed to was it hand delivered to you how exactly was it delivered to you?
>
> A.  Fax, it was fax.
>
> . . . .
>
> Q.  And so . . . someone at AmTrak is reviewing the passenger list, making a determination as to who you might be interested in and then forwarding that information to you by fax; is that correct is that a correct statement or a fair statement?
>
> A.  Yes.
>
> . . . .
>
> Q.  Now, I want to get back into the information that was provided to you by an AmTrak employee.  It will establish I think we established a ticket agent somewhere in the AmTrak system faxed that information to you correct?
>
> A.  Yes.
>
> Q.  And that's something that's done on a regular basis?
>
> A.  Yes.
>
> Q.  You were asked a question . . . concerning whether you knew who the person was who faxed the information to you, I believe, and you answered "no"; is that correct?
>
> A.  That's correct.

Tr. at 76:3-19, 83:20, 102:6-12, 142:18-22 (Padilla, Hyland)(objections omitted).  Thus, Hyland first

testified that the PNR was "sent to us" via facsimile transmission.

-13-

At the February 18, 2010 suppression hearing, Hyland testified:

Q.  First of all when you testified you indicated that this investigation began as a result of the passenger name record that you received was what's been referred to as a PNR?

A.  Correct.

Q.  And it's my understanding again referring back to your prior testimony, that you or someone in your office received a fax of that [PNR]?

. . . .

Q.  Any way to begin with, was that fax directed specifically to you?  I don't think we covered that in the last hearing?

A.  No.

Q.  Do you remember if it was received in your office with a cover sheet?

A.  I don't know.

Q.  And just in terms of a question about the procedure, because I assume this happens on a pretty frequent basis as the DEA receives a PNR, is it faxed just generally to the Drug Enforcement Administration and someone at that point gives it to whoever is going to be working the train that day?

A.  It comes to the interdiction group.  We have our own fax.

Q.  It goes directly to your group?

A.  Yes.

Q.  And did you specifically take that out of the machine that morning.

Q.  If you recall?

A.  I can't recall.

Second Tr. at 4:3-5:18 (objections omitted).  Thus, at the second hearing, Hyland testified that the

Group One Interdiction Group received the facsimile transmission, that it was not directed

specifically to him, and that he did not recall if he personally took the transmission off of the

-14-

facsimile transmission apparatus.

At the December 1, 2010 hearing, Hyland testified:

Q.  At the suppression hearing you testified that the AmTrak ticket agent you believe from Arizona, faxed the PNR to you.  Right?

A.  I know that.

Q.  You know that?

A.  Yes, sir.

Q.  Okay.  And you say that you did not pull it out of the fax machine yourself, but you pulled it out off an envelope here the fax machine?

A.  Yes, in my group, in the interdiction group.

Q.  Who would have pulled it out of the fax machine?

A.  I have no idea.

Q.  How many people are in the room where that fax machine is located?

A.  At that time the interdiction group would have been about eight agents and task force officers total.

Q.  And what -- How is -- What's the purpose of that particular envelope that it was put in?

A.  There were two envelopes.  One is labeled for train number 4 and one is labeled for train number 3, which is the westbound train.

Q.  Okay.  And how often do you check that envelope?

A.  Well, if you are going to go to that train you'll go to that envelope daily.

Q.  You testified that you had no communication with the ticket agent either before or after the PNR was received.  Is that correct?

A.  Correct.

Q.  And you had no follow-up with the ticket agent to get more information about Mr. McKenzie, correct?

A.  Correct.

Third Tr. at 35:25-37:5 (Cooper, Hyland).  Hyland further testified:

Q.  One of the first questions you were asked by defense counsel was and you answered yes, I believe, was the PNR faxed to you, and you answered yes; is that correct?

A.  Yes.

Q.  Now, could you clarify "to you"?  Were you answering specifically to you or was it faxed to the DEA office?

A.  It was faxed to group one interdiction fax.

Q.  So when you were answering the question it was faxed to you, you meant actually this group one interdiction group?

A.  Correct.

Q.  Now you heard me clarify for the Court here . . . that you didn't remember if you took it off the fax or not?

A.  Yes, sir.

Q.  Now you remember that you took it from this envelope?

A.  Yes.

Q.  And could you please describe for the judge what this room is like and specifically put in context the fax machine and the envelope and what it looks like, if you can give a description?

A.  Sure.  It's maybe a thousand square foot room.  There's about like I said before, there's about eight officers and agents assigned to this interdiction group at the time, so there's about maybe no more than eight or ten desks.  On the east side wall are the . . . two plastic bins that we've been referring to [as] envelopes.  One is marked train number 4 the other one is marked train number 3.  They were there before I got into interdiction in the fall of 2000.  And our fax machine would be located in about the center part of the group, maybe 25 feet from that wall.

Third Tr. at 43:11-44:14 (Martinez, Hyland).  Thus, at the third hearing, Hyland testified that the

Group One Interdiction Group received the facsimile transmission, that it was not directed

-16-

specifically to him, that he now recalls that he did not personally take the transmission off of the facsimile transmission apparatus, but that someone else had removed the transmission from the apparatus and placed in an envelope specific to the train in which McKenzie was traveling, and that Hyland retrieved the PNR from the envelope.

After reviewing this testimony, in its February 10, 2011 MOO, the Court held that Hyland did not falsely testify about receiving McKenzie's PNR from the AmTrak ticket agent. The Court found:

> The facsimile transmission was sent to the DEA's Group One Interdiction Group, of which Hyland was a member, and Hyland did not communicate with the ticket agent before or after receiving the PNR by facsimile transmission. See Third Tr. at 34:15-17, 36:24-37:5 (Cooper, Hyland). Additionally, Hyland did not receive the facsimile transmission directly, but took it from an envelope specific to the number four train on which McKenzie traveled, which was on the wall of the room in which the apparatus was located, and Hyland does not know who moved the PNR from the facsimile transmission apparatus to the envelope. See Third Tr. at 35:25-36:20 (Cooper, Hyland); id. at 43:25-44:14, 46:13-16 (Martinez, Hyland).

February 10, 2011 MOO at 18.

McKenzie advances no new evidence or authority to undermine the Court's finding that Hyland did not testify falsely when he stated that he received McKenzie's PNR via facsimile transmission from an AmTrak ticket agent. Moreover, a careful review of Hyland's testimony reveals that, while Hyland recalled additional details about the mundane event of receiving a facsimile transmission over time, his testimony is not inconsistent and does not contain discrepancies. At the August 20, 2009 hearing, Hyland testified the facsimile transmission was "sent to us" -- he did not testify that he took the transmission from off the apparatus or that he did not take it from a envelope on the wall. At the February 18, 2010 hearing, Hyland testified that the facsimile transmission was not specifically directed to him. See Second Tr. at 4:15-19 ("Q. Any way to begin with, was that fax directed specifically to you? I don't think we covered that in the last

-17-

hearing? A. No." (Padilla, Hyland)).  Hyland did not volunteer and McKenzie's counsel did not inquire whether Hyland took the facsimile transmission directly from the machine or in another fashion.  At the December 1, 2010 hearing, when asked about the details of the facsimile transmission, Hyland provided additional detail on how the PNR was processed within the Group One Interdiction Group.  The Court finds no inconsistency in Hyland's statement that McKenzie's PNR was sent by facsimile transmission to the Group One Interdiction Group, but not specifically to him, and his statement that the PNR was moved from the Group One Interdiction Group's facsimile transmission apparatus and placed in an envelope specific to the number four train, from which Hyland retrieved it.  The Court therefore declines to embrace McKenzie's contention, "[b]ased on these discrepancies, and the evidence Mr. McKenzie presented at the hearing on the Motion for Franks Hearing, . . . that Agent Hyland illegal[ly] seized the PNR in violation of the Fourth Amendment to the United States Constitution."  Motion ¶ 9, at 2.  The Court, after a careful review of the record, finds no instance in which Hyland states he took McKenzie's PNR directly from the facsimile transmission apparatus.   Moreover,  it is unclear on what basis McKenzie contends that a discrepancy in Hyland's testimony would require the Court to suppress evidence against him.  Discrepancies in Hyland's testimony, without more, are not sufficient to amount to Fourth-Amendment violations that would require the Court to suppress evidence against McKenzie. Whether Hyland retrieved McKenzie's PNR from the facsimile transmission apparatus or from an envelope on the wall beside the apparatus is immaterial to the Court's analysis.  It is unsurprising that Hyland did not elaborate on such an insignificant detail, without being pressed, when he testified about the events of July 7, 2008.  Whether he obtained the PNR from the envelope or the apparatus appears to be irrelevant to the issues before the Court.  The Court therefore again denies McKenzie's request that it reconsider its decision not to suppress the evidence against McKenzie.

**IT IS ORDERED** that the Court denies Defendant's Motion to Suppress Evidence Based on Illegal Seizure of Passenger Named Report PNR and to Reconsider, in Part, Factual Findings Relating to the Seizure of the PNR, filed March 30, 2011 (Doc. 124).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
    United States Attorney
Damon P. Martinez
Samuel A. Hurtado
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Robert R. Cooper
Albuquerque, New Mexico

*Attorney for the Defendant*