Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW MEXICO
2

3

4

5    UNITED STATES OF AMERICA,

6                         Plaintiff,

7    -vs-                 NO:  1:08-CR-01669-01 JB

8    RICHARD ANTHONY McKENZIE,

9                         Defendant.

10

11

12

13

14

15             TRANSCRIPT OF PROCEEDINGS

16         MOTIONS AND SENTENCING HEARING

17                 September 7, 2012

18

19

20

21

22

23   BEFORE:  HONORABLE JAMES O. BROWNING
             UNITED STATES DISTRICT JUDGE
24
     Proceedings reported by stenotype.
25   Transcript produced by computer-aided transcription.

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

```
 1                    APPEARANCES

 2   For the Plaintiff:

 3       US ATTORNEY'S OFFICE
         PO Box 607
 4       Albuquerque, NM  87103-0607
         505-346-7274
 5       BY:  SAMUEL A. HURTADO, ESQ.
              samuel.a.hurtado@usdoj.gov
 6
     For the Defendant:
 7
         JAMES BAIAMONTE, ESQ.
 8       900 Lomas Blvd., NW,
         Albuquerque, NM  87102
 9       505-246-8166
              baiamonte@qwest.net
10
     The defendant appeared in person.
11
     Also present:
12
         Luis Zuniga, Probation Officer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 3

```
 1              (In open court at 9:04 a.m.)
 2              THE COURT:  All right.  Good morning,
 3      everyone.  I appreciate everyone making themselves
 4      available to me this morning.
 5              MR. HURTADO:  Good morning, Your Honor.
 6              THE COURT:  The Court will call United
 7      States of America vs Richard Anthony McKenzie, Case
 8      Number 1:08-CR-01669-01 JB.
 9              Counsel, may I have your appearances?  For
10      the government?
11              MR. HURTADO:  Samuel Hurtado for the
12      United States.
13              THE COURT:  Mr. Hurtado, good morning to
14      you.
15              MR. HURTADO:  Good morning.
16              THE COURT:  For the defendant?
17              MR. BAIAMONTE:  Good morning, Your Honor.
18      Jim Baiamonte, representing Mr. Richard McKenzie.
19      My client appears personally before you today.
20              THE COURT:  All right.  Mr. Baiamonte,
21      good morning to you.
22              Mr. McKenzie, good morning to you.
23              All right.  We received -- I'm not sure I
24      have a date that this was filed.  But we received it
25      by mail, and I gave instructions for it to be filed.
```

**PAUL BACA, OFFICIAL COURT REPORTER**

1        It's a motion to set aside the jury

2   verdict against the defendant and to reconsider

3   defendant's motion to compel production of witnesses

4   and documents.

5        Have you received a copy of this?  It

6   looks like it was written and filed or sent to the

7   Court by Mr. McKenzie.

8        Have you had a chance to see this

9   document, Mr. Baiamonte?

10       MR. BAIAMONTE:  No, sir.  I did not get a

11  copy from my client until this morning, about three

12  minutes ago.  I'm only on page 6 of 24.  I have not

13  had a chance to read it.

14       THE COURT:  All right.  Well, do you wish

15  to say anything on this motion?

16       MR. BAIAMONTE:  It appears that he's just

17  relitigating the issues that have been litigated

18  continually.  So it would appear, one, that the

19  issue is not timely filed.  And secondly, it doesn't

20  look like there's any new ground to cover on the

21  motion.

22       But I have not had an opportunity to read

23  the entirety of the motion.

24       THE COURT:  All right.  Mr. Hurtado, do

25  you want the hearing or sentencing vacated so you

**PAUL BACA, OFFICIAL COURT REPORTER**

1   can respond to this?  Are you ready to respond to it

2   today orally, or how would you like to proceed?

3              MR. HURTADO:  Yes, sir.  If I may, I would

4   like to respond to it orally at first.

5              THE COURT:  Okay.

6              MR. HURTADO:  And as I understand, Your

7   Honor, I did notice that there was a motion filed

8   this morning at about 8:51 a.m.  I have not looked

9   at that electronic pleading.  I also showed it to

10  Mr. Baiamonte.  I just wanted to bring it to the

11  Court's attention.

12             I don't know if the Court --

13             THE COURT:  It may be this motion.  I'm

14  kind of open -- it got filed earlier.  But it looks

15  like this it's his motion.

16             Do you have a copy of this?

17             MR. HURTADO:  I do not have a copy of the

18  electronic motion.  I do have a copy of the

19  handwritten motion.

20             THE COURT:  Okay, it's the same one.  I'm

21  looking at on the screen.  So all we did was take

22  the copy that Mr. McKenzie mailed to us, and I

23  instructed the clerk's office to file it.

24             So you have it?

25             MR. HURTADO:  Yes, sir.  And with that

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 6

1    said, it does not appear that this was filed by

2    Mr. Baiamonte himself.

3           And with that said, Your Honor, the United

4    States would move to strike the defendant's motion

5    because it was filed in his personal capacity.  And

6    consistent with the local rules, the United States

7    would hereby request an order from the Court

8    prohibiting any similar future filings.

9           The Court is aware that Mr. Baiamonte is

10   the attorney appointed to represent Mr. McKenzie.

11   Electronic filing in the District of New Mexico is

12   mandatory under the Court's administrative order

13   dated August 28th, 2006.

14           Under the CM-ECF Administrative Procedures

15   Manual, Mr. McKenzie is not permitted to file

16   pleadings electronically.  The CM-ECF Administrative

17   Procedures Manual, at 1 through 3, allows attorneys

18   and pro se litigants who have obtained an order from

19   court to file pleadings electronically.

20   Mr. McKenzie is not permitted to file pleadings with

21   the Court.

22           This motion is also untimely, as the

23   motions deadline has passed prior to the current

24   document being filed, and no relief was being sought

25   by Mr. McKenzie for an extension.

02a9903f-434b-4ea8-ad2d-4008164e29ff

1          Also, given the fact that all of the

2    arguments that are contained in the motion, as

3    Mr. Baiamonte pointed out, have been rehashed, and

4    these matters have been litigated extensively before

5    the Court.

6          And Your Honor, given the lateness of this

7    filing, the United States would move to strike at

8    this time.  Thank you.

9          THE COURT:  All right.  Thank you,

10   Mr. Hurtado.

11          Mr. McKenzie, I know that you've been --

12   probably a lot of the things that Mr. Hurtado said

13   are correct, and I agree with him.  But I know

14   you've been trying to preserve this issue.

15          Is there anything you'd like to say on

16   this motion, so that you have it preserved for any

17   appeal that you may take?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  And really, anything else you

20   want to say in support of the motion, I'll allow you

21   to do that.

22          THE DEFENDANT:  Yes.  The reason why I

23   filed this motion is because --

24          MR. BAIAMONTE:  Would you like --

25          THE COURT:  It's up to you.  If he wants

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    to stay seated, if you'll just pull that microphone

2    up and talk into it, or if he wants to come up to

3    the podium, whatever is best for you.

4              THE DEFENDANT:  Good morning, Your Honor.

5              The issue at hand is that I when I

6    first -- when I was first given Mr. Baiamonte as my

7    attorney, one of the issues that I brought to him

8    was that it's my understanding that perjury was

9    committed and suborning perjury was committed, and

10   that I believe Giglio violations and Brady material

11   violations was committed.

12             At the time, I was researching it, and I

13   couldn't fully explain it.  But I understood that it

14   was committed, and I asked my attorney to pursue

15   this.  And the comment that he made to me was that,

16   why would he do this, when it would offend you,

17   because it happened in your courtroom?  So I felt as

18   though I had no other choice but to submit a motion

19   on my own.

20             Now he, my attorney, is stating that I'm

21   rehashing old arguments, which I am not.  The

22   argument that I have now is related to Giglio

23   violations, as far as Brady material violations, as

24   well as perjury.  And the only way that could have

25   came out was by me going to trial.

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

1           I went to trial.  And based on my

2    constitutional right, I had the right to face my

3    accuser.  I believe that the prosecutor put a

4    witness on the stand, knowing she was going to

5    commit perjury.

6           And if I was going take the stand knowing

7    I was going commit perjury, the United States -- I

8    mean pardon me, the District Attorney would have

9    seeked an enhancement, as well as my attorney would

10   have been in trouble.

11          So these are allegations that could be

12   proven that my attorney does not want to seek out.

13   That's why I was forced to submit my own motion.

14          THE COURT:  All right .

15          THE DEFENDANT:  And besides that, I'm

16   going to -- I've worked with other cases that the

17   prosecutor submitted perjury, along with the

18   officer.  I want to question him, and Daymon

19   Martinez is not showing up.

20          This is the second time with this

21   sentencing.  I was trying to retain a private

22   attorney, and I guess that fell through.  I wasn't

23   trying to stymie the Court or trying to delay it.

24          It's just that I felt as though the

25   attorneys that you kept assigning to me wasn't

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    representing my constitutional rights to the best of

2    my ability.  They wasn't seeking any justice for me,

3    so I was forced to submit my own motion.  And it has

4    continued to happen.

5           He hasn't read -- he hasn't read the

6    motion.  I sent a copy to his office.  I sent a copy

7    to the justice -- I mean to the judge, to the

8    prosecutor, and to my attorney.  He hasn't read it.

9           But yet he comes here and says that I'm

10   rehashing old arguments, which I'm not.  Giglio is

11   not an old argument.  Nor have I ever argued

12   perjury, suborning perjury, or Brady violations.  So

13   for him to say that is basically what I've been --

14   the frustration or the problem I've been going

15   through since I've been down here in New Mexico for

16   four years now.

17          I've had attorneys.  For some reason, when

18   I enter this courtroom, the constitution does not

19   apply to me, and my attorney does not bring that

20   out.

21          You've been the judge on my case for four

22   years now.  Like I said, my argument always has been

23   that there is no informant on my case.  There is

24   no -- pardon me.  There is no informant, that the

25   United States committed perjury, and the prosecutor

02a9903f-434b-4ea8-ad2d-4008164e29ff

1  suborned perjury.  And I have proof of that without

2  a doubt.

3          I have proven it.  And my motion -- and

4  that's why this motion that I submitted, I'm trying

5  to seek relief from that.  What I want to do is I

6  want to argue perjury on my 1055.  And the only way

7  I can do that is by asking certain questions.

8          THE COURT:  All right.

9          THE DEFENDANT:  If I'm explaining it

10  correctly.

11          THE COURT:  All right.

12          Mr. Baiamonte, do you have anything

13  further?  What pages do you have?  Do you want to

14  take a moment to look at the rest of it?

15          I have my copy here, if you'd like to --

16          MR. BAIAMONTE:  I would, Your Honor.

17          And of course, I would have read

18  Mr. McKenzie's motion, had it found its way into my

19  mailbox.  I obviously didn't have time to look at

20  the electronic version of it this morning.  I was

21  here.

22          Just regarding briefly, now that he's

23  broached the subject of attorney/client

24  conversations, he's waiving attorney/client

25  privilege in that regard.

02a9903f-434b-4ea8-ad2d-4008164e29ff

1          And just to inform the Court what the

2    actual conversation was, Mr. McKenzie has been

3    adamant from the beginning that not only DEA Agent

4    Hyland should be prosecuted, but also Assistant US

5    Attorney Daymon Martinez.

6          And when I asked him about the proof that

7    he had for that, his answer was simple:  That it was

8    just so self-evident that anybody in the courtroom

9    could have seen that happen.  And I inquired of him

10   if that would include Judge Browning.  And he agreed

11   that you should have seen it, and perhaps that you

12   were in on the conspiracy as well.

13         At that point, I did point out that his

14   position was ludicrous.  So he's partially correct

15   that we did have a conversation along those lines,

16   but his memory is a little faulty on some of the

17   finer points.

18         I think his issues regarding Agent Hyland

19   and the PNR and all the other litigation is very,

20   very well preserved in several motions and the trial

21   and the objections, and they will be given all the

22   attention they deserve on appeal.  I don't know that

23   the issue needs to be continually litigated at this

24   level.

25         And if the 10th Circuit Court of Appeals

Page 13

1    agrees with Mr. McKenzie, then the 10th Circuit

2    Court of Appeals will do what they feel is

3    appropriate.

4          But I do think it might be helpful if I

5    could have a moment to review the entirety of

6    Mr. McKenzie's pleading.  The first 12 pages don't

7    seem to indicate that there's any new ground to

8    tread, but perhaps --

9          THE COURT:  Do you have a copy?  Ms. Wild

10   has a copy.  You can have my copy, whatever would be

11   best for you.

12         MR. BAIAMONTE:  Mine stops at page 18.

13         THE COURT:  I'll let Ms. Wild hand you

14   that copy.

15         MR. BAIAMONTE:  Yes, sir.

16         THE COURT:  While you're looking at that,

17   let me go to Mr. Hurtado and see if he has any

18   comments on what's been said so far on this motion.

19         Mr. Hurtado.

20         MR. HURTADO:  Yes, Your Honor.

21         As an initial matter, the United States

22   would deny any of the allegations that the defendant

23   did set forth in his most recent filing with regard

24   to perjury by either Special Agent Mark Hyland or

25   Assistant US Attorney Daymon Martinez.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 14

1           It's the government's position that those

2    claims are absolutely meritless, and the only

3    support for those contentions are that they are

4    defendant's own self-serving statements.

5           And once again, the United States does

6    stand by its initial motion to go ahead and strike

7    the defendant's pleadings, since he's not authorized

8    to do so, and proceed with sentencing in this

9    matter.  Thank you, sir.

10          THE COURT:  All right.  Thank you,

11   Mr. Hurtado.

12          While Mr. Baiamonte is looking at the

13   motion, Mr. McKenzie, if you have anything further

14   you want to say on the motion?

15          THE DEFENDANT:  Yes, Your Honor.  I have

16   four questions I want to pose to the Court, as well

17   as Officer Hylander and Assistant Prosecutor Daymon

18   Martinez.

19          One is that Officer Hylander stated that

20   he enlarged the PNR report to take off the time.

21   And the PNR report was faxed to him, showing two

22   exhibits, showing the warrant that was from the day

23   I was arrested and also the lab report that came

24   back from Texas, along ...

25          If you want, I also have with me the

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    transcripts that they subpoenaed from T-Mobile.  And

2    T-Mobile sent back a reply, along with different

3    phone numbers.  And on the cover sheet, it has the

4    DEA fax number on it.  Case Agent Hylander said that

5    he enlarged it to take off the numbers on top, which

6    reveal who the informant was.

7           But the prosecutor apparently stated that

8    he didn't want to be disingenuous to the Court.  But

9    there's a system identifier, and there's numbers

10   within the PNR that suggest that the person who I

11   dealt was -- Gabby Chester is the person who I dealt

12   with.

13          So my question is:  Why would the case

14   agent enlarge the PNR report to take off numbers

15   that's not relevant to who sent it, but leaves the

16   system identifier numbers on the PNR report?  That's

17   one.

18          I never got the original copy.  The only

19   thing I received was a duplicate.  Under

20   Rule 18-101, I'm entitled to the original copy.  I

21   never got that.

22          Two, a sealed document was sent to you.

23   The sealed document in question had four fax

24   numbers.  Agent Hylander stated that he only

25   received one fax that day from the envelope.

02a9903f-434b-4ea8-ad2d-4008164e29ff

1          My question is:  How can the prosecutor

2    still maintain that the informant sent the PNR

3    report, when Agent Hylander said he got it from out

4    of the envelope?  And the PNR report which is in

5    question has a system identifier number, which is

6    Gabby Chester's, and it doesn't have anybody else's

7    system identifier number on it.

8          Three, all he would have to do is give the

9    original PNR -- the original form PNR in its

10   entirety, and it would show -- the time on top would

11   show or match one of the four faxes that relates to

12   the sealed document that was sent to you.  But I

13   know for a fact that it was not, because date on it

14   was 2007.  I was arrested in 2008.

15         So not only did Agent Hylander lie or

16   mislead the Court about the PNR being enlarged to

17   take off the -- to reveal who the informant was,

18   they also submitted the Court's own evidence, which

19   is the PNR report, which is the sealed document with

20   four faxes on it, but not related to when I was

21   arrested.  It was the year before when I was

22   arrested.

23         You used that as part of your factual

24   findings.  Excuse me, I'm kind of nervous.  But

25   also, Agent Hylander said that he relied on the PNR

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    report to approach me that day.

2            If you look at the PNR report, it

3    doesn't -- you can look at the PNR report from top

4    to bottom, and it doesn't state the method of

5    payment, who paid for it and how it was paid for.

6    You have to have the unit element.

7            And that's my argument in my motion right

8    now is that you have to have the human element.  Who

9    is an Amtrak employee or somebody who works for

10   Amtrak to let you know how the method of payment

11   was?  Hylander could not have come up with that on

12   his own.

13           But he said that he spoke to nobody

14   before, during, and after he got the PNR report.  So

15   how does he make the determination that it was paid

16   for by credit card or that Ruby Johnson paid for it

17   by credit card, which it states on the warrant that

18   it was paid for by a third party?  You cannot look

19   at the PNR report and determine how it was paid for.

20           And Amtrak -- and speaking of Amtrak, the

21   only person who would know that is the person who I

22   dealt with or if a representative of Amtrak was able

23   to go into the system and look at it themselves.

24           There's no way in the world that somebody

25   from the DEA office can look at the PNR report and

02a9903f-434b-4ea8-ad2d-4008164e29ff

1   explain or elaborate or even suggest the method of

2   payment.  That's another thing.  These are questions

3   I want to pose to Officer Hylander, as well as the

4   prosecutor.

5           Also, if Agent Hylander got the PNR report

6   and not the envelope, Daymon Martinez -- excuse me.

7   Prosecutor Daymon Martinez knew at the time -- or

8   when did he ever ask to -- or did he ever speak to

9   the informant?

10          So my thing is that when Agent Hylander

11  got on the stand and the question was posed to him,

12  "Did the informant send it," and he answered, "Yes,"

13  Daymon Martinez knew that Agent Hylander was

14  committing perjury.  He allowed it to happen.

15          Those are issues I bring up in my motion

16  that I sent to you.

17          THE COURT:  All right.  Thank you,

18  Mr. McKenzie.

19          Have you had a chance now, Mr. Baiamonte,

20  to review the entire motion that Mr. McKenzie filed

21  this week?

22          MR. BAIAMONTE:  Yes, sir.  Thank you for

23  that opportunity.

24          I have read it in its entirety.  And I

25  stand by my earlier assertion that there's nothing

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 19

1    new in there which would necessitate the Court

2    vacating today's hearing or setting aside the jury

3    verdict.  Again, he has remedies available to him,

4    and those will certainly be pursued.

5              THE COURT:  All right.  Thank you,

6    Mr. Baiamonte.

7              Well, I did carefully review

8    Mr. McKenzie's motion yesterday, in preparation for

9    today's hearing.  I took it home last night and also

10   reviewed it.  And I think it breaks down into a

11   couple of categories.

12             One is the substance of the suppression

13   motion.  I don't think any of this goes to guilt or

14   innocence in the trial phase, but it does go to

15   Mr. McKenzie's concerns about what took place in the

16   suppression hearing.  And it didn't seem to raise

17   new issues.

18             I understand Mr. McKenzie's concern that

19   there were incorrect statements that were made at

20   one or more of the hearings.  I think we explored

21   those in considerable detail, and I gave

22   Mr. McKenzie quite a bit of latitude to establish

23   that it never went, though, to the issue that the

24   Court had to decide.

25             And that was whether Mr. McKenzie and

02a9903f-434b-4ea8-ad2d-4008164e29ff

1   Mr. Hyland's confrontation there on the train and on

2   the platform, whether that was consensual or not.  I

3   still think that it was consensual and that

4   therefore, anything that occurred after that, the

5   profiling issue is irrelevant because the consent

6   broke any sort of concern about what took place

7   before.  And so I think any attack on that is

8   misplaced.

9         And I know Mr. McKenzie disagrees with me,

10   and that probably will be a subject of his appeal or

11   any habeas attack under 2255.  And I understand that

12   we just had a disagreement on that.

13         But the reason I gave Mr. McKenzie a great

14   deal of latitude to explore those issues earlier --

15   I know it wasn't as much as he wanted, but I think

16   everyone would agree it's probably more than most

17   courts would have allowed -- was because I was

18   concerned about the credibility of Mr. Hyland

19   because he did make, I think, some mistakes.  And

20   the government made some representations that turned

21   out not to be correct.

22         And so I wanted to explore those to make

23   sure that those did not undermine the findings of

24   fact that I made about Mr. Hyland.  And I think I

25   explored this.  Some of the concerns that

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 21

1    Mr. McKenzie has had, I've shared.

2            But in the end, I don't think that, you

3    know, how Mr. Hyland got the information and whether

4    his memory was correct or whether he got it off a

5    fax machine or someone else is terribly important.

6    Because the bottom line is that however an officer

7    gets up to a particular defendant, if the defendant

8    consents to the search, as I think he did here, then

9    it makes everything after that or what occurred

10   before that somewhat irrelevant.

11           So I'm going to deny the motion to

12   overturn the jury verdict against the defendant.

13   I'm not going to reconsider the defendant's motion

14   to compel production of witnesses and documents or

15   the motion to suppress.  I'll leave that in place.

16           We'll leave the motion -- I filed it for

17   Mr. McKenzie, so it is part of the record.  His

18   additional comments, of course, will be part of the

19   record.  And I think that issue will have to remain

20   for either appeal or a 2225 attack.  All right.

21           Mr. McKenzie, have you reviewed the

22   presentence report, as well as the memorandum dated

23   September 30th, 2011, in this case?  Have you

24   reviewed those two documents?

25           THE DEFENDANT:  Yes, sir.  I have a

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    problem -- an issue with that, also.

2           THE COURT:  All right.  Let me hear from

3    Mr. Baiamonte, because I know there have been

4    objections raised.  So it may be that those are the

5    same ones that you're raising.

6           But Mr. Baiamonte, have you reviewed those

7    two documents with Mr. McKenzie?

8           MR. BAIAMONTE:  Yes, sir.  That's been

9    done not only by myself, but Mr. Bob Cooper did it

10   as well.

11          And the Court will of course notice in the

12   record that Mr. Cooper -- that would be attorney

13   number three -- I'm sorry, attorney number two.

14   Mr. Cooper filed a sentencing memorandum on,

15   ironically, September 8th of last year.  So one day

16   shy of a year ago, Mr. Cooper was representing

17   Mr. McKenzie.

18          Yes, the PSR has been reviewed in its

19   entirety.  And we have filed a sentencing memorandum

20   objecting to some of the characterizations,

21   particularly to Mr. McKenzie's criminal history.

22          And I won't belabor the point.  But

23   Mr. McKenzie's belief is that, as the driver -- the

24   getaway car driver of the robbery, he should not be

25   held to an armed robbery.

02a9903f-434b-4ea8-ad2d-4008164e29ff

1          He would also point out that nobody was

2     injured in the robbery.  And these issues, I'm sure,

3     were raised at trial, because it did go to trial.

4     Nonetheless, Mr. McKenzie got convicted of the

5     robbery.

6          And as to the drug charge which is

7     plaguing Mr. McKenzie, he would also point out for

8     the Court's edification that a very, very small

9     amount of drugs were used.  And as such a tiny

10    amount, it should not be held against him.  I

11    believe it's .2 grams.  And that's contained on

12    paragraph 41, page 11.

13         And so the criminal history, in our

14    estimation, does overrepresent his criminal history.

15    And we're asking for a sentence, as I've said in my

16    sentencing memorandum, of five years, which is the

17    mandatory minimum.

18         THE COURT:  All right.  And are all the

19    objections or issues that you have stated in the --

20    I believe there's now three sentencing memorandums

21    from Mr. McKenzie -- are they all stated in those?

22         MR. BAIAMONTE:  Yes, sir, they are, in my

23    sentencing memorandum on July 3rd of this year.

24         And one last loose end, sir, if I may.

25    When we were here last, there was an issue about

Page 24

1   Mr. Jason Bowles coming in to enter an appearance on

2   behalf of Mr. McKenzie.  I spoke personally with

3   Mr. Bowles about two weeks ago, and it was his

4   feeling at that time they were not intending to file

5   an entry of appearance.

6            Last night, in preparation for today's

7   hearing, I called Mr. Bowles' office and left a

8   message around 4:00 in the afternoon, informing them

9   that the sentencing was set to begin at 9:00 this

10  morning.  And if Mr. Bowles wished to be part of the

11  case, he needed to do whatever it is he felt

12  appropriate, and I was available to answer any

13  questions.  I received no phone call back from

14  Mr. Bowles' office.

15           THE COURT:  Yes.  On that score, we

16  received calls, I guess, from Mr. McKenzie's

17  brother.  It may have been yesterday.  And Ms. Wild

18  called and talked to Mr. Crow, and he indicated they

19  would not be entering an appearance as well.

20           We received another call from I believe it

21  was Mr. McKenzie's brother, but somebody on behalf

22  of Mr. McKenzie this morning.  But there's no

23  indication that anyone else is coming into the case.

24           All right.  So if all the objections and

25  requests for downward departures and things are

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    contained in these documents, let's take those one

2    at a time.

3             Let's start then with the objection that I

4    think you began with, Mr. Baiamonte, on

5    paragraph 41, which is this criminal sale of a

6    controlled substance to a fellow in New York.

7             I believe, if I understand largely

8    Mr. McKenzie's argument, he is challenging the

9    amount of the drugs that were there at this stage.

10   And if I'm misunderstanding his argument, please

11   correct me.

12            But if there's anything else you wish to

13   say on behalf of Mr. McKenzie as to the objection in

14   paragraph 41 on page 11.

15            MR. BAIAMONTE:  He is wishing the Court to

16   know that there's no indictment on this charge.  But

17   I would note that he did plead guilty.

18            THE DEFENDANT:  If it please the Court,

19   may I get my own paperwork?

20            THE COURT:  If Mr. Baiamonte is finished,

21   then I'll allow you to speak as well.

22            MR. BAIAMONTE:  That's all I have, Your

23   Honor.  The argument was that it was a very small

24   amount.

25            And I would also note that the age of the

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    offense, it's rolling up on 20 years.  So it's our

2    estimation or our hope that the Court will agree

3    with us that Mr. McKenzie is a different man than he

4    was in 1994.

5              THE COURT:  All right.  Did you have

6    something you wanted to say on this, Mr. McKenzie?

7              THE DEFENDANT:  Yes, Your Honor.

8              This is another issue that I had with my

9    attorney, Mr. Cooper, and also my present attorney

10   is that I see that the presentence report was done

11   by a Mr. Zuniga.

12             And when he did it, he had -- the robbery

13   charge in question, he has my indictment.  He has a

14   police report.  He also has a judge's -- I mean the

15   officer's report, the indictment and the verdict.

16   And also, the indictment was a true bill.

17             But when it comes to my own '94 case, I

18   understand ignorance is no excuse of the law.  But

19   from me doing research on my own and also seeing

20   what the probation officer provided, I believe that

21   I entered a plea to -- I can't explain.  There's no

22   indictment on this case, there's no police report.

23   I can't find nothing that resembles any type of

24   charge.

25             But what the probation -- excuse me.  But

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    what's in the report by the probation officer in New

2    Mexico is basically what's reflected by the

3    probation -- by the PSR person in New York, where I

4    pled guilty to this offense there.

5            There's no indictment.  The police never

6    submitted a report.  I don't know the quantity of

7    drugs.  I remember offhand it was cocaine that I did

8    sell.  I will admit to that.

9            But I believe that I entered into a plea

10   agreement that was illegal.  And it reflects this,

11   that there's nothing here but summaries of legal

12   history or just information based on a presentence

13   report, and nothing else.

14           To my memory, I don't remember, even when

15   I went to the plea agreement, that my attorney was

16   even present.

17           THE COURT:  All right.  Mr. Zuniga, you

18   had mentioned in the PSR, "according to the

19   indictment."  Do you have a copy of the indictment?

20           PROBATION OFFICER ZUNIGA:  Your Honor, I

21   do have a copy.  We have a copy of the presentence

22   report.

23           THE COURT:  Do you want to show

24   Mr. McKenzie that indictment?  We might have that

25   attached to the clerk's minutes here or a copy of

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    it.

2              THE DEFENDANT:  This is not an indictment.

3    This is just the presentence report.  Basically, he

4    had the information of what would he do, what he did

5    with me.  He has the information from the

6    presentence report that was done on me in Troy, New

7    York, in '94.

8              He doesn't have the indictment.  He

9    doesn't have -- I don't know what I was indicted

10   for, the quantity, the amount I was indicted for.

11   There's no police report.  It was never filed.

12   There's no officer.  I don't have an officer in my

13   case.

14             That's the same thing my family was trying

15   to inquire, and they couldn't find that, either.

16   And like I said, ignorance is no excuse for the law.

17   I pled guilty to it.  But now, in hindsight, I

18   believe I was railroaded.  I went to my sentencing.

19   I remember that the attorney wasn't even present.

20             I asked for the particulars at the time,

21   because I did understand that.  I didn't get a bill

22   of particulars.  So I believe I entered into a plea

23   agreement.  But I can't explain it because there's

24   no record to show that I was legally indicted or

25   what was I charged for, besides what the probation

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 29

1    officer is saying.

2             THE COURT:  Mr. Hurtado, any thoughts on

3    paragraph 41?

4             MR. HURTADO:  Yes, Your Honor.

5             Very briefly, Your Honor, as to the age of

6    the offense, I know that's an issue that

7    Mr. Baiamonte just raised with the Court, indicating

8    that this occurred almost 20 years ago.  However,

9    the government would maintain that that wouldn't

10   necessarily invalidate the offense.

11            He stands before the Court convicted on

12   yet another drug trafficking offense.  And in the

13   way of interest to the government, that's a pattern

14   of escalating criminal activity that shows no signs

15   of abatement or even of respect for the law.  So I

16   don't necessarily agree that just because the charge

17   is almost 20 years ago would necessarily invalidate

18   it.

19            As far as the information contained in

20   paragraph 41, the information shows that the

21   defendant was in fact represented by counsel.  And

22   just because the defendant may not agree with the

23   amount of cocaine sold doesn't necessarily

24   invalidate the conviction, either.  He did plead

25   guilty, and he was represented by counsel.  And on

Page 30

1    its face, it appears that it is a valid conviction.

2         And for those reasons, the United States

3    would ask the Court to sustain -- excuse me, deny

4    the defense's objection with regard to paragraph 41.

5    Thank you.

6         THE COURT:  All right.  Thank you,

7    Mr. Hurtado.

8         Is there anything else you want to put

9    into the record to support either the indictment or

10   any other material you have, Mr. Zuniga?

11        PROBATION OFFICER ZUNIGA:  No, Your Honor.

12        THE COURT:  We'll mark as Exhibit A the

13   presentence report.  Is that what that is,

14   Mr. Baiamonte?

15        MR. BAIAMONTE:  It is the 1994 documents

16   from New York.

17        THE COURT:  Okay.  We'll look at those,

18   and we'll mark those as Exhibit A, if there's no

19   objections to attaching those.

20        MR. BAIAMONTE:  No objection from the

21   defense, Your Honor.

22        MR. HURTADO:  No objection from the

23   government, Your Honor.

24        (Exhibit A was admitted.)

25        THE COURT:  So if I understand your

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 31

1    argument, you're not saying you weren't convicted?

2    You're just arguing that you were kind of railroaded

3    into, I guess, pleading to something that you don't

4    know what you really pled to.  Is that the guts of

5    what you're saying?

6            THE DEFENDANT:  Yes.  I'm basically saying

7    that I could ask you, as a judge, to look at the

8    elements of my past crimes.  And how can I get you

9    to actually look at it if there's no elements?

10   Besides me pleading guilty, there's no entry of a

11   crime being committed.  There's no indictment,

12   there's no police report.

13           And I know ignorance is no excuse for the

14   law.  But I believe the way I was sentenced, it's

15   unconstitutional.  There's no fingerprints of what

16   happened.  If I was to ask you to look at the

17   elements of the crime in order to determine the

18   quantity of drugs or the role I played in it,

19   there's nowhere I could get it.  And how would you

20   get it?  So I feel that it's doing me a disservice.

21           THE COURT:  All right.  Mr. Zuniga?

22           PROBATION OFFICER ZUNIGA:  Your Honor, on

23   August 22nd of 2008, at that time we received a

24   collateral response from the Northern District of

25   New York or yes, the Probation Office.  And

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 32

1    according to Kelly Martin, who was a probation

2    officer at that time, that's where we got our

3    information from as far as the way she said the

4    individual was sentenced and what he pled guilty to.

5           Here she indicated -- on this one, there's

6    no reference to an indictment.  But there is a

7    response as far as what he pled guilty to and what

8    he was sentenced to.

9           THE COURT:  All right.  Why don't you show

10    that to Mr. McKenzie?

11           And any objection to making that Exhibit B

12    to the clerk's minutes?

13           MR. HURTADO:  No objection from the

14    government.

15           THE COURT:  Mr. Baiamonte --

16           PROBATION OFFICER ZUNIGA:  That's from the

17    probation officer in New York, where we got a

18    collateral response.

19           THE COURT:  -- any objection?

20           MR. BAIAMONTE:  No, sir.  No objection.

21           (Exhibit B was admitted.)

22           THE COURT:  Anything further,

23    Mr. McKenzie?

24           THE DEFENDANT:  Yes.  Also, if you look at

25    41, the date on this is 5/13/94, criminal sale of a

Page 33

1    controlled substance.  And then if you go down to --

2    let me take you to the first one above that, which

3    is unlawful possession of marijuana, which is dated

4    5/5/1994, unlawful possession of marijuana.

5           Then if you go down, it says, "attorney

6    presentation was not confirmed," which I know is

7    important in every stage of proceedings.

8           Then if you go to the last sentence, it

9    says, "Offense report was requested.  However, the

10   report was unable to be located."

11          Then you go down to 41, 5/13/1994, which

12   is criminal sale of a controlled substance.  Then if

13   you go down, it says, "Defendant was represented by

14   counsel."  All right?

15          According to the indictment, on or about

16   May 5th, May 5th is the marijuana charge, the

17   unlawful possession of marijuana.  It doesn't make

18   any sense if the criminal sale happened on

19   5/13/1994, and in the report he's attributing my

20   indictment to May 5th.

21          Then if you go down to the bottom, it

22   says, "Offense report was requested.  However, the

23   report was unable to be located."

24          But yet I had a counselor, the exact same

25   wording, except the difference is that now, on the

Page 34

1    13th one, I had -- mysteriously, I was represented

2    by counsel.  It is the exact same language, but two

3    different dates.

4              MR. BAIAMONTE:  Except for the

5    marijuana/cocaine distinction.

6              THE DEFENDANT:  He's saying that the

7    criminal sale of a controlled substance, I was

8    indicted on May 5th.  But I was also indicted on

9    May 5th for possession of marijuana, right?

10             THE COURT:  Well, they look like they're

11   just different charges.

12             THE DEFENDANT:  Exactly, they're different

13   charges.  But I'm being attributed and being

14   indicted for the criminal sale on the indictment of

15   the marijuana, which is a misdemeanor that I served

16   15 days for.

17             THE COURT:  And you're not receiving any

18   points for that.

19             THE DEFENDANT:  What I'm trying to say is

20   that you're attributing an indictment of May 13,

21   1994, as a controlled substance charge.  But when

22   you go down into the paragraph, it says, according

23   to the indictment on May 5th, for 41, the date is

24   from May 13th, which is when I was arrested for the

25   controlled substance charge.

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 35

1            THE COURT:  All right.  Mr. Zuniga,

2   anything further?

3            PROBATION OFFICER ZUNIGA:  Yes, Your

4   Honor.  We have some more reports here.  We can

5   indicate -- as far as where we got those dates from,

6   I can show it to Mr. McKenzie.

7            THE COURT:  All right.  Why don't you show

8   that to him?

9            Any objections to these being attached as

10  Exhibit C to the clerk's minutes?

11           MR. HURTADO:  No, Your Honor.

12           THE COURT:  Any objection, Mr. Baiamonte?

13           PROBATION OFFICER ZUNIGA:  It says

14  "controlled substance" here.  Whether it be, Your

15  Honor, an error on our part, maybe the May 5th --

16  maybe that last sentence should probably have been

17  applied to the indictment.

18           THE COURT:  Well, just take out the

19  indictment portion, and take out," according to the

20  indictment on or about May 5th, 1994."

21           PROBATION OFFICER ZUNIGA:  Yes, Your

22  Honor.

23           THE COURT:  Any objection to that,

24  Mr. Baiamonte?

25           MR. BAIAMONTE:  No, sir.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 36

1           THE COURT:  Any objection, Mr. Hurtado?

2           MR. HURTADO:  No, sir.

3           (Exhibit C was admitted.)

4           THE COURT:  All right.  Well, one of the

5     things -- and this will apply to probably what we're

6     going to hear as arguments on 42 as well.  Remember,

7     the framework that we start with is in Custis, the

8     Supreme Court, and I'm bound by the Supreme Court.

9           They made a distinction between collateral

10    attacks based on the complete denial of counsel and

11    then collateral attacks based on other

12    constitutional claims.  And that applies to

13    sentencings, some of the guidelines, and under the

14    ACCA.  So we're bound by that structure.

15          Therefore, when you apply Custis, with the

16    exception of collateral attacks based upon complete

17    denial of counsel, and I don't think that's what

18    we're dealing with in paragraph 42, the District

19    Court sentencing a defendant under the career

20    offender provisions of the guidelines cannot

21    consider a collateral attack on a prior conviction.

22          And if the defendant doesn't allege a

23    complete denial of counsel in the state proceedings,

24    then the sentencing district judge can refuse to

25    consider any constitutional challenges to that.  I

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 37

1    base that distinction on United States vs Garcia, a

2    10th Circuit case.  That's at 42 F.3d. 573.

3           Custis, of course, is a Supreme Court case

4    at 511 US 485, decided in 1994, where they, in that

5    case, basically said they're not going to consider

6    an ineffective assistance claim in state proceedings

7    at the sentencing stage.

8           I have issued an opinion, which I reviewed

9    last night, in preparation for today.  It's called

10   United States vs Jim.  It's at 2012 Westlaw 2574807,

11   in which it talks about challenges to prior

12   convictions of sentences.  So they really can't be

13   collaterally attacked, except on this complete

14   denial of counsel.

15          And I also issued an opinion in United

16   States vs Justice, at 2011 WL 5223032, which deals

17   with what has to be shown by the defendant, and that

18   is the challenge.  And that hasn't been the

19   challenge that's been brought here.

20          So I will overrule the challenge to

21   paragraph 41 and continue to consider it.

22          I will take into consideration, which I

23   think is what Mr. Baiamonte said, that given the age

24   of it, the circumstances of it, those sort of things

25   that are the kind of things that I think

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 38

1    Mr. McKenzie was arguing, are more important for the

2    variance challenge.  And I'll certainly consider

3    those and hear those later.

4              But I do think, at least as far as for

5    criminal history, I think that the challenge should

6    be overruled.

7              All right, let's go to paragraph 42.  Your

8    challenge to paragraph 42, Mr. Baiamonte.

9              MR. BAIAMONTE:  Other than what I've

10   previously said, Your Honor, and what's filed in my

11   sentencing memorandum, that's all I have on that

12   issue.

13             THE COURT:  All right.

14             Mr. Hurtado, anything further on that?

15             MR. HURTADO:  No, sir.

16             THE COURT:  Well, I think largely for the

17   same reasons, that one should be overruled.

18             All right, let's talk about the acceptance

19   of responsibility.  I think this is an argument

20   Mr. Cooper made.

21             Anything further you want to say on that,

22   Mr. Baiamonte?

23             MR. BAIAMONTE:  I filed that issue, along

24   with several of the other issues, under Anders vs

25   California, Your Honor.  I don't think it's

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 39

1    applicable in this case.  But my client wished it

2    raised, and I raised it.

3            THE COURT:  All right.

4            Anything further on that, Mr. Hurtado?

5            MR. HURTADO:  Just briefly, Your Honor.

6            The United States would stand by its

7    position, as set forth in the government's

8    sentencing memorandum, that basically reduction for

9    acceptance of responsibility is not appropriate in

10   the facts of this particular case simply because the

11   defendant did put the United States to its burden of

12   proof at trial by denying all the essential elements

13   of guilt and, quite frankly, continues to do so.

14           So pursuant to United States Sentencing

15   Guidelines, Section 3E1.1, it's the government's

16   position that the defendant would be ineligible for

17   a reduction based on acceptance of responsibility.

18   And he has also never submitted a statement

19   admitting his responsibility for any of the

20   offenses.  Thank you.

21           THE COURT:  All right.  Thank you,

22   Mr. Hurtado.

23           Let me ask Mr. Baiamonte if he has

24   anything else.

25           MR. BAIAMONTE:  No, sir.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 40

1          THE COURT:  Okay.  Mr. McKenzie?

2          THE DEFENDANT:  Yes, Your Honor.

3          I would disagree.  I never one time, and

4   the attorneys that I've had, I never instructed them

5   to ever say that or I didn't have possession or that

6   I didn't have cocaine.  My issues always have been

7   constitutional.

8          And if I can read into the record, under

9   3E1.1, Acceptance of Responsibility, paragraph 2,

10  "In rare situations, the defendant may clearly

11  demonstrate an acceptance of responsibility for his

12  criminal conduct even though he exercises his

13  constitutional right to a trial.  This may occur,

14  for example, where a defendant goes to trial to

15  assert and preserve issues that do not relate to

16  factual guilt to challenge the applicability of a

17  statute or to challenge to accept ability of a

18  statute to his conduct.  In each such instance,

19  however, a determination that a defendant has

20  accepted responsibility will be based primarily upon

21  pretrial statements and conduct."

22          You have sat in on all my hearings, read

23  all my motions that were submitted by my attorneys.

24  And never one time did I ever say I was guilty or

25  innocent of said charges.  My issues always have

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 41

1   been constitutional issues, and they will remain a

2   constitutional issue.  How they got the PNR report

3   and what they did after that.  That's it.

4          THE COURT:  All right.

5          Well, I've certainly considered this

6   because Mr. McKenzie's focus has been on this motion

7   to suppress.  That has been the focus that he's had

8   throughout these proceedings.

9          But if you continue to read the part of

10  the guidelines that Mr. McKenzie was referencing,

11  which I do think are the controlling portions here,

12  it does say, "In each such instance, however, a

13  determination that a defendant has accepted

14  responsibility will be based primarily upon the

15  pretrial statements and conduct."

16         While I think his focus has been on the

17  motion to suppress, I'm not sure that I really have

18  seen, even through today, that he's accepted

19  responsibility for the criminal conduct.  And in

20  fact, there have been considerable actions that

21  indicate that he's resisted accepting

22  responsibility.  And that may well be in his

23  interest, of course, trying to preserve that for

24  appeal.

25         But I do think that he has not indicated

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 42

1    that he accepts responsibility for the criminal

2    conduct here.  And simply because his focus has been

3    on the motion to suppress doesn't mean that that

4    constitutes acceptance of responsibility.

5           I've outlined some of the factors here.

6    And it's not identical, but it does have some

7    similar factual characteristics to this case.  In a

8    case called United States vs Manzanares-Sanabria,

9    it's actually an unpublished opinion at

10   814 F.Supp. 2d at 1155, and I will refer

11   particularly to pages 1163 through -- and I wrote

12   here kind of extensively on it -- through 1167 --

13   I'll make sure -- I got through 1168 -- in which I

14   talked about the court's need to look at the

15   pretrial conduct.

16          And I think it establishes why I think, in

17   this case, there was no acceptance of

18   responsibility.  It must be clearly done.  And it

19   can be even denied, of course, when people go to

20   trial, as Mr. McKenzie pointed out.

21          But I think in a case like this, even

22   though there's a focus on the motion to suppress, I

23   do think that he resisted both at trial and pretrial

24   that he was legally liable for the criminal conduct

25   for which he was charged.

1          So I'll overrule that objection and not

2   give the points for acceptance of responsibility.

3          All right.  Then, Mr. Baiamonte, I think

4   you also made a Kimbrough argument against the

5   enhancement.  If you wish to argue in support of

6   that objection.

7          MR. BAIAMONTE:  Well, I think all the

8   issues, everything I was going inform the Court of,

9   have been brought to the Court's attention on all

10   the cumulative arguments that we've been making

11   throughout this morning, and I have nothing further

12   to add to the comments.  That would be repetitious

13   and unnecessary.  But I rest on my pleadings and

14   prior comments.

15          THE COURT:  All right.  Anything else then

16   that you wish to say on behalf of Mr. McKenzie

17   before sentence is imposed?

18          MR. BAIAMONTE:  We would ask the Court to

19   make a recommendation to the Bureau of Prisons for a

20   place of incarceration in New York.  My client has

21   substantial family up in that area.

22          And there's a valid reason to make that

23   request of the Bureau of Prisons, mindful of the

24   fact that it's simply that.  It's a hoped-for

25   request that the Bureau of Prisons would honor,

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 44

1    because it's our understanding that it's a

2    recommendation by the Court that is taken very

3    seriously by those folks.

4            THE COURT:  All right.  Do you have any

5    specific place up there?  Is there a particular

6    region of New York, or is it New York City?

7            MR. BAIAMONTE:  It's Upstate New York.

8    And forgive me, Your Honor.  There's a place up

9    there that was the site of the 1980 Winter Olympics

10   at Lake Placid.  They don't call it that anymore, of

11   course, but that's been turned into an FCI.

12           I could supplement to the Court, if you

13   wish me to, the exact name.  He's also informed me

14   that New Jersey is very acceptable to him.

15           THE COURT:  All right.  Mr. Zuniga, why

16   don't you take a look at that?  You don't have to

17   answer right at the moment.  But see if there's a

18   place in Upstate New York and New Jersey.

19           And we'll come back to this issue before

20   we're done today and see if there's an appropriate

21   facility for Mr. McKenzie.  And we can discuss

22   whether he has a preference on that.

23           Mr. McKenzie, you have an opportunity to

24   speak on your own behalf before sentence is imposed.

25   What would you like to say to the Court, and what

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 45

1    would you like the Court to consider before I impose

2    sentence this morning?

3          THE DEFENDANT:  I have one more objection

4    about the sentencing memorandum prepared by

5    Mr. Zuniga, dealing with his analysis on the

6    robbery.  What I have right now is a State of New

7    York Public Corrections Service Temporary Release

8    Notice.

9          The way in which he wrote it into his

10   sentencing memorandum was that it was coming from

11   the opinion of a counselor.  What I have is the

12   paperwork, which is, "A review of inmate's current

13   conviction indicates that he does not fall into the

14   specific language of Executive Order 521, which was

15   enacted by Professor Tachie (sic).

16         And what it is is that he issued an

17   executive order which allowed a commission to look

18   at the elements of my crime or robberies and

19   determine whether, because no violence was displayed

20   and because of my minor role, I fit the criteria,

21   which my attorney felt in the beginning which I

22   should have been charged with, facilitating a lesser

23   charge, which was never given to me in my trial.

24         So the language in 5.1, which I felt and

25   which in an executive order by the government,

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 46

1    basically said that because of my role or because

2    the victim never identified me, the witnesses to the

3    crime never identified me, and the fact that it was

4    the theory of the crime where it went from me being

5    a person of custody to this individual to now where

6    I was the driver of the car, the language in that

7    executive order fitted me to where I shouldn't have

8    been charged with the robbery.

9          And that is why I was eligible to be

10   considered for temporary release consideration,

11   instead of the reverse, where he contacted the

12   facility which I was released from.  And the

13   counselor has explained to him that they considered

14   me -- you know, I was considered by their own

15   executive order.

16         And I know that you can look at the

17   elements of my past history, as far as the robbery

18   goes.

19         THE COURT:  Yes.  And that's what I --

20         THE DEFENDANT:  And that was then

21   submitted by me and my attorney.

22         THE COURT:  Yes.  It's that ineffective

23   assistance claim, basically on that, that I really

24   am not free to consider on the objection to the

25   criminal history.  But I can certainly consider that

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 47

1    as part of your request for a variance.

2          THE DEFENDANT:  The only reason I bring it

3    up is because maybe I was misinterpreting the

4    Fanfan.  My attorney was sitting next to me, and we

5    had some cases, like Anderson.  But when I was

6    reading Fanfan and Booker on the statements of fact

7    on the Sixth Amendment, you can look at past

8    elements of my past crimes to determine where my

9    sentencing falls at.

10         And I was charged with robbery.  And if

11   you look at it, it's a harsh crime.  But if you

12   cross-reference it to the federal guidelines, it's

13   one that doesn't cause bodily harm.

14         And like I said, the victim in that crime

15   didn't -- didn't -- money wasn't even taken, it was

16   receipts.  And again, I state that ignorance is no

17   excuse of the law.  But I believe my attorneys

18   failed me in that case also.

19         I should be been charged with a lesser

20   included charge.  And like I said, the theory of my

21   indictment changed once I went to trial.  I guess

22   once the prosecutor seen that the witness, along

23   with the victim, wasn't going to identify me, and in

24   fact, the victim wasn't hurt, they still allowed me

25   to be prosecuted for robbery.

**PAUL BACA, OFFICIAL COURT REPORTER**

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 48

1        But then I guess once I went to prison,

2    under this Executive Order 5.1 to review my case,

3    and seeing that the statute didn't hold, that's why

4    they dropped it and made me eligible -- well, not

5    dropped it as far as the crime itself, but they

6    dropped it as far as recommending me for work

7    release.

8        Because if you have a violent crime, you

9    can't get work release.  And I was eligible to be

10   recommended for work release, based on an executive

11   order, and I just wanted to read that into the

12   record.

13       THE COURT:  All right.  Thank you,

14   Mr. McKenzie.

15       Mr. Hurtado, any remarks on behalf of the

16   United States before sentence is imposed?

17       MR. HURTADO:  Only that the United States

18   would stand by its recommended sentence of 327

19   months, as set forth in the sentencing memorandum,

20   given that the defendant is in fact a career

21   criminal.

22       And given the facts and circumstances of

23   this particular case, the United States believes

24   that the sentence is appropriate in this case.

25   Thank you, Your Honor.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 49

1            THE COURT:  All right.  Thank you,

2   Mr. Hurtado.

3            All right.  I will now state the sentence,

4   but the attorneys will have a final chance to make

5   legal objections before the sentence is actually

6   imposed.

7            The Court has, I think this record will

8   reflect, carefully reviewed the presentence report

9   factual findings, and I think I've addressed all the

10   objections to them.

11            We've made one change to paragraph 41 to

12   reflect the correct information about the

13   indictment.  But other than those, the Court will

14   adopt the presentence report factual findings as its

15   own.

16            The Court has also considered the

17   sentencing guideline applications in the presentence

18   report.  There not being any objections that the

19   Court has not dealt with, the Court will adopt those

20   as its own as well.

21            The Court has also considered the factors

22   set forth in 18 USC, Section 3553(a)(1) through (7),

23   including the finding that the defendant is a career

24   offender.  The offense level is 34, and the criminal

25   history category is 6, the guideline imprisonment

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 50

1    range is 262 to 327 months.

2         The Court notes that on June 7th, 2008,

3    the defendant unlawfully, knowingly, and

4    intentionally distributed a total of 2.984 kilograms

5    of cocaine.

6         The Court has, as I think the record of

7    these proceedings reflects, carefully considered the

8    guidelines, but in arriving at the sentence, has

9    taken into account not only the guidelines, but

10   other sentencing goals.  Specifically, the Court has

11   considered the guideline sentencing range

12   established for the appropriate category of offense

13   committed by the applicable category of the

14   defendant.

15        And, of course, the parties have really

16   gone to the far ends on this.  And the defendant has

17   asked for 60 months, which would be a substantial

18   variance.  And the government has asked for

19   something at the high end of the guideline range.

20        Taking first Mr. McKenzie's request for a

21   downward departure, the Court doesn't have any

22   substantial disagreement, in a Kimbrough sense, with

23   the career offender enhancement.  It is a

24   substantial enhancement.  But I think that these are

25   pretty typical in the federal system and in the

1    state systems.

2         There has been criticism of the amount,

3    maybe the way the Guideline Commission did it.  But

4    the 10th Circuit has, in a few opinions, been

5    unimpressed on those from a Kimbrough standpoint.

6    The Court doesn't have any substantial disagreement

7    with the Commission's guideline range.

8         The Court has also considered the

9    arguments that Mr. McKenzie has made over the course

10   of the case.  And I fear that if I start varying

11   from the guidelines, I'll begin to undercut and give

12   him reductions for acceptance of responsibility, in

13   effect given that there has not been one in this

14   case.  And to start varying I think would begin to,

15   in effect, give him some reduction.

16        I carefully reviewed the presentence

17   report, his history, his family history.  I didn't

18   see anything so extraordinary that called for a

19   variance from it because of his particular history.

20   While obviously, there's some things that's occurred

21   to him that are unfortunate and sad, I don't see the

22   sort of unique circumstances in his history, social

23   history, that calls for a variance.

24        And so I think that after carefully

25   considering his circumstances, I believe the

Page 52

1  punishment as set forth in the guidelines is

2  appropriate for this sort of offense.

3         I then have considered the kinds of

4  sentencing range established by the guidelines.  And

5  I don't see any reason, largely for the same

6  reasons, to go further up in the guidelines.

7         It's high enough, and I don't see any

8  reason to go at the high end of the range.  These

9  are high sentences that the Commission has

10  promulgated, and I don't think that there's a need

11  in Mr. McKenzie's situation to go at the high end of

12  the range.

13         So I think something at the low end of the

14  range of 262 months is adequate to reflect the

15  seriousness of the offense.  I think it promotes

16  respect for the law.  I think it provides just

17  punishment.  I think it affords adequate deterrent

18  both at the specific and the general level.  It

19  protects the public.

20         And because it remains a guideline

21  sentence, and I usually, unless there's some

22  compelling reason, don't go into the higher portions

23  of the range, I think this avoids unwarranted

24  sentencing disparity for defendants of similar

25  record who have been found guilty of similar

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 53

1   conduct.

2            And because of some things I'm going to

3   require as part of supervised release, I think it

4   provides the defendant with some needed education

5   and training and care to overcome some of the

6   problems he's had in life.

7            In sum, I think this sentence fully and

8   effectively reflects each of the factors embodied in

9   18 USC, Section 3553(a).  I think this sentence

10  is -- given the guidelines, I think it's reasonable.

11  And this sentence is sufficient, without being

12  greater than is necessary, to comply with the

13  purposes of punishment set forth in the Sentencing

14  Reform Act.

15           Therefore, as to

16  Indictment 1:08-CR-01669-01 JB, the defendant,

17  Richard Anthony McKenzie, is committed to the

18  custody of the Bureau of Prisons for a term of 262

19  months.  The defendant is placed on supervised

20  release for a term of four years.  The defendant

21  must comply with the standard conditions of

22  supervised release and the following mandatory

23  conditions.

24           The defendant will submit to DNA

25  collection and compliance with statutory

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 54

1    requirements while incarcerated in the Bureau of

2    Prisons, under the direction of the United States

3    Probation Office.

4          The defendant shall not possess, have

5    under his control or have access to any firearm,

6    ammunition, explosive device or other dangerous

7    weapons, as defined by federal, state or local law.

8          The following special conditions will also

9    be imposed.  I'm going to rewrite this one slightly.

10   I'm not going to impose any sort of residential

11   placement, so I'm going to delete that.

12         The defendant must participate in and

13   successfully complete a substance abuse treatment

14   program, which may include drug testing or

15   outpatient counseling, and I'll just eliminate

16   residential placement.

17         The defendant is prohibited from

18   obstructing or attempting to obstruct or tamper in

19   any fashion with the collection, efficiency and

20   accuracy of any substance testing device or

21   procedure.  The defendant may be required to pay a

22   portion of the cost of treatment and/or drug

23   testing, as determined by the Probation Office.

24         The defendant must refrain from the use

25   and possession of alcohol and other forms of

Page 55

1     intoxicants.  He must not frequent places where

2     alcohol is the primary item for sale.

3          The defendant must submit to a search of

4     his person, property or automobile under his

5     control, to be conducted in a reasonable manner and

6     at a reasonable time, for the purpose of detecting

7     illegal substances, weapons and contraband, at the

8     direction of the probation officer.  He must inform

9     any residents that the premises may be subject to a

10    search.

11         And I'm also going to require some mental

12    health treatment program, but I'm not going do it on

13    a residential placement basis.  So I'll rewrite this

14    one to say, "The defendant must participate in and

15    successfully complete a mental health treatment

16    program, as approved by the probation officer, which

17    may include outpatient counseling or prescribed

18    medication," period.

19         So we'll eliminate any reference to

20    residential placement and remove that clause about

21    approval up behind the program.

22         I don't like medication because I think

23    the people in the mental health program ought to be

24    the ones taking the lead on that.

25         The defendant may be required to pay a

1    portion of the cost of this treatment, as determined

2    by the Probation Office.

3              The first condition as to the substance

4    abuse treatment, I'm going to impose that obviously

5    because of the nature of this crime.

6              As far as special condition number two,

7    which goes to the -- number three, which goes to the

8    mental health counseling -- actually it was number

9    four, I'm going to impose that to assist the

10   defendant in the reintegration after serving his

11   sentence, which is lengthy.

12             And the one as to the illegal substances,

13   alcohol, those are imposed to assure that he

14   complies with the mandatory condition that he not

15   possess or use any illegal substances.  So I think

16   these other ones help him avoid any possession of

17   illegal substances, which has been a problem in his

18   life.

19             Based on the defendant's lack of financial

20   resources, the Court will not impose a fine.  The

21   defendant will pay a special assessment of $100,

22   which is due immediately.

23             Let me see if Mr. Zuniga -- do you have

24   some thoughts on what would be an appropriate

25   facility in either Upstate New York or New Jersey

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 57

1    for Mr. Zuniga (sic)?

2              PROBATION OFFICER ZUNIGA:  Your Honor, FCI

3    Raybrook, in Raybrook, New York, I think that would

4    be appropriate.

5              THE COURT:  Is that R-A-Y-B-R-O-O-K?

6              PROBATION OFFICER ZUNIGA:  Yes, Your

7    Honor.

8              THE COURT:  And what is that close to?

9              PROBATION OFFICER ZUNIGA:  It's close

10   to -- it says, "Upstate New York, between the

11   villages of Lake Placid and Saranac Lake."  And

12   there are some in New Jersey.

13             THE DEFENDANT:  Fort Dix would be closer.

14             PROBATION OFFICER ZUNIGA:  Fort Dix,

15   that's in New Jersey, right?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you have -- are all three

18   of those facilities --

19             PROBATION OFFICER ZUNIGA:  Yes, Your

20   Honor.

21             THE COURT:  And do you have a preference

22   among those three?

23             THE DEFENDANT:  Yes.  Fort Dix or

24   Farrington.

25             THE COURT:  All right.  So do you want me

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 58

1    to eliminate the Lake Placid one and just go with

2    the New Jersey sites?  Do you have a preference

3    between those two?

4              THE DEFENDANT:  Fort Dix.

5              THE COURT:  All right.  You may list both

6    the New Jersey facilities in the order of one, two.

7              Any objection to that, Mr. Hurtado?

8              MR. HURTADO:  No, sir.

9              THE COURT:  All right.  Any objection --

10   or let me ask both counsel whether they know of any

11   reason why the sentence should not be imposed as the

12   Court has stated it, other than what may have been

13   argued before.  Mr. Hurtado?

14             MR. HURTADO:  No, sir.

15             THE COURT:  Mr. Baiamonte?

16             MR. BAIAMONTE:  No, other than what's been

17   argued, sir.

18             THE COURT:  All right.  It is ordered then

19   that sentence be imposed as the Court has stated it.

20             Mr. McKenzie, you can appeal your

21   conviction if you believe that things occurred here

22   unlawfully or involuntarily or if there's some other

23   fundamental defect in the proceedings that was not

24   waived.

25             You also have a statutory right to appeal

02a9903f-434b-4ea8-ad2d-4008164e29ff

1     your sentence under certain circumstances,

2     particularly if you think the sentence is contrary

3     to law.

4             You have the right to appeal in in forma

5     pauperis.  And what that means is the Clerk of the

6     Court will prepare and file a Notice of Appeal, upon

7     your request, if you're unable to pay the cost of an

8     appeal.  With very few exceptions, any Notice of

9     Appeal must be filed within 14 days of the entry of

10    judgment.

11            Mr. McKenzie, do you understand your

12    rights to an appeal?

13            THE DEFENDANT:  Yes, I will appeal.

14            Also, if the Court may, under 18 USC,

15    306(a)(2)(B), and 20 USC, 2255, paragraph 7,

16    Rule 8(c), I'm requesting or asking the Court, can I

17    have legal assistance in filing 2255?

18            THE COURT:  Well, I'll tell you how that

19    generally works here in this district is if you want

20    to request, we have a committee.  It's a pro se

21    committee.  And if you want to make a request, send

22    a letter to the Clerk of the Court.  And then they

23    will send it to the committee and see if anyone

24    wants to represent you.

25            You probably need to watch the statute of

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 60

```
 1    limitations, because you don't want to wait too

 2    long.  So you might want to go ahead and file yours

 3    and then make a request there, as well.

 4           So I'd do two things if I were you.  I'd

 5    send maybe a letter to the Clerk of the Court,

 6    asking that a lawyer be appointed.

 7           But I think I'd also go ahead and file

 8    your -- and you've done good work here.  And I'll

 9    get it started, because you don't want to miss the

10    statute of limitations.  But file that.  And with

11    it, file a request for an attorney, and then a judge

12    will rule on that.

13           So that will give you two ways to get it

14    started.  But I don't think I can probably appoint

15    somebody to a case that hasn't started.  So get it

16    started, and then we'll consider it.

17           THE DEFENDANT:  And I have one statement.

18    Being that I'm a layman on the law, on the 2255 that

19    I'm going to submit, I want to reflect perjury.  I

20    want to know that I have enough on the record.

21           I mean earlier, I was kind of nervous.  I

22    don't know if there's enough on the record to

23    warrant your consideration to even answer the

24    perjury charges.  So I want to know, do I have

25    enough on the record to even make a 2255 claim in
```

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    dealing with that?

2              THE COURT:  You know, I don't have an

3    opinion on that.  I want to keep an open mind on it,

4    and so I'm not going say yes or no.

5              Probably what will happen is when you

6    submit it, I'm going to refer this to a magistrate

7    judge to take a completely fresh look at it.  And

8    I'll ultimately have to be the one that makes the

9    decision on it.

10             But I'm going to refer this to a

11   magistrate judge to take a fresh look, and we'll let

12   him see whether you have enough evidence or not.

13             THE DEFENDANT:  Because one of the

14   questions that I asked during trial and was never

15   answered was on dealing with the PNR again is that

16   when the prosecutor -- when we had a bench

17   conference, I didn't know until I got my

18   transcripts, he said he didn't want to be

19   disingenuous to the Court, but that in the system

20   identifier, that he recognized in the PNR report

21   that belonged to Gary Chester that the investigator

22   was speaking of the person who I dealt with who I

23   got the ticket from.

24             So the question that I had wanted the

25   prosecutor to answer was, when and how did he find

1    out that that system identifier belonged to Gary

2    Chester?

3              Because at that time, then you would have

4    to have asked Agent Hylander, "Who is this informant

5    that you're speaking of?"  And that's where there

6    was perjury.  Because at the time, at the bench,

7    when said the system identifier, he didn't want to

8    be disingenuous to the Court, but the series of

9    numbers on the PNR report reflected who I dealt

10   with, which was Chester.

11             But like I said, Agent Hylander said that

12   he enlarged the PNR report to take off the series of

13   numbers.  And the reason why he did that was because

14   it reflected who the informant was.  So my thing

15   was, why would he take that off and then leave Gary

16   Chester, the person I dealt with, unredacted?

17             THE COURT:  Well, put that in your

18   petition.  And then like I said, I'm going to give

19   this to a magistrate judge to get a completely fresh

20   look.  And then it will ultimately have to come back

21   to me to make a final determination.

22             But you'll get a shot to have somebody

23   that hasn't sat through this and made all these

24   decisions take a look at it and see whether he or

25   she thinks that I've done the right thing here.  And

Page 63

1    whatever complaints you have, you can put in the

2    petition.

3            THE DEFENDANT:  Also, on Document 150,

4    Exhibit 1, dealing with the four facts that

5    originated out of Flagstaff, I never got a copy of

6    it unredacted, and I never got the unredacted,

7    sealed document that was submitted.

8            And also, from my understanding, these

9    informants are paid.  They are paid over 10 percent.

10   I never got any discovery showing how the payment

11   was handled, if they was paid.  And if no one took

12   the stand, and if Hyland doesn't know who he

13   received the document from, who was paid, is that

14   fraud committed by the DEA?

15           THE COURT:  Well, I certainly will limit

16   it to discovery.  And you know, I may have gotten --

17   I mean I think I got it right, but you may think I

18   got it wrong.

19           And you can complain to the magistrate

20   judge, saying, "I didn't get this, I didn't get

21   that."  And if he wants to give you discovery or

22   something, that's something you can request if it's

23   necessary.  If it's more of an issue, then he can

24   just look at it.  That's another possibility.  But

25   those are things you can raise when you file your

02a9903f-434b-4ea8-ad2d-4008164e29ff

1    2255.

2            It will be referred to me, since it's my

3    case.  But to give you a clean set of eyes to look

4    at it, and me, too, you know, they'll give me a

5    report.  And if they tell me I did something wrong,

6    which I make mistakes, then we'll look at what the

7    magistrate says.  But you can raise those issues in

8    your petition.

9            THE DEFENDANT:  I respect your opinion.  I

10   respect your opinion.

11           THE COURT:  Oh, I know.  You've been

12   respectful to me.

13           THE DEFENDANT:  What I hope is that by me

14   studying the law, is that what I've come to

15   understand which is the most important thing, is

16   that if I don't preserve it, after I'm sentenced,

17   then I can't bring it up later on.  That's why I'm

18   bringing it up.

19           THE COURT:  Okay.  Well, I want to give

20   you that opportunity to make sure that you make your

21   record.

22           Anything further, Mr. McKenzie?

23           THE DEFENDANT:  Also, you instructed

24   Prosecutor Martinez to do a good-faith NCIC check to

25   see, did Hylander did conduct an NCIC request before

02a9903f-434b-4ea8-ad2d-4008164e29ff

Page 65

1    he approached me at the Amtrak station?

2              From my understanding, first I called NCIC

3    in Virginia.  They referred me to the Legal

4    Department in the FBI.  And they explained the

5    procedure which one has to go through in order for

6    that request.  And what it is is we have to put a

7    request in, and it has to be date and time specific.

8              And what the FBI does is they check.  And

9    if any inquiries originated out of New Mexico, they

10   would know what time it happened and who checked on

11   it.  And in my discovery, I never received that

12   before the trial or after the trial.  I never

13   received this kind of stuff.

14             THE COURT:  My memory is that he just said

15   that they determined that there wasn't --

16             THE DEFENDANT:  I have the page where you

17   instructed Prosecutor Martinez to do a good-faith

18   check, and I never received it.

19             THE COURT:  I recall that he said that

20   they didn't do an NCIC.

21             THE DEFENDANT:  He did say that.  And he

22   also said that you informed him to do it.  And in

23   order for him to do it, he would have to either

24   prove or show good faith that he did do it.  So I

25   want to put that in the record also.

02a9903f-434b-4ea8-ad2d-4008164e29ff

1            THE COURT:  Okay.

2            THE DEFENDANT:  The PNR report itself, the

3    PNR report, that was Exhibit No. 3 that the

4    prosecutor submitted.  One thing my attorneys never

5    asked -- I didn't pose it to -- truthfully, I never

6    posed it to Mr. Baiamonte to ask, but I did to

7    Mr. Cooper during trial, because he kept blowing me

8    off, is that Agent Hylander said that he relied on

9    the PNR report to come into the train station.

10            And if you look at the PNR report, the

11    original copy or the copy that I was given, if you

12    look at the PNR report, the only thing on it says,

13    "Purchased July 2nd."

14            As I said before, there's no way -- as I

15    said in my motion, there's no way to indicate, based

16    on just the PNR, my method of payment.  Which was

17    stated on his DEA-6 Form the day I was arrested and

18    also on the form that I submitted to the judge.

19            And that's another question I want to pose

20    to Officer Hylander.  How did he determine that

21    without speaking to anyone at Amtrak?  The liaison

22    wasn't there that day.  How did he determine my

23    method of payment?

24            There's three names on there.  There's

25    Ruby Johnson's name, my name, and also Andrew Lewis.

Page 67

1    There's no way to tell who paid for it and how they

2    paid for it.  And that's one of the questions I

3    wanted to pose.

4              And I want an answer, when the time is

5    appropriate, to how did he determine the method of

6    payment, and how it was paid for?  There's no way he

7    could have known that, unless he spoke to somebody

8    at Amtrak.

9              And he's saying, "No, it's in my report."

10   And I want to ask him if he spoke to anybody who

11   works for Amtrak to say that they gave him

12   information about the PNR report.

13             THE COURT:  All right.  And you know that

14   it's kind of difficult for the Court to deal with

15   ineffective assistance in your case.  So the 2255 is

16   the place where you generally raise the ineffective

17   assistance.

18             All right, Mr. McKenzie.  We've been

19   together a long time.  Good luck to you, and I wish

20   you well.

21             All right, we'll be in recess.

22             (Court in recess at 10:24 a.m.)

23

24

25

1

2

3                    REPORTER'S CERTIFICATE

4            I, Paul Baca, Official Court Reporter for

5    the US District Court, District of New Mexico, do

6    hereby certify that I reported the foregoing

7    proceedings in stenographic shorthand and that the

8    foregoing pages are a true and correct transcript of

9    those proceedings and was reduced to printed form

10   under my direct supervision.

11           I FURTHER CERTIFY that the transcript fees

12   and format comply with those prescribed by the Court

13   and the Judicial Conference of the United States.

14

15   Date:  September 14, 2012

16

17

18           _____

                 PAUL BACA
19               NM Certified Court Reporter #112
                 License Expires: 12/31/2012
20

21

22

23

24

25

**PAUL BACA, OFFICIAL COURT REPORTER**